**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff,*
Victoria Palmer

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**Case No.: 2:25-cv-04777**

VICTORIA PALMER,
**Individually and On Behalf of All Others Similarly Situated,**

**Plaintiff,**

v.

**THE COCA-COLA COMPANY,**

**Defendant.**

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF:**
1) **CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA"), CAL. CIV. CODE §§ 1750, *ET SEQ.*;**
2) **CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;**
3) **CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*;**
4) **BREACH OF EXPRESS WARRANTY**
5) **UNJUST ENRICHMENT;**
6) **NEGLIGENT MISREPRESENTATION; AND,**
7) **INTENTIONAL MISREPRESENTATION.**

**JURY TRIAL DEMANDED**

**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**

# INTRODUCTION

1.    Plaintiff Victoria Palmer ("Plaintiff" or "Ms. Palmer"), individually and on behalf of all others similarly situated, brings this class action complaint ("Complaint") for damages, injunctive relief, and any other available legal or equitable remedies resulting from the unlawful actions of Defendant The Coca-Cola Company, doing business as Sprite and Fanta ("Coca-Cola " or "Defendant").

2.    This Complaint concerns the illegal, unfair, and deceptive labeling, marketing, and sale of Coca-Cola's beverage products as being made with "100% Natural Flavors."

3.    The unlawfully and deceptively represented products are sold through multiple channels, including, but not limited to, direct-to-consumer sales via Defendant's Amazon.com ("Amazon") store, as well as through third-party merchants operating both brick-and-mortar locations and online platforms. These include, but are not limited to, Safeway, Vons, Albertsons, Target, Walmart, Kroger, CVS, Walgreens, and numerous other retailers throughout the United States.

4.    Ms. Palmer alleges as follows upon personal knowledge as to herself and her own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by her attorneys.

5.    In the highly competitive beverage industry, companies sometimes seek to gain an unfair advantage by misleading consumers about the nature and quality of their products. Coca-Cola manufactures, markets, and sells two lines of products that are prominently labeled as containing "100% Natural Flavors." In reality, these products contain significant amounts of synthetic ingredients that are integral and indispensable to their flavor systems, rendering the labeling false, deceptive, misleading, and fraudulent.

6.    Numerous federal and state laws, rules, and regulations govern the proper labeling of consumer products, including beverages.

7.     For example, the Federal Food, Drug, and Cosmetic Act ("FDCA"), and various state laws[1] that generally align with the FDCA govern the aspects of food and beverage labeling discussed herein. These laws reflect a fundamental principle: **consumers have the right to know what they are purchasing and consuming**.

8.     When companies misrepresent the presence of key ingredients, fail to disclose the true nature of components that materially affect product flavor or composition, mischaracterize the nature of their formulations, or falsely imply that certain ingredients are natural or derived from natural sources, they violate fundamental consumer protection laws. Such conduct erodes consumer trust, distorts fair competition, and grants deceptive actors an improper advantage in the marketplace.

9.     Under both the FDCA and the Sherman law, a food is considered misbranded if its labeling is false or misleading in *any particular*.[2] This includes representations about the nature, source, or quality of ingredients, including claims regarding whether flavors are "natural."

10.    Defendant's Sprite and Fanta beverage products are labeled, marketed, and sold in the United States as being made with "100% Natural Flavors," thereby expressly warranting that they contain no artificial flavoring ingredients and that no synthetic substances contribute to their flavor systems, including the flavor experienced by consumers. In reality, these products contain synthetic ingredients—including key flavoring compounds—rendering such representations false and misleading under both federal and California law.

11.    Defendant's Sprite Lemon-Lime flavor beverages (the "Sprite Product") and Fanta Orange flavor beverages (the "Fanta Product" and, together with the Sprite Product, the "Product(s)") purchased by Plaintiff were falsely labeled as containing

---

[1] *See* California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code §§ 109875–111915.
[2] *See* 21 U.S.C. § 343(a); Cal. Health & Safety Code § 110390, 110395, 110398.

"100% Natural Flavors," despite the presence of synthetic ingredients that materially contributed to the Products' flavor.

12.     As stated by the California Supreme Court in *Kwikset v. Superior Court*, 51 Cal. 4th 310, 328-29 (2011):

> **Simply stated: labels matter.** The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities that may come to associate with a particular source. . .

13.     Defendant's conduct of labeling, marketing and selling deceptively labeled products bearing the aforementioned misrepresentation(s) violates: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (2) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (3) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; and constitutes (4) breach of express warranty; (5) unjust enrichment; (6) negligent misrepresentation; and (7) intentional misrepresentation.

14.     Defendant's conduct of labeling, marketing and selling deceptively labeled products bearing the aforementioned misrepresentations also violates the FDCA and the Sherman Law.

15.     This conduct caused Plaintiff, and other similarly situated consumers, damages, and requires restitution and injunctive relief to remedy and prevent future harm.

16.     In addition to the "100% Natural Flavors" claims on the Products purchased by Plaintiff, upon information and belief, many of Defendant's other substantially similar Sprite and Fanta beverages—including, but not limited to, Sprite Zero Sugar, Sprite Chill Strawberry Kiwi, Sprite Tropical Mix, Sprite Lymonade, Sprite Cherry, Sprite Winter Spiced Cranberry, Fanta Zero Sugar Orange, Fanta Strawberry, Fanta

Grape, Fanta Peach, Fanta Pineapple, Fanta Pina Colada, and Fanta Berry (collectively, with the Products purchased by Plaintiff, the "Class Products")[3]—are, or have been marketed and sold using the same unlawful, unfair, and deceptive "100% Natural Flavors" claims.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because: (1) there is minimal diversity because Plaintiff is a citizen of the State of California and Defendant is a Delaware corporation with its headquarters and principal place of business in Georgia;[4] (2) the amount in controversy in this matter exceeds $5 million, exclusive of interest and costs; and (3) there are more than one hundred (100) people in the putative class.

18.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in Los Angeles County, California, which is within this judicial district; (ii) a substantial part of the conduct complained of herein occurred within this judicial district; (iii) Defendant conducted business within this judicial district at all relevant times.

## PARTIES

19.    Ms. Palmer is, and at all times mentioned herein was, a natural person, an individual citizen and resident of Los Angeles County, California.

20.    Defendant is a corporation that is organized and exists under the laws of Delaware, with its principal place of business in Georgia located at One Coca-Cola Plaza, Atlanta, Georgia 30313.

---

[3] Class Products include all seasonal and limited edition variations of Sprite and Fanta, including but not limited to those not specifically listed herein.

[4] According to the California Secretary of State's website, The Coca-Cola Company (Control ID 167890) is a Delaware corporation that has been registered to do business in California since July 28, 1936.

KAZEROUNI
LAW GROUP, APC

21.     Defendant is a manufacturer, distributor and seller of beverage and releated food products that conducts business: (a) direct-to-consumers through its Amazon store; (b) through the websites of third-party vendors, including, but not limited to, Walmart.com, CVS.com, Walgreens.com, Target.com, and Kroger.com, among others; and (c) through the distribution of its products to be sold in grocery stores, convenience stores, movie theaters, amusement parks, sports and entertainment venues, hotels, airports, vending machines, and elsewhere including, but not limited to, Walmart, CVS, Walgreens, Target, and 7-Eleven, among others.

22.     Ms. Palmer alleges that at all relevant times Defendant conducted business within the State of California, in Los Angeles County, and within this judicial district.

23.     Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendant, respectively.

## NATURE OF THE CASE

24.     Defendant was founded in Atlanta, Georgia in 1886 and has since grown into one of the most recognizable brands in the world—whether in the beverage industry or among global consumer brands generally. Today, depending on the year, Defendant ranks as either the largest or second-largest beverage company in the United States, if not the world.

25.     Defendant produces, markets and sells a wide portfolio of beverage products through multiple distribution channels including, but not limited to, its Amazon store, through third-party retailers online as well as in brick and mortar stores, restaurants and elsewhere. In 2024, Defendant reported annual revenue of $47.1 billion, underscoring its immense scale and market dominance.[5]

---

[5] *See Coca-Cola Reports Fourth Quarter and Full Year 2024 Results* https://investors.coca-colacompany.com/news-events/press-

26.    As a direct result of its sustained success, Defendant commands financial, technical, legal, and regulatory resources that are virtually unparalleled in the global marketplace.

27.    Given Defendant's long-standing presence in the food and beverage industry—and its vast resources and operational sophistication—it is difficult to comprehend how it could so blatantly disregard the well-established laws, rules, and regulations governing the labeling, marketing, and sale of beverage products.

