UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 25-4777-GW-AGRx | Date | October 8, 2025 |
| Title | *Victoria Palmer v. The Coca-Cola Company* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| | | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None Present | None Present |

**PROCEEDINGS: IN CHAMBERS - TENTATIVE RULINGS ON DEFENDANT THE COCA-COLA COMPANY'S MOTION TO TRANSFER [19]; and DEFENDANT THE COCA-COLA COMPANY'S MOTION TO DISMISS THE COMPLAINT [20]**

Attached hereto is the Court's Tentative Ruling on Defendant's Motions [19, 20], set for hearing on October 9, 2025 at 8:30 a.m.

______ : ______

Initials of Preparer JG

***Victoria Palmer v. The Coca-Cola Company***; Case No. 2:25-cv-04777-GW-(AGRx)
Tentative Rulings on: (1) Motion to Transfer to the Northern District of Georgia, and (2) Motion to Dismiss

## I. **Background**

On May 27, 2025, Plaintiff Victoria Palmer ("Plaintiff") brought suit against Defendant The Coca-Cola Company ("Defendant"), individually and on behalf of all similarly situated consumers. *See* Complaint, Docket No. 1. Plaintiff alleges that Defendant deceptively labeled, marketed, and sold beverage products as being made with "100% Natural Flavors" when they actually contain significant amounts of synthetic flavoring ingredients.[1] *Id.* ¶¶ 2, 5. Plaintiff seeks both monetary damages and injunctive relief based on seven causes of action: (1) violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; (2) violations of the Unfair Competition Law ("UCL"), Cal Civ. Code § 17200, et seq.; (3) violations of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq.; (4) breach of express warranty; (5) unjust enrichment; (6) negligent misrepresentation; and (7) intentional misrepresentation. *See generally id.* The Court's review of the Complaint reveals the following allegations.[2]

Plaintiff is a citizen and resident of Los Angeles County in the State of California. *Id.* ¶ 19. Defendant is a corporation that is organized and exists under the laws of Delaware, with its principal place of business in Georgia. *Id.* ¶ 20. Plaintiff alleges that "[c]ontrary to Coca-Cola's prominent claim of '100% Natural Flavors,' the Class Products – including the Products purchased by the Plaintiff – do not consist exclusively of natural flavors." *Id.* ¶ 55. Rather, "they incorporate industrially manufactured citric acid ("MCA"), a synthetic compound that significantly influences the flavor profile of the Class Products."[3] *Id.* Plaintiff alleges that the Class Products use a citric

---

[1] In addition to the lemon-lime flavored ("Sprite Product") and orange flavored ("Fanta Product") beverages that Plaintiff purchased, Plaintiff identified "other substantially similar Sprite and Fanta beverages" that were allegedly also falsely labeled, marketed, and sold by Defendant as being made with "100 Natural Flavors" (collectively, "Class Products"). *See* Complaint ¶¶ 11, 16.

[2] The well-pled facts therein are accepted as true for the purpose of this ruling. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

[3] "Citric acid, an organic compound with the formula $C_6H_8O_7$, is a colorless organic acid that occurs naturally in citrus fruits." FAC ¶ 56. This compound "is a key acid widely used in the food and beverage industry, valued both as a preservative and a flavoring agent." *Id.* ¶ 57.

acid that "is industrially synthesized through a process involving genetically mutated mold (*Aspergillus niger*), a method fundamentally distinct from natural extraction from citrus fruit." *Id.* ¶ 58. MCA is frequently used in food and beverage products because of "its distinct tart, tangy and sour taste." *Id.* ¶ 60. Plaintiff further alleges that the Class Products contain other synthetic ingredients that contribute to the beverages' flavor, such as sodium citrate and potassium citrate, *see id.* ¶ 64; aspartame and acesulfame potassium, *see id.* ¶¶ 73-74; as well as sodium benzoate and potassium benzoate, *see id.* ¶ 75. Plaintiff seeks to represent a "National Class" defined as:

> All persons in the United States who purchased one or more of the Class Products that were marketed or represented as being made with "100% Natural Flavors" or any similar representation, whether on the product packaging or in marketing materials.

*Id.* ¶ 117. Plaintiff also seeks to represent a California Sub-Class, defined as:

> All persons in California who purchased one or more of the Class Products that were marketed or represented as being made with "100% Natural Flavors" or any similar representation, whether on the product packaging or in marketing materials.

*Id.* ¶ 118.

On July 25, 2025, Defendant filed a Motion to Transfer to this action to the Northern District of Georgia ("MTT," Docket No. 19) and a Motion to Dismiss ("MTD," Docket No. 20). On September 8, 2025, Plaintiff filed an opposition to the MTT ("MTT Opp.," Docket No. 23) and an opposition to the MTD ("MTD Opp.," Docket No. 25). On September 29, 2025, Defendant filed a reply to the MTT ("MTT Reply," Docket No. 26) and a reply to the MTD ("MTD Reply," Docket No. 27). Upon consideration of the parties' briefings, the Court would **DENY** the MTT, **GRANT** the MTD **IN PART**, and **DENY** the MTD **IN PART**.

## II. Motion to Transfer

### A. Legal Standard

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a); *Ventress v. Japan Airlines*, 486 F.3d 1111, 1118 (9th Cir. 2007).

First, the movant must establish that the matter "might have been brought" in the district to which transfer is sought. 28 U.S.C. § 1404(a). "This includes demonstrating that subject matter jurisdiction, personal jurisdiction, and venue would have been proper if the plaintiff had filed the action in the district to which transfer is sought." *Catch Curve, Inc. v. Venali, Inc.*, No. 2:05-cv-

04820-DDP-(AJWx), 2006 WL 4568799, at *1 (C.D. Cal. Feb. 27, 2006) (citing *Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960)).

Second, courts "must evaluate both the convenience of the parties and various public-interest considerations . . . and decide whether, on balance, a transfer would serve the convenience of parties and witnesses and otherwise promote the interest of justice." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62-63 (2013) (internal quotation marks omitted). In analyzing the "interests of justice," a number of factors are relevant, including:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

"Other factors that can be considered are: the enforceability of the judgment; the relative court congestion in the two forums; and which forum would better serve judicial economy." *Kem v. Strike Advisory, LLC*, No. 2:23-cv-07459-CAS-(SKx), 2023 WL 7021172, at *3 (C.D. Cal. Oct. 23, 2023) (citing 17 Moore's Federal Practice § 111.13[1][c] (3d ed. 1997)). "Although section 1404(a) sets no limit on the time at which a transfer motion may be made, the passage of time is a factor to be considered." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 500 (C.D. Cal. 1981). A court has broad discretion to decide a motion to transfer venue because the analysis is "flexible and individualized." *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

"Substantial weight is accorded to the plaintiff's choice of forum, and a court should not order a transfer unless the 'convenience' and 'justice' factors set forth above weigh heavily in favor of venue elsewhere." *Catch Curve*, 2006 WL 4568799, at *1 (citing *Sec. Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985)). Thus, "[a] transfer will not be granted if it would merely transfer the burden from one party to the other." *Id.* The moving party bears the burden of demonstrating that transfer is appropriate. *See Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979); *Metz v. U.S. Life Ins. Co. in City of New York*, 674 F. Supp. 2d 1141, 1146 (C.D. Cal. 2009).

**B. Discussion**

The parties do not dispute that this case could have been brought in the transferee district, the Northern District of Georgia. *See* MTT at 5-6; MTT Opp. at 2. The Court, therefore, focuses its inquiry on the convenience of the parties and witnesses and the interest of justice factors.

1. Convenience of the Parties

Defendant asserts that this factor weighs strongly in favor of transfer. *See* MTT at 7. Defendant first argues that "[t]he relative convenience to Plaintiff of litigating in the Central District of California is, at best, a neutral factor" because while she "resides in Northridge and used Amazon.com to purchase only two of the Class Products there," Plaintiff "is litigating this case on behalf of a putative *nationwide* class of purchasers of *all* of the Class Products." *Id.* at 7-8 (emphasis in original). Defendant claims that "convenience for Plaintiff is accorded less weight" because class members are located in all fifty states. *See id.* at 8 (quoting *Mina v. Red Robin Int'l, Inc.*, No. 2:18-cv-09472-PSG-(GJSx), 2020 WL 4037163, at *3 (C.D. Cal. Mar. 3, 2020)). Defendant then argues that its "relevant contacts with California are scant" and that "[l]itigating and trying this case in California would . . . require Coca-Cola witnesses and representatives to travel thousands of miles." *Id.* Defendant indicates that "[n]o Coca-Cola employees responsible for the labeling or development of the Class Products are located in California, as the teams responsible for those functions are headquartered in Atlanta." *Id.* (citing Declaration of Josh Kroo ("Kroo Decl."), Docket No. 19-1, ¶¶ 7, 9, 11-12). Further, "none of Coca-Cola's facilities in California – which include only one office, production plants, and a warehouse – have anything to do with the labeling or development of Sprite or Fanta products." *Id.* (citing Kroo Decl. ¶ 11). In contrast, Defendant indicates that "the Northern District of Georgia is ground zero for the conduct allegedly giving rise to Plaintiff's claims that the Class Products are falsely labeled." *Id.*

Plaintiff contends in opposition that "transferring this case from a federal court in California to Georgia, which is on the other side of the country, while perhaps beneficial to [Defendant], would significantly burden [Plaintiff], an individual consumer and senior citizen with mobility challenges." MTT Opp. at 5. Plaintiff "is a senior citizen with mobility challenges who has been medically advised against traveling long distances" and claims that she "purchased the Class Products in this district after viewing alleged misrepresentations about the Class Products on Amazon.com while she was physically present in this judicial district." *Id.* at 5-6. Plaintiff also claims that Defendant "has no difficulty litigating this case in the present district" based on

the fact that Defendant has litigated in a similar suit before the Northern District of California without moving to transfer. *Id.* at 6 (citing *Tapia v. Coca-Cola Co.*, No. 4:22-cv-01362-HSG, 2023 WL 2621346 (N.D. Cal. Mar. 23, 2023)).

The Court would acknowledge that the convenience of the parties factor might weigh against transfer because Plaintiff is seeking to represent a nationwide class. Nonetheless, the Court remains unpersuaded that transferring this case to the Northern District of Georgia would render the litigation more convenient for Defendant when Defendant made no move to transfer in at least three other cases outside of Georgia involving the same allegedly deceptive "100% Natural Flavors" labeling of its products. *See generally Tapia*, 2023 WL 2621346; *Hawkins v. Coca-Cola Co.*, 654 F. Supp. 3d 290 (S.D.N.Y. 2023); *Jordan v. Coca-Cola Co.*, No. 4:23-cv-00028-SEP, 2025 WL 917216 (E.D. Mo. Mar. 26, 2025).

The Court would, therefore, find that Defendant has not met its burden of showing that the convenience of the parties weighs in favor of transfer.

2. Convenience of the Witnesses

Defendant asserts that this factor similarly weighs in favor of transfer. *See* MTT at 9. Defendant claims that "for 'all of [Coca-Cola's] employee witnesses . . . a [Georgia] venue would be substantially more convenient than a California venue should they have to testify at trial.'" *Id.* (alteration in original) (quoting *Moreno v. Johnson & Johnson Consumer Inc.*, No. 2:21-cv-02666-AB-(PVCx), 2021 WL 12302429, at *2 (C.D. Cal. Oct. 5, 2021)). Defendant claims that "Plaintiff's role as a witness will likely be comparatively limited, as her testimony will focus on her purchase and use of only two of the Class Products." *Id.*

Plaintiff contends in opposition that the convenience of Defendant's employee witnesses and the location of evidence should be given "minimal weight" because "evidence in this modern era can be – and often is – easily digitized and transported electronically." MTT Opp. at 6 (citing *Van Slyke v. Cap. One Bank*, 503 F. Supp. 2d 1353, 1362 (N.D. Cal. 2007)). Plaintiff further contends that Defendant has not met its burden of showing that the Northern District of Georgia is more convenient for witnesses when it "has not identified any witnesses by name who will face some inconvenience if this case were to proceed in California" and "has not identified any non-party witnesses who would be inconvenienced without transfer." *Id.* at 8-9. Plaintiff identifies three non-party witnesses, including persons from Amazon, Reyes Coca-Cola Bottling, and Swire

Coca-Cola, who "could reasonably be disadvantaged by transferring the case to Georgia."[4] *Id.* at 10.

Defendant argues in response that "'[t]he employees responsible for the development, marketing, and labeling of Sprite and Fanta products in the United States are located in Atlanta,' including 'leadership and other individuals on the research and development brand/marketing, consumer, and market research, and scientific and regulatory affairs teams" for those Products.'" MTT Reply at 7 (quoting Kroo Decl. ¶¶ 7-9). Moreover, "[a]ny analysis and decisions regarding how to label Sprite and Fanta, including with the '100% Natural Flavors' labeling statement at issue in this lawsuit, and to ensure compliance with FDA requirements, also would have occurred in Atlanta." *Id.* (quoting Kroo Decl. ¶ 8).

The convenience of the witnesses is often the paramount factor in ruling on a motion to transfer under section 1404(a). *See Ironworkers Loc. Union No. 68 & Participating Emps. Health & Welfare Fund v. Amgen, Inc.*, No. 2:07-cv-05157-PSG-(AGRx), 2008 WL 312309, at *5 (C.D. Cal. Jan. 22, 2008). "Importantly, while the convenience of party witnesses is a factor to be considered, the convenience of non-party witnesses is the more important factor." *Id.* (citing *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005)). While Plaintiff's arguments with respect to her potential non-party witnesses are rather unconvincing, it is ultimately Defendant's burden to establish that the convenience of any witnesses favors transfer. As Plaintiff argues, Defendant has not identified a single non-party witness, yet it argues that "[t]he overwhelming majority of key witnesses" is located in Georgia. *See* MTT at 8; MTT Reply at 7. Defendant's description of the relevant witnesses does not identify with any particularity "who the key witnesses will be and what their testimony will generally include." *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1119 (C.D. Cal. 1998) (citations omitted); *see also Commodity Futures*, 611 F.2d at 279 (indicating that the movant "ha[s] the burden to justify by particular circumstances that the transferor forum was inappropriate").

The Court would, therefore, find that Defendant has not met its burden of showing that the

[4] Plaintiff claims that "[w]itnesses from Amazon could authenticate documents pertaining to the specific webpage Plaintiff viewed as well as Plaintiff's purchase" and "provide testimony as to sales of the Class Products on Amazon.com." MTT Opp. at 10 (citation omitted). Plaintiff claims that "Coke's distributor(s) in California and on the West Coast, including Reyes Coca-Cola Bottling and Swire Coca-Cola, may also be able to provide testimony pertinent to establishing an amount of unjust enrichment for trial in terms of Class Product sales and numerosity for purposes of class certification based on number of units sold." *Id.* (citation omitted).

convenience of the witnesses weighs in favor of transfer.

3. Interest of Justice

*a. Ease of Access to Sources of Proof*

Defendant asserts that "Coca-Cola's decisions regarding the marketing and labeling of the Class Products were made in its Atlanta headquarters." MTT at 10 (citing Kroo Decl. ¶¶ 7-9). Plaintiff contends in opposition that "other evidence, such as the packaging and labeling of the Class Products that Palmer purchased, Palmer's receipt of purchase, and other evidence from non-parties such as Amazon.com and Coke's local distributors, are either all located in this district or closer to this district than the Northern District of Georgia, which slightly favors retaining jurisdiction in this judicial district." MTT Opp. at 11. Defendant argues in response that it "has established that decisions regarding the marketing and labeling of the Class Products were made in its Atlanta headquarters, that none of the records related to those decisions are located in California, and that relevant hard copy records concerning the Class Products are all located in Atlanta." MTT Reply at 10 (citing Kroo Decl. ¶¶ 7-10).

Neither party has established that the relevant evidence would be so immense and/or the sources of proof would be so numerous *and* located solely in Georgia such that a Georgia situ for the litigation would have any great impact on this case.

The Court would find that this factor is neutral or slightly in Defendant's favor.

b. *Local Interest in the Controversy*

Defendant asserts that Georgia's interest in the controversy strongly favors transfer in part because "the alleged conduct at the center of this action occurred in Georgia." MTT at 10-11. Why that should be the case is somewhat unclear. Certainly, if the applicable law and/or governing standards would be different in the Georgia federal courts versus the California district courts, or if the dispute centered some element associated with the state (*e.g*. if a company in Georgia bottled water from the springs on Brasstown Bald mountain and sold it nationwide), perhaps an argument could be made as to Georgia having a stronger interest. However, Defendant has not pointed to any particular aspect of this case other than its being headquartered in Georgia.

Plaintiff contends in opposition that California has a stronger local interest in this controversy than Georgia because Plaintiff is a California consumer who seeks to represent both a national class based on a number of common law causes of action and a California sub-class based on three California consumer statutes. MTT Opp. at 13. Defendant argues in response that "while

'California is not indifferent to the issues raised in this lawsuit,' the 'dispute is not localized to California' because this is a putative nationwide class action, and instead, 'the fundamental locus of this case is in [Georgia], where the pertinent decisions about the . . . [Class] [P]roducts were made.'" MTT Reply at 12 (quoting *Montenegro v. Johnson & Johnson Consumer, Inc.*, No. 2:24-CV-01895-SB-(BFMx), 2024 WL 4720925, at *6 (C.D. Cal. Sept. 16, 2024)).

The Court would find that this factor is neutral.

*c. Relative Court Congestion*

Defendant asserts that "this factor slightly favors transfer or is at worst neutral" because "the Central District [of California] is one of the busiest districts in the nation." MTT at 12-13 (quoting *N. Bay Credit Union v. MRB Direct,* No. 8:23-cv-01951-DOC-(ADSx), !2024 WL 1136137, at *3 (C.D. Cal. Jan. 26, 2024)) (citing *MJT Water Tech., LLC v. First Fed. Bank*, No. 8:24-cv-01002-FWS-(KESx), 2024 WL 5424411, at *12 (C.D. Cal. Oct. 28, 2024)). Plaintiff contends in opposition that (1) Defendant "has offered no evidence comparing the likely court congestion in the respective judicial districts"; and (2) this factor "weighs in favor of keeping [Plaintiff's] case in the Central District of California because the time to disposition at trial would likely take less time here than it would in Defendant's proposed transferee district, and the estimated caseload per judge in this district is estimated to be less than it would be in the Northern District of Georgia." MTT Opp. at 14.

The Court would find that this factor is neutral.

*d. Familiarity with the Governing Law*

Defendant asserts that "[a]lthough Plaintiff brings her claims under California law, because she brings this case on behalf of a nationwide class, both the Central District of California and the Northern District of Georgia would be required to conduct an analysis of how each of the other 49 states' laws compare to California's." MTT at 13 (citing *Meza v. Procter & Gamble Co.*, No. 5:23-cv-00091-JGB-(SHKx), 2023 WL 3267861, at *8 (C.D. Cal. Apr. 27, 2023)). Plaintiff contends in opposition that "[w]hile the Northern District of Georgia is presumably capable of properly applying California law, 'this Court is necessarily more familiar with California state laws' than the Northern District of Georgia." MTT Opp. at 12 (quoting *Biederman v. FCA US LLC*, No. 3:23-cv-06640-JSC, 2024 WL 2818854, at *3 (N.D. Cal. June 3, 2024)).

The Court would find that this factor is neutral.

e. *Plaintiff's Choice of Forum*

Defendant asserts that "Plaintiff's choice of forum – the Central District of California – is of minimal importance in this case" because "the putative nationwide class includes millions of class members who reside all over the country and have allegedly been injured elsewhere." MTT at 14 (citing Complaint ¶¶ 123-24). Plaintiff contends in opposition that this factor weighs in favor of keeping her case in the Central District of California because she resides and purchased two of the Class Products here. MTT Opp. at 3. Defendant also made the Class Products available for California residents such as Plaintiff to purchase through third-party retailers. *See id.* Plaintiff is also seeking "to represent a California sub-class, given that [Defendant's] conduct is alleged to have violated several California laws, including important California consumer protection laws under the CLRA, UCL, and FAL." *Id.* (citation omitted). Although Plaintiff purports to represent a nationwide class, Plaintiff's choice of forum is still entitled to deference, even though diminished. The Court would find that this factor weighs slightly against transfer.

Balancing the interest of justice factors, the Court would find that Defendant has not met its burden of showing that the interests of justice weigh in favor of transfer.

Accordingly, the MTT is **DENIED**.

## III. Motion to Dismiss

### A. Legal Standard

#### 1. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Under Rule 12(b)(6), the court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell*, 266 F.3d at 988; *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v.*

*Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 561-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief).

2. Rule 15(a)

Under Federal Rule of Civil Procedure 15(a)(2), federal courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). A district court, however, may in its discretion deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**B. Discussion**

Defendant asserts that Plaintiff's claims are expressly preempted by federal law because Plaintiff has not "plead sufficient facts to plausibly show that the accused ingredients – (1) sweeteners (aspartame and acesulfame potassium), (2) preservatives (sodium benzoate and potassium benzoate), (3) citrates (sodium citrate and potassium citrate), and (4) citric acid – *function as flavors* in the Products and *are artificial*, as defined by FDA regulations." MTD at 9 (emphasis in original) (citing C.F.R. § 101.22(a)(1) and *Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 889 (C.D. Cal. 2013)). Plaintiff contends in opposition that her claims are not preempted because she does not seek to impose any labeling requirements contrary to or in addition to federal law. Opp. to MTD at 8.

1. Federal Preemption

The Supremacy Clause of the United States Constitution empowers Congress to enact legislation that preempts state law. *See Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) ("In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."). Federal law may preempt state law in

three ways:

> First, Congress may preempt state law by so stating in express terms. Second, preemption may be inferred when federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. In such cases of field preemption, the mere volume and complexity of federal regulations demonstrate an implicitly congressional intent to displace all state law. Third, preemption may be implied when state law actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Bank of Am. v. City & Cnty. of S.F.*, 309 F.3d 551, 558 (9th Cir. 2002) (internal quotation marks and citations omitted). In assessing whether a plaintiff's claims are preempted, the Court acknowledges that there is a presumption against preemption. *See Viggiano*, 944 F. Supp. 2d at 887 (collecting cases). "Where Congress has expressly preempted state law, the presumption against preemption requires that the court read the federal statute narrowly." *Id.* (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

The Federal Food, Drug, and Cosmetic Act ("FDCA") expressly prohibits states from "directly or indirectly establish[ing] . . . any requirement for the labeling of food required by section . . . 343(k) of this title that is not identical to the requirement of such section." 21 U.S.C. § 343-1(a)(3). Section 343(k) governs claims on food labels that concern "[a]rtificial flavoring, artificial coloring, or chemical preservatives." 21 U.S.C. § 343(k).

21 C.F.R. § 101.22(a)(1) provides:

> The term artificial flavor or artificial flavoring means any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof. Artificial flavor includes the substances listed in §§ 172.515(b) and 182.60 of this chapter except where these are derived from natural sources.

21 C.F.R. § 101.22(a)(1). 21 C.F.R. § 101.22(a)(3) provides:

> The term natural flavor or natural flavoring means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional.

*Id.* at § 101.22(a)(3). Where a product's label or marketing makes a direct or indirect

representation with respect to the "primary recognizable flavor," that flavor is considered the product's "characterizing flavor." *Id.* at § 101.22(i). "A manufacturer can use a 'natural flavor' label on a product even if the product contains artificial, non-flavoring ingredients, so long as the 'characterizing flavor' is, in fact, natural." *Viggiano*, 944 F. Supp. 2d at 888. If the food contains any artificial flavor "which simulates, resembles or reinforces the characterizing flavor," however, the label must designate the words "artificial" or "artificially flavored." 21 C.F.R. § 101.22(i)(2). While a "flavor" is "any substance, the function of which is to impart flavor," *id.* § 101.22(a)(1), a "flavor enhancer" is a "[s]ubstance[ ] added to supplement, enhance, or modify the original taste and/or aroma of a food, without imparting a characteristic taste or aroma of its own," 21 C.F.R. § 170.3(o)(11). *See Viggiano*, 944 F. Supp. 2d at 889 (finding that sucralose and ace-k are not "flavors" because rather than give the product an original taste, they "sweeten or amplify whatever characterizing flavor it has from another source").

*a. Whether the Sweeteners, Preservatives, and Citrates Function As Flavors*

Defendant asserts that the Plaintiff cannot show that sweeteners, preservatives, and citrates in the Class Products function as flavors. *See* MTD at 10. Plaintiff alleges that Defendant's inclusion of these ingredients "contribute[s] to the flavor, flavor system, and overall flavor experience of the Class Products." Complaint ¶ 75. Defendant argues that "such conclusory allegations fall well short of plausibly demonstrating that any of these ingredients 'stimulate[ ], resemble [ ], or reinforce[ ] the characterizing flavor' of the Products." MTD at 10 (quoting 21 C.F.R. § 101.22(i)(1)). Plaintiff contends in opposition that she has sufficiently alleged that these ingredients in the Class Products are artificial flavors. *See* MTD Opp. at 2. Specifically, Plaintiff claims that she has alleged "which ingredients 'impart flavor' on the Class Products." *Id.* at 2-3. These allegations include the following paragraphs from the Complaint:

> Contrary to Coca-Cola's prominent claim of "100% Natural Flavors," the Class Products – including the Products purchased by the Plaintiff – do not consist exclusively of natural flavors. Instead, they incorporate industrially manufactured citric acid ("MCA"), a synthetic compound that *significantly influences the flavor profile of the Class Products*.

Complaint ¶ 55 (emphasis added).

> In addition to MCA, Defendant's Sprite Product contains sodium citrate, another synthetic ingredient, *which has a flavor profile that is both salty and sour, further contributing to the Sprite Product's flavor*. Similarly, Defendant utilizes other forms of citrate, which are also synthetic, in the Class Products. For example, Defendant's Fanta Orange Zero Sugar product contains potassium citrate, an

> additive *with a saline flavor profile that contributes to its flavor*.

*Id.* ¶ 64 (emphasis added) (footnotes omitted).

> While Coca-Cola may argue that sweetness does not constitute "flavor," no reasonable consumer would agree. Sweetness is a fundamental component of how flavor is experienced. *If the aspartame and acesulfame potassium were removed from the Sprite or Fanta "Zero" products, no consumer would recognize the resulting beverage as tasting like the lemon-lime, orange, or other flavors represented on the product labels.* Ultimately, no reasonable consumer would expect a product labeled and marketed as containing "100% Natural Flavors" to also include two entirely artificial sweeteners.

*Id.* ¶ 74 (emphasis added).

> Furthermore, Defendant includes synthetic preservatives – specifically sodium benzoate and potassium benzoate – under the guise of "protecting taste." *If these additives genuinely serve to protect taste, they necessarily contribute to the flavor, flavor system, and overall flavor experience of the Class Products.* Their inclusion further undermines and contradicts Defendant's claim that the Class Products contain "*100%* Natural Flavors."

*Id.* ¶ 75 (emphasis added) (footnotes omitted).

The Court would find itself in agreement with Plaintiff that she has sufficiently alleged that the sweeteners, preservatives, and citrates in the Class Products function as flavors. Defendant's arguments to the contrary are premature at this stage of the litigation. Further evidence may demonstrate that these ingredients do not in fact function as flavors; however, construing all allegations in favor of Plaintiff, the Court cannot make such a determination at this juncture.[5]

Defendant's reliance on *Viggiano* is unavailing because the plaintiff in that case did not identify any flavors in the sodas at issue that were "not natural or artificial." *See Viggiano*, 944 F. Supp. 2d at 889. Rather, the plaintiff in *Viggiano* cited synthetic ingredients that were "artificial sweeteners or 'flavor enhancers.'" *Id.* By contrast, Plaintiff specifically alleges that the sweeteners, preservatives, and citrates in the Class Products "contribute to the flavor, flavor system, and overall flavor experience of the Class Products." *See* Complaint ¶ 75. This allegation in particular would appear to suggest that these ingredients, at the very least, "reinforce[ ] the characterizing flavor[s]" of the Class Products. *See* 21 C.F.R. § 101.22(i)(2). "[B]oth sodium citrate and potassium citrate are alleged to impart a salty, sour, and/or saline flavor profile to

---

[5] There are a large number of cases which have raised the issue of whether MCA is a flavoring and/or a preservative and gotten past the pleading stage. *See, e.g., Taylor v. Walmart, Inc.*, No. EDCV 25-186-KK-(SHKx), 2025 WL 1600395, *6 (C.D. Cal. June 4, 2025); Mason v. Reed's Inc., 515 F.Supp.3d 135, 145 (S.D.N.Y. 2021).

Defendant's Sprite and Sprite Zero Products and Fanta Orange Zero Sugar product," and "[b]oth aspartame and acesulfame potassium are alleged to provide Defendant's 'Zero' products with a sweet flavor, the absence of which would make certain Class Products' tastes unrecognizable." MTD Opp. at 5 (citing Complaint ¶¶ 64, 66, 73-74). Whether these ingredients function as flavors, or perhaps as flavor enhancers, is a factual dispute that cannot be resolved at this stage. *See Noohi v. Kraft Heinz Co.*, No. 2:19-cv-10658-DSF-(SKx), 2020 WL 5554255, at *4 (C.D. Cal. July 20, 2020).

*b. Whether the Citric Acid in the Class Products Renders Their Labeling Misleading*

i. Whether Citric Acid Functions As a Flavor

As with the sweeteners, preservatives, and citrates discussed in the preceding section, Defendant asserts that Plaintiff has not plausibly alleged that the citric acid found in the Class Products functions as a flavor. *See* MTD at 12. Specifically, Defendant claims that "allegations that the citric acid in the Products contributes to, impacts, or influences their taste do not give rise to a plausible inference that the citric acid is what 'stimulates, resembles or reinforces the [Products'] characterizing flavor[s],' 21 C.F.R. § 101.22(i)(1), which Plaintiff does not dispute are 'Lemon-Lime' and 'Orange,' (Compl[aint] ¶ 11)." *Id.* Defendant argues that citric acid is a flavor enhancer for the Class Products, especially in light of the fact that it is alleged to be a flavor in products that have different characterizing flavors. *See id.* at 13. Plaintiff contends in opposition that she has sufficiently alleged that citric acid functions as a flavor. *See* Section III.B.1.a, *supra*. Defendant argues in response that "Plaintiff's arguments are belied by the plain language of the Complaint, which does not allege that the citric acid in the Class Products 'imparts flavor,' but rather expressly claims that it 'contributes meaningfully to their flavor systems and overall flavor experience' given 'its potent taste' (Compl[aint] ¶ 70), that it has an "*impact* . . . on flavor" (*id.* ¶ 72 (emphasis added)), and that it '*influences* the flavor profile of the Class Products' (*id.* ¶ 55) (emphasis added))." MTD Reply at 7.

For the same reasons identified with respect to the other synthetic ingredients at issue in this case, the Court would find that whether citric acid functions as a flavor or a flavor enhancer is a factual issue not properly resolved at the motion to dismiss stage.

ii. Whether Citric Acid Is Artificial

Defendant next asserts that Plaintiff has not plausibly alleged that the citric acid found in the Class Products is artificially derived. *See* MTD at 14. Defendant claims that Plaintiff's

allegations "do not set forth actual *facts* establishing that the citric acid in the Products she purchased was produced in any particular way, let alone in a way that makes it 'artificial.'" *Id.* (emphasis in original). Plaintiff contends in opposition that she has alleged "the particular process by which ingredients, such as MCA, are made – further illustrating the artificial nature of said ingredients." MTD Opp. at 3. Specifically, Plaintiff alleges:

> Although citric acid can be naturally derived from citrus fruits, this method of production has been largely abandoned due to economic inefficiency, agricultural limitations, lack of standardization, and other practical constraints. Instead, the citric acid used in many commercial products – including the Class Products – is industrially synthesized through a process involving genetically mutated mold (*Aspergillus niger*), a method fundamentally distinct from natural extraction from citrus fruit.

Complaint ¶ 58 (footnote omitted).

> The industrial synthesis of MCA involves introducing a sucrose- or glucose containing medium to carefully selected and genetically mutated *Aspergillus niger* under highly controlled and optimized conditions. In response to these conditions, *Aspergillus niger* metabolizes the sugars and synthesizes citric acid.

*Id.* ¶ 61 (footnote omitted).

Defendant argues in response that these "high-level descriptions of 'constraints' on citric acid production" and Plaintiff's "allegations about 'the particular process' by which citric acid purportedly is manufactured" are speculative and unsupported. *See* MTD Reply at 8-10.

The Court would disagree. Plaintiff expressly alleges that the citric acid used in the Class Products is industrially synthesized and supports her allegations with, *inter alia*, scientific articles describing how the limited supply of natural citric acid necessitates biotechnological fermentation processes. *See* Complaint ¶ 58. The Court would "find[ ] that Plaintiff has drawn a sufficient connection between the industry practice of using artificial citric acid and Defendant's practices." *See Ringler v. J.M. Smucker Co.*, 783 F. Supp. 3d 1229, 1238 (C.D. Cal. May 13, 2025). Plaintiff's allegations appear to go "beyond conclusory allegations of a common industry practice and is sufficiently detailed to provide enough factual support to raise Plaintiff's right to relief above a speculative level." *Id.* (citing *Hayes v. Kraft Heinz Co.*, No. 1:23-cv-16596, 2024 WL 4766319, at *3 (N.D. Ill. Nov. 13, 2024)); *see also Squeo v. Campbell Soup Co.*, No. 5:24-cv-02235-SVK, 2024 WL 4557680, at *4 (N.D. Cal. Oct. 22, 2024).

Defendant also asserts that Plaintiff has not plausibly alleged that fermentation by *Aspergillus niger* "renders the resulting citric acid 'artificial' as defined by [the] FDA." MTD at

16. Specifically, Defendant claims that Plaintiff's description of the process by which *Aspergillus niger* produces citric acid is "simply . . . a process by which sugar, a natural carbohydrate produced by plants, is metabolized into citric acid by a mold, *i.e.*, a naturally-occurring fungus, through fermentation, which is itself a natural process." *Id.* (citing Complaint ¶ 61). Defendant claims that Plaintiff does not allege that the citric acid produced by this process "is molecularly different from the citric acid derived from fruits in any way." *Id.* (citing Complaint ¶ 56). Defendant also argues that the FDA's definition of "natural flavor" as set forth in 21 C.F.R. § 101.22(a)(3) contemplates "fermentation products" such as the citric acid produced by *Aspergillus niger*. *See id.* at 17. Defendant relies on 21 C.F.R. § 184.1033(a), which indicates that citric acid "is a naturally occurring constituent of plant and animal tissues." 21 C.F.R. § 184.1033(a).

Plaintiff contends in opposition that "nothing in § 101.22(a)(3) suggests that fermentation by *inedible*, genetically mutated, and *toxic* industrial molds like *Aspergillus* were ever intended to fall within the definition of 'natural flavor.'" MTD Opp. at 3 (emphasis in original). Plaintiff claims that adopting Defendant's interpretation of "fermentation products thereof," as used in § 101.22(a)(3), "would let virtually any industrially engineered molecule from any carbon (sugar) source be labeled "natural flavor," erasing § 101.22(a)(3)'s intended limits." *Id.* at 3 n.1. Plaintiff further contends that Defendant's reliance on § 184.1033(a) is misplaced because "nothing in [this section] declares that all production methods yield a 'natural flavor' within the meaning of 21 C.F.R. § 101.22(a)(3)." *Id.* (footnote omitted).

The Court is unpersuaded at this point in the litigation by Defendant's argument that citric acid fermented from *Aspergillus niger* falls within the FDA's definition of "natural flavor." The Court would find that Plaintiff has adequately *alleged* that the citric acid used in the Class Products is artificial.

Because Plaintiff has sufficiently plead claims that are not expressly preempted by federal law, the Court would **DENY** the MTD insofar as it seeks to dismiss Plaintiff's claims on this basis.

2. Common Law Claims[6]

Defendant asserts that Plaintiff's common law claims should be dismissed for other

[6] Defendant did not expressly challenge the breach of express warranty claim in their Motion, which Plaintiff pointed out in her opposition. *See* MTD Opp. at 12. Defendant argues in response that this claim is preempted by federal law because Plaintiff has not plausibly alleged that any of the ingredients at issue in this case are artificial flavors. *See* MTD Reply at 13. Because this Court would find otherwise, *see* Section III.B.1, the Court would not dismiss Plaintiff's breach of express warranty claim on the basis of federal preemption.

reasons. *See* MTD at 17.

*a. Unjust Enrichment*

Defendant moves to dismiss the unjust enrichment claim because "[u]nder California law, 'unjust enrichment is an equitable principle, not a standalone claim.'" MTD at 17-18 (quoting *W.A. Call Mfg. Co. v. WiLine Networks, Inc.*, No. 3:24-cv-07141-LB, 2025 WL 1507089, at *2 (N.D. Cal. May 27, 2025)) (citing *Crosland v. Earle*, No. 2:24-cv-06277-AB-(PVCx), 2025 WL 1720190, at *6 (C.D. Cal. Apr. 29, 2025)). Plaintiff contends in opposition that Ninth Circuit case law suggests that her "unjust enrichment claim may survive either 'as an independent cause of action or as a quasi-contract claim for restitution.'" MTD Opp. at 12 (quoting *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016)). The Court would agree with Plaintiff and **DENY** the MTD with respect to the unjust enrichment claim. *See Barrales v. New Chapter, Inc.*, No. 2:25-cv-01171-HDV-(KESx), 2025 WL 1584424, at *7 (C.D. Cal. June 4, 2025) ("District courts in the Ninth Circuit that have scanned the case law have landed on allowing quasi-contract/unjust enrichment claims to be pled alongside express contract claims in the alternative, with the recognition that a plaintiff would ultimately be barred from collecting on both.").

*b. Intentional Misrepresentation*

Defendant moves to dismiss the intentional misrepresentation claim because the Complaint fails to satisfy Rule 9(b) by sufficiently alleging Defendant's knowledge and intent. *See* MTD at 18. Plaintiff contends in opposition that the Complaint "satisfies Rule 9(b) because . . . [Defendant] marketed, labeled and packaged its products with the '100% Natural Flavors' representation, which was false and misleading when the products contain industrially, and chemically manufactured ingredients that are integral and indispensable to their flavor systems." MTD Opp. at 14 (citing Complaint ¶¶ 5, 10, 29, 63).

Rule 9(b) requires that Plaintiff's claim for intentional misrepresentation be pleaded with particularity. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (holding that fraud-based claims arising out of state law are subject to the heightened pleading requirements of Rule 9(b)). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To properly plead fraud with particularly under Rule 9(b), "a pleading must identify the who, what, when, where, and how of the misconduct charged." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018). The pleading must provide "an account of the 'time, place, and specific content of the false representations as

well as the identities of the parties to the misrepresentations.'" *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam)). In doing so, the pleading "must explain 'why the statements were false or misleading at the time they were made.'" *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

To state a claim for intentional misrepresentation, the Plaintiff must show: "(1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Aton Ctr. Inc. v. United Healthcare Ins. Co.*, 93 Cal. App. 5th 1214, 1245 (2023). "The absence of any one of these elements will preclude recovery." *Mend Health, Inc. v. Carbon Health Techs., Inc.*, No. 2:21-cv-06142-AB-(MRWx), 2022 WL 2191205, at *2 (C.D. Cal. May 3, 2022) (citing *Gonsalves v. Hodgson*, 38 Cal. 2d 91, 100-01 (1951)).

Plaintiff indicates that "[t]he 'who' is Defendant itself; the 'what' is the false representation '100% Natural Flavors'; the 'when' was at the time of Plaintiff's purchase and during the four-year putative class period; the 'where' was on the front product label, outer case packaging and the advertisements for the product; and the 'how' was that the statement was false because the products contained non-natural ingredients that are a key aspect of their flavor systems, which Defendant knew due to its exclusive control over products' ingredients and these representations." MTD Opp. at 14 (citing Complaint ¶¶ 1-2, 5, 10, 87, 93, 109, 117-18, 162, 168, 192, 243, 252). Defendant argues that none of the allegations referenced by Plaintiff in her opposition support her intentional misrepresentation claim, "as they are either *silent* as to those elements of a fraud claim" or "otherwise state legal conclusions." MTD Reply at 14 (emphasis in original) (citations omitted).

Based on the Court's review of these allegations, the Court would disagree with Defendant. The Complaint alleges that (1) Defendant's labeling of certain products as "100% Natural Flavors" is false and misleading, *see* Complaint ¶ 5; (2) Defendant knew that its representations were false, *see id.* ¶ 252 (3) Defendant intended to induce consumers to purchase the Class Products at a premium price, *see id.* ¶ 243; (4) Plaintiff and the putative class members reasonably believed the Class Products contained no synthetic flavoring ingredients, *see id.* ¶ 83; and (5) Plaintiff and the putative class members were damaged, *see id.* ¶ 192. The Court would find that this is all that is required at the pleading stage. Therefore, the Court would **DENY** the MTD with respect to the intentional misrepresentation claim.

*c. Negligent Misrepresentation*

Defendant moves to dismiss the negligent misrepresentation claim on the ground that it is

barred by the economic loss rule. *See* MTD at 18-19. Plaintiff contends in opposition that the economic loss rule is inapplicable to her negligent misrepresentation claim. *See* MTD Opp. at 13. Defendant argues in response that "because the Complaint alleges only that Plaintiff was misled 'about a quality of the product[s]' and contains 'no allegations beyond economic loss,' her negligent misrepresentation claims are barred." MTD Reply at 14 (quoting *Gamino v. Spin Master, Inc.*, No. 5:23-cv-02242-DMG-(SPx), 2025 WL 1421907, at *9 (C.D. Cal. Mar. 31, 2025)).

"The California Supreme Court has recognized that '[t]he economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.'" *In re Safeway Tuna Cases*, No. 3:15-cv-05078-EMC, 2016 WL 3743364, at *2 (N.D. Cal. July 13, 2016) (quoting *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)). "Thus, if a purchaser seeks damages for economic loss, without any claim of personal injury or damages to other property, he must recover in contract." *Id.* In short, "the economic loss rule prevent[s] the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter*, 34 Cal. 4th at 988 (internal quotation omitted). "There is an exception to the economic loss rule when the claim is based on fraudulent inducement." *Barrales*, 2025 WL 1584424, at *8 (citing *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 923 (2022) and *Robinson Helicopter*, 34 Cal. 4th at 991); *see also Barrett v. Optimum Nutrition*, No. 2:21-cv-04398-DMG-(SKx), 2022 WL 2035959, at *4 (C.D. Cal. Jan. 12, 2022) ("Fraud-based claims can be exempted from the economic loss rule, but only when the fraudulent conduct at issue is *independent* from the breach of a contractual promise." (emphasis in original) (citing *Robinson Helicopter*, 34 Cal. 4th at 991)). This exception is "narrow in scope and limited to a defendant's affirmative representations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." *Robinson Helicopter*, 34 Cal. 4th at 993.

Here, to the extent that Defendant has made an affirmative misrepresentation, it is regarding whether the Class Products contain any artificial flavors. This representation concerns the receipt of a product labeled as being made with "100% Natural Flavors" in exchange for the purchase price, and the breach amounts to receiving a product made with artificial flavors at that price. This breach is based in contract, and there are no misrepresentations alleged that are independent of this breach. The Court would, therefore, **GRANT** the MTD with respect to the

negligent misrepresentation claim, but with leave to amend.

3. Standing

"Article III of the Constitution requires that a plaintiff have standing before a case may be adjudicated." *Covington v. Jefferson Cnty.*, 358 F.3d 626, 637 (9th Cir. 2004). For Article III standing, a plaintiff must show: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See, e.g., Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 949 (9th Cir. 2006); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Article III standing is a threshold issue, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), and the plaintiff bears the burden of demonstrating her standing for each claim. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

*a. Standing to Sue for Products Plaintiff Did Not Purchase*

Defendant asserts that Plaintiff lacks standing to sue for the Class Products that she herself did not buy. *See* MTD at 19. Plaintiff admits that she purchased only two of the Class Products at issue. *See* Complaint ¶¶ 87-97. Plaintiff contends in opposition that the Class Products she did not purchase "are sufficiently similar to the Sprite Lemon-Lime and Fanta Orange product lines purchased by Palmer to confer standing" because all of the Class Products have the alleged "100% Natural Flavors" misrepresentation. *See* MTD Opp. at 15 (citing Complaint ¶¶ 5, 16, 50, 55, 58, 66, 214, 241). Plaintiff further contends that the Class Products "are marketed in virtually the same way and meant for personal use, containing a non-natural form of citric acid, and non-natural citrates." *Id.* at 15-16 (citing Complaint ¶¶ 16, 30, 32, 50, 55, 58, 66, 214, 218).

The Court acknowledges that "[t]here is a division of authority as to whether class action plaintiffs have standing to bring claims for products that they did not personally purchase but that were purchased by unnamed class members." *Cordes v. Boulder Brands USA, Inc.*, No. 2:18-cv-06534-PSG-(JCx), 2018 WL 6714323, at *5 (C.D. Cal. Oct. 17, 2018). In *Melendres v. Arpaio*, the Ninth Circuit acknowledged that although standing and class certification are overlapping concepts, "[t]hey spring from different sources and serve different functions." 784 F.3d 1254, 1261 (9th Cir. 2015) (citation omitted), *cert. denied sub nom. Maricopa Cnty., Ariz. v. Melendres*, 577 U.S. 1062 (2016). "*Standing* is meant to ensure that the injury a plaintiff suffers defines the scope of the controversy he or she is entitled to litigate. *Class certification*, on the other hand, is

meant to ensure that named plaintiffs are adequate representatives of the unnamed class." *Id.* (emphasis in original). When there is a "disjuncture between the claims of named plaintiffs and those of absent class members," courts have inconsistently classified the disjuncture as either "an issue of standing" or "an issue of class certification." *Id.* (citation omitted). Under the "standing approach," courts "say the disjuncture deprived the named plaintiff of standing to obtain relief for the unnamed class members." *Id.* at 1261 (citation omitted). By contrast, under the "class certification" approach, courts hold that "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Id.* (citation omitted).

The Ninth Circuit has expressly adopted the "class certification" approach. *Id.* (recognizing that this approach has been "embraced several times (though not always) by the Supreme Court" and "'most' other federal courts" (citations omitted)); *see also B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019). Accordingly, "any issues regarding the relationship between the class representative and the passive class members – such as dissimilarity of injuries suffered – are relevant only to class certification, not to standing." *Id.* at 1262 (citations omitted). While *Melendres* arose out of claims that the defendants adopted a discriminatory policing policy targeting Latinos, this Court has applied its holding in the consumer class action context, where the named plaintiffs purported to represent class members who had purchased products the named plaintiffs had not alleged they had purchased. *See, e.g.*, *Sotelo v. Rawlings Sporting Goods Co.*, No. 2:18-cv-09166-GW-(MAAx), 2019 WL 4392528, at *3-4 (C.D. Cal. May 8, 2019); *Stotz v. Mophie Inc.*, No. 2:16-cv-08898-GW-(FFMx), 2017 WL 1106104, at *6 (C.D. Cal. Feb. 27, 2017).

Here, Defendant does not dispute that Plaintiff has standing to bring claims for the two beverages that she did purchase, or that other consumers in the putative class did purchase the other beverages. The Court would find that Plaintiff's allegations sufficiently establish her Article III standing as pleaded. In light of *Melendres*, whether Plaintiff "may be allowed to present claims on behalf of others in the class who have purchased similar but not identical, products will be determined on an assessment of typicality and adequacy of representation at the motion for class certification stage." *Stotz*, 2017 WL 1106104, at *6 (citations omitted). The Court would, therefore, **DENY** the MTD with respect to Plaintiff's standing to bring claims related to the Class Products that she did not purchase.

*b. Standing to Seek Injunctive Relief*

Defendant asserts that Plaintiff's request for injunctive relief must be dismissed because "there is simply no threat that [she] will be deceived in the same way again." MTD at 21 (quoting *Squeo*, 2024 WL 4557680, at *8). Defendant claims that "by her own admission, Plaintiff is aware that the Products contain citric acid and several other ingredients which she claims are artificial flavors" and "can always confirm the presence of those ingredients in the Products by reviewing their ingredient lists." *Id.* at 20. Plaintiff contends in opposition that her allegations are sufficient to confer standing for a forward-looking injunction because "[t]he product labels and online marketing do not indicate whether the citric acid or other flavoring ingredients are natural or artificial" and so she "cannot be certain she won't be misled again in the future until and unless [Defendant] either removes the '100% Natural Flavors' representation or begins using all-natural ingredients that affect the products' flavor." MTD Opp. at 18 (citing Complaint ¶ 66).

"A plaintiff must demonstrate constitutional standing separately for each form of relief requested." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC) Inc.*, 528 U.S. 167, 185 (2000)). "For injunctive relief, which is a prospective remedy, the threat of injury must be 'actual and imminent, not conjectural or hypothetical.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, (2009)). *Davidson* also provides:

> A previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an actual and imminent, not conjectural or hypothetical threat of future harm. Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to. In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved.

*Id.* at 969-70 (internal citations and footnotes omitted).

Here, Plaintiff alleges that "[a]lthough [she] would like to purchase the Class Products in the future, she cannot be certain that she will not be misled again unless and until Defendant and its agents accurately label and represent the Class Products." Complaint ¶ 115. Nonetheless, Plaintiff, by her own allegations, is aware that the Class Products contain the various flavoring

ingredients that she claims are artificial. The Court would find that "Plaintiff can easily determine whether the Products contain [ingredients like] citric acid by simply looking at the ingredients label."[7] *Ringler*, 783 F. Supp. 3d at 1247. If she can simply look at the ingredients label, then Plaintiff can uncover whether the Class Product contains the allegedly artificial ingredients and avoid purchasing it. Arguably, therefore, the Court could the MTD with respect to Plaintiff's individual request for injunctive relief; perhaps even without leave to amend because Plaintiff "cannot plead around [her] inability to be deceived again without fundamentally changing [her] allegations." *Ringler*, 783 F. Supp. 3d at 1248 (quoting *Squeo*, 2024 WL 4557680, at *8) (citing *Caldwell v. Nordic Nats., Inc.*, 709 F. Supp. 3d 889, 913 (N.D. Cal. 2024)).

However, the question arises as to whether injunctive relief could still be sought for the class. The Court will entertain arguments from the parties on this point.

4. Sufficiency of the Pleading for Equitable Relief

Defendant also asserts that Plaintiff's claims for equitable relief are barred by *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), because she does not allege that adequate legal remedies are unavailable. *See* MTD at 21-22. For the CLRA, UCL FAL, and unjust enrichment claims, Plaintiff seeks various equitable remedies, including injunctive relief and restitution. *See, e.g.*, Complaint ¶¶ 153, 200-01, 208, 237. Plaintiff contends in opposition that "it remains to be seen whether [Plaintiff] will be able to obtain damages and thus have an adequate legal remedy" and that "equitable claims and legal claims may be pled *in the alternative*." MTD Opp. at 17 (emphasis in original). Defendant argues in response that these arguments are not permitted by *Sonner* and its progeny. *See* MTD Reply at 17-18.

The *Sonner* decision has raised much discussion as to the scope of its holding, its substantive underpinnings, and its precedential value. *See, e.g.*, Stern, *Bus. & Prof. Code § 17200 Practice* (The Rutter Group 2025) §§ 5:239-239.5 ("*§ 17200 Practice*") (and cases cited therein). In *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1021, n.13 (9th Cir. 2020), the Ninth Circuit

[7] Plaintiff argues that *Ringler* is distinguishable because "*Ringler* does not acknowledge citric acid for use in consumer goods *can* come from natural sources, if the manufacturer so chooses." MTD Opp. at 19 (emphasis in original). Plaintiff effectively concedes, however, that she has not expressly alleged that Defendant uses naturally-occurring citric acid in the Class Products. *See id.* Furthermore, Plaintiff alleges that "[a]lthough citric acid can be naturally derived from citrus fruits, this method of production has been largely abandoned due to economic inefficiency, agricultural limitations, lack of standardization, and other practical constraints." Complaint ¶ 58. The Court would, therefore, agree with Defendant that Plaintiff's "entire theory of deception concerning citric acid hinges on her belief that virtually *all* of the citric acid used in commercial products 'is industrially synthesized,' *i.e..*, artificial, due to 'economic' concerns." MTD Reply at 16 (emphasis in original) (citing *id.*).

stated: "Defendants' argument that Plaintiffs cannot seek equitable relief under the UCL or FAL, given an adequate legal remedy under the CLRA, is foreclosed by statute. The UCL, FAL and CLRA explicitly provide that remedies under each act are cumulative to each other."[8]

This Court in *Ferry v. Porsche Cars North America, Inc.*, No. CV 21-5715-GW-(ASx), 2022 WL 1769120, at *4-5 (C.D. Cal. Mar. 11, 2020), found *Moore* to be controlling over *Sonner*. Additionally, it was noted:

> Moving beyond the potential (or perceived) impact of *Sonner*, with respect to whether they have adequately alleged a likelihood of harm in the future for purposes of obtaining prospective injunctive relief, Plaintiffs rely upon *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018), which held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Id*. at 969. They also assert that Defendant's allegedly unlawful/improper practices will "continue absent an injunction and . . . will affect every emissions part in Plaintiffs' Vehicle that is improperly and illegally omitted from warranty coverage," Docket No. 30, at 17:26-28, and that class members are continuing to be misled by Defendant's practices.

*Id*. at *6 (footnote omitted). Continuing along that line, it is observed that the UCL statutory scheme includes not only § 17200 (which does not prohibit anything but merely provides the definition of what constitutes "unfair competition") but also § 17203. *See § 17200 Practice* at §§ 3:2-3:3. Section 17203 provides in relevant part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

Section 17203 encompasses two *separate* equitable provisions: injunctive relief and restitution. *See ABC Int'l Traders, Inc. v. Matsushita Elec. Corp. of Am.*, 14 Cal.4th 1247, 1269-71 (1997).[9]

---

[8] It is noted that the *Moore* decision did not reference the holdings in *Sonner*.

[9] As stated in *ABC Int'l Traders*:

> Nothing in the actual language of section 17203 indicates the availability of restitution is contingent on the issuance of an injunction. The statute contains, as ABC notes, no language of condition linking injunctive and restitutionary relief. On its face, section 17203 appears to authorize "injunctive relief to prevent [unfair competition], and/or restitution (*i.e.* disgorgement) of money or

This Court would apply *Sonner*'s bar in the situation where plaintiffs are seeking equitable restitution under the UCL where the same monetary relief is available to them in the form of damages under some legal cause of action (*e.g.* under the CLRA). In such situations, there is an adequate remedy at law which vitiates the need for equitable relief as to that injury. However, where a person is engaging in activities which constitute unfair competition and there is no apparent bar to that person's continuation of that improper conduct, injunctive relief would be available as there is no adequate remedy at law. *See Barquis v. Merchants Collection Ass'n*, 7 Cal.3d 94, 111 (1972) (The Legislature "intended . . . to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur."). Finally, as noted in *Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 687 (N.D. Cal. 2021):

> [Plaintiff] has shown that monetary damages for past harm are an inadequate remedy for the future harm that an injunction under California consumer protection law is aimed at. [Plaintiff's] remedy at law, damages, is retrospective. An injunction is prospective. Damages would compensate [plaintiff] for his past purchases. An injunction would ensure that he (and other consumers) can rely on WellPet's representations in the future. *See, e.g., McGill v. Citibank*, N.A., 2 Cal. 5th 945, 955 . . . (2017) (explaining that UCL, CLRA, and FAL injunctive relief is designed to prevent "future harm"). Accordingly, retrospective damages are not an adequate remedy for that prospective harm. * * * * California's consumer protection laws permit courts to issue injunctions that serve different purposes and remedy different harms than retrospective monetary damages.

In light of the above, the Court would **DENY** the MTD insofar as it seeks to dismiss Plaintiff's request for equitable relief based on *Sonner*, except as to equitable restitution.

5. <u>Punitive Damages</u>

Defendant asserts that Plaintiff's request for punitive damages should be dismissed because "it fails to set forth any basis on which such damages may be awarded." MTD at 22. Defendant claims that "the Complaint does not include a single allegation about any Coca-Cola officer, director, or managing agent, let alone any allegation that any such individual 'authorized or ratified . . . oppressive, fraudulent, or malicious conduct,' or was 'personally guilty of oppression, fraud or malice.'" *Id.* at 23 (quoting *Bridges v. Kohl's Stores, Inc.*, No. 2:23-cv-00685-DAD-(JDPx), 2024 WL 584319, at *7 (C.D. Cal. Feb. 13, 2024)). Plaintiff contends in opposition that she "need

---

> property wrongfully obtained." (*State Farm Fire & Cas. Co. v. Super. Ct.* (1996) 45 Cal. App. 4th 1093, 1102 . . . .

14 Cal.4th at 1268.

not plead any particularity in connection with intent, knowledge or condition of the mind of Defendant." MTD Opp. at 20 (citing *Somera v. Indymac Fed. Bank, FSB*, No. 2:09-cv-01947-FCD-(DAD), 2010 WL 761221, at *10 (E.D. Cal. Mar. 3, 2010) and *Taheny v. Wells Fargo Bank, N.A.*, No. 2:10-cv-02123-LKK-(EFB), 2011 WL 1466944, at *4-5 (E.D. Cal. Apr. 18, 2011)). Plaintiff claims that Defendant "has adequate notice of Plaintiff's basis for seeking punitive damages, including [Defendant's] alleged knowing and intentional express misrepresentation on consumer beverages during the class period for the purpose of economic gain and competitive advantage, as part of a pattern of unfair and unlawful business practices, including *fraud*." *Id.* (emphasis in original) (citing Complaint ¶¶ 5, 162, 166, 170, 173, 190, 196, 243, 245, 251, 255, 256).

Under California law, a plaintiff may recover punitive damages when "the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). Oppression means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2). Fraud is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3). "For a corporate employer to be liable for punitive damages, an officer, director, or managing agent of the corporation must have had advance knowledge of, must have conscious disregard toward, or must have authorized, the malicious, oppressive, or fraudulent acts." *Dallah & Dallah, Inc. v. State Farm Gen. Ins. Co.*, No. 5:21-cv-01348-JWH-(SHKx), 2022 WL 2784391, at *3 (C.D. Cal. Apr. 20, 2022).

"Under [Rule] 9(b), malice, intent, knowledge, and other conditions of the mind may be alleged generally." *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 273 (N.D. Cal. 2015) (internal quotation marks omitted). "In the Ninth Circuit, plaintiffs need not plead 'any particularity in connection with an averment of intent, knowledge or condition of the mind.'" *Id.* (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994)). "[C]ourts have reached different results regarding the sufficiency of pleadings in federal court for punitive damages . . . Some courts have required plaintiffs to plead authorization or ratification of allegedly wrongful acts by officers,

directors, or managing agents of a corporation to survive motions to strike punitive damages. Others have assumed authorization." *Id.* at 274 (citations omitted) (collecting cases). Importantly, however, "California's heightened pleading requirements for punitive damages conflict with, and are overruled in federal court by, Federal Rules of Civil Procedure 8 and 9, the rules governing federal pleading standards." *Alejandro v. ST Micro Elecs., Inc*, 129 F. Supp. 3d 898, 918 (N.D. Cal. 2015). A complaint "satisfies the federal pleading standard by reciting 'a short and plain prayer for punitive damages' that satisfies each of the substantive requirements of Cal. Civ. Code § 3294."[1] *Id.*; *Grausz v. Kroger Co.*, No. 19-cv-449-TWR-(AGS), 2021 WL 5534706, at *9 (S.D. Cal. Jan. 22, 2021) (finding that allegations of intentional placement of alleged misrepresentations on product label with intent to induce purchase, and that senior officers allowed the product to be sold with knowledge or reckless disregard that claims were fraudulent, were sufficient).

The Court would agree with Defendant that none of the allegations Plaintiff specifically identifies in her opposition show that any officer, director, or managing agent took any action amounting to authorization or ratification of the alleged misconduct. *See* MTD Reply at 18-19. "[A] plaintiff [seeking punitive damages] must plead the corporation's advance notification or ratification of the conduct made on the part of an officer, director, or managing agent of the corporation . . . because a company simply cannot commit willful and malicious conduct – only an individual can." *Rothman v. Equinox Holdings, Inc.*, No. 2:20-cv-09760-CAS-(MRWx), 2021 WL 1627490, at *12 (C.D. Cal. Apr. 27, 2021) (internal quotation marks omitted); *see* Cal. Civ. Code § 3294(b). Plaintiff, therefore, has failed to sufficiently plead a basis for punitive damages. Accordingly, the Court would **GRANT** the MTD with respect to Plaintiff's request for punitive damages under § 3294, but with leave to amend.

## IV. <u>Conclusion</u>

Based on the foregoing discussion, the Court would:

- **DENY** the MTT;
- **DENY** the MTD insofar as it seeks to dismiss Plaintiff's claims on federal preemption grounds;
- **DENY** the MTD with respect to the unjust enrichment and intentional misrepresentation claims;
- **GRANT** the MTD with respect to the negligent misrepresentation claim;

- **DENY** the MTD with respect to Plaintiff's standing to bring claims related to the Class Products that she did not purchase;
- **GRANT** the MTD with respect to the request for injunctive relief;
- **DENY** the MTD insofar as it seeks to dismiss Plaintiff's request for equitable relief based on *Sonner*, except as to equitable restitution; and
- **GRANT** the MTD with respect to the request for punitive damages.