# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA PALMER, SUE KIM, AND IVAN ZERMENO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) |
| PLAINTIFFS, | ) |
| VS. | ) CASE NO. 25-CV-4777-GW-AGR |
| THE COCA-COLA COMPANY, | ) |
| DEFENDANT. | ) |

CORRECTED TRANSCRIPT

VIDEOTAPED DEPOSITION OF VICTORIA PALMER
WEDNESDAY, APRIL 15, 2026

JOB NO. 8007744
REPORTED BY KIMBERLY EDELEN,
CSR. NO. 9042, CRR, RPR.
PAGES 1 - 165

VIDEOTAPED DEPOSITION OF VICTORIA PALMER, TAKEN ON BEHALF OF THE DEFENDANT, AT 10:14 A.M. PDT, WEDNESDAY, APRIL 15, 2026, AT 2000 AVENUE OF THE STARS, 6TH FLOOR, LOS ANGELES, CALIFORNIA, BEFORE KIMBERLY A. EDELEN, CSR NO. 9042, CRR, RPR.

APPEARANCES OF COUNSEL

FOR PLAINTIFFS:

KAZEROUNI LAW GROUP, APC
BY: GIL MELILI, ESQ.
245 FISCHER AVENUE
SUITE D1
COSTA MESA, CALIFORNIA 92626
800.400.6808
gil@kazlg.com

KAZEROUNI LAW GROUP, APC
BY: JASON A. IBEY, ESQ.
(VIA ZOOM)
321 NORTH MALL DRIVE
SUITE R108
ST. GEORGE, UTAH 84790
800.400.6808
jason@kazlg.com

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

APPEARANCES OF COUNSEL (CONTINUED)

FOR DEFENDANT:

PATTERSON BELKNAP WEBB & TYLER LLP
BY: DAKOTAH BURNS, ESQ
FAUST PETKOVICH, ESQ.
1133 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
212.336.2000
dburns@pbwt.com
fpetkovich@pbwt.com

DLA PIPER LLP (US)
BY: TANYA L. GREENE, ESQ.
ERIN HUNTINGTON, ESQ.
(VIA ZOOM)
2000 AVENUE OF THE STARS
6TH FLOOR, NORTH TOWER
LOS ANGELES, CALIFORNIA 90067
310.595.3000
tanya.greene@us.dlapiper.com
erin.huntington@us.dlapiper.com

ALSO PRESENT: TRISTAN KNUDSEN, VIDEOGRAPHER

# I N D E X


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| VICTORIA PALMER | | |
| | BY MR. BURNS | 8, 159 |
| | BY MR. MELILI | 151 |


# E X H I B I T S


| NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 1 | 32 | PLAINTIFF VICTORIA PALMER'S FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT'S INTERROGATORIES TO PLAINTIFF, SET ONE |
| EXHIBIT 2 | 36 | FIRST AMENDED COMPLAINT |
| EXHIBIT 3 | 47 | PHOTOGRAPH |
| EXHIBIT 4 | 68 | PHOTOGRAPH |
| EXHIBIT 5 | 114 | INSTACART RECEIPT, BATES NOS. PALMER000174 - PALMER000178 |
| EXHIBIT 6 | 130 | LETTER DATED APRIL 30, 2025 FROM KAZEROUNI LAW GROUP, BATES NOS. PALMER000376 - PALMER000378 |


(EXHIBITS CONTINUED ON FOLLOWING PAGE)

E X H I B I T S

| NO. | PAGE | DESCRIPTION |
| --- | --- | --- |
| EXHIBIT 7 | 137 | COMPLAINT RE: PALMER V. THE RECEIVABLE MANAGEMENT SERVICES, LLC: AND TRANSFORM SR HOLDING MANAGEMENT LLC D/B/A SEARS REPAIR SERVICES, BATES NOS. PALMER000365 - PALMER000375 |

QUESTIONS INSTRUCTED NOT TO BE ANSWERED

| PAGE | LINE |
| --- | --- |
| 38 | 20 |
| 49 | 1 |

involved with? 10:27:26
A No. 10:27:27
Q Ms. Palmer, did you do anything today to prepare for this deposition? 10:27:42 10:27:44
A Other than get up and get here, no. 10:27:46
Q No. 10:27:49
You didn't meet with your lawyers? 10:27:50
A Oh, I'm sorry. Yes. 10:27:52
Q Which lawyers did you meet with? 10:27:53
A With Gil and Ali. 10:27:56
Q Ali...? 10:28:01
A I can't say his last name. 10:28:03
Gil? 10:28:05
Q Ali is another attorney -- 10:28:09
A He's another attorney, yeah. 10:28:11
Q -- at the Kazerouni law firm? 10:28:12
Did you meet with any other lawyers? 10:28:16
A No. 10:28:17
Q Were Gil and Ali present at every meeting that you had to prepare for today's deposition? 10:28:22 10:28:24
A Just -- Gil was at every meeting. 10:28:27
Q How many times did you meet with your lawyers? 10:28:31 10:28:33
A Two. 10:28:35
Q Two. 10:28:36

Who was present at the first meeting? 10:28:37
A Just Gil. 10:28:41
Q And when did you meet with Gil that first time? 10:28:43 10:28:45
A Last week, Monday. 10:28:50
Q And the second time, when was that? 10:28:53
A Wednesday, last week. 10:28:56
Q And that was with Gil and Ali? 10:29:00
A Yeah. I think he was on the phone. 10:29:03
Q All right. I'm going to preface my next set of questions by saying that I'm not going to ask you to tell me about the contents of what you spoke about with your lawyers. Okay. 10:29:12 10:29:16 10:29:18 10:29:20
Where did you meet with your lawyers, firstly, on that first meeting? 10:29:23 10:29:25
A On Zoom. 10:29:27
Q On Zoom. 10:29:28
And how long was that first meeting with Gil? 10:29:34 10:29:36
A Less than an hour. 10:29:37
Q Was anyone else in the room beside you and your lawyer during those meetings? 10:29:43 10:29:47
A No. 10:29:49
Q And that -- just to be clear, that means no one was in the room with you when you were on Zoom 10:29:49 10:29:51

Was this in person or by Zoom? 10:31:46
A By Zoom. 10:31:48
Q By Zoom. 10:31:49
How long did that meeting last? 10:31:50
A It was an hour-ish. 10:31:51
Q And was anyone else in the room with you during that meeting? 10:31:55 10:31:57
A No. 10:31:58
Q Was it -- to your knowledge, was anyone else in the room other than Gil and Ali on their end? 10:31:59 10:32:01 10:32:04
A I have no idea. 10:32:04
Q Did you review any documents during that meeting? 10:32:07 10:32:09
A Yes. 10:32:09
Q What documents did you review? 10:32:10
A Again, we went through the interrogatories -- 10:32:13 10:32:16
Is that what you called them? 10:32:16
Q Yes. 10:32:17
A -- there were a couple of little changes that needed to be corrected. We skimmed through articles. I think that was basically it. 10:32:18 10:32:19 10:32:24
Q What articles were you referring to? 10:32:35
A Articles on the citric acid and its effects 10:32:36

A Matthew. 10:35:15
Q When did you speak to Matthew? 10:35:16
A Well, when they said -- when they set the date, I -- we talked about it and whether he would take the day off to bring me here or not. 10:35:20 10:35:22 10:35:27
Q How long did you speak to Matthew about the deposition? 10:35:31 10:35:33
A How long? 10:35:34
Q Uh-huh. Yes. 10:35:34
A 25 seconds. 10:35:38
Q What did you discuss? 10:35:42
A If he could get the day off to bring me down here. 10:35:44 10:35:46
Q Did you discuss anything else? 10:35:47
A No. 10:35:49
Q And Matthew is the only person, other than your lawyers, that you've spoken to about this deposition? 10:35:53 10:35:55 10:35:57
A Yes. 10:35:58
Q Ms. Palmer, we're here today because you're suing Coca-Cola, correct? 10:36:04 10:36:06
A Yes. 10:36:08
Q Why are you suing Coca-Cola? 10:36:09
A It ticked me off that their advertising wasn't truthful. 10:36:14 10:36:19

Q You said "it." 10:36:23
What is "it" that tipped you off that their advertising wasn't -- 10:36:25 10:36:26
A That it said that the flavors were all natural. 10:36:28 10:36:30
Q All right. What tipped you off that the -- that the representation that the flavors were natural weren't truthful? 10:36:30 10:36:33 10:36:36
A Oh, I had bought the sodas for a specific reason. And I guess my son had talked to a friend, and -- about it, and he said that -- he came out and said, you know that they're not all natural, that there are ingredients, flavor ingredients that aren't natural. 10:36:42 10:36:45 10:36:47 10:36:55 10:37:00 10:37:05
Q You said you bought the product for a specific reason. 10:37:07 10:37:10
What was that reason? 10:37:10
A My nephew, Jason, and his children were coming over and I was trying to find something that would be approved by their mother. 10:37:12 10:37:15 10:37:22
Q What do you mean by "approved by their mother"? 10:37:28 10:37:30
A No caffeine, no natural flavors -- or no artificial flavors. 10:37:33 10:37:38
Q And your understanding was that Sprite and 10:37:51

BY MR. BURNS: 10:41:01
Q You didn't give it any thought? 10:41:02
A Well, the can didn't say "no artificial coloring." It said "no artificial flavoring." 10:41:04 10:41:08
Q Did you see any coloring in the Sprite lemon-lime when you purchased it? 10:41:10 10:41:11
MR. MELILI: Objection. Relevance. 10:41:13
You may answer if you know. 10:41:15
THE WITNESS: Did I see any coloring in it? 10:41:17
BY MR. BURNS: 10:41:20
Q Uh-huh. 10:41:20
A No. 10:41:21
Q Do you believe the products you purchased from Coca-Cola were falsely labeled? 10:41:29 10:41:31
A Yes. 10:41:33
Q And what products were those? 10:41:35
A I don't understand the question. 10:41:39
Q What were the products you purchased -- 10:41:40
A All the products I purchased or just those two? 10:41:43 10:41:45
Q Coca-Cola products you purchased. 10:41:47
A I don't know what the other Coca-Cola products are unless it says "Coca-Cola" on it. 10:41:48 10:41:49
Q What products are you challenging in this lawsuit that you purchased? 10:41:52 10:41:54

A Sprite and Fanta. 10:41:55
Q And what products -- what specific products were those? 10:41:56 10:41:59
A Cans of Sprite and Fanta. 10:42:02
Q What flavors? 10:42:04
A Oh, Sprite, I guess lemon-lime. Sprite is Sprite. And orange Fanta. 10:42:05 10:42:10
Q And when I refer to "Sprite," you understand that I'm referring to the Sprite products that you're challenging in this action? 10:42:22 10:42:24 10:42:26
A Yes. 10:42:28
Q And when I refer to "Fanta," you understand that I'm referring to the Fanta products that you're challenging in this action? 10:42:28 10:42:30 10:42:32
A Yes. 10:42:34
Q And when I say "class products," do you understand that I'm talking about those Sprite and Fanta products together? 10:42:35 10:42:38 10:42:41
A Okay. Yes. 10:42:43
Q Okay. Let's talk about the Sprite product you purchased. 10:42:44 10:42:49
What do you recall about the Sprite lemon-lime product that you bought? 10:42:51 10:42:55
MR. MELILI: Objection. Vague and ambiguous. 10:42:58 10:42:58

document, and let me know when you've looked it over. 10:44:39 10:44:42

(Brief pause.) 10:45:30

THE WITNESS: All right. This is the document that we went through, and I've read it before. 10:46:44 10:47:04 10:47:07

BY MR. BURNS: 10:47:10

Q And do you see on the very last page that you declared under penalty of perjury that the contents of this document were true and correct? 10:47:10 10:47:15 10:47:16

A Yes. 10:47:18

Q All right. If you could go to Page 9. 10:47:19

Let me know when you're there. 10:47:42

A Okay. 10:47:44

Q You see the paragraph in the middle of this page, and toward the middle of that paragraph, it starts with "On April 27th, 2025." 10:47:45 10:47:49 10:47:54

Let me know when you see that. 10:47:57

A Yes. 10:47:59

Q Do you see where it says "On April 27th, 2025, using a Visa card ending in 0247, while in California, Plaintiff's purchased a 10-pack of Sprite 7 and a half ounce cans and a 10-pack of the Fanta Orange 7 and a half ounce cans via the Amazon.com online marketplace. Each unit cost 10:48:01 10:48:04 10:48:10 10:48:13 10:48:17 10:48:21

$5.98, exclusive of shipping, taxes and fees. The units of the Sprite and Fanta Orange products were shipped to the Plaintiff's residence on April 28th, 2025." 10:48:26 10:48:33 10:48:37 10:48:39
Do you see that? 10:48:40
A Yes. 10:48:41
Q Is that accurate? 10:48:42
A Yes. Although, I don't really know the difference between a Visa credit card and a Visa debit card. 10:48:44 10:48:50 10:48:54
Is there a difference? 10:48:55
Q There is a difference between a credit and debit card. I'm not -- I'm not interested in that difference, so if -- 10:48:58 10:49:00 10:49:03
A Okay. 10:49:04
Q -- it was a debit card, then so be it. 10:49:05
A That's the only thing I can see. 10:49:08
Q Okay. Is this the first time that you bought the Sprite lemon-lime product? 10:49:15 10:49:17
MR. MELILI: Objection. Vague and ambiguous. 10:49:20 10:49:21
BY MR. BURNS: 10:49:22
Q I've already defined "Sprite" earlier in the deposition. 10:49:23 10:49:25
So I just want to be clear when I refer to 10:49:25

the Sprite lemon-lime product, I'm referring to this product that you purchased -- 10:49:27 10:49:29

A Probably not, but I don't -- cannot remember buying it before. 10:49:31 10:49:32

Q Okay. Now, I'll just remind you, Ms. Palmer, I know it's hard to remember, but from our earlier instructions, try to let me finish my question before you answer, just for Kim's sake. 10:49:34 10:49:37 10:49:40 10:49:43

But we've already established when I refer to the "Sprite product" or the "Sprite lemon-lime product," I'm referring to the product you purchased that you're challenging in this case. 10:49:46 10:49:48 10:49:50 10:49:53

Do you understand? 10:49:54

A Yes. 10:49:55

Q You don't remember purchasing the Sprite product prior to this April 27th date; is that correct? 10:49:57 10:50:00 10:50:02

A No, I don't. 10:50:03

Q And where did you purchase the Sprite product on April 27th? 10:50:08 10:50:10

A From Amazon. 10:50:12

Q And when you purchased the Sprite product on April 27th on Amazon.com, did you read any information about the product on Amazon before you bought it? 10:50:25 10:50:28 10:50:33 10:50:36

A I read the information on the outside of the carton that said that it had no caffeine and that it was all natural flavors. And that's what I was looking for. 10:50:39 10:50:42 10:50:45 10:50:52

Q You said that was on the outside of the carton? 10:50:53 10:50:54

A Yes. 10:50:55

MR. BURNS: I'm going to introduce another exhibit which I'll mark as Exhibit 2. 10:51:17 10:51:19

(Deposition Exhibit 2 was marked for identification.) 10:51:21 10:51:21

MR. BURNS: This is a very long document so I'm just going to tell you in advance that my question is going to concern Paragraph 95 on Page 33, but take your time reviewing the document and let me know when you're ready to answer your question -- answer my questions. 10:51:54 10:51:56 10:51:58 10:52:02 10:52:05 10:52:07

(Brief pause.) 10:53:23

THE WITNESS: Yeah. I'm ready. I'm sorry. 10:53:54

BY MR. BURNS: 10:53:56

Q Where is a picture of the carton of the Sprite product on this web page in the photo on Paragraph 95? 10:53:57 10:53:59 10:54:03

A On Page 33? 10:54:10

Q Yes. 10:54:12

artificial ingredients; is that correct? 10:58:42
A Yes. 10:58:44
Q On April 27th, did you understand that Sprite lemon-lime contained artificial ingredients? 10:58:45 10:58:47
A No. 10:58:51
Q And when you bought Sprite lemon-lime on April 27th, did you do so because you thought that the product contained no artificial ingredients? 10:59:00 10:59:02 10:59:06
A Yes. 10:59:09
Q And you intended to avoid buying a product with artificial ingredients of any kind? 10:59:10 10:59:13
A Or at least minimal. 10:59:17
Q What do you mean by that? 10:59:22
A I wanted it to be as natural as possible. 10:59:28
Q I'm sorry. That's still pretty vague. 10:59:36
Can you give me more detail about what you mean by that? 10:59:38 10:59:40
A Well, I assumed that everything had artificial coloring in it. Although, I -- looking at it, I wouldn't assume that of the Sprite. 10:59:41 10:59:45 10:59:51
Q You didn't assume that of the Sprite? 11:00:00
A I guess not, no. 11:00:02
Q Was your expectation that Sprite lemon-lime had no artificial ingredients in that case? 11:00:05 11:00:10
A My expectation of the Sprite was that the 11:00:15

A A bunch of different people. 11:32:40
Q Who were those people? 11:32:42
A So I -- Jason's kids, me, Matthew may have, 11:32:43 we may have offered it to other guests. 11:32:54
Q At the time you took this photo, were you 11:33:07 already planning to file a lawsuit against 11:33:10 Coca-Cola? 11:33:13
A I think Matthew and I may have discussed 11:33:24 it. 11:33:27
Q And what did you understand the reasons to 11:33:31 be for filing a lawsuit against Coca-Cola at the 11:33:34 time you discussed that possibility? 11:33:38
A Yes. 11:33:40
Q What did you understand the reasons to be 11:33:42 for filing that lawsuit at the time? 11:33:44
A Well, I was miffed that the advertising was 11:33:47 false, after being informed that they weren't all 11:33:52 natural flavors, and I'm not sure who informed him. 11:33:59 He had a conversation with a friend. 11:34:04
Q And you never asked him? 11:34:09
A But I never asked him who he was talking 11:34:10 to, no. 11:34:12
Q So you're planning to file a federal 11:34:13 lawsuit and you never bothered to ask your son where 11:34:15 he got that information? 11:34:17

A Yes. 11:42:42
Q Prior to that, what was your understanding as to whether Sprite contained 100 percent natural flavors? 11:42:45 11:42:46 11:42:51
A I assumed that they were all natural flavors or derived from natural products. 11:42:52 11:42:53
Q Why did you assume that? 11:43:01
A Because that's what the box says. 11:43:02
Q So you based that assumption entirely on what the box says? 11:43:10 11:43:12
A Yes. 11:43:13
Q The carton itself? 11:43:14
A Yes. 11:43:15
Q And after April 30th, you believed that the Sprite product contained artificial flavors? 11:43:30 11:43:33
A Yes. 11:43:38
Q What artificial flavors do you believe Sprite contained? 11:43:39 11:43:41
A Citric acid. 11:43:42
Q Any others? 11:43:45
A No. 11:43:46
Q All right. Let's turn to the Fanta Orange product. 11:43:52 11:43:54
Do you recall whether the Fanta Orange product you bought was in a bottle or a can? 11:43:58 11:44:00

product before you purchased it on Amazon -- 11:51:11
A No. 11:51:13
Q -- on April 27th? 11:51:13
Did you speak to anyone about Fanta before you purchased it on April 27th? 11:51:17 11:51:19
A No. 11:51:21
MR. BURNS: All right. I'm going to mark another exhibit which I believe is Exhibit 4. 11:51:33 11:51:34
(Deposition Exhibit 4 was marked for identification.) 11:51:37 11:51:37
BY MR. BURNS: 11:52:13
Q Have you had a chance to look at this photo? 11:52:29 11:52:31
A Uh-huh. 11:52:32
Q Is this the product that you purchased from Amazon.com? 11:52:33 11:52:36
A Yes. 11:52:37
Q And I believe you testified earlier that you saw a picture or you recall seeing a picture of the Sprite carton on Amazon.com before you purchased it; is that correct? 11:52:38 11:52:40 11:52:45 11:52:48
A Yes. 11:52:50
Q Do you recall seeing a picture of the Fanta carton on Amazon.com before you purchased it? 11:52:51 11:52:53
A I think so, yes. 11:52:57

A I think so, yes. 11:56:55
Q And prior to that, did you have any understanding as to whether Fanta Orange contained 100 percent natural flavors? 11:56:57 11:56:59 11:57:03
A I assumed before April 30th, yes, that they were natural flavors. 11:57:06 11:57:09
Q And that was based on the representations you saw on the carton? 11:57:14 11:57:15
A On the carton, yes. 11:57:17
Q All right. I want to talk about your typical practice when you're deciding whether you want to purchase a particular food or beverage. 11:57:31 11:57:32 11:57:36
So before you buy a product, do you look at the front of the package? 11:57:40 11:57:42
A Yes. 11:57:45
Q Do you look at the ingredients list? 11:57:47
A Not necessarily, no. 11:57:49
Q Why not? 11:57:50
A Most of them are things that are unreadable, and it's -- usually when I buy food, it's at a request from someone else. 11:58:00 11:58:04 11:58:10
Q Do you care what ingredients are in the food and beverages that you offer to other people? 11:58:14 11:58:19
A Depending on who the other people are. 11:58:23
Q Do you care what ingredients are in the 11:58:27

THE WITNESS: That's the last one. 13:56:50
MR. BURNS: Actually, rather than going 13:56:50
back to Exhibit 1, let me just mark a new exhibit. 13:57:00
(Deposition Exhibit 6 13:57:03
was marked for identification.) 13:57:03
THE WITNESS: This was -- I see this says 13:57:42
April 30th on there but there is no date of when I 13:57:43
signed it. 13:57:46
BY MR. BURNS: 13:57:50
Q So you think that the letter was drafted on 13:57:51
April 30th but you didn't sign it until later? 13:57:53
A Unfortunately, yes. Because if they sent 13:58:00
it to me on an e-mail, I might not have seen it for 13:58:02
days. I don't remember. 13:58:08
Q Let's go to Exhibit 1 which is your 13:58:10
interrogatory responses. 13:58:13
Can you go to the last page. 13:58:19
Did you review this document before you 13:58:24
signed it? 13:58:26
A Yes. 13:58:26
Q Do you see where you've written "I declare, 13:58:27
under penalty of perjury under the laws of the 13:58:29
United States of America that the foregoing is true 13:58:32
and correct"? 13:58:34
A No. Where are you? 13:58:37

A A vague idea. 14:14:07
Q What is your vague idea? 14:14:09
A That the costs will come, I guess, if they win. It's very vague. I... 14:14:12 14:14:17
Q Do you understand that you personally are seeking to represent an entire class of persons in this lawsuit? 14:14:24 14:14:26 14:14:29
A Yes. 14:14:30
Q Do you know who the other members of that class would be? 14:14:33 14:14:34
A I imagine that two of the people that are listed on the -- Sue Kim and Ivan Zemero -- Zermeno. 14:14:36 14:14:38
Q Do you know what time period someone would have had to have purchased the Sprite and Fanta class products in order to be a member of the class? 14:14:51 14:14:53 14:14:57
A No. 14:14:59
Q Do you know what product someone would have had to have purchased to be a part of the class? 14:15:01 14:15:04
A No. 14:15:07
Q Do you know what states they would need to be from? 14:15:07 14:15:08
A No. 14:15:09
Q What are your responsibilities as a class representative in this case? 14:15:14 14:15:16
A To keep them in mind in any kind of 14:15:18

settlement, that it's not just me, it's -- 14:15:20
Q It's Ms. Kim and Mr. Zermeno? 14:15:24
A Yes. 14:15:29
Q Other than what we already discussed today, have you ever been a named plaintiff in a class action before? 14:15:32 14:15:34 14:15:37
A No. 14:15:37
Q Other than being a named plaintiff, have you ever been a member of a class action before? 14:15:47 14:15:48
A I don't think so. 14:15:53
Q Are you expecting to receive any extra compensation in this case for being the named plaintiff? 14:15:57 14:16:00 14:16:01
A No. 14:16:02
Q Have you spoken to any other consumers about the Sprite or Fanta products? 14:16:15 14:16:18
A I might have, but I couldn't tell you who. 14:16:25
Q Do you have any idea what other consumers paid for the Sprite and Fanta products? 14:16:32 14:16:34
A No. 14:16:36
Q Fair to say the price may have varied? 14:16:39
A May have, yes. 14:16:42
Q Do you know any other consumers who share your concerns about the Sprite and Fanta products? 14:16:49 14:16:51
A Yes. 14:16:55

Q Who are they? 14:16:56

A I know that I talked about this with a group of ladies in my aqua aerobics class. I don't know their names. 14:17:02 14:17:06 14:17:12

Q How did you communicate with them about it? 14:17:16

A We were gossiping in the pool. 14:17:19

Q Okay. So not over e-mail? 14:17:22

A No. 14:17:24

Q Nothing written down? 14:17:24

A No. 14:17:25

Q Okay. What do you think your damages are in this case? 14:17:25 14:17:55

A I have no idea. 14:17:55

MR. MELILI: Objection. Calls for a legal conclusion and/or expert testimony. 14:17:56 14:17:57

BY MR. BURNS: 14:18:02

Q How do you think you should be compensated in this case? 14:18:02 14:18:05

MR. MELILI: Same objections. 14:18:05

THE WITNESS: I have no idea. I don't know how any of that's done. 14:18:06 14:18:08

BY MR. BURNS: 14:18:16

Q Do you want to be compensated in this case? 14:18:29

A Sure. 14:18:32

Q Other than your communications with your 14:18:40

A I have no idea. 14:35:49
MR. MELILI: Same objection. 14:35:50
BY MR. BURNS: 14:36:06
Q Do you recall when I showed you your Instacart receipts earlier today? 14:36:07 14:36:09
A (Witness nods head.) 14:36:13
Q How did you go about compiling the Instacart receipts that you sent to your lawyers? 14:36:14 14:36:18
A I went to the Instacart site and you can go back in your orders and get the receipts from them. 14:36:22 14:36:26
Q Did you pick and choose which receipts to send, or did you send all of the receipts? 14:36:33 14:36:35
A I think I sent all of the receipts for a couple of years, maybe back to 2021, '2. It was long and arduous. 14:36:44 14:36:48 14:36:56
Q So you didn't look at your receipts and decide which receipts reflected products that might have contained -- 14:37:00 14:37:03 14:37:06
A No. 14:37:07
Q -- the ingredients that you're challenging in this lawsuit? 14:37:07 14:37:09
Okay. 14:37:11
A And then I think they had an expert go through them. 14:37:15 14:37:22
Q What kind of expert? 14:37:27

A Oh, I had read -- okay. 14:52:32
Q After reading Paragraph 59 of this document, do you recall seeing this allegation before it was filed? 14:52:35 14:52:38 14:52:41
A Yes. 14:52:42
Q And what does the allegation in Paragraph 59 say, in your own words? 14:52:44 14:52:46
A That it's economically not used because it's too expensive to use natural citric acid and that it's -- the industry synthesizes it through a process. Genetically mutated mold, I knew I'd read that somewhere. 14:52:50 14:52:53 14:52:57 14:53:04 14:53:08
Q Okay. 14:53:09
A Not from citrus fruit. 14:53:14
Q Now, if we go to Page 33, Paragraph 95, can you read that paragraph for me. 14:53:18 14:53:35
A "As of May 19th, 2025, the Amazon page for the Sprite Product continues to show images representing 100 percent natural flavors, as depicted below." 14:53:37 14:53:44 14:53:47 14:53:51
Q And can you tell me what you see below that paragraph? 14:53:52 14:53:55
A A picture of the Sprite box or a Sprite ad saying "100 percent Natural Flavor, Zero Caffeine, Perfectly Clear," and it's not what I saw from 14:53:56 14:54:04 14:54:08

A It's a picture of the Fanta box and a part of a box saying -- showing the calorie nutrition facts. 14:55:28 14:55:32 14:55:41
Q Do you see a price listed in this picture? 14:55:42
A 6.58. 14:55:46
Q Is that the same price that you -- 14:55:49
A No, I don't think so. 14:55:51
Q Is that the same price that you purchased the Fanta product for in April? 14:55:53 14:55:55
A I don't think so, no. 14:55:57
Q Okay. Still in the same exhibit, can you flip to Page 43. Under Paragraph 130, do you mind just reading that to yourself. 14:56:00 14:56:23 14:56:40
A Okay. 14:57:05
Q After reading that, does that refresh your recollection as to what class is being involved in this lawsuit? 14:57:05 14:57:07 14:57:12
A Yes. 14:57:13
Q And in your own words, what is the class involved in this lawsuit? 14:57:13 14:57:16
A People who purchased the products and were represented it as being 100 percent natural flavors. 14:57:20 14:57:24
Q Okay. And then is there -- do you recall the time period for this class? 14:57:29 14:57:33
A No, I don't. 14:57:37

A It was 55 years ago. 15:02:57
Q Uh-huh. 15:03:00
Are you a scientist? 15:03:01
A No. 15:03:02
Q Are you a lawyer? 15:03:05
A No. 15:03:06
Q Are you an expert in what makes a flavor or a product natural or not? 15:03:13 15:03:15
A No. 15:03:19
Q Let's go back to Exhibit 2. That's the First Amended Complaint. 15:03:27 15:03:32
Do you -- 15:03:36
A Exhibit 2? 15:03:50
Q Yeah. 15:03:51
A Okay. 15:03:53
Q Do you recall reviewing this document before it was filed with the court? 15:03:53 15:03:56
A Yeah. Yes. 15:03:59
Q Okay. And, unfortunately, we don't have the original Complaint in front of us in this case, but do you recall reviewing the original Complaint in this case before it was filed with the court? 15:04:06 15:04:08 15:04:11 15:04:15
A Yes. 15:04:17
Q Okay. Before, you testified about offering your nephew's children different beverage options. 15:04:18 15:04:49

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) ss.

I, Kimberly A. Edelen, C.S.R. No. 9042, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was {X} was not requested.

I further certify that I am not interested in the event of the action.

Witness my hand this 17th day of April, 2026.

KIMBERLY A. EDELEN, C.S.R. NO. 9042

GIL MELILI, ESQ.
gil@kazlg.com

April 30, 2026

RE: Palmer, Victoria, Et Al. v. The Coca-Cola Company
4/15/2026, Victoria Palmer, (#8007744).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

_x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.