28.    At all relevant times, Defendant has made and continues to make material misrepresentations regarding the Class Products either directly or through its agents.[6]

29.    Specifically, Defendant labeled, packaged, marketed, and sold the Class Products as containing "100% Natural Flavors" when, in reality, they contain multiple synthetic ingredients that contribute to the Class Products' flavor—including one that is a primary driver of the overall flavor profile. These claims are false, unlawful, unfair, and deceptive, and they continue to be made to this day.

30.    Each consumer, including Plaintiff, was exposed to the same material misrepresentations, as substantially similar labels, packaging and/or marketing materials were used in connection with all Class Products sold—and currently being sold—throughout the United States, including within the State of California.

31.    Federal and state laws, rules, and regulations regarding the labeling of

---

releases/detail/1128-coca-cola-reports-fourth-quarter-and-full-year-2024-results (last visited May 16, 2025).

[6] Indeed, Coca-Cola's B2B platform represents many of the Class Products as being made with "100% Natural Flavors." *See* https://www.cokesolutions.com/products/brands/sprite/sprite.html (last accessed May 16, 2025); https://www.cokesolutions.com/products/brands/sprite-zero/sprite-zero_-.html (same); https://www.cokesolutions.com/products/brands/fanta/fanta.html (same); https://www.cokesolutions.com/products/brands/fanta-zero/fanta-zero_.html (same).

consumer products are well-established and clearly defined. Specifically, under the FDCA and the Sherman Law, a food is considered misbranded if its labeling is false or misleading in any particular.

32.    As a direct result of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased the Class Products based on false impressions and in reasonable reliance on Defendant's misrepresentation.

33.    As a result, Plaintiff and other similarly situated consumers overpaid for the Class Products, purchased the Class Products over the products of competitors, and/or purchased the Class Products under the belief that the Defendant's representations were accurate, truthful and lawful. This includes both initial and repeat purchases of the Class Products.

34.    Despite clearly established and well-defined federal and state laws, rules, and regulations—including consumer protection laws—governing the labeling, marketing, and sale of food and beverage products in the United States, Defendant falsely, unfairly, and deceptively advertised, marketed, and sold its products, including the Products purchased by Plaintiff, as further detailed herein.

35.    Had Plaintiff been aware that the labeling and marketing of the Class Products contained false and deceptive misrepresentations, she would not have purchased the Class Products or would have paid less for them.

36.    As a result of Defendant's false, unfair, and deceptive representations—and its failure to disclose the true nature of the flavoring ingredients used in the Class Products—consumers nationwide, inclusive of Plaintiff, purchased millions of units of the Class Products across the United States, including in California, and have suffered, and continue to suffer, harm, including the loss of money and/or property.

37.    Defendant's conduct regarding the labeling, marketing, and sale of the Class Products, as alleged herein, violates multiple federal and California laws, rules, and regulations, as detailed below.

38.    This action seeks, among other things, actual damages and prospective

injunctive relief (including public injunctive relief), and in the alternative restitution and disgorgement of all ill-gotten profits resulting from Defendant's alleged wrongdoing.

39.    Unless enjoined, Defendant's unfair, deceptive and unlawful conduct will continue into the future, and Plaintiff and Class members will continue to suffer harm through the purchase of Defendant's misbranded Class Products in the marketplace.

## FACTUAL ALLEGATIONS

40.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

41.    At all relevant times, including as of the filing of this Complaint, Defendant has made material misrepresentations regarding the Class Products either directly or through its agents.

42.    Defendant produces, markets, advertises and sells certain of its products, including the Products purchased by Plaintiff, as being made with "100% Natural Flavors."

43.    The term "Natural Flavor" is well-defined under United States law.[7] In general, it refers exclusively to flavoring substances that are derived from natural sources, including plant or animal materials.

44.    The legal definition of "Natural Flavor" does not encompass substances

---

[7] *See* 21 C.F.R. § 101.22(a)(3) ("The term *natural flavor* or *natural flavoring* means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional. Natural flavors include the natural essence or extractives obtained from plants listed in §§ 182.10, 182.20, 182.40, and 182.50 and part 184 of this chapter, and the substances listed in § 172.510 of this chapter.") (emphasis in original)

produced synthetically, including those synthesized by genetically modified or mutated strains of mold. Additionally, consumers' understanding of "Natural Flavor" does not encompass synthetic ingredients that drive or contribute to the overall flavor experience.

45. In the food and beverage industry, natural flavors are highly valued by consumers and frequently used in products targeted at health-conscious individuals. Companies often include natural flavors—and prominently advertise their use—to enhance the perceived healthfulness of their products, boost sales, gain a competitive edge, and avoid public scrutiny.

46. Consumers, including Plaintiff, increasingly favor products labeled or marketed as "natural," associating them with health benefits and safety. A recent Acosta Group study found that 59% of shoppers prioritize natural and organic groceries and household products, primarily due to perceptions of better health and fewer synthetic additives.[8] In the same study, younger consumers showed an even stronger preference for natural and organic products, with 89% of Gen Z and 85% of Millennials reporting they purchased such items within the past six months. Additionally, research published in the Journal of Consumer Research indicates that consumers prefer natural products more strongly when used for prevention rather than cure, as they are perceived to be safer.[9] Given the widespread recognition of the term "Natural Flavors," consumers are attracted to products that contain them— and even more so to those that are marketed as being made with "100% Natural Flavors."

47. Consumers, including Plaintiff, have often sought out products labeled as containing "100% Natural Flavors," relying on such representations as an express warranty that the product contains no synthetically created flavoring ingredients that contribute to their flavor systems or overall flavor experience. This claim also

---

[8] *See* https://shorturl.at/LLnFZ (last accessed May 16, 2025).
[9] *See* https://shorturl.at/NdFk4 (last accessed May 16, 2025).

signals to consumers that the product is generally more natural and healthful overall.

48.    As a result, representations such as "100% Natural Flavors" have become a significant factor in consumer purchasing decisions, leading consumers to prefer—and ultimately purchase—products that prominently make such claims over those that do not.

49.    Recognizing this consumer demand, Coca-Cola deliberately sought to exploit it by prominently marketing the Products with bold and conspicuous "100% Natural Flavors" claims—both in advertising and on product packaging—in order to capitalize on consumers' recognition of, and preference for, such representations.

50.    Coca-Cola sought to capitalize on consumers' preferences by promoting the Class Products not merely with a vague or general "natural flavors" claim, but with highly specific assertions of "***100%*** Natural Flavors" (emphasis added) and similar representations.

51.    A reasonable consumer understands that when a product explicitly claims to be made with "100% Natural Flavors," it does not contain flavoring ingredients that are synthetically derived or sourced from anything other than natural materials.

52.    In the case of the Class Products, Coca-Cola prominently displays the "100% Natural Flavors" representation on the packaging and heavily features it throughout its marketing materials and marketing materials of retailers.

53.    Below are non-exhaustive examples of the aforementioned representations appearing on the packaging and in the marketing of the Class Products.[10]

---

[10]    Images include representations found on Coca-Cola's websites at https://www.coca-cola.com/us/en/brands/sprite/products and https://www.coca-cola.com/us/en/brands/fanta/products (last accessed May 16, 2025).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28













1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





















54. In every instance, the claim of "100% Natural Flavors" is prominently featured on all packaging variants of the Class Products, including, but not limited to, bottles, cans, and paper packaging used for multipack can sets. This claim is also central to the marketing strategies for the Class Products.

55. Contrary to Coca-Cola's prominent claim of "100% Natural Flavors," the Class Products—including the Products purchased by the Plaintiff—do not consist exclusively of natural flavors. Instead, they incorporate industrially manufactured citric acid ("MCA"), a synthetic compound that significantly influences the flavor profile of the Class Products.

56. Citric acid, an organic compound with the formula $C_6H_8O_7$, is a colorless organic acid that occurs naturally in citrus fruits.

57. Citric acid is a key acid widely used in the food and beverage industry, valued both as a preservative and a flavoring agent.

58. Although citric acid can be naturally derived from citrus fruits, this method of production has been largely abandoned due to economic inefficiency, agricultural limitations, lack of standardization, and other practical constraints.[11] Instead, the

---

[11] *See* Lotfy WA, Ghanem KM, El-Helow ER. *Citric Acid Production by a Novel Aspergillus niger Isolate: II. Optimization of Process Parameters Through*

citric acid used in many commercial products—including the Class Products—is industrially synthesized through a process involving genetically mutated mold (*Aspergillus niger*), a method fundamentally distinct from natural extraction from citrus fruit.

59.    Citric acid produced through the above-described industrial synthesis is commonly referred to as MCA.

60.    Given its distinct tart, tangy and sour taste, MCA is frequently used to enhance or create sour or citrus flavors in food and beverage products,[12] such as Coca-Cola's citrus flavored beverages. While citric acid naturally occurs in citrus fruits—particularly lemons, limes and oranges, where it can constitute up to 8% of their dry weight [13]—MCA is a synthetic alternative used in products such as the Class Products.

61.    The industrial synthesis of MCA involves introducing a sucrose- or glucose-containing medium to carefully selected and genetically mutated *Aspergillus niger* under highly controlled and optimized conditions.[14] In response to these conditions, *Aspergillus niger* metabolizes the sugars and synthesizes citric acid.

62.    Citric acid is not present in either the sugar medium or the *Aspergillus niger* itself prior to synthesis, and thus cannot be extracted, as can be done from natural

---

*Statistical Experimental Designs*. 98 BIORESOURCE TECH. 3470 (2007). ("The supply of natural citric acid is limited and the demand can only be satisfied by biotechnological fermentation processes."); Max B, Salgado JM, Rodriguez N, *et. al. Biotechnological production of citric acid*. 4 BRAZ. J. MICROBIOL. 862 (2010). ("About 99% of world production of citric acid occurs via microbial processes, which can be carried out using surface or submerged cultures.")

[12] *See* Penniston KL, Nakada SY, Holmes RP, Assimos DG. *Quantitative assessment of citric acid in lemon juice, lime juice, and commercially-available fruit juice products*. 22 J ENDOUROL. 567 (2008).

[13] *Id*.

[14] *See* Max, *et al*., *supra*. n. 9 ("Although many microorganisms can be employed to produce citric acid, *A. niger* is still the main industrial producer. In fact, *specific strains that are able to overproduce citric acid* in different types of fermentation processes *have been developed*.") (emphasis added)

sources such as citrus fruits. This method of production stands in stark contrast to the definition of "natural flavor" in 21 C.F.R. § 101.22(a)(3). *See, supra*, n.8.

63.    Even after the mutated *Aspergillus niger* metabolizes the sugar medium—along with other introduced catalysts—to fuel its growth and produce a citric acid derivative as a byproduct, that derivative is not immediately usable.[15] It must undergo a series of chemically intensive processes. Specifically, the compound is first reacted with non-natural sulfuric acid,[16] then subjected to further refinement steps including adsorption using resins and activated charcoal, evaporation, crystallization, and drying. [17] Only after these steps is the purified, biotechnologically synthesized citric acid (or MCA) ultimately produced. This method of production further underscores the departure from any reasonable definition of "natural," involving genetically modified organisms, non-natural catalysts, and extensive chemical processing that defy consumer expectations.

64.    In addition to MCA, Defendant's Sprite Product contains sodium citrate, another synthetic ingredient,[18] which has a flavor profile that is both salty and sour,[19] further contributing to the Sprite Product's flavor. Similarly, Defendant

---

[15] *See* Mores S, Porto de Souza Vandenberghe L, Magalhães AI, et. al. *Citric acid bioproduction and downstream processing: Status, opportunities, and challenges*. 320 BIORESOURCE TECHNOLOGY 124426 (2021)

[16] *See* https://pubchem.ncbi.nlm.nih.gov/compound/Sulfuric-Acid ("Pure sulfuric acid is not encountered naturally on Earth in its anhydrous form, due to its great affinity for water.") (last accessed May 16, 2025).

[17] *See supra* n. 13.

[18] *See* https://www.jungbunzlauer.com/en/products/citrics/trisodium-citrate-anhydrous ("Trisodium citrate is a tribasic salt of citric acid. It is produced by complete neutralisation of citric acid with high purity sodium hydroxide or carbonate and subsequent crystallisation and dehydration.") (Notably, sodium citrate is not derived from natural sources; rather, it is produced through a chemical reaction between two synthetic ingredients: citric acid and sodium hydroxide.) (last accessed April 16, 2025)

[19] *See* https://pubchem.ncbi.nlm.nih.gov/compound/Sodium-Citrate (last accessed May 16, 2025).

---

KAZEROUNI
LAW GROUP, APC

utilizes other forms of citrate, which are also synthetic,[20] in the Class Products. For example, Defendant's Fanta Orange Zero Sugar product contains potassium citrate, an additive with a saline flavor profile[21] that contributes to its flavor.

65.     Defendant's inclusion of synthetic ingredients that contribute to the flavor of the Class Products is not immaterial. Specifically, MCA (labeled as "citric acid") appears *before* "natural flavors" in the ingredient statements of the Products purchased by Plaintiff, indicating its greater relative weight or concentration.

66.     Below are non-exhaustive examples of the aforementioned ingredient statements.

**Sprite Lemon-Lime[22]**

## Ingredients

CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, CITRIC ACID, NATURAL FLAVORS, SODIUM CITRATE, SODIUM BENZOATE (TO PROTECT TASTE).

100% NATURAL FLAVORS NO CAFFEINE

---

[20] *See* 21 C.F.R. §184.1625(a) ("Potassium citrate … is the potassium salt of citric acid. It is prepared by neutralizing citric acid with potassium hydroxide or potassium carbonate. It occurs as transparent crystals or a white granular powder, is odorless and deliquescent, and contains one mole of water per mole of potassium citrate.")

[21] *See* https://xitrical.com/application-of-potassium-citrate-in-beverages-and-formulation-optimization/ ("It appears as white crystals or powder, dissolves easily in water, and has a mildly sour taste.") (last accessed May 15, 2025)

[22] *See* https://www.coca-cola.com/us/en/brands/sprite/products (last accessed May 15, 2025)

**Sprite Lemon-Lime Zero Sugar[23]**

## Ingredients

CARBONATED WATER, CITRIC ACID, POTASSIUM CITRATE, NATURAL FLAVORS, POTASSIUM BENZOATE (TO PROTECT TASTE), ASPARTAME, ACESULFAME POTASSIUM.

**Fanta Orange[24]**

## INGREDIENTS

CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, LESS THAN 2% OF: CITRIC ACID, NATURAL FLAVORS, SODIUM BENZOATE (TO PROTECT TASTE), MODIFIED FOOD STARCH, GLYCEROL ESTER OF ROSIN, YELLOW 6, RED 40.

---

[23] *Id.*
[24] *See* https://www.coca-cola.com/us/en/brands/fanta/products (last accessed May 15, 2025).

**Fanta Orange Zero Sugar[25]**

**INGREDIENTS**

CARBONATED WATER, CITRIC ACID, POTASSIUM CITRATE, ASPARTAME, NATURAL FLAVORS, MODIFIED FOOD STARCH, POTASSIUM BENZOATE (TO PROTECT TASTE), ACESULFAME POTASSIUM, GLYCEROL ESTER OF ROSIN, YELLOW 6, MEDIUM CHAIN TRIGLYCERIDES, SUCROSE ACETATE ISOBUTYRATE, RED 40.

PHENYLKETONURICS: CONTAINS PHENYLALANINE

LOW SODIUM

PHENYLKETONURICS: CONTAINS PHENYLALANINE CAFFEINE FREE 100% NATURAL FLAVORS

67. The placement of citric acid before "natural flavors" in the Products' ingredient statements underscores the significance of MCA to the overall flavor profile. If MCA were removed or substantially reduced, the flavor of the Products would be materially altered. In other words, synthetic, non-natural MCA is a critical component of the flavor in Class Products that are marketed as containing "100% Natural Flavors."

68. Similarly, if sodium citrate were removed or substantially reduced in the Sprite Product, its flavor would also be materially affected, further underscoring the role of synthetic ingredients in shaping the taste of products marketed as containing "100% Natural Flavors."

69. Additionally, the removal or substantial reduction of potassium citrate from

[25] *Id.*

the Fanta Orange Zero Sugar product would materially alter its flavor, further highlighting the influence of synthetic additives on products labeled as containing "100% Natural Flavors."

70.     Even if citric acid appears after natural flavors in the ingredient statements of the Class Products, its potent taste ensures that any amount contributes meaningfully to their flavor systems and overall flavor experience. In short, synthetic flavoring ingredients—including, but not limited to, citric acid, sodium citrate, and potassium citrate—are integral to the Class Products' flavor profiles.

71.     The position of citric acid in the Products' ingredient statements renders Coca-Cola's subjective purpose or intent immaterial, as both the potency of citric acid's flavor and its relative quantity in the Products and Class Products have a significant impact on their overall flavor profiles.

72.     Given the significant impact of MCA on flavor, it is highly likely that the quantity of MCA in the Class Products was either specifically determined or carefully adjusted by Defendant's experts responsible for formulating the Class Products' flavor profiles. The details surrounding the development of these flavor profiles remain exclusively within Defendant's knowledge. Accordingly, Plaintiff cannot fully allege the extent of Defendant's experts' involvement or knowledge without the benefit of discovery.

73.     As yet another example of Defendant's misleading use of "100% Natural Flavors," Defendant's "Zero" products—marketed as containing zero sugar—rely not on one, but two well-known and controversial fully artificial sweeteners: aspartame[26] and acesulfame potassium.[27]

---

[26] *See* https://pubchem.ncbi.nlm.nih.gov/compound/Aspartame ("Commonly used as an artificial sweetener. It has a role as a sweetening agent, a nutraceutical, a micronutrient, a xenobiotic, an environmental contaminant, an apoptosis inhibitor and an EC 3.1.3.1 (alkaline phosphatase) inhibitor.") (last accessed April 17, 2025)
[27] *See* https://www.ncbi.nlm.nih.gov/books/NBK576288/ (" Acesulfame potassium is an artificial sweetener used throughout the world. It is currently available as a dry

74.     While Coca-Cola may argue that sweetness does not constitute "flavor," no reasonable consumer would agree. Sweetness is a fundamental component of how flavor is experienced. If the aspartame and acesulfame potassium were removed from the Sprite or Fanta "Zero" products, no consumer would recognize the resulting beverage as tasting like the lemon-lime, orange, or other flavors represented on the product labels. Ultimately, no reasonable consumer would expect a product labeled and marketed as containing "100% Natural Flavors" to also include two entirely artificial sweeteners.

75.     Furthermore, Defendant includes synthetic preservatives—specifically sodium benzoate[28] and potassium benzoate[29]—under the guise of "protecting taste." If these additives genuinely serve to protect taste, they necessarily contribute to the flavor, flavor system, and overall flavor experience of the Class Products. Their inclusion further undermines and contradicts Defendant's claim that the Class Products contain "*100%* Natural Flavors."

76.     Coca-Cola's "100% Natural Flavors" claim is highly deceptive and misleading because a primary contributor to the citrus flavor in the Class Products—MCA—is not natural, but synthetic. While citric acid does occur naturally in fruits such as lemons, limes, and oranges, and was historically extracted from these sources, modern production relies on industrial synthesis. Although advancements in biotechnology have made this method efficient, it does not yield

---

powder for use in food and beverages and is present as a flavoring agent in numerous food items and diet drinks; therefore, there is extensive human exposure.") (last accessed May 16, 2025).

[28] *See* 21 C.F.R. § 184.1733(a) ("Sodium benzoate is the chemical benzoate of soda . . . produced by the neutralization of benzoic acid with sodium bicarbonate, sodium carbonate, or sodium hydroxide. The salt is not found to occur naturally.").

[29] See https://foodadditives.net/preservatives/potassium-benzoate/ ("It is not natural. Potassium benzoate is the salt of benzoic acid. The salt is not found to occur naturally and the manufacturing process through chemical synthesis, so it is not natural.") (last accessed May 16, 2025)

citric acid from a natural source, nor does it align with the regulatory definition of a "natural flavor."

77. As a result of the "100% Natural Flavors" representations on the Class Products packaging and in their advertising, retailers have further propagated this misrepresentation through their websites' product pictures and descriptions, in addition to continuing to sell the Class Products with "100% Natural Flavors" misrepresentations on their shelves, where applicable.[30]

78. Defendant's unqualified "100% Natural Flavors" misrepresentations were also prominently displayed in the "About this item" section of its Amazon product pages.[31]

79. As a result of Defendant's false "100% Natural Flavors" claims, the Class Products obtained an unfair competitive advantage across social media platforms, search engine algorithms, and Amazon search results—harming both consumers and legitimate competitors in the marketplace.

80. One of the methods Defendant used to advance its deceptive "100% Natural Flavors" claims was through social media marketing and influencer partnerships[32]—the full scope of which is known only to Defendant and its marketing agencies at this time.

---

[30] For illustrative examples of Defendant's "100% Natural Flavors" (or similar) claims appearing on Amazon, Target.com, Walmart.com and Walgreens.com sales pages, see ¶ 53, *supra*.

[31] *Id.*

[32] https://www.instagram.com/p/CnFk0DaPNM8/?igsh=NTc4MTIwNjQ2YQ%3D%3D (last accessed May 16, 2025); https://www.instagram.com/reel/Cop2kO1JYrQ/?igsh=NTc4MTIwNjQ2YQ%3D%3D (same); https://www.facebook.com/100064334276280/posts/2420116801553246/ (same); https://www.facebook.com/FantaUSA/videos/520899021987841/?app=fbl (same); https://www.facebook.com/FantaUSA/videos/1197131617833604/?app=fbl (same); https://www.facebook.com/FantaUSA/videos/714423405660982/?app=fbl (same); https://x.com/Sprite/status/1471887944558555136 (same).

---

81. Some examples of Defendant's social media marketing and influencer partnerships are shown below:



*Instagram*





82.    Defendant's misleading and deceptive claims regarding "100% Natural Flavors," misleads consumers into purchasing products that do not meet their expectations. This deception causes financial harm, poses potential physical risks,[33] and undermines consumer trust in product labeling. As a result, consumers, including Plaintiff, did not receive the "100% Natural Flavors" or their associated benefits that they paid for and were unknowingly exposed to synthetic flavoring ingredients—without their consent.

83.    As a result of Defendant's "100% Natural Flavors" claim on the Class Products' packaging and in their marketing, consumers have been misled for years into making both initial and repeat purchases of products they reasonably believed contained no synthetic flavoring ingredients.

84.    Had Plaintiff and other similarly situated consumers been made aware that the Class Products contained a substantial amount of synthetic flavoring ingredients, they would not have purchased the Class Products or would have paid less for them.

85.    Defendant possesses superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

86.    On information and belief, Defendant either charged a premium for the Class Products compared to its competitors or gained a significant competitive advantage by misleading consumers into choosing its products over others based on false "100% Natural Flavors" claims. Federal and California laws are specifically designed to protect consumers from such false, deceptive, misleading, and unlawful

---

[33] *See* Sweis, IE, Cressey, BC. *Potential Role of the Common Food Additive Manufactured Citric Acid in Eliciting Significant Inflammatory Reactions Contributing to Serious Disease States: A Series of Four Case Reports*. 5 TOXICOL. REP. 808 (2018) ("We believe that ingestion of the MCA may lead to a harmful inflammatory cascade which manifests differently in different individuals based on their genetic predisposition and susceptibility, and that the use of MCA as an additive in consumable products warrants further studies to document its safety.")

representations, as well as from predatory business practices that unfairly manipulate consumer choice.

## FACTS SPECIFIC TO PLAINTIFF VICTORIA PALMER

87.     On or about April 28, 2025, Plaintiff searched online for beverages while in Northridge, Los Angeles County, California. While searching online, Plaintiff found the Products available for sale on Amazon.

88.     Plaintiff viewed the Amazon product page for the "Sprite Mini-Can 7.5oz" ten-pack located at https://a.co/d/jgTq8IQ. On that page, Plaintiff viewed the Sprite Product's images and information.

89.     Plaintiff observed multiple references to "100% Natural Flavors" on the Amazon product listing, including both in product images and written descriptions.

90.     Particularly, on the Sprite Product's Amazon product page, the words "100% Natural Flavors" appeared in capitalized white letters on an image of the Sprite Product's box; in bold, capitalized white letters on an image with a green background along with the words "ZERO CAFFEINE" in a lighter shade of green, and "PERFECTLY CLEAR" in yellow; and on an image of the Sprite Product's ingredient list. Plaintiff noticed the "100% Natural Flavors" representations on the image of the Sprite Product's box and in bold, capitalized white letters on the image with the green background.

91.     Plaintiff also noticed that the language "Lemon-lime soda, 100% natural flavors" appeared under the "About this item" section of the Sprite Product's webpage. A similar "100% natural Flavors" representation is made under the "Product Description" section of the same Amazon webpage.

92.     Relying on Coca-Cola's repeated representations on the Amazon product page that the Sprite Product was made with "100% Natural Flavors," Plaintiff added the Sprite Product to her Amazon shopping cart and paid $5.98, exclusive of shipping, taxes and fees.

93.    As of May 19, 2025, the Amazon page for the Sprite Product continues to show images representing 100% natural flavors, as depicted below.









94.    Plaintiff also viewed the Amazon product page for the "FANTA ORANGE CAN 7.5 OZ X10" ten-pack located at https://a.co/d/8YdPZgQ. On that webpage, Plaintiff viewed the Fanta Product's images and information.

95.    In reviewing the Amazon product listing for the Fanta Product, Plaintiff again observed clear representations of "100% Natural Flavors," including in both product images and written descriptions.

96.    One of the images Plaintiff observed on the Amazon product page for the Fanta Product displayed the front and side of the packaging, which featured both a nutrition panel and the claims "CAFFEINE FREE" and "100% NATURAL FLAVORS." Additionally, under the "About this item" section of the same listing, Plaintiff noticed the statement "100% naturally flavored soft drink."

97.    Relying on Coca-Cola's representations on the Amazon product page that the Fanta Product was made with "100% Natural Flavors," Plaintiff added the Fanta Product to her Amazon shopping cart and paid $5.98, exclusive of shipping, taxes and fees.

98.    As of May 19, 2025, the Amazon page for the Fanta Product continues to show images representing 100% natural flavors, as depicted below.





99.     Plaintiff's reliance on Defendant's representations was reasonable given the circumstances, as ordinary consumers are not experts in beverage product formulations or the true nature or origins of ingredients. They have no reason to doubt such claims or suspect that a manufacturer would deliberately misrepresent the contents of a product, especially when such claims are prominently displayed on the product's labels and in its marketing.

100.   For instance, when a consumer encounters an explicit representation such as "*100%* Natural Flavors" on a product's labeling or marketing, they reasonably expect that the product contains *only* natural flavoring ingredients and is free from synthetic ones. A reasonable consumer would not anticipate that the product is significantly—or even predominantly—flavored with synthetically produced

ingredients.

101.   Defendant's representations regarding the Products and the Class Products were unlawful, unfair, deceptive, and misleading, as the Products contain synthetic, chemically derived, or otherwise non-natural ingredients that contribute a significant—if not predominant—portion of the Products' flavor.

102.   Accordingly, Defendant is not entitled to lawfully make the claims of "100% Natural Flavors" that it made on and regarding the Products and the Class Products.

103.   Defendant's representations were material to Plaintiff's decision to purchase the Products.

104.   In deciding to purchase the Products, Plaintiff relied on the labeling, marketing, and/or advertising prepared and approved by Defendant and its agents, as disseminated through the Products' and the Class Products' packaging and marketing containing the misrepresentations alleged herein.

105.   Had Plaintiff known that the Products did not contain only naturally derived flavoring ingredients, and instead included synthetic flavoring ingredients, she would not have purchased the Products or would have paid less for them.

106.   In other words, Defendant's "100% Natural Flavors" representation was important to Plaintiff's decision to purchase the Products.

107.   Plaintiff believed, at the time of purchase, that the Products were of superior quality and more healthful than comparable products that do not claim to be made with "100% Natural Flavors."

108.   Each time Plaintiff and putative Class members purchased Class Products, they relied on Defendant's representations in their purchasing decisions, as is typical of most U.S. consumers.

109.   After purchasing the Products, Plaintiff learned that the Products were flavored with synthetically produced ingredients.

110.   As a result, Plaintiff was harmed because Defendant took Plaintiff's money due to its unlawful, false, unfair, and deceptive misrepresentations on the Class

Products, including the Products Plaintiff purchased.

111.    Consequently, Plaintiff and other similarly situated consumers were deceived by Defendant's unlawful actions and suffered harm as a direct result of Defendant's false, unlawful, unfair, and deceptive representations.

112.    The Class Products, including the Products purchased by Plaintiff, contain synthetic flavoring ingredients and are not worth the purchase price paid by Plaintiff and putative Class members.

113.    The precise amount of damages will be proven at the time of trial.

114.    This false, unlawful, unfair, and deceptive advertising of the Class Products by Defendant presents an ongoing threat to consumers, as Defendant's conduct continues to this day.

115.    Although Plaintiff would like to purchase the Class Products in the future, she cannot be certain that she will not be misled again unless and until Defendant and its agents accurately label and represent the Class Products.

## CLASS ALLEGATIONS

116.    Plaintiff brings this action on behalf of herself and all others similarly situated.

117.    Plaintiff is a member of and seeks to represent a National Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in the United States who purchased one or more of the Class Products that were marketed or represented as being made with "100% Natural Flavors" or any similar representation, whether on the product packaging or in marketing materials.

118.    Plaintiff is also a member of and seeks to represent a California Sub-Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in California who purchased one or more of the Class Products that were marketed or represented as

being made with "100% Natural Flavors" or any similar representation, whether on the product packaging or in marketing materials.

119.   The National Class and the California Sub-Class are referred to collectively as the "Class(es)."

120.   Excluded from the Classes are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Further excluded from the Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

121.   Plaintiff reserves the right to modify the proposed definition of the Classes, including but not limited to expanding the Classes to protect additional individuals and to assert additional sub-classes as warranted by additional investigation.

122.   <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of members of the Classes is unknown to Plaintiff at this time, based on information and belief, the Classes each consist of hundreds of thousands to hundreds of millions of individuals within the United States and California.

123.   Defendant has estimated that it serves approximately 325 million consumers in North America alone.[34] And, Reyes Coca-Cola Bottling, which is a distributor of Defendant's Class Products servicing the West Coast and Midwest, estimates that it serves more than 210,000 customers nationwide.[35] Similarly, Swire Coca-Cola USA, another one of Defendant's distributors servicing parts of California, Arizona, Colorado, Idaho, Kansas, Nebraska, Nevada, New Mexico, Oregon, South Dakota,

---

[34] https://web.archive.org/web/20250402012754/https://investors.coca-colacompany.com/about/segments (last accessed May 16, 2025).
[35] https://www.reyescocacola.com (last accessed May 16, 2025).

Utah, Washington, and Wyoming, states that it "delivers . . . to 31 million consumers across the American West."[36]

124.  <u>Commonality</u>: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual members of the Classes. These common questions of law and fact include, without limitation:

- The nature, scope, and operations of the wrongful practices of Defendant;

- Whether the Class Products are or have been represented as being made with "100% Natural Flavors";

- Whether the Class Products contain citric acid;

- Whether the citric acid in any of the Class Products is derived from citrus fruits;

- Whether Defendant negligently or intentionally misrepresented or omitted the fact that the Class Products, including the Product purchased by Plaintiff and other Class members, were sold illegally in the United States, including California;

- Whether Defendant knew or should have known that its business practices were unfair and/or unlawful;

- Whether Defendant's conduct violated the CLRA;

- Whether Defendant's conduct violated the FAL;

- Whether Defendant's conduct was "unlawful" as that term is defined in the UCL;

- Whether Defendant's conduct was "unfair" as that term is defined in the UCL;

- Whether Defendant's conduct was "fraudulent" as that term is defined in the UCL;

---

[36] https://www.swirecc.com (last accessed May 16, 2025).

- Whether Defendant's conduct was "unfair, deceptive, untrue or misleading" as those terms are defined in the UCL;

- Whether Defendant was unjustly enriched by its unlawful, unfair and deceptive business practices;

- Whether Defendant breached an express warranty to Plaintiff and members of the Classes;

- Whether Defendant negligently or intentionally misrepresented its products;

- Whether Plaintiff and members of the Classes suffered monetary damages as a result of Defendant's conduct and, if so, the appropriate amount of damages; and

- Whether Plaintiff and members of the Classes are entitled to injunctive relief, including public injunctive relief.

125. <u>Typicality</u>: Plaintiff's claims are typical of those of the Classes. Plaintiff and all members of the Classes have been harmed by Defendant's wrongful practices. Plaintiff's claims arise from the same course of conduct that gave rise to the claims of the Classes and are based on the same legal theories. Specifically, Plaintiff purchased one or more of the Class Products that were labeled, represented and/or advertised as being made with "100% Natural Flavors."

126. <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of members of the Classes. Plaintiff's counsel are competent and experienced in litigating consumer class actions. Plaintiff has retained counsel experienced in consumer protection law, including complex class action litigation involving unfair business practices. Plaintiff has no adverse or antagonistic interests to those of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and the proposed Classes.

127. <u>Predominance</u>: Defendant has engaged in a common course of conduct

toward Plaintiff and members of the Classes, in that Plaintiff and members of the Classes were induced to purchase the Class Products. The common issues arising from Defendant's conduct affecting members of the Classes set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

129.    Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most members of the Classes would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

130.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each member of the Classes.

131.    Unless the Classes are certified, Defendant will retain monies received as a result of Defendant's unlawful, unfair and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to advertise, market, label, promote and package the Class Products in an unlawful, unfair, deceptive and misleading manner, and members of the Classes will continue to be deceived, misled, harmed, and denied their rights under federal and California law.

132.    Defendant has acted on grounds that apply generally to the Classes, so that class certification is appropriate.

\\

\\

\\

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Violations of the Consumer Legal Remedies Act ("CLRA")
### (Cal. Civ. Code §§ 1750, *et seq.*)
### (On Behalf of Plaintiff and the California Sub-Class)

133.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

134.   California Civil Code Section 1750, *et seq.,* entitled the Consumer Legal Remedies Act ("CLRA"), enumerates various "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer" that are illegal in the State of California.

135.   The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia,* that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protections.

136.   Defendant's actions, representations, and conduct have violated, and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in the sale of beverage products to consumers.

137.   Plaintiff and the members of the California Sub-Class are not sophisticated experts with independent knowledge of product labeling, marketing practices and/or ingredient sourcing.

138.   Plaintiff and members of the California Sub-Class are consumers in California who purchased the Class Products for personal, family or household purposes.

139.   Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

140.   The Class Products that Plaintiff and other members of the California Sub-Class purchased from Defendant constitute "goods" as defined in Cal. Civ. Code § 1761(a).

141.   Plaintiff, and the members of the California Sub-Class, are each "consumer[s]" as defined in Cal. Civ. Code § 1761(d).

142.   The purchases of Defendant's products by Plaintiff and the members of the California Sub-Class constituted a "transaction" as defined in Cal. Civ. Code § 1761(e).

143.   Cal. Civ. Code § 1770(a)(2), (5), (7) and (9) of the CLRA provide that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised.

144.   Defendant violated Civil Code section 1770(a)(2), (5), (7), and (9) by marketing and representing the Class Products as being made with "100% Natural Flavors." In reality, the Class Products contain synthetically manufactured or otherwise non-natural flavoring ingredients, and were falsely, deceptively, and unlawfully labeled and marketed to conceal this fact.

145.   Plaintiff further alleges that the Defendant committed these acts with full awareness of the harm it would cause and engaged in such unfair and deceptive conduct despite this knowledge.

146.   Defendant knew or should have known that its representations about the Class Products, as described herein, violated numerous regulations and laws, including consumer protection laws, and that these statements would be relied upon by Plaintiff and members of the California Sub-Class.

147.   As a direct and proximate result of Defendant's violations of Cal. Civ. Code §§ 1750, *et seq.*, Plaintiff and members of the California Sub-Class have suffered harm by paying for the Class Products, which they would not have purchased or would have purchased at a lower price had they known the products were unlawfully, falsely, unfairly, and deceptively labeled and/or marketed.

148.   Plaintiff and members of the California Sub-Class suffered monetary harm as a result of Defendant's conduct because: (a) they would not have purchased the Class Products on the same terms had it not been for Defendant's unlawful, unfair, and deceptive actions as set forth herein; and/or (b) they paid a price premium for the Class Products or chose them over competing products due to Defendant's marketing misrepresentations and deceptive labeling, as discussed herein.

149.   Plaintiff was therefore harmed because her money was taken by Defendant as a result of Defendant's false, unlawful, unfair, and deceptive misrepresentations regarding the Class Products. These unlawful actions include misrepresenting the nature of the flavoring ingredients used in the Class Products.

150.   Plaintiff and members of the California Sub-Class reasonably relied upon Defendant's representations regarding the Class Products, and Plaintiff and members of the California Sub-Class reasonably expected that the Class Products would not be unlawfully labeled or marketed in a unfair, deceptive and misleading manner.

151.    Thus, Plaintiff and members of the California Sub-Class reasonably relied to their detriment on Defendant's unlawful, unfair, deceptive and misleading representations.

152.    Pursuant to California Civil Code § 1782(a), on or about May 23, 2025, Plaintiff, through counsel, sent Defendant a notice and demand for corrective action (the "CLRA Demand") via certified mail, informing Defendant of its violations of the CLRA and demanding that it cease and desist from such violations, as well as make full restitution by refunding all monies received in connection therewith.

153.    If Defendant fails to respond to Plaintiff's CLRA Demand, fails to agree to rectify the problems associated with the conduct detailed above, or fails to give notice to all affected consumers within 30 days of the CLRA Demand's date, Plaintiff reserves the right to amend the Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendant. As to this cause of action, at this time, Plaintiff seeks only restitution, injunctive relief, and declaratory relief.

154.    Plaintiff and members of the California Sub-Class were harmed as a direct and proximate result of Defendant's conduct because they paid a premium for 100% naturally-flavored Class Products even though the Class Products they purchased were not-in fact 100% naturally flavored as labeled.

155.    Attached hereto as **Exhibit A** is a sworn declaration from Plaintiff pursuant to Cal. Civ. Code § 1780(d).

## SECOND CAUSE OF ACTION
### Violations of California's Unfair Competition Law ("UCL")
### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)
### (On Behalf of Plaintiff and the California Sub-Class)

156.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

157.  Plaintiff brings this claim individually and on behalf of members of the California Sub-Class for Defendant's violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

158.  Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201.

159.  California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

160.  "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."

161.  The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

162.  Through the conduct alleged in detail above and herein, Defendant engaged in unlawful, unfair, deceptive and/or fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., during the four-year period preceding the filing of this Complaint, Cal. Bus. & Prof. Code § 17208, and persisting to this day.

### A. *"Unlawful" Prong*

163.  Defendant has committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code § 17200, *et seq.*

164.  Defendant violated federal and California law by falsely advertising, marketing, labeling, and selling the Class Products as being made with "100% Natural Flavors" when they were not, while failing to disclose the true nature of the flavoring ingredients contained therein.

165.  Specifically, by manufacturing, distributing, and/or marketing the Class Products with false, unlawful, unfair and deceptive claims, Defendant violates the

FDCA, 21 U.S.C. § 343(a); Cal. Health & Safety Code §§ 110390, 110395, 110398; California's CLRA, Civil Code §§ 1750, *et seq.*; and Californias' FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

166.    Defendant falsely, unlawfully, unfairly, and deceptively represents that the Class Products are made with "100% Natural Flavors" when, in fact, they are not. Instead, Defendant uses synthetically manufactured or otherwise non-natural flavor ingredients to create the flavor profile for the Class Products.

167.    Aside from the unlawful conduct described herein, Defendant has other reasonably available alternatives to advance its business interests, such as accurately, truthfully, and lawfully marketing, labeling, and selling the Class Products.

168.    Instead, Defendant deliberately and deceptively misled and continues to mislead consumers through unlawful and unfair practices for its own economic gain.

## B. *"Unfair" Prong*

169.    Defendant has engaged in acts of unfair competition prohibited by Bus. & Prof. Code § 17200, *et seq*.

170.    Defendant engaged in a pattern of "unfair" business practices that violate both the letter and the intent of the statutes. Defendant's conduct threatens an incipient violation of the law or violates the policy and spirit of the law by manufacturing, distributing, and/or marketing its products with false, unfair and deceptive claims.

171.    The utility of such conduct, if any, is vastly outweighed by the harm it inflicts, particularly through the manufacturing, distribution, and/or marketing of the Class Products by means of false representations that they are made with "100% Natural Flavors" despite containing synthetically manufactured or otherwise non-natural flavoring ingredients.

172.    As a result of Defendant's conduct: (1) the injury to consumers was substantial; (2) the injury was not outweighed by any countervailing benefits to

consumers or competition; and (3) the injury was one that consumers could not have reasonably avoided.

173. Without limitation, Defendant's knowing mislabeling and false, unlawful marketing of the Class Products constitute unlawful, unfair, and deceptive business practices, misleading consumers into believing they are purchasing products that contain only natural flavoring ingredients despite containing synthetically manufactured or otherwise non-natural flavoring ingredients.

174. Plaintiff could not have reasonably avoided the resulting injury.

### C. *"Fraudulent" Prong*

175. Defendant violated the "fraudulent" prong of the UCL by misleading Plaintiff and the members of the California Sub-Class to believe that the Class Products contain only natural flavoring ingredients.

176. The Class Products are falsely labeled and marketed as being made with "100% Natural Flavors" despite Defendant's use of synthetically manufactured or otherwise non-natural flavoring ingredients in the Class Products. These misrepresentations mislead consumers, including Plaintiff, into consuming synthetic flavoring ingredients to which they did not, and could not have, given informed consent.

177. On or about April 28, 2025, Plaintiff searched online for beverages while in Northridge, Los Angeles County, California. While searching online, Plaintiff found the Products available for sale on Amazon.

178. First, Plaintiff viewed the Amazon webpage for the "Sprite Mini-Can 7.5oz" ten-pack located at https://a.co/d/jgTq8IQ. On that webpage, Plaintiff viewed the Sprite Product's images and information.

179. One image Plaintiff observed on the Sprite Product's Amazon product page included a green background with bold, capitalized letters stating "100% NATURAL FLAVORS" in white, "ZERO CAFFEINE" in a lighter shade of green, and "PERFECTLY CLEAR" in yellow in the foreground.

180.    Another image Plaintiff observed on the Sprite Product's Amazon product page included the words "100% Natural Flavors" in capitalized white letters on an image of the Sprite Product's box

181.    Plaintiff also noticed that the words "Lemon-lime soda, 100% natural flavors" appeared under the "About this item" sections of the same page. A similar "100% natural Flavors" representation is made under the "Product Description" section of the same Amazon webpage.

182.    Relying on Coca-Cola's representations on the Amazon webpage that the Sprite Product was made with "100% Natural Flavors," Plaintiff added the Sprite Product to her Amazon shopping cart and paid $5.98, exclusive of taxes and fees, for same.

183.    Next, Plaintiff viewed the Amazon webpage for the "FANTA ORANGE CAN 7.5 OZ X10" ten-pack located at https://a.co/d/8YdPZgQ. On that webpage, Plaintiff viewed the Fanta Product's images and information.

184.    One of the images Plaintiff observed on the Amazon product page for the Fanta Product displayed the front and side of the packaging, which featured both a nutrition panel and the claims "CAFFEINE FREE" and "100% NATURAL FLAVORS." Additionally, under the "About this item" section of the same listing, Plaintiff noticed the statement "100% naturally flavored soft drink."

185.    Relying on Coca-Cola's representations on the Amazon webpage that the Fanta Product was made with "100% Natural Flavors," Plaintiff added the Fanta Product to her Amazon shopping cart and paid $5.98, exclusive of taxes and fees, for same.

186.    Like Plaintiff, members of the California Sub-Class purchased the Class Products in reliance on Defendant's misrepresentations.

187.    Plaintiff and the Class are not sophisticated experts in beverage marketing practices, product labeling or ingredient sourcing, or the regulations governing the Class Products.

188.   Plaintiff and members of the California Sub-Class acted reasonably in purchasing the Class Products based on their incorrect belief that Defendant's representations that the Class Products contained "100% Natural Flavors" were accurate, truthful and lawful.

### D. *"Unfair, Deceptive, Untrue or Misleading Advertising" Prong*

189.   Defendant's labeling, marketing and advertising is unfair, deceptive, untrue, and misleading, as it misleads consumers into believing that the Class Products contain only natural flavoring ingredients, when in fact that is not true.

190.   Plaintiff, as a reasonable consumer, and the public are likely to be, and in fact were, deceived and misled by Defendant's labeling and marketing. They reasonably interpreted Defendant's representations according to their ordinary meaning—that the Class Products contain "*100%* Natural Flavors" and do not contain synthetically manufactured or otherwise non-natural flavoring ingredients.

191.   Plaintiff and members of the California Sub-Class are not sophisticated experts in beverage marketing practices, product labeling, ingredient sourcing, or the regulations governing the Class Products. They acted reasonably in purchasing the Class Products based on their belief that Defendant's representations were accurate, truthful and lawful.

192.   Plaintiff and the members of the California Sub-Class lost money or property as a result of Defendant's UCL violations because, at a minimum: (a) they would not have purchased the Class Products on the same terms had they known the true facts about Defendant's representations; (b) they paid a price premium for the Class Products due to Defendant's alleged misrepresentations; and/or (c) they chose Class Products over the products of Defendant's competitors who made accurate, truthful and lawful representations about their products.

193.   Defendant's alleged unlawful, unfair, and deceptive business practices, along with their unfair, deceptive, untrue, or misleading advertising, present a continuing

threat to the public as Defendant continues to engage in unlawful conduct that harms consumers.

194.    Such acts and omissions by Defendant are unlawful, unfair, and/or deceptive, constituting violations of Business & Professions Code §§ 17200, *et seq*.

195.    As a direct and proximate result of the acts and representations described above, Defendant has received and continues to receive unearned commercial benefits at the expense of its competitors and the public.

196.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct described herein, Defendant has been, and will continue to be, enriched by ill-gotten gains from customers, including Plaintiff, who unwittingly provided money based on Defendant's "100% Natural Flavors" misrepresentation.

197.    Plaintiff was harmed because Defendant took Plaintiff's money through an unlawful, false, unfair, and deceptive representation made regarding the Class Products.

198.    The conduct of Defendant, as described above, demonstrates the need for injunctive relief to restrain such acts of unfair competition pursuant to the California Business and Professions Code. Unless enjoined by the court, Defendant will retain the ability to, and may, continue engaging in unfair and deceptive competition and misleading marketing. As a result, Plaintiff and members of the California Sub-Class are entitled to monetary relief and prospective injunctive relief, and restitution in the alternative.

199.    Plaintiff would like to purchase at least some of the Class Products again but cannot be certain she will not be misled in the future unless and until Defendant makes the appropriate changes to the labeling and marketing of its Class Products, as requested herein.

200.    Pursuant to Bus. and Prof. Code § 17203, Plaintiff and members of the California Sub-Class are entitled to, and hereby seek, injunctive relief to prevent

Defendant from continuing the conduct in question as well as restitution of Defendant's ill-gotten gains.

201. Plaintiff also seeks public injunctive relief to prevent Defendant from marketing and selling the Class Products as being made with "100% Natural Flavors" despite the inclusion of synthetically manufactured or otherwise non-natural flavoring ingredients, including the removal of the misbranded Class Products from the marketplace.

202. In prosecuting this action to enforce important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

203. As it concerns the Second Cause of Action, Plaintiff, on behalf of herself and the California Sub-Class, seeks prospective injunctive relief as well as restitution in the alternative to monetary damages.

## THIRD CAUSE OF ACTION
### Violations of California's False Advertising Law ("FAL")
### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)
### (On Behalf of Plaintiff and the California Sub-Class)

204. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

205. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with intent … to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

206.   Defendant's material misrepresentations and omissions concerning the nature of the flavoring ingredients used in its Class Products, as alleged herein, violate Bus. & Prof. Code §§ 17500, *et seq*. Defendant knew or should have known that its misrepresentations and omissions were false, unlawful, unfair, deceptive, and misleading. This includes the representations that the Class Products contain "100% Natural Flavors" despite containing synthetically manufactured or otherwise non-natural flavoring ingredients.

207.   Plaintiff and the Class suffered tangible, concrete injuries as a result of Defendant's actions, as set forth herein, because they purchased the Class Products in reliance on Defendant's misrepresentations.

208.   As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff and members of the Class are entitled to injunctive relief, equitable relief, and restitution.

209.   Further, Plaintiff and the members of the Class seek an order requiring Defendant to disclose the misrepresentations and request an order awarding Plaintiff restitution for the money wrongfully acquired by Defendant through those misrepresentations.

210.   Additionally, Plaintiff and members of the Class seek an order requiring Defendant to pay attorneys' fees pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

211.   As it concerns this Third Cause of Action, Plaintiff, on behalf of herself and the California Sub-Class, also seeks prospective injunctive relief as well as restitution in the alternative to monetary damages.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty
### (On Behalf of Plaintiff, the National Class, and the California Sub-Class)

212.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

213.    Under California law, the elements of breach of express warranty include the seller's statement(s) constituting an affirmation of fact or promise or a description of the goods which is made part of the basis of the bargain, and breach of that warranty. Reliance is not required. *See Weinstat v. Dentsply Internat., Inc.*, 180 Cal.App.4th 1213, 1227 (2010).

214.    Defendant represented to Plaintiff and similarly situated consumers, through its labeling, advertising, and marketing, that the Class Products are made with "100% Natural Flavors" when, in fact, they are not. Instead the Class Products are also flavored with synthetically manufactured, artificial, or otherwise non-natural ingredients.

215.    Defendant's representations regarding the flavoring of the Class Products constitute affirmations of fact.

216.    Defendant's explicit claim that the Class Products contain "100% Natural Flavors" directly pertains to the nature and composition of the products. This representation forms a fundamental part of the bargain between Defendant and purchasers, influencing consumer purchasing decisions and expectations.

217.    Defendant's statements—prominently featured on the labeling and marketing of the Class Products constitutes an express warranty concerning the nature, composition, and origin of the products' flavoring ingredients.

218.    Defendant breached its express warranty by falsely representing that the Class Products are made with "100% Natural Flavors" when, in reality, they contained synthetically manufactured, artificial, or otherwise non-natural flavoring ingredients.

219.    As a result of Defendant's breach, Plaintiff and Class members suffered harm and are entitled to recover either the full purchase price of the Class Products or the difference between their actual value and the value they would have held if Defendant's representations regarding the Class Products had been accurate, truthful, and lawful.

220.    Plaintiff and Class members did not receive the benefit of their bargain and sustained additional injuries, as alleged herein.

221.    Had Plaintiff and Class members known the true nature of the Class Products, they either would not have purchased the products or would not have paid the price Defendant charged.

222.    Defendant's misrepresentations were a substantial factor in causing Plaintiff and the Class economic harm.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff, the National Class, and the California Sub-Class)**

223.    Plaintiff pleads this unjust enrichment cause of action in the alternative to contract-based claims.

224.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein, with the exception of contract-based claims, and further alleges as follows:

225.    Under California law, the elements of unjust enrichment are the receipt of a benefit and the unjust retention of that benefit at the expense of another.

226.    Plaintiff and members of the Classes conferred non-gratuitous benefits upon Defendant by purchasing the Class Products, which Defendant misrepresented as to their flavoring ingredients' "natural" status.

227.    Plaintiff and members of the Classes allege that Defendant owes them money for the unjust conduct described herein that resulted in the wrongful acquisition of funds.

228.    An undue advantage was taken of Plaintiff's and members of the Classes' lack of knowledge of the deception, resulting in money being extracted to which Defendant had no legal right.

229.   Defendant is therefore indebted to Plaintiff and members of the Classes in a specific sum—the amount of money each paid for the Class Products, which Defendant should not retain in equity and good conscience.

230.   Defendant is therefore liable to Plaintiff and members of the Classes for the amount of unjust enrichment.

231.   Defendant's retention of any benefit, whether directly or indirectly collected from Plaintiff and members of the Classes, violates principles of justice, equity, and good conscience.

232.   As a result, Defendant has been and continues to be unjustly enriched.

233.   Plaintiff and the Classes are entitled to recover from Defendant all amounts that Defendant has wrongfully and improperly obtained, and Defendant should be required to disgorge to Plaintiff and members of the Classes the benefits it has unjustly received.

234.   Defendant accepted and retained such benefits with knowledge that Plaintiff's and members of the Classes' rights were being violated for financial gain. Defendant has been unjustly enriched by retaining the revenues and profits obtained from Plaintiff and members of the Classes, and such retention under these circumstances is both unjust and inequitable.

235.   As a direct and proximate result of Defendant's unlawful practices and the retention of monies paid by Plaintiff and members of the Classes, Plaintiff and the members of the Classes have suffered concrete harm and injury.

236.   Defendant's retention of the non-gratuitous benefits conferred upon it by Plaintiff and members of the Classes would be unjust and inequitable.

237.   Plaintiff and members of the Classes are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendant, in a manner to be determined by this Court.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation
**(On Behalf of Plaintiff, the National Class, and the California Sub-Class)**

238.  Plaintiff pleads this negligent misrepresentation cause of action in the alternative to the intentional misrepresentation cause of action stated below.

239.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

240.  Under California law, the elements of negligent misrepresentation are a misrepresentation of a past or existing material fact without reasonable grounds for believing it to be true, with intent to induce reliance on the fact misrepresented, intent by the defendant that the plaintiff rely on the representation, justifiable reliance by the plaintiff, and damages.

241.  Defendant represented to the public, including Plaintiff and the Classes, through its marketing, advertising, labeling, and other means, that the Class Products are made with "100% Natural Flavors." This representation is false and misleading because the Class Products contain synthetically manufactured, artificial, or otherwise non-natural flavoring ingredients.

242.  Defendant had no reasonable grounds to believe that its "100% Natural Flavor" representation was true when it made such a representation because it is uniquely aware of the ingredients it puts in its Class Products.

243.  Plaintiff alleges that Defendant made these negligent, false and deceptive representations with the intent to induce the public, including Plaintiff and the members of the Classes, to purchase the Class Products.

244.  Plaintiff and other similarly situated individuals saw, believed, and reasonably relied upon Defendant's negligent, false, unfair, and deceptive misrepresentations, and purchased the Class Products as a result of this reliance.

245.  At all relevant times, Defendant made the negligent, false, unfair, and deceptive misrepresentations alleged herein, knowing or reasonably having known

that such representations were unlawful, unfair, deceptive, inaccurate, and misleading.

246.   As a direct and proximate result of Defendant's negligent, false, unfair, and deceptive misrepresentations, Plaintiff and similarly situated consumers were induced to purchase the Class Products, purchase more of them, pay a higher price, or choose them over competitors' products.

247.   Defendant's unlawful, unfair, and deceptive acts caused damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Intentional Misrepresentation
### (On Behalf of Plaintiff, the National Class, and the California Sub-Class)

248.   Plaintiff pleads this intentional misrepresentation cause of action in the alternative to the negligent misrepresentation cause of action stated above.

249.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

250.   Under California law, the elements of intentional misrepresentation are a false representation of a material fact, knowledge by the defendant that the representation was false or reckless disregard for its truth, intent by the defendant to induce reliance, justifiable reliance by the plaintiff, and damages.

251.   Defendant knowingly and intentionally represented to the public, including Plaintiff and the Classes, through its marketing, advertising, labeling, and other means, that the Class Products are made with "100% Natural Flavors." This representation is false and misleading because the Class Products contain synthetically manufactured or otherwise non-natural flavoring ingredients.

252.   Defendant knew its representations were false because it maintains full control over the labeling, sourcing, formulation and manufacturing of the Class Products, including the sourcing of its flavoring ingredients.

253.   Defendant acted intentionally by willfully and purposefully disseminating misrepresentations about the Class Products through labeling, online and offline marketing, advertising, and social media.

254.   However, as described above, Defendant's representations regarding the Class Products are false, unlawful, unfair, deceptive and/or misleading.

255.   Defendant knew that its representations regarding the Class Products were false, unlawful, unfair, deceptive, and/or misleading, yet continued to make such representations over a period of years.

256.   Defendant further knew that retailers were marketing the Class Products in a false or misleading manner, as Defendant designed, manufactured, and affixed the product labeling to the Class Products before supplying them to retailers. Additionally, Defendant provided retailers with marketing materials that contained its false and misleading representations, thereby perpetuating the deception.

257.   Plaintiff and members of the Classes saw, believed, and relied on Defendant's misrepresentations when deciding to purchase the Class Products.

258.   As a direct and proximate result of Defendant's intentional misrepresentations, Plaintiff and the putative Class members suffered damages in an amount to be determined at trial.

259.   By engaging in the acts described above, Plaintiff and members of the Classes are entitled to recover exemplary or punitive damages.

## PRAYER FOR RELIEF

260.   WHEREFORE, Plaintiff prays for relief and judgment against Defendant as follows, seeking restitution and disgorgement in the alternative to legal relief where applicable, as well as prospective injunctive relief:

- Certification of this action as a class action;
- Appointment of Plaintiff as Class Representative;
- Appointment of Plaintiff's attorneys as Class Counsel;

- That Defendant's wrongful conduct alleged herein be adjudged and decreed to violate the consumer protection statutes asserted herein;
- An Order declaring that Defendant's conduct violated the CLRA, California Civil Code §§ 1750, *et seq.*, and awarding injunctive relief pursuant to Cal. Civ. Code § 1780(a) and (b);
- An Order declaring that Defendant's conduct violated California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*; and awarding injunctive relief pursuant to Bus. & Prof. Code § 17203;
- An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;
- An Order requiring the imposition of a constructive trust and/or disgorgement of Defendant's ill-gotten gains, compelling Defendant to pay restitution to Plaintiff and all members of the Classes, and to restore to Plaintiff and the Classes all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes, or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;
- For pre and post-judgment interest on all amounts awarded;
- For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Bus. & Prof. Code § 17535; and/or Bus. & Prof. Code § 17203;
- For public injunctive relief as pleaded or as the Court may deem proper;
- That Defendant be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;
- Punitive damages including under Cal. Civ. Code § 3294;
- General and compensatory damages in an amount to be determined at trial;
- That Plaintiff recover her costs of suit, including reasonable attorneys' fees and expenses pursuant to, *inter alia*, Cal. Civ. Code. § 1021.5; and

- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

261. Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: May 27, 2025                              Respectfully submitted,

                                                 KAZEROUNI LAW GROUP, APC

                                                 By:  /s/ *Abbas Kazerounian*
                                                     Abbas Kazerounian, Esq.
                                                     *ATTORNEYS FOR PLAINTIFF*

**Additional Plaintiff's Counsel**
**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Gil Melili, Esq. (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523