# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VICTORIA PALMER, SUE KIM, and IVAN ZERMENO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>THE COCA-COLA COMPANY,<br><br>Defendant. | 2:25-cv-04777-GW-CTS<br><br>Hon. George H. Wu, presiding |

**<u>DECLARATION OF STEPHEN F. HAMILTON, Ph.D. IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

**Central Economics, LLC**

**June 24, 2026**

## TABLE OF CONTENTS

**I. QUALIFICATIONS ..... 1**

**II. SCOPE OF ANALYSIS ..... 3**

**III. SUMMARY OF PRINCIPAL CONCLUSIONS ..... 5**

**IV. CONSUMERS ARE WILLING TO PAY, AND DO PAY, A PRICE PREMIUM FOR NATURAL CLAIMS ON PRODUCTS. ..... 9**

A. CONSUMERS ARE MOTIVATED TO BUY PRODUCTS THAT CONTAIN "100% NATURAL FLAVORS" ..... 10

B. CONSUMERS RELY ON THE ACCURACY OF PRODUCT MARKETING WHEN MAKING PURCHASING DECISIONS. ..... 12

C. THERE IS AN ABUNDANCE OF ACADEMIC LITERATURE AND GOVERNMENT REPORTS THAT ACKNOWLEDGE AND MEASURE PRICE PREMIUMS FOR PRODUCTS MAKING NATURAL CLAIMS. ..... 15

**V. RELIABLE METHODOLOGIES MAY BE USED TO CALCULATE CLASS-WIDE DAMAGES IN THIS CASE. ..... 19**

A. THERE IS A VALID AND ACCURATE METHODOLOGY TO CALCULATE THE PRICE PREMIUM RESULTING FROM THE CHALLENGED CLAIMS ON THE PRODUCTS. ..... 20

1. Hedonic regression analysis can be used to measure the value of the "100% Natural Flavors" claim on the Products. ..... 21
2. "Conjoint analysis" can be used to value the "100% Natural Flavors" claim on the Products. ..... 30
3. Class-wide damages are measured as the product of the Price Premium and the sales quantity of the Products. ..... 33

B. THERE IS A VALID AND ACCURATE METHODOLOGY TO CALCULATE UNJUST GAINS FROM SALES OF THE MISLABELED PRODUCTS. ..... 33

**VI. CONCLUSION ..... 35**

## I. QUALIFICATIONS

1. I am Professor and Director of Graduate Studies in the Department of Economics at California Polytechnic State University, San Luis Obispo ("Cal Poly"). I received a Ph.D. in Agricultural and Resource Economics from the University of California, Berkeley in 1996. I have held teaching positions at Kansas State University, the University of Arizona, the University of Central Florida, Toulouse School of Economics, and Cal Poly. I was selected as Chair of the Department of Economics at Cal Poly in 2005 and served in that capacity over the period 2005-2017.

2. I have published extensively in academic and professional journals on the application of statistical methods, industrial organization, wholesale and retail market pricing, international trade, environmental and resource economics, and public policy. During my academic career, I have served on panels of the U.S. Department of the Interior Science Advisory Board and I have been awarded grants for research by the U.S. Department of Agriculture and private foundations. I have secured over $5 million in Federal grants to fund my research. I have published over 70 articles, proceedings and book chapters and have won numerous awards for my teaching and scholarship.

3. I have been recognized internationally for my research and consulting related to retail market practices, consumer products, environmental and land use regulation, energy and water markets, and antitrust issues. My academic and professional honors include receiving the Atlas Award for Research with Social Impact, the Early Career Award for Outstanding Faculty Research, selection as a Research Fellow in the Rural Development Research Consortium, and member of the Sustainable Management Panel for the Tallgrass Prairie National Preserve. I have provided plenary and keynote addresses at international research conferences, presented scholarly

work at over 30 national and international conferences, and delivered invited seminars at over 25 different universities.

4. My published research in retail markets includes more than a dozen peer reviewed articles in which I have conducted econometric analyses of consumer demand using models that measure the effect of individual product attributes on prices using retail scanner data. These studies are part of a broader academic research program that is focused on consumer purchasing behavior and retail pricing outcomes in categories with extensive product differentiation, such as yogurt, breakfast cereal, soft drinks, ice cream, snack bars, beer, personal care products, and consumer electronics. I have extensive experience utilizing retail point of sale (POS) and household panel data to examine the role of product attributes in determining consumer demand and market prices for individual products in highly differentiated product categories.

5. In my published academic work, I have also analyzed economic incentives for firms to engage in fraudulent labeling of conventional products as "green" products (e.g., "environmentally friendly," "natural," and "organic"). I have estimated consumer willingness to pay premiums for "organic" attributes in food products using consumer survey data.

6. In addition to my work in academia, I have over twenty years of consulting experience. My consulting engagements have included measurement of economic damages in complex litigation, including consumer product cases involving deceptive pricing allegations, as well as comparative price advertising. I have provided expert reports in over 30 class action cases involving consumer damages for misleading product representations, including testimony on economic damages for consumer fraud and false advertising allegations within various retail industries (e.g., food, vitamins, coffee, apparel, and personal care products, among others). As part of my consulting work, I have used hedonic regression models to measure consumer overcharge

for mislabeled "organic" and "natural" product attributes. My consulting engagements have also included market analysis of regulated industries, economic feasibility studies, environmental and land use regulation, groundwater basin management, and portfolio investment modeling.

7. A more detailed list of my qualifications, experience, professional activities, and publications may be found in my curriculum vitae, attached as Exhibit A. A true and correct list of my testimony over the last four years is attached as Exhibit B.

## II. SCOPE OF ANALYSIS

8. I understand that this case involves the labeling of certain beverage products manufactured and marketed by The Coca-Cola Company ("Defendant" or "Coca-Cola") across the Sprite and Fanta brands (the "Products").[1] Over the period May 27, 2021 through at least May 27, 2025 (the "Proposed Class Period"), Plaintiff[2] alleges that the Products were falsely and misleadingly represented as containing "100% Natural Flavors" (the "Challenged Claim") when these Products, in fact, contained synthetically manufactured, artificial, or otherwise non-natural flavoring ingredients that materially contributed to the Products' flavor profile.[3] Plaintiff alleges that, due to the presence of the Challenged Claim on the Products' labels and/or outer packaging, and/or based on the "100% naturally flavored" claim for certain products sold online, consumers paid more for the Products than they would have in the absence of those factual claims (i.e., a "Price Premium").[4]

---

[1] See First Amended Class Action Complaint ("Complaint"), filed March 12, 2026, at p. 1, ¶1. I understand that Plaintiff intends to seek class certification of the beverage products identified in ¶¶ 11 and 16 of the Complaint, for a total of fifteen products (inclusive if various sizes).

[2] Plaintiff as used herein refers to the named Plaintiff, Victoria Palmer. I understand that Sue Kim and Ivan Zermeno are no longer named plaintiffs in this action.

[3] Complaint, at p. 1, ¶5, p.2, ¶11, and p. 51, ¶174.

[4] Complaint, at pp. 6-7, at ¶¶31-32; and pp. 48-49, ¶¶157-158. Rule 30(b)(6) deposition of Defendant, at p. 165: 11-18 (noting the representation 100% Natural Flavors is a factual statement).

9. I understand that Plaintiff seeks actual damages pursuant to the Consumer Legal Remedies Act (Cal. Civ. Code §1780(a) and (b)), for breach of express warranty, and for intentionally misrepresentation for class members during the Proposed Class Period;[5] and in the alternative seeks disgorgement and restitution of wrongful profits, revenue, and benefits acquired by Defendant by unjust enrichment.[6] I understand that the proposed class include all persons in California who purchased one or more of the Products during the Proposed Class Period (the "Class").

10. I understand that the Court, in deciding whether to certify this case as a class action, will evaluate whether the damages allegedly suffered by Class members can be determined using evidence common to the Class. As an economist, I have been retained by Plaintiff's counsel to analyze the issues of (1) whether, during the Proposed Class Period, consumers paid more for the Products than they would have had the Products not been labeled with the Challenged Claims, and (2) in the event they did pay more, the magnitude of the Price Premium they paid. I have also been asked to analyze whether restitutionary measures of recovery can be determined on a class-wide basis in the event the Court determines that a measure other than Price Premium is appropriate in this case.

11. I am not a food scientist and offer no opinion on whether the Challenged Claims relating to the Products is false or misleading. For the purposes of this Declaration, I accept Plaintiff's theory of liability that the Products' labeling was false and misleading because the Products were labeled as containing "100% Natural Flavors" when they, in fact, contained non-

---

[5] Complaint, at pp. 49-50, ¶¶163; p. 51, ¶175; p. 53, ¶88l and p. 55, ¶204.
[6] Complaint, at p. 54, ¶¶202-203.

natural ingredients such as manufactured citric acid that influence the flavor profile of the Products.[7]

12. To support my analysis, I have analyzed data, written discovery responses, deposition testimony and documents produced during discovery.[8] I also reviewed academic research and government reports on various topics, including market prices and consumers' demand for "all natural" and "100% natural" products. A list of the materials that I reviewed or relied upon in the course of my work is attached hereto as Exhibit C.

13. I hold all of the opinions expressed herein to a reasonable degree of professional certainty. The information on which I relied consists of the type of information that is reasonably relied upon by economists in my field of expertise.

14. My compensation does not depend on the substance of my opinions or the outcome of the litigation, and the rate charged for my time spent on this matter is $700 per hour. I was supported in my work by the staff of Central Economics, LLC, an economic and statistical analysis firm. My compensation is independent of the outcome of this matter or of any of the opinions expressed in this matter. All the opinions expressed in this report are my own, independent conclusions.

## III. SUMMARY OF PRINCIPAL CONCLUSIONS

15. It is my opinion that, if Plaintiff establishes that the Challenged Claim for the Products is unfair, false, deceptive and/or misleading, it is possible to reliably calculate, on a class-wide basis, the damages attributable to the presence of the Challenged Claim on every unit of the Products.

---

[7] *Id*. at p. 20, ¶56.

[8] I understand that the Court has limited the scope of discovery to matters related to class certification inquiries only. Dkt. No. 57. In this Declaration, I do not seek to provide a calculation of damages at this time, which damages calculations will be subject to merits discovery at a later stage of the action.

16. I have analyzed the economics literature for consumer products marketed as "natural," "all natural," and "100% natural" and concluded that the "100% Natural Flavors" label (and "100% naturally flavored" claim) is likely to increase consumer demand and market prices for the Products for California consumers. Economic studies systematically confirm that consumers pay higher prices for products labeled as "natural," "all natural," and "100% Natural" than they otherwise would pay for similar products without these representations. The claim of "100% Natural Flavors" on the Products has a direct, logical connection to the "all natural" and "100% Natural" claims on food and beverage products, because each Product is formulated as a flavored concentrate that the Defendant attributes "to the Class Products by **flavor variant** [emphasis added] for Coca-Cola's concentrate sales to the bottlers that service the California market."[9] This evidence suggests that there is little distinction between the "100% natural" flavors claim on the Products and the "100% natural" product claims on other food and beverage products purchased by consumers in California.

17. The existence of higher prices in general for food and beverage products labeled as natural, all natural, and 100% natural provides support for the proposition that the proposed Class members paid a Price Premium due to the mislabeling of the Products as containing "100% Natural Flavors." Valid and accurate methodology exists in the economics literature to ascertain whether the proposed Class members paid a Price Premium and to reliably measure the extent of the Price Premium they paid (e.g., as a percentage of the retail price paid for the Products).

18. The methodologies that I describe in Section V can be used to test the hypothesis that a Price Premium exists in the carbonated soft drink category for the "100% Natural Flavors" claim. If the hypothesis is not rejected, then it is possible to measure the Price Premium at a level of

[9] Defendant's Second Supplemental Responses and Objections to Plaintiff's First Set of Requests for Production ("SSRO"), May 22, 2026 Supplemental Response to Request No. 71, No. 72, and No. 73, at pp. 7-9.

statistical precision that meets the prevailing publication standards in the economics profession for peer-reviewed research.

19. If analysis shows that a Price Premium existed on the Products during the Proposed Class Period due to the presence of the "100% Natural Flavors" claim, then all Class members suffered a common impact, regardless of their motivations for purchasing the Products or their experiences with them after the fact of the purchase. A Price Premium on the Products represents common impact, because, absent the misleading claim of "100% Natural Flavors" (or similar statement) on the Products, **all** consumers would have paid a lower market price for the Products (i.e., by the amount of the Price Premium).

20. Apart from measuring the Price Premium, I can also reliably calculate measures of restitutionary recovery. In particular, for unjust enrichment, there are at least three relevant metrics readily available from ordinary financial statements, including "net sales revenue," "gross profit," and "net profit before tax." The "net sales revenue" metric, which involves disgorgement of net revenue from Defendant's sales of the concentrate to bottlers used for the finished Products, is consistent with the notion that Defendant should not be able to retain any incremental sales revenues received from the allegedly misrepresented Products. The "gross profit" and "net profit before tax" metrics are also based on the incremental sales revenues received from the allegedly misrepresented Products, but seek as a remedy the disgorgement of incremental profits (rather than incremental sales revenue) by adjusting net sales to account for various components of Coca-Cola's production costs.

21. To quantify the Price Premium consumers paid as a result of the Challenged Claims, I presently intend to use a common methodology relied on by economists called "hedonic regression analysis." Hedonic regression analysis is a technique used widely by economists to

measure the value of product attributes, such as "100% Natural Flavors", using actual historical retail price data from sources such as Nielsen, Circana/IRI, or Amazon.com. The hedonic regression methodology reliably accounts for the value consumers received for the Products by controlling for other variables that also influence a product's value such as flavor, brand (e.g., Sprite, Fanta), package size, retail format, geographic location of purchase, and trends in the carbonated soft drink category over time.[10]

22. Regression analysis identifies and quantifies the relationship between two or more variables, seeking to identify the variation in a so-called "dependent" variable (such as the price of a carbonated soft drink) due to that variable's relationship with one or more "independent" or "explanatory" variables (such as whether or not a carbonated soft drink brand is labeled with the "100% Natural Flavors" claim). Regression analysis can confirm that use of the "100% Natural Flavors" representation on the Product label increases the market price of the Products, and if so, the magnitude of the associated Price Premium. Regression analysis controls for other factors influencing prices that are measured in the data (e.g., flavor, brand, package type, retail chain, and location of purchase) and captures the effects of unmeasured variables through the residual or "disturbance" term.

23. Another common and well-established methodology that I could use to value the Price Premium on the Products is "conjoint analysis." Conjoint analysis is a representative survey technique that analyzes consumer responses directly—as opposed to analyzing historical retail prices and the role of product attributes in determining retail prices—to determine consumers' willingness-to-pay for a particular representation made on a product label (e.g., "100% Natural

---

[10] Lusk, J.L., Jamal, M., Kurlander, L., Roucan, M. and Taulman, L., 2005. A meta-analysis of genetically modified food valuation studies. *Journal of Agricultural and Resource Economics*, pp.28-44; and Bonanno, A., 2016. A hedonic valuation of health and non-health attributes in the US yogurt market. *Agribusiness*, 32(3), pp.299-313.

Flavors"). As in the case of hedonic regression analysis, conjoint analysis is founded on rigorous statistical and economic principles.

24. The use of either hedonic regression or conjoint analysis results in a valid and reliable measure to quantify the Price Premium consumers paid for the Products in excess of the amount they would have paid for the products absent the labeling claim. Class-wide damages can be quantified as the product of the overcharge (i.e., the portion of consumer sales attributed to the Price Premium on the Products) and the quantity of the Products sold.

25. The factual foundation, analytical methods and techniques for arriving at these conclusions are set forth in the following sections of this Declaration.

## IV. CONSUMERS ARE WILLING TO PAY, AND DO PAY, A PRICE PREMIUM FOR NATURAL CLAIMS ON PRODUCTS.

26. The existence of a Price Premium for natural claims on food and beverage products provides evidence that the proposed Class members paid a Price Premium due to the presence of the Challenged Claims on the Products. It also demonstrates that Defendant had an economic inventive to mislabel the Products as containing "100% Natural Flavors" (or using the virtually identical representation "100% naturally flavored"[11]) to acquire the Price Premium, including by unjust enrichment.[12]

27. There is an abundance of academic literature and government reports establishing that consumers are motivated to buy natural products in the food and beverage category and that consumers, accordingly, have higher willingness to pay for natural products and pay higher market

[11] I understand that Plaintiff's marketing expert, R. Sukumar, opines that the "100% Natural Flavors" statement is virtually identical to the "100% naturally flavored" statement which I understand is used by online retailers for the Fanta brand of Class Products. Expert Report of R. Sukumar, Ph.D. –Consumer Materiality and Perception, June 24, 2026, p.6.

[12] As previously noted in Section II of this Declaration, I explicitly do not offer an opinion on whether the alleged products are, in fact, mislabeled. However, in analyzing whether or not reliable methodologies exist to calculate the forms of damages alleged in this case, the remainder of this Declaration proceeds as if these products are mislabeled.

prices to acquire natural products in the marketplace. The academic literature is also clear that consumers rely on the accuracy of product labeling to make purchase decisions. As a result, the expected economic impact from the Challenged Claim is for a Price Premium to emerge on the Products that caused common economic damage among members of the proposed Class, each of whom paid a market price that was driven higher by the Price Premium, and was therefore commonly impacted, irrespective of their individual motivations to purchase the Products, or their personal experiences with the Products after the point of sale ("POS").

**A. *Consumers are motivated to buy products that contain "100% Natural Flavors"***

28. I understand that Plaintiff alleges that the proposed Class paid more for Defendant's Products than they would have if those Products had not been labeled with the "100% Natural Flavors" claim, and for the Fanta brand of beverages, also represented online by retailers as "100% naturally flavored".[13] This proposition is supported by substantial industry, academic, and government literature that indicates consumers are driven to purchase natural food and beverage products.

29. Industry evidence indicates that rising consumer demand for products in the natural food and beverage category over time has led to substantial sales growth over the last several decades. According to *Natural Foods Merchandiser*, a leading information provider for the natural, organic, and health food industry in the U.S., the natural and organic products ("NOP") industry generated $325.2 billion in global sales in 2024, and is expected to grow to over $350 billion in 2026.[14] Within the NOP industry, sales in the Natural, Organic and Food and Beverage category totaled $234.8 billion in 2024, growing 5.7% from 2023, driven in part by an increase in

---

[13] Complaint, at pp. 48-49, ¶¶157-158; see also p. 35, ¶98; and p. 19, ¶54.

[14] *Natural Foods Merchandizer*, "Protein, pixels, and purchasing power: Decoding today's natural products consumer," Summer 2025, p.9.

demand among millennials for natural products.[15] Within beverages, natural and organic soft drinks, enhanced drinks, sparkling and flavored waters accounted for $8.9 billion in sales in 2024.[16]

30. In a February 2025 consumer survey by the *Nutrition Business Journal*, respondents were asked to list the attributes they cared about most when shopping NOP, and natural shoppers ranked flavor as more important than price, behind only quality as a driver of purchase intention.[17]

31. Documents obtained by Plaintiff from Coca-Cola confirm that consumers are willing to pay more for, and are motivated to purchase, beverages labeled "100% Natural Flavors" (or similar statement). In a materiality survey[18] conducted by or at the direction of Defendant for [redacted].[19] When listing the most important claims to see on a [redacted].[20]

32. Customer complaint logs provided by Defendant indicate that Coca-Cola customers were aware of the "100% Natural Flavors" claim and found it to be misleading. This evidence suggests that Defendant [redacted] to their customer

[15] *Id.*, p. 11.
[16] *Id.*, p. 16.
[17] *Id.*, p. 12, sourcing *Nutrition Business Journal* survey (N = 1,014 respondents, aged 19-75).
[18] The survey results include [redacted] TCCC_0000159 (confidential); and an email exchange establishes that [redacted], TCCC_0002746 (confidential).
[19] TCCC_0000159 (Confidential).
[20] TCCC_0000160 (Confidential).

service agents for use in addressing complaints regarding the Challenged Claim.[21] These documents provide additional support for the proposition that consumers paid a Price Premium for the Products due to the Challenged Claim.

33. Additionally, I understand that Plaintiff's expert Dr. Sukumar conducted a materiality and consumer perception survey relating to Sprite and Fanta Orange products. Dr. Sukumar's analysis concluded that the use of 100% natural flavors in carbonated beverages is material to consumers' purchasing decisions;[22] that the "100% Natural Flavors" claim is a significant factor in consumer purchasing decisions;[23] that the Challenged Claim is highly important to consumers, with more than half of respondents stating that a carbonated soft drink's label that clearly communicates that all of the flavors are from natural sources is "extremely important" (51.5%);[24] and that most respondents believed that the "100% natural Flavors" representation meant that 100% of the ingredients contributing to the flavor of Sprite and Fanta products are derived from natural sources.[25] This evidence provides further evidence that California consumer consider the "100% Natural Flavors" representation to be important in their purchasing decision as it relates to the Class Products.

**B. *Consumers rely on the accuracy of product marketing when making purchasing decisions.***

34. Consumers rely on the accuracy of marketing statements.[26] Companies communicate information about their products through advertising and labeling statements and consumers, in turn, rely on the accuracy of such marketing to make informed purchase decisions. Advertising through mass media and specialized media can capture consumer attention, explain product usage,

---

[21] TCCC_0000509, quoting [redacted] (Confidential).
[22] Expert Report of R. Sukumar, Ph.D. –Consumer Materiality and Perception, June 24, 2026, p. 30.
[23] *Id.*, pp. 9, 30.
[24] *Id.*, p. 15.
[25] *Id.*, pp. 9, 15-17, 30.
[26] *Kwikset v. Superior Court*, 51 Cal. 4th 310, 328-29 (2011).

and highlight its advantages, while labeling provides specific information about the contents, ingredients, health and safety features, preparation, and storage of a product.[27]

35. For many products, including products labeled as having "100% Natural Flavors," consumers cannot perceive the accuracy of a product's claims at the point of sale, because the attributes advertised in the claims do not substantially affect the appearance of the products. For example, a carbonated soft drink labeled as containing "100% Natural Flavors" looks no different in appearance than a carbonated soft drink that makes no natural claim, but consumers may be willing to pay a higher price for the product with the "100% Natural Flavors" representation. For this reason, consumers rely on companies to make accurate representations of attributes such as "100% Natural Flavors" that may or may not be contained in their products.

36. Accurate marketing statements allow consumers to make informed purchasing decisions based on the attributes contained in the products and the prevailing market prices.[28] It is reasonable to expect that the Challenged Claim on the Products allowed Defendant to receive a Price Premium from consumers in the marketplace.

37. In the United States, the Federal Trade Commission monitors truth in advertising to protect consumers. Truth-in-advertising rules state that advertising "must be truthful and non-deceptive," "must have evidence to back up their claims," and "cannot be unfair."[29] Advertisements identified as deceptive contain a statement or omit information that "[i]s likely to mislead consumers acting reasonably under the circumstances" and "is important to a consumer's decision to buy or use the product."[30]

---

[27] Gardner, Sherwin. "Consumers and food safety: A food industry perspective." In *Food, Nutrition and Agriculture—8/9—Consumer participation in food control.* Food and Agriculture Organization of the United Nations, 1993, accessed June 22, 2026 at http://www.fao.org/docrep/v2890t/v2890t05.htm.
[28] Gardner, Sherwin. Supra note 14.
[29] Federal Trade Commission. "Advertising FAQ's: A Guide for Small Business." April 2001, accessed June 1, 2026 at https://www.ftc.gov/tips-advice/business-center/guidance/advertising-faqs-guide-small-business.
[30] *Id.*

38. Consumers rely on accurate product representations on product labels as well as in online advertising of the Products as containing "100% Natural Flavors" such as appeared on the Coca-Cola website and on the websites of online retailers like Amazon.com. It is also reasonable to expect that the Challenged Claim on the Products in connection with online marketing, such as on a retailer website, allowed Defendant to receive a Price Premium from consumers in the marketplace.

39. It is my understanding that Defendant has represented some of the Products as containing "100% Natural Flavors" on its own website,[31] in online other online promotional materials,[32] and in the advertising copy given the Amazon.com for use for Defendant's online store.[33]

40. It is my understanding that the US Food and Drug Administration ("FDA") has not engaged in rulemaking to establish a formal definition for the term "natural" in the "100% Natural Flavors" claim. The FDA, however, under 21 C.F.R. § 101.22(a)(3), defines the term "natural flavor" or natural flavoring to mean "the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional"; and that "Natural flavors include the natural essence or extractives obtained from plants …"

---

[31] PALMER000270, 273 and 285; Exhibit 13 to Rule 30(b)(6) deposition of Defendant.
[32] PALMER000306, 362, 363 and 364; Complaint, pp. 12-20, ¶54; and pp. 33-35, ¶95.
[33] TCCC_0000156 (Confidential); Rule 30(b)(6) deposition of Defendant, at 125:17-24, and 190:22 – 193:14; *see also* Defendant's First Supplemental Response and Objections to Plaintiff's First Set of Interrogatories, No. 19 (referring to the advertising copy for the Amazon store).

**C. *There is an abundance of academic literature and government reports that acknowledge and measure Price Premiums for products making natural claims.***

41. There is substantial evidence from academic, government, and industry sources that consumers are willing to pay a Price Premium, and indeed do pay a Price Premium, in the market for food and beverages products labeled with natural claims. The existence of a Price Premium in the marketplace for similarly situated food and beverages products is especially relevant to this litigation, because it suggests that the proposed Class was also likely to have paid a Price Premium due to the presence of the Challenged Claims.

42. In regards to price premium for the "100% Natural Flavors" claim, there is considerable evidence that consumers are willing to pay substantial Price Premiums in the market for natural food and beverages.[34] McFadden and Huffman (2017) find consumers are willing to pay a 13-16% Price Premium for food labels describing the product as "natural."[35] For the case of "natural" beef, Lusk and Fox (2002) found consumers are willing to pay 17% and 10% more, respectively, for beef labeled as coming from animals not administered growth hormones, or not fed genetically modified corn.[36]

43. Economic studies have also controlled for multi-attribute labeling of products that jointly make representations "natural" and "organic." For example, Anstine (2007) finds substantial market price premiums for yogurt labeled "all natural" and "organic" and demonstrates

---

[34] Cole, G. 2014. "Natural" labeling and consumers' sentimental pastoral notion, *Journal of Product & Brand Management*, Vol. 23 No. 4/5. https://doi.org/10.1108; Moscato, E.M. and Machin, J.E., 2018. Mother natural: motivations and associations for consuming natural foods. *Appetite*, 121, pp.18-28.

[35] McFadden, J.R. and Huffman, W.E., 2017. Willingness-to-pay for natural, organic, and conventional foods: The effects of information and meaningful labels. *Food Policy*, 68, pp.214-232.

[36] Lusk, J.L. and Fox, J.A., 2002. Consumer demand for mandatory labeling of beef from cattle administered growth hormones or fed genetically modified corn. *Journal of Agricultural and Applied Economics*, 34(1), pp.27-38.

there is no statistically significant difference between consumers' willingness to pay for yogurt that is "all natural" relative to yogurt that is "organic."[37]

44. This finding that consumers are willing to pay substantial Price Premiums for natural food and beverages is corroborated by economic studies that have reliably measured substantial Price Premiums in market data at the point of sale (POS). Using hedonic regression analysis, Bonanno (2016) finds a 35% market price premium for yogurt products making the natural claim in the US market, and Bimbo, et al. (2016) find this premium to be 102% in the Italian market.[38]

45. My review of the economics literature suggests that the market Price Premium for food and beverage products that make natural claims is similar (and in some studies even larger) in magnitude to the price premium consumers are willing to pay for organic food products.[39] This finding is relevant, because an extensive economic literature has found substantial market price premiums for organic attributes in food products that may be similar in magnitude to the Price Premium paid for the Products in this litigation. Examples of peer reviewed studies that have examined the Price Premium on the organic attribute on food and beverage products include:

---

[37] Anstine, J., 2007. Organic and all natural: Do consumers know the difference? *Journal of Applied Economics & Policy*, 26(1), pp. 15-27.

[38] Bonanno, A., 2016. A hedonic valuation of health and nonhealth attributes in the US yogurt market. *Agribusiness*, 32(3), pp.299-313; Bimbo, F., Bonanno, A., and Viscecchia, R., 2016. Do Health Claims Add Value? The Role of Functionality, Effectiveness and Brand. *European Review of Agricultural Economics*, 43(5): 761–780.

[39] Anstine, J., 2007. Organic and all natural: Do consumers know the difference? *Journal of Applied Economics & Policy*, 26(1), pp. 15-27; Adalja, A.A., 2018. The Impact of Voluntary Non-GMO Labeling on Demand in the Ready-to-Eat Cereal Industry. In 2018 Annual Meeting, August 5-7, Washington, DC (No. 273817). *Agricultural and Applied Economics Association*. Bonanno, A., 2016. A hedonic valuation of health and nonhealth attributes in the US yogurt market. *Agribusiness*, 32(3), pp.299-313; Bimbo, F., Bonanno, A., and Viscecchia, R., 2016. Do Health Claims Add Value? The Role of Functionality, Effectiveness and Brand. *European Review of Agricultural Economics*, 43(5): 761–780.

- Green, et al. (2009): Using Nielsen Homescan data on actual consumer food purchases in 2005, Green et al. (2009) compared organic and conventional prices for 18 fruits and 19 vegetables and found an organic price premium for all products in their sample.[40]
- Lin, et al. (2008): Using the same dataset as Green, et al., Lin, et al. compared organic and conventional prices for 5 fruits and 5 vegetables. Their analysis found substantial organic price premiums for all 10 products, with estimates that were statistically significantly at the 99% confidence level.[41]
- Szathvary and Trestini (2014): Also using Nielsen Homescan data on actual purchases, Szathvary and Trestini considered fruit beverage products, and found an organic price premium of 61.9% (relative to conventional prices), which was statistically significant at the 99% confidence level.[42]
- Leschewski, et al. (2016): Leschewski, et al. found organic price premiums for fruit juice (35% above conventional) and fruit drinks (136% above conventional).[43]
- Tavares, et al. (2021): Tavares, et al. study the market for fruit nectars and juices in Brazil and France, where they find organic price premiums (relative to conventional prices) of 50% and 10%, respectively. [44]
- Smith, et al. (2009): Using Nielsen Homescan data on consumer food purchases in 2006, Smith, et al. found organic price premiums for milk ranging from 60% to 109% over

---

[40] Greene, C., Dimitri, C., Lin, B.-H., McBride, W., Oberholtzer, L., and Smith, T., "Emerging issues in the U.S. Organic Industry," *Economic Research Service/USDA* EIB 55 (2009), p. 18.
[41] Lin, B.-H., Smith, T.A., and Huang, C.L., "Organic premiums of fresh produce," *Renewable Agriculture and Food Systems* 23.3 (2008), p. 214.
[42] Szathvary, S. and Trestini, S., 2014. A Hedonic Analysis of Nutrition and Health Claims on Fruit Beverage Products. *Journal of Agricultural Economics*, 65: 505-517.
[43] Leschewski, A., Weatherspoon, D. and Kuhns, A., 2016. A Segmented Hedonic Analysis of the Nutritional Composition of Fruit Beverages. *International Food and Agribusiness Management Review*, 19(3): 119-140.
[44] Tavares, V. de S., Perez, R., Stringueta, P.C. and Braga, G.B., 2021. Impact of Organic Certification on the Price of Ready-to-Drink Fruit Nectars and Juices. *Food Science and Technology,* 41(2):395-403.

conventional prices, with price premiums statistically significant at the 99% confidence level.[45]

- Staudigel and Trubnikov (2022): Using household scanner data from Germany on actual purchases, Staudigel and Trubnikov analyze different types of red meat and poultry products, finding organic price premiums (relative to conventional prices) that range from 14% for minced beef to 108% for chicken breast. [46]
- Greene and Calvin (1996): Greene and Calvin found organic price premiums for salad mix (14% above conventional) and carrots (110% above conventional).[47]
- Sok and Glaser (2001): Sok and Glaser found organic price premiums for salad mix (10% above conventional) and carrots (125% above conventional), and broccoli (130% above conventional).[48]
- Oberholtzer, et al. (2004): Oberholtzer found organic price premiums for salad mix (7% above conventional) and carrots (148% above conventional), and broccoli (153% above conventional).[49]

---

[45] Smith, T.A., Huang, C.L., and Lin, B.-H., "Estimating organic premiums in the US fluid milk market," *Renewable Agriculture and Food Systems* 24.3 (2009), p. 203.
[46] Staudigel, M. and Trubnikov, A., 2022. High Price Premiums as Barriers to Organic Meat Demand? A Hedonic Analysis Considering Species, Cut and Retail Outlet. *Australian Journal of Agricultural and Resource Economics*, 66: 309-334.
[47] Greene, C. and Calvin, L., "'Organically grown' vegetables: U.S. acreage and markets expand during the 1990s," *USDA Economic Research Service Vegetables and Specialties Situation and Outlook, Special Article* VGS-271, (1997) p 27-28.
[48] Sok, E., and Glaser, L., "Tracking wholesale prices for organic produce," *USDA, Economic Research Service Agricultural Outlook* (2001), p. 7-8.
[49] Oberholtzer, L., Dimitri, C., and Greene, C., "Price premiums hold on as U.S. organic produce market expands," *Economic Research Service/USDA* VGS-308-01 (2005), p. 14.

- Thompson and Kidwell (1998): Thompson and Kidwell reported that organic products in general are sold at a statistically significant price premium ranging from 40% to 175% above the price of conventional products.[50]
- Maguire, et al. (2004): Maguire, et al. found a statistically significant premium for organic baby food of 16%–27% over the conventional price.[51]

46. The vast economic literature estimating substantial market price premiums for natural and organic food and beverages indicates that it is highly likely that consumers paid a Price Premium due to the Challenged Claim on the Products. To the extent that such a Price Premium exists for the "100% Natural Flavors" claim (or "100% naturally flavored" claim), which can reasonably be viewed as a species of "natural" claims, it absolutely can be reliably quantified using conventional retail scanner data that I expect to receive at the damages stage of this litigation, such as from Nielsen, Circana/IRI, and retailers such as Amazon.com.

## V. RELIABLE METHODOLOGIES MAY BE USED TO CALCULATE CLASS-WIDE DAMAGES IN THIS CASE.

47. I understand that the court will assess whether a reliable methodology exists that can be used to calculate damages on a Class-wide basis. In my opinion, there are two feasible and accurate methodologies available to calculate the Price Premium due to the Challenged Claim: hedonic regression analysis and conjoint analysis. I understand that appropriate data exist and will be available to Plaintiff to conduct such analysis at the merits stage of the action. As detailed in this section, there are proven methodologies to calculate the Price Premium paid by consumers

[50] Thompson, G.D. and Kidwell. J., "Explaining the choice of organic produce: Cosmetic defects, prices, and consumer preferences," *American Journal of Agricultural Economics* 80 (1998), p. 279.
[51] Maguire, K.B., Owens. N., and Simon, N.B., "The price premium for organic baby food: A hedonic analysis," *Journal of Agricultural and Resource Economics* 29 (2004), p. 147.

due specifically to the "100% Natural Flavors" claim.[52] The methodology to calculate the Price Premium will proceed as described below.[53]

48. Before determining the Price Premium on the Products, I will estimate the total retail sales of the Products, in dollars and units, using reported data from Coca-Cola or from third parties such as Nielsen and IRI, which collect point-of-sale data from retail outlets. The data is reported in a format that will allow me to obtain retail sales for the Proposed Class Period and geographic location (e.g., California). I understand that records maintained by Coca-Cola, or which could be obtained from third parties such as bottlers of the Products and/or retailers, would also reflect the number of units shipped for retail sale by time period and geographic location, sufficient to determine relevant sales to California consumers.

***A. There is a valid and accurate methodology to calculate the Price Premium resulting from the Challenged Claims on the Products.***

49. The Price Premium California consumers paid in the market for the "100% Natural Flavors" claim on the Products provides a reliable metric for measuring class-wide damages. The reason is that, while consumers purchase products labeled as "100% Natural Flavors" for a variety of different motivations, the specific reason why each customer purchased a Product is irrelevant to the measurement of overall damages, because a properly labeled product would have been less expensive to **all** consumers. Thus, if a Price Premium is shown to exist due to the Challenged Claims on the Products, every California Class member suffered common harm even if some Class members chose to purchase the Products based upon considerations unrelated to the Challenged Claims. Because the presence of the "100% Natural Flavors" representation (or "100% naturally

[52] Should the Court decide that a measure of damages other than Price Premium is appropriate in this case, there are alternative methodologies available to measure Coca-Cola's sales and/or profits derived from the sale of the concentrate to bottlers used to make the finished Products. Rule 30(b)(6) deposition of Defendant, at 199:25-200:18.
[53] Note that some of these steps may be unnecessary or revised based on the nature of the sales data received. However, any alteration will still ensure that damages are applied only to the Products sold in the correct geographic location during the Proposed Class Period.

flavored" claim) on products results in a Price Premium paid by all consumers, this approach to measuring economic damages requires neither individualized analyses nor Class-member-specific inquiry.

50. There are two valid and accurate methods that can be used to calculate the Price Premium paid by the proposed Class members attributable to the Challenged Claim on the Products, while controlling for other product attributes that may also influence consumer prices. The first method is "hedonic regression analysis," which relies on historical point-of-sale ("POS") data reporting the actual prices paid for Coca-Cola's products and competitors' products to determine whether there is a Price Premium for Products containing the Challenged Claim and to calculate the Price Premium if there is one. The second method is "conjoint analysis," which identifies consumers' willingness-to-pay for the "100% Natural Flavors" representation on products through carefully controlled experiments.

51. Once the Price Premium has been identified using one or more of these methods, class-wide damages can be measured by multiplying the calculated Price Premium by the number of units of the Products sold, as discussed above.

**1. *Hedonic regression analysis can be used to measure the value of the "100% Natural Flavors" claim on the Products.***

52. The Price Premium for the "100% Natural Flavors" claim on the Products can be measured using hedonic regression analysis, a statistical technique frequently applied by economists in the academic literature to estimate the value associated with claims on product

labels,[54] and widely accepted by courts for the reliable measurement of class-wide damages.[55] Indeed, the two seminal papers establishing the use of the hedonic pricing methodology for multi-attribute products[56] and for differentiated products[57] collectively have been cited over 37,500 times by studies in the economics literature, including over 2,300 times since 2025.[58]

53. The hedonic regression approach has a strong pedigree in the economics literature dating back at least to Waugh (1928) and is rooted in well-established and formal economic theory predicated on the fact that consumers derive satisfaction or utility from the characteristics that goods contain (Lancaster, 1966; Rosen, 1974).[59] More recently, the modern approach to

---

[54] Examples of hedonic studies estimating the price premium for the all natural attribute include Anstine, Jeffrey. 2007. Organic and All Natural: Do Consumers Known the Difference? *Journal of Applied Economics & Policy* 26(1), pp. 15-27; Bonanno, A., 2016. A hedonic valuation of health and nonhealth attributes in the US yogurt market. *Agribusiness*, 32(3), pp.299-313. Bimbo, F., Bonanno, A., and Viscecchia, R., 2016. Do Health Claims Add Value? The Role of Functionality, Effectiveness and Brand. *European Review of Agricultural Economics*, 43(5): 761–780; McFadden, J.R. and Huffman, W.E., 2017. Willingness-to-pay for natural, organic, and conventional foods: The effects of information and meaningful labels. *Food Policy*, 68, pp.214-232. Examples of hedonic studies estimating the price premium for the organic attribute in food and beverages include Szathvary, S. and Trestini, S., 2014. A Hedonic Analysis of Nutrition and Health Claims on Fruit Beverage Products. *Journal of Agricultural Economics*, 65: 505-517; Leschewski, A., Weatherspoon, D. and Kuhns, A., 2016. A Segmented Hedonic Analysis of the Nutritional Composition of Fruit Beverages. *International Food and Agribusiness Management Review*, 19(3): 119-140; Tavares, V. de S., Perez, R., Stringueta, P.C. and Braga, G.B., 2021. Impact of Organic Certification on the Price of Ready-to-Drink Fruit Nectars and Juices. *Food Science and Technology,* 41(2):395-40; Lin, B.H., Smith, T.A. and Huang, C.L., 2008. Organic premiums of US fresh produce. *Renewable Agriculture and Food Systems,* 23(3), pp.208-216; Maguire, K.B., Owens, N. and Simon, N.B., 2004. The price premium for organic baby food: a hedonic analysis. *Journal of Agricultural and Resource Economics*, pp.132-149; Smith, T.A., Huang, C.L. and Lin, B.H., 2009. Estimating organic premiums in the US fluid milk market. *Renewable agriculture and food systems*, 24(3), pp.197-204.

[55] I have measured consumer damages from false labeling claims using the hedonic regression approach in *Brown v. Hain Celestial Group, Inc.,* 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014), *In Re. KIND LLC "Healthy and All Natural" Litigation*, No. 15-MD-02645-WHP, (S.D. New York), *Lenore Miley v. Belkin International Inc.*, No. 20STCV00033 (Cal Sup, Los Angeles), and *Lisa Rouse et al. v. H.B. Fuller Company*, No. 0:22-cv-02173-JMB-JFD (District of Minnesota), including estimation of a positive and highly significant Price Premium for the "all natural" claim in *In Re. KIND LLC "Healthy and All Natural" Litigation*, No. 15-MD-02645-WHP, (S.D. New York).

[56] Lancaster, K. "A New Approach to Consumer Theory," *The Journal of Political Economy* 74, no. 2 (1966): 132-157.

[57] Rosen, S. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," *Journal of Political Economy* 82, no. 1 (1974): 34-55.

[58] Google Scholar. "Lancaster: A new approach to consumer theory - Google Scholar," accessed June 1, 2026, at https://scholar.google.com/scholar?cites=2474203905604306248&as_sdt=2005&sciodt=0,5&hl=en; Google Scholar. "Rosen: Hedonic prices and implicit markets: product... - Google Scholar" accessed June 1, 2026, at https://scholar.google.com/scholar?cites=11460718718858810305&as_sdt=2005&sciodt=0,5&hl=en.

[59] Waugh, F.V., 1928. Quality factors influencing vegetable prices. *Journal of Farm Economics*, 10(2), pp.185-196; Lancaster, Kelvin. "A New Approach to Consumer Theory," *The Journal of Political Economy* 74, no. 2 (1966): 132-157; Rosen, S. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," *Journal of Political Economy* 82, no. 1 (1974): 34-55.

identifying demand parameters in attribute models, which has become standard in the economics literature, was pioneered by Berry, Levinsohn and Pakes (1995)[60] and Nevo (2001).[61] These articles have provided the methodological basis for estimating price premia on individual product attributes in branded, multi-attribute products in a wide class of product categories. The article by Berry *et al*. has been cited over 8,600 times, and the Nevo article has been cited over 3,450 times.[62]

54. The hedonic regression model has been employed in a myriad of applications across a wide range of fields such as economics, marketing, food science, real estate, and environmental sciences. For example, they have been used to calculate price premiums of attributes for goods as diverse as vehicles (Berry, et al., 1995), personal computers (Berndt and Rappaport, 2001), breakfast cereal (Stanley and Tschirhart, 1991), produce (Thompson and Kidwell, 1998), baby food (Maguire et al., 2004), eggs (Chang et al., 2010), meat (Staudigel and Trubnikov, 2022), milk (Loke et al., 2015), yogurt (Bonanno, 2016), housing (Karato et al., 2015), running shoes (Arrondo et al., 2018), among many others.[63]

---

[60] Berry, S., Levinsohn, J., and Pakes, A. 1995. Automobile prices in market equilibrium. *Econometrica* 63(4): 841-890.

[61] Nevo, A., 2001. Measuring Market Power in the Ready-to-Eat Cereal Industry. *Econometrica* 69(2): 307–342.

[62] Google Scholar. "Berry: Automobile prices in market equilibrium - Google Scholar," accessed June 1, 2026, athttps://scholar.google.com/scholar?cites=929349664358777430&as_sdt=2005&sciodt=0,5&hl=en; Google Scholar. "Nevo: Measuring Market Power in the Ready-to-Eat Cereal Industry - Google Scholar," accessed June 1, 2026 at https://scholar.google.com/scholar?cites=9110320443802079447&as_sdt=2005&sciodt=0,5&hl=en

[63] Berndt, E.R. and Rappaport, N.J., 2001. Price and quality of desktop and mobile personal computers: A quarter-century historical overview. *American Economic Review*, *91*(2), pp.268-273; Stanley, L.R. and Tschirhart, J., 1991. Hedonic prices for a nondurable good: The case of breakfast cereals. *The Review of Economics and Statistics*, pp.537-541; Thompson, G.D. and Kidwell, J., 1998. Explaining the choice of organic produce: cosmetic defects, prices, and consumer preferences. *American Journal of Agricultural Economics*, 80(2): 277-287; Maguire, K.B., Owens, N. and Simon, N.B., 2004. The price premium for organic babyfood: a hedonic analysis. *Journal of Agricultural and Resource Economics*, pp.132-149; Chang, J.B., Lusk, J.L. and Norwood, F.B., 2010. The price of happy hens: A hedonic analysis of retail egg prices. *Journal of Agricultural and Resource Economics*, pp.406-423; Staudigel, M. and Trubnikov, A., 2022. High Price Premiums as Barriers to Organic Meat Demand? A Hedonic Analysis Considering Species, Cut and Retail Outlet. *Australian Journal of Agricultural and Resource Economics*, 66: 309-334; Loke, M.K., Xu, X. and Leung, P., 2015. Estimating organic, local, and other price premiums in the Hawaii fluid milk market. *Journal of Dairy* Science, 98, pp.2824-2830; Bonanno, A., 2016. A Hedonic Valuation of Health and Nonhealth Attributes in the U.S. Yogurt Market. *Agribusiness*, 32(3): 299-313; Karato, K., Movshuk, O. and Shimizu, C., 2015. Semiparametric Model of Hedonic Housing Prices in Japan. *Asian Economic Journal,* 29(4), pp.325-345; Arrondo, R., Garcia, N. and Gonzalez, E., 2018. Estimating product efficiency through a hedonic pricing best practice frontier. *Business Research Quarterly*, *21*(4), pp.215-224.

55. In addition, hedonic regression has been used in the literature (in combination with scanner data) to analyze product attributes of carbonated soft drinks such as bottle size, sugar content, flavor, and brand.[64] While I am presently unaware of previous economics research that has estimated a price premium for the "100% Natural Flavors" claim on carbonated soft drinks, a large literature has used hedonic regression to estimate the price premium for various forms of the natural claim on food products,[65] and to estimate price premiums for related attributes like "organic" specifically for beverage products.[66] Estimating the price premium on the "100% Natural Flavors" claim for carbonated soft drinks is conceptually no more complex than estimating the price premiums on the natural and organic attributes of the products considered in the literature, and reasonably represents a species of "natural" product claims.

56. The hedonic regression model enables economists to calculate the relationship between a dependent variable (e.g., sales price) and multiple independent variables (e.g., brand, package type, container size, pack size, time trends, and the natural representation on the product label). A regression model identifies the magnitude of the effect for each independent variable, determines whether the effect is statistically significant (i.e., not due to random variation in the

---

[64] Bronnmann, J., and Hoffmann, J., 2018. Product Differentiation in the German Soft Drink Market: Which Attributes Matter? *Applied Economics Letters*, 25(14): 968–971; Martínez-Garmendia, J., 2010. Application of Hedonic Price Modeling to Consumer Packaged Goods Using Store Scanner Data. *Journal of Business Research*, 63(7): 690-696; Fox, K.J. and Melser, D., 2014. Non-Linear Pricing and Price Indexes: Evidence and Implications from Scanner Data. *Review of Income and Wealth*, 60: 261-278.

[65] Anstine, Jeffrey. 2007. Organic and All Natural: Do Consumers Known the Difference? *Journal of Applied Economics & Policy* 26(1), pp. 15-27; and Bonanno, A., 2016. A hedonic valuation of health and nonhealth attributes in the US yogurt market. *Agribusiness*, 32(3), pp.299-313; Bimbo, F., Bonanno, A., and Viscecchia, R., 2016. Do Health Claims Add Value? The Role of Functionality, Effectiveness and Brand. *European Review of Agricultural Economics*, 43(5): 761–780.

[66] Szathvary, S. and Trestini, S., 2014. A Hedonic Analysis of Nutrition and Health Claims on Fruit Beverage Products. *Journal of Agricultural Economics*, 65: 505-517; Leschewski, A., Weatherspoon, D. and Kuhns, A., 2016. A Segmented Hedonic Analysis of the Nutritional Composition of Fruit Beverages. *International Food and Agribusiness Management Review*, 19(3): 119-140; Tavares, V. de S., Perez, R., Stringueta, P.C. and Braga, G.B., 2021. Impact of Organic Certification on the Price of Ready-to-Drink Fruit Nectars and Juices. *Food Science and Technology,* 41(2):395-40.

data), and measures how well the model predicts the outcomes (i.e., the "coefficient of determination" or "R-Squared"). Thus, a regression framework can simultaneously measure the Price Premium associated with the "100% Natural Flavors" representation, while assessing its statistical significance and providing diagnostics to measure the overall predictive capabilities and "goodness of fit" of the model.

57. The hedonic regression method uses retail scanner data comprising actual retail sales prices and various product attributes, which are available from market research firms that track actual point-of-sale purchases (e.g., Nielsen, Circana/IRI, Spins).[67] These data are available for products in the carbonated soft drinks category and, to the extent that the POS data contains insufficient granularity to determine the "100% Natural Flavors" representation on product labels or other relevant characteristics of the products (e.g., whether the product contains caffeine, is zero sugar, contains real fruit, or other positioning claims), these data can be supplemented with publicly-available data documented below.

58. I understand that Plaintiff has acquired a sample of [redacted] data from Coca-Cola through discovery in this litigation.[68] Nielsen, Circana/IRA, and Spins data of this nature include key product attributes such as brand, product type, time and place of purchase, volume (ounces), flavor, container size, pack size, and various label claims that represent key marketing attributes used by competing brands in the category, including in some cases "natural." However, the data currently provided to me in TCCC_0000189, TCCC_0000267, and TCCC_0002748 differs substantially from previous retail scanner data I have work with (e.g., Nielsen, Circana/IRI,

[67] The Nielsen "ScanTrack" data and Circana "Infoscan" data both track actual sales for grocery stores in different states by state and by metropolitan area, which allows the analysis to be limited to calculating the price premium in the appropriate jurisdictions (e.g., California). As previously noted in Section IV.C of this Declaration, there are many different studies by academic and government economists that use data from these sources to estimate the price premium of the "natural" attribute in consumer products.

[68] TCCC_0000189, TCCC_0000267, and TCCC_0002748.

Amazon.com) for both academic and litigation purposes, as I would expect more detailed data to be available.

59. There are at least three important differences between the [redacted] data provided by Defendant and the [redacted] data I regularly procure for regression analysis. First, the data produced in TCCC_0000189, TCCC_0000267 contain information [redacted]. Second, while the file TCCC_0002748 does contain [redacted] to allow numeric matching of products across databases, which is typically available from [redacted]. Third, the data contain information on only two brands (FANTA and SPRITE), instead of containing information for a wide range of flavors offered by Coca-Cola and for the flavors offered by competing brands in the carbonated soft drinks category. To conduct my hedonic regression analysis, I will seek additional data concerning retail sales in the carbonated soft drink category from Coca-Cola and third-party data vendors that includes competing brands.

60. To conduct hedonic regression analysis of the Price Premium on the "100% Natural Flavors" claim, I intend to acquire the usual, third-party scanner data (or else Defendant will provide it) from Nielsen, Circana/IRI, Spins and/or Amazon.com. If natural flavoring claims such as "100% Natural Flavors" do not appear in the list of key marketing attributes in the carbonated soft drinks category provided by third-party data purveyors, then I will collect them using standard methods of attribute collection used regularly in the economics profession in conducting hedonic regression analysis. Specifically, the method I will use to augment the list of attributes provided with the scanner data, if necessary, includes visual inspection of product marketing statements

from online websites and in-store product labels, combined with the use of third-party data collected by companies such as Mintel and Innova that track product marketing claims throughout the retail industry.

61. Detailed data on products labeled as containing "100% Natural Flavors" are available from Mintel Group Ltd.'s Global New Products Database ("GNPD"). I have purchased and utilized Mintel GNPD data numerous times for both academic studies and for litigation. The Mintel Group maintains an IRIS database that overlays Circana/IRI sales data with marketing claims made on products.[69]

62. Based on my review of files produced by Defendant in discovery, I understand that Coca-Cola has relied on [redacted].[70] Data from the Mintel Group are publicly available for purchase and can be used to refine, cross-check, and expand attribute designations on products in the carbonated soft drinks category obtained from Nielsen, Circana/IRI, and retailers such as Amazon.com.

63. The Table below contains an example of the attributes collected by Mintel for food and beverage products in the snack bars category. I expect Mintel to provide a similarly detailed range of attributes claimed on individual products in the carbonated soft drinks category. I have not yet purchased access to the Mintel GNPD to acquire the actual attributes Mintel has recorded for the carbonated soft drink category, but I will report them in itemized detail after I have purchased the Mintel GNPD in the event that such a purchase is necessary.

[69] Mintel Group Ltd., GNPD database, accessed June 1, 2026 from data obtained on February 26, 2020, at https://www.mintel.com/global-new-products-database.

[70] TCCC_0000571-0000574 contains a summary of a [redacted], which suggests Coca-Cola is at least aware of and has purchased [redacted].

| Positional Claims for Products in the Snack Bars Category | |
|---|---|
| ***Challenged:*** | All Natural |
| ***Other:*** | Added Calcium, Anti-Ageing, Antioxidant, Babies & Toddlers (0-4), Biodegradable, Caffeine Free, Carbon Neutral, Children (5-12), Cobranded, Convenient Packaging, Dairy Free, Diabetic, Diet/Light, Ease of Use, Economy, Ethical-Animal, Ethical-Charity, Ethical-Environmentally Friendly Package, Ethical-Environmentally Friendly Product, Ethical-Human, Ethical-Recycling, Ethical-Sustainable, Ethical-Toxins Free, Event Merchandising, Female, Functional - Beauty Benefits, Functional - Bone Health, Functional - Brain & Nervous System, Functional - Cardiovascular, Functional - Digestive, Functional - Energy, Functional - Eye Health, Functional - Immune System, Functional - Other, Functional - Skin, Functional - Slimming, Functional - Stress & Sleep, Functional - Weight & Muscle Gain, Gluten Free, Halal, High Satiety, High/Added Fiber, High/Added Protein, Hormone Free, Innovative Ingredient, Kosher, Limited Edition, Low/No/Reduced Allergen, Low/No/Reduced Calorie, Low/No/Reduced Carb, Low/No/Reduced Cholesterol, Low/No/Reduced Fat, Low/No/Reduced Glycemic, Low/No/Reduced Lactose, Low/No/Reduced Saturated Fat, Low/No/Reduced Sodium, Low/No/Reduced Transfat, Low/No/Reduced Sugar, Male, Maternal, Microwaveable, Nails & Hair, No Added Sugar, No Additives/Preservatives, Novel, On-the-Go, Organic, Palm Oil Free, Portionability, Prebiotic, Premium, Probiotic, Seasonal, Social Media, Stanols/Sterols, Sugar Free, Time/Speed, Vegan/No Animal Ingredients, Vegetarian, Vitamin/Mineral Fortified, Wholegrain |

64. The characteristics of the products that are included in the hedonic regression analysis depend on the measured product attributes provided in the available data as well as on the potential sources of variation present in the data sample. Potentially relevant characteristics that commonly appear in retail scanner data include: (1) indicator variables for the time period (e.g., week, month or year), which control for factors that are constant within a given time period but change over time (e.g., government regulations, economic conditions, price inflation, and seasonal price trends); (2) flavor-level indicator variables, which control for characteristics that determine demand for individual brands and flavor variants; (3) manufacturer-level indicator variables (e.g., Coca-Cola, PepsiCo, Keurig Dr. Pepper), which control for company-level characteristics that may be important to consumers such as company recognition or loyalty at the flagship level; and (3)

indicator variables for the store or chain where the product is sold, which control for pricing tendencies and product availability across retail stores and chains.

65. I have regularly employed data from Nielsen, Circana/IRI, and Amazon.com in my research and the methodology for calculating a price premium using hedonic regression analysis is the same both for data provided by online retailers such as Amazon.com and by third-party data purveyors such as Nielsen. In the case of Nielsen and Circana/IRI scanner data, regional sales information is captured by major metropolitan area and at the State level for California, whereas data from Amazon.com is typically provided by zip code at the individual customer transaction level.

66. Retail scanner data also includes information on the type of packaging (e.g., plastic, glass, aluminum), container size (e.g., 12 ounces, 1 liter), pack size (e.g., single, 6-pack, 12-pack, 24-pack, 30-pack), and various marketing and positional claims that are commonly used by brands in the category of interest, which potentially includes "100% Natural Flavors" in the case of carbonated soft drinks. These data can be supplemented, as needed, with data from Mintel Group and from consumer groups that track the use of natural claims on individual product labels. These data can be matched with products in the retail scanner data by Universal Product Code (UPC), Global Trade Item Number (GTIN), Amazon Standard Identification Number (ASIN), Target Department Class item (DPCI), barcode, and Vendor item descriptions. These supplemental data sources can also be used to gather information on other relevant characteristics of the products, such as whether the product is zero sugar, contains real fruit, is organic, if it contains caffeine, as well as the type of sweetener used, and whether it is sold on a promotional price on the date of sale.

67. Economic damages from the "100% Natural Flavors" representation in the hedonic regression equation are represented by the Price Premium on this attribute contained in the Products. The hedonic regression approach offers a method to calculate the overcharge to consumers that is due only to the mislabeling conduct (i.e., the additional value created by use of the "100% Natural Flavors" representation (or similar "100% naturally flavored" claim) after controlling for other attributes contained in the product).

68. I have considerable experience using retail scanner data from Nielsen, Circana/IRI, and Amazon.com, both in producing hedonic models for litigation,[71] and in estimating consumer demand and the value of product attributes for determining economic value in academic studies.[72]

**2. *"Conjoint analysis" can be used to value the "100% Natural Flavors" claim on the Products.***

69. Conjoint analysis is another method that can be used to value a specific marketing claim on products, while controlling for various other product attributes that affect consumers' willingness to pay. Conjoint analysis, which I could use here, would focus on directly measuring consumers' willingness to pay for the product attribute of interest by eliciting the value of products

[71] In Re. KIND LLC "Healthy and All Natural" Litigation, No. 15-MD-02645-WHP, (S.D. New York); *Lenore Miley v. Belkin International Inc.*, No. 20STCV00033 (Cal Sup, Los Angeles); *Lisa Rouse et al. v. H.B. Fuller Company*, No. 0:22-cv-02173-JMB-JFD (District of Minnesota); and *Brown v. Hain Celestial Group, Inc.,* 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014) (holding that "the proposed damages model controls for other variables, will be run on a universe of known labels, [and] is proposed by a reputable expert.").

[72] Richards, T.J. and Hamilton, S.F., 2006. Rivalry in price and variety among supermarket retailers. *American Journal of Agricultural Economics*, *88*(3), pp.710-726; Richards, T.J., Hamilton, S.F. and Patterson, P.M., 2010. Spatial competition and private labels. *Journal of Agricultural and Resource Economics*, pp.183-208; Richards, T.J., Allender, W.J. and Hamilton, S.F., 2012. Commodity price inflation, retail pass-through and market power. *International Journal of Industrial Organization*, *30*(1), pp.50-57; Richards, T. and Hamilton, S.F., 2012. Network externalities in supermarket retailing. *European Review of Agricultural Economics*, *40*(1), pp.1-22; Richards, T.J., Allender, W.J. and Hamilton, S.F., 2013. Rivalry in price and location by differentiated product manufacturers. *American Journal of Agricultural Economics*, *95*(3), pp.650-668; Richards, T.J. and Hamilton, S.F., 2015. Variety pass-through: An examination of the ready-to-eat breakfast cereal market. *Review of Economics and Statistics*, *97*(1), pp.166-180; Richards, T.J., Hamilton, S.F. and Yonezawa, K., 2017. Variety and the cost of search in supermarket retailing. *Review of Industrial Organization*, *50*(3), pp.263-285; Richards, T.J., Hamilton, S.F. and Yonezawa, K., 2018. Retail market power in a shopping basket model of supermarket competition. *Journal of Retailing*, *94*(3), pp.328-342; Richards, T.J. and Hamilton, S.F, 2020. Retail Price Discrimination and Food Waste, *European Review of Agricultural Economics*, 47(5), pp. 1861–1896.

with and without the "100% Natural Flavors" representation. Using this method, product quality and brand effects can be controlled for by explicitly asking survey respondents to consider choice sets with different combinations of product attributes, including products labeled with the precise statements used on Coca-Cola's Products. The difference in a consumers' willingness to pay for products with and without the misleading representation effectively isolates consumers' willingness to pay for the attribute of interest, for instance the value of a product making the statement "100% Natural Flavors" relative to the value of a product that does not make this representation.

70. Conjoint analysis confronts survey panelists with various choices of product attributes, prices, and other alternatives, and asks them either to rank their preferences over attributes, or to choose the most preferred attribute or combination of attributes. By systematically (and randomly) varying the attributes of the product and observing how respondents react to the resulting product profiles, conjoint analysis gathers statistical information about consumer's willingness to pay for various attributes in the products, including the actual market prices charged for the products. Statistical methods, typically conducted through regression analysis, are then applied to the survey responses to calculate attribute value.

71. Conjoint analysis is founded on rigorous statistical and economic principles and has a long history of use as a method used to certify Class damages in litigation.[73] Conjoint

[73] See, e.g., *Khoday v. Symantec Corp*., 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.,* 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.,* 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); Microsoft v. Motorola, Inc., 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.,* 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *TV Interactive Data Corp. v. Sony Corp.,* 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.,* 2018 WL 3126385 (N.D. Cal. June 26, 2018); *In Re Arris Cable Modem Consumer Litig*., 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018); *Hadley v. Kellogg Sales Co.,* 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018); *Martinelli v. Johnson & Johnson,* 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019)

analysis is also widely used by economists in academic research to estimate the value of the attributes introduced on product labels.[74]

72. Conjoint analysis relies on data generated through the survey process and does not require existing data from Coca-Cola, nor from Nielsen or IRI, to calculate economic damages for the Products. The choice options in a conjoint analysis can include price options that coincide with the actual prices that Coca-Cola charged for their products, thereby controlling for supply-side factors that influence market outcomes.

73. I have relied on consumer survey techniques to measure consumers' willingness to pay in markets for natural food products in my own academic research,[75] and I have conducted conjoint analysis to calculate economic damages in the form of a Price Premium on the "100% clean, pollution free energy" claim in the New York electricity provider market.[76] I have used specialized market research firms to design the sampling frame and survey instrument for the conjoint analysis and will do the same in the event I use data from conjoint analysis to measure the Price Premium on Products.

74. Conjoint analysis can be used to measure the price differential attributable to Coca-Cola's statements in exactly the form they appear on product labels. Conjoint analysis does not require individualized analyses, or Class-member-specific inquiry. All relevant data needed to complete conjoint analysis is class-wide, common evidence, as are the results of the conjoint analysis.

---

[74] Green, P.E., Krieger, A.M. and Wind, Y., 2001. Thirty years of conjoint analysis: Reflections and prospects. *Interfaces*, *31*(3_supplement), pp. S56-S73.

[75] For example, see: Hamilton, Stephen, David Sunding, and David Zilberman. "Public goods and the value of product quality regulations: The case of food safety," *Journal of Public Economics* 87 (2003): 799-817.

[76] *Sudakow v. CleanChoice Energy, Inc*. No. 24-1988-cv (S.D. NY).

75. I have not yet decided whether to conduct conjoint analysis to calculate the Price Premium on the Products, but I understand Plaintiff has designated Dr. Sumukar as a marketing expert, with whom I would work to complete the conjoint analysis. I understand that Dr. Sumukar regularly collects data from conjoint panels. I have corresponded with him on the potential to collaborate with him on data collection for the conjoint analysis in the event that I decide to conduct such analysis for the damages stage of this litigation.

**3. *Class-wide damages are measured as the product of the Price Premium and the sales quantity of the Products.***

76. After the value of the "100% Natural Flavors" representation is calculated using one of the methods described in Section V.B.1 - Section V.B.2 above, economic damages can be measured as the product of the Price Premium and the total units sold of the Products in California.

**B. *There is a valid and accurate methodology to calculate unjust gains from sales of the mislabeled products.***

77. Should the Court decide that a measure of damages other than Price Premium is appropriate in this case, it is possible to calculate the amount of revenue and profit Defendant wrongfully gained from sales of the mislabeled products. This method uses financial metrics from standard accounting statements (e.g., Coca-Cola's profit and loss statements) for the mislabeled products.

78. For the purposes of calculating disgorgement, there are at least three relevant financial metrics customarily presented in financial statements:

- First, "net sales revenue" represents the concentrate sales revenue obtained by Defendant, after deducting adjustments such as returns, rebates, or sales discounts. Use of this metric is consistent with the notion that Defendant should be disgorged of any net sales revenues obtained through selling falsely labeled products.

- Second, "gross profit" is calculated as Defendant's net sales revenue minus the "cost of goods sold," which incorporates the costs of materials and direct labor used to obtain and sell the concentrate to produce the finished Products. This metric is consistent with the notion that Defendant should be disgorged of sales revenues net of production costs.
- Third, "net profit before tax" represents the profits retained by Defendant from the sale of the concentrate, after deducting for production costs, marketing expenses, and allocated general & administrative expenses. This metric is consistent with the notion that that Defendant should be disgorged of sales revenues net of production costs, marketing costs, and allocated general and administrative costs.

79. I understand that Defendant has represented in written discovery responses that its "profit and loss statements reflect gross revenue attributable to the Class Products by flavor variant for Coca-Cola's concentrate sales to the bottlers that service the California market"; and that "[n]et revenue … is only captured at the total trademark level, *i.e.*, across the Sprite or Fanta brands."[77] Also, "… Coca-Cola has access to nationwide COGS for its concentrate sales to bottlers," while "[o]ther financial data, including operating and non-operating expenses attributable to the Class Product flavor variants, and California-specific COGS, including shipping and warehousing costs for the California market, are not in Coca-Cola's possession, custody, and/or control" but that "such financial data are maintained by the independent non-party bottlers who are responsible for selling the finished Class Products in California."[78] I

[77] Defendant's Second Supplemental Responses and Objections to Plaintiff's First Set of Requests for Production ("SSRO"), May 22, 2026 Supplemental Response to Request No. 71, at p. 7.
[78] *Id*.

reasonably expect that such information maintained by the bottlers could be obtained by Plaintiff during the merits stage of this action.

80. Additionally, based on my review of Defendant's data retention policy, Coca-Cola maintains records on [redacted].[79]

## VI. CONCLUSION

81. Based on the analysis presented in this Declaration, I conclude that there are widely accepted and feasible methodologies for calculating the damages alleged in this case on a class-wide basis.

82. My opinion is based upon the documents, data, and the information that is currently available to me. I reserve the right to update or alter my opinions if new information subsequently becomes available to me.

83. I declare under penalty of the perjury laws of the United States that the foregoing is true and correct. Executed on June 24, 2026 in San Luis Obispo, California.

Stephen F. Hamilton, Ph.D.

[79] TCCC_0000468-0000504.

# Exhibit A

## Curriculum Vitae

# STEPHEN F. HAMILTON
## Curriculum Vitae

**Work Address:**

Department of Economics
Orfalea College of Business
California Polytechnic State University
San Luis Obispo, CA 93407
Voice: 805-756-2555
FAX: 805-756-1473
E-mail: shamilto@calpoly.edu

## EDUCATION

Ph.D., Agricultural and Resource Economics, University of California at Berkeley, 1996.
M.S., Agricultural and Resource Economics, University of California at Berkeley, 1994.
B.A., Environmental Studies (with distinction) and Economics, *magna cum laude*, University of California, Santa Barbara, 1991.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| **2019 to date** | Professor of Economics, Cal Poly San Luis Obispo |
| **2016 to 2019** | Professor and Director of Graduate Studies, Department of Economics, Cal Poly San Luis Obispo |
| **2005 to 2017** | Professor and Chair of Economics, Cal Poly San Luis Obispo |
| **2011** | Visiting Researcher, Institut National de la Recherche Agronomique (INRA) and Toulouse School of Economics (TSE) |
| **2004 to 2005** | Associate Professor, Cal Poly San Luis Obispo |
| **2001 to 2004** | Director of Graduate Studies, University of Central Florida<br>Associate Professor, University of Central Florida |
| **1999 to 2001** | Associate Professor, University of Arizona |
| **1996 to 1999** | Assistant Professor, Kansas State University |

## HONORS AND AWARDS

*Distinguished Scholarship Award*, California Polytechnic, 2021.
*Quality of Research Discovery Award,* European Association of Agricultural Economists, 2020.
*Keynote Address*, TRANSFORuM: Industry Pioneers & Visionaries, Waste Expo, 2019.
Scientific Committee, Industrial Organization in the Food Industry workshop, TSE, 2018-19.
*Atlas Award*, Research with Social Impact, Elsevier-Science Direct, 2018.
*Keynote Address*, 3rd GAEL Conference, Product Differentiation and Innovation, Grenoble France, June 2013.
*Outstanding Doctoral Dissertation Award,* (Advisee: William Allender), American Agricultural and Applied Economics Association, 2014.
Invited Participant, NBER Summer Workshops on Environmental Economics, 2004-present.
*Fellow*, Rural Development Research Consortium.
*Early Career Award* for Outstanding Research, Gamma Sigma Delta, 1999.
*Faculty of the Semester Award* for Instruction, Kansas State University, 1998.
*Outstanding Graduate Student Instructor Award*, University of California at Berkeley, 1994.

## EDITORIAL BOARDS

Editor, *Journal of Public Policy & Marketing*, special issue on Analytics Insights, 2019-2021.
Editorial Board, *Journal of Environmental Economics and Management*, 2008-2015.
Editorial Council, *Journal of Agricultural and Resource Economics*, 2009-2012.
Associate Editor, *Journal of Industrial Organization Education*, 2005-2009.
Associate Editor, *Journal of Agricultural & Food Industrial Organization*, 2003-2007.
Associate Editor, *American Journal of Agricultural Economics*, 2001-2005.

## FIELDS OF INTEREST

Agricultural Economics
Industrial Organization and Antitrust Analysis
Law and Economics
Policy and Regulation
Natural Resource Economics
Environmental Economics
Public Economics
International Trade

## MEMBERSHIP IN PROFESSIONAL SOCIETIES

American Agricultural Economics Association
American Economic Association
Association of Environmental and Resource Economics
Australian Agricultural Economics Association
European Association of Agricultural Economics
International Water Resource Consortium

## PUBLICATIONS

### Articles in Refereed Journals

"Optimal Deterrence of Environmental Accidents Under Oligopoly," (with Harrison Ridland and David Sunding), *Review of Industrial Organization*, in press.

"Sequential Pricing in Platform Markets: Implications for Antitrust," (with Philippe Bontems and Jason Lepore), *Economics Letters*, Volume 255, September 2025, 112543.

"Spatial Procurement of Farm products and the Supply of Processed Foods: Application to the Tomato Processing Industry," (with Aric Shafran and Ethan Ligon), *Review of Industrial Organization*, 2024, pp. 1-23 (***lead article***)

"Food Donations, Retail Operations, and Retail Pricing," (with John Lowrey and Timothy Richards), *Manufacturing and Service Operations Management*, 25(2), March-April 2023, pp. 792-810.

"Food Banks and Retail Markups," (with John Lowrey and Timothy Richards), *European Review of Agricultural Economics*, 49 (5), December 2022, pp. 1027-1055.

"Inventory Management and Loss in Beer Retailing," (with Timothy Richards), *Agribusiness: An International Journal*, 38(3), Summer 2022, pp. 461-485 (***lead article***).

"Farm Labor Productivity and the Impact of Mechanization," (with Aric Shafran, Katya Vasilaky, and Timothy Richards), *American Journal of Agricultural Economics,* 104(4), August 2022, pp. 1435-1459.

"The Future of Marketing Analytics and Public Policy," (with Brennan Davis and Dhruv Grewal), *Journal of Public Policy and Marketing*, 40(4), October 2021, pp. 447–452.

"Differentiation by Certification: Quantity Effects on Tropical Timber Production," (with Jackie Doremus and Matt Cole), *Journal of Environmental Economics and Management*, 107, May 2021, Article 102423.

"Joint Oligopsony-Oligopoly Power in Food Processing Industries: Application to the US Broiler Industry." (with David Sunding), *American Journal of Agricultural Economics*, 103(4), August 2021, pp. 1398-1413.

"Retail Price Discrimination and Food Waste," (with Timothy Richards), *European Review of Agricultural Economics*, 47(5), December 2020, pp. 1861–1896.

"Pricing Strategies of Food Retailers," (with Jura Liaukonyte and Timothy Richards), *Annual Review of Resource Economics*, 12 (2020), pp. 87-110.

"Spatial and Temporal Variation of Offshore Wind Power and its Value along the Central California Coast," (with Yi-Hui Wang, Ryan Walter, Crow White, Matt Kehrli, Patrick Soper, and Ben Ruttenberg), *Environmental Research Communications*, 1(12), October 2019.

"Agricultural Policy and Household Food Waste," (with Timothy Richards), *American Journal of Agricultural Economics*, 101(2), March 2019, pp. 600-614.

"Coordination for Collective Rents: An Experimental Analysis," (with Olivier Bonroy, Alexis Garapin and Diogo M. Souza Monteiro), *American Journal of Agricultural Economics*, 101(1), January 2019, pp. 89-108. (***Recipient of EAAE's Quality of Research Discovery Award***.)

"Retail Market Power in a Shopping Basket Model of Supermarket Competition," (with Timothy Richards and Koichi Yonezawa), *Journal of Retailing* 94(3), September 2018, pp. 328-342.

"Food Waste and the Sharing Economy," (with Timothy Richards), *Food Policy* 75, February 2018, pp. 109-123. (***Recipient of Elsevier's Atlas Award***.)

"Market Competition and the Health Composition of Manufactured Food," (with Vincent Réquillart), *Health Economics*, 26(12), December 2017, pp. 1637-1643.

"Slotting Allowances and Product Variety in Oligopoly Retail Markets," (with Robert Innes). *Economics Letters*, 158, September 2017, pp. 34-36.

"Retail Intermediation and Local Foods," (with Timothy J. Richards, Elliot Rabinovich, and Miguel Gomez), *American Journal of Agricultural Economics*, 99(3), April 2017, pp. 637-659.

"Variety and the Cost of Search in Supermarket Retailing," (with Timothy J. Richards and Koichi Yonezawa), *Review of Industrial Organization*, 50(3), May 2017, pp. 263-285 (***lead article***).

"Attribute Search in Online Retailing," (with Timothy J. Richards and Janine Empen), *American Journal of Agricultural Economics* 99(1), January 2017, pp. 225-242.

"Measuring the Welfare Losses from Urban Water Supply Disruptions," (with Steven Buck, Max Auffhammer and David Sunding), *Journal of the Association of Environmental and Resource Economists* 3(3), September 2016, pp. 743-778.

"Search and Price Dispersion in Online Grocery Markets." (with Timothy J. Richards and William Allender), *International Journal of Industrial Organization* 47, July 2016, pp. 255-281.

"Optimal Recycling Policy for Used Lubricating Oil: The Case of California's Used Oil Management Policy," (with David Sunding), *Environmental and Resource Economics* 62(1), September 2015, pp. 3-17 (***lead article***).

"Oligopoly Intermediation, Relative Rivalry, and Market Conduct," (with Philippe Bontems and Jason Lepore), *International Journal of Industrial Organization* 40, May 2015, pp. 49-59.

"Variety Pass-Through: An Examination of the Ready-to-eat Breakfast Cereal Market," (with Timothy J. Richards), *Review of Economics and Statistics* 97(1), March 2015, pp. 166-180.

"How Do Supermarkets Price Beer During Periods of Peak Demand? Evidence from Game Weeks of the German Bundesliga," (with Janine Empen). *Southern Economic Journal* 81(3), January 2015, pp. 679-696.

"Potential Economic Impacts of Environmental Flows Following a Possible Listing of Endangered Texas Freshwater Mussels," (with Brad Wolaver, Cassandra Cook, David Sunding, Bridget Scanlon, Michael Young, Xianli Xu, and Robert Reedy). *Journal of the American Water Resources Association* 50(5), October 2014, pp. 1081-1101.

"Social Networks and New Product Choice: Peer Effects in an Incentive-Compatible Choice-Based Conjoint Experiment," (with Timothy J. Richards and William Allender), *American Journal of Agricultural Economics* 96(2), March 2014, pp. 489-516.

"Environmental Policy with Collective Waste Disposal," (with Thomas Sproul, David Sunding and David Zilberman), *Journal of Environmental Economics and Management* 66(2), September 2013, pp. 337-346.

"How Do Supermarkets Respond to Brand-Level Demand Shocks? Evidence from the German Beer Market," (with Janine Empen), *American Journal of Agricultural Economics (Proceedings)* 95(5), October 2013, pp. 1223-1229.

"Slotting Allowances and Variety Provision in Supermarket Retailing," (with Robert Innes), *American Journal of Agricultural Economics (Proceedings)* 95(5), October 2013, pp. 1216-1222.

"How Does Advertising Affect Market Demand? The Case of Generic Advertising," (with Kyle W. Stiegert and Timothy J. Richards), *Economic Inquiry* 51(2), April 2013, pp. 1183-1195.

"Rivalry in Price and Location by Differentiated Product Manufacturers," (with Timothy J. Richards and William J. Allender), *American Journal of Agricultural Economics* 95(3), April 2013, pp. 650-668.

"Network Externalities in Supermarket Retailing," (with Timothy J. Richards), *European Review of Agricultural Economics* 40(1), February 2013, pp. 1-22 (***lead article***).

"Emissions Standards and Environmental Quality Standards with Stochastic Environmental Services," (with Till Requate), *Journal of Environmental Economics and Management* 64(3), November 2012, pp. 377-389.

"Obesity and Hyperbolic Discounting: An Experimental Analysis," (with Timothy J. Richards), *Journal of Agricultural and Resource Economics* 37(2), August 2012, pp. 181-198.

"Commodity Price Inflation, Retail Pass-Through and Market Power," (with Timothy J. Richards and William J. Allender), *International Journal of Industrial Organization* 30(1), January 2012, pp. 50-57.

"Spatial Competition in Private Labels," (with Tim Richards and Paul Patterson), *Journal of Agricultural and Resource Economics* 35(2), August 2010, pp. 183-208.

"Second-Best Tax Policy and Natural Resource Management in Growing Economies," (with Steve Cassou, Arantza Gorostiaga and Maria Jose Guitierrez), *International Tax and Public Finance* 17(6), December 2010, pp. 607-26.

"$SO_2$ policy and input substitution under spatial monopoly," (with Shelby Gerking), *Resource and Energy Economics* 32(3), August 2010, pp. 327-340.

"Variety Competition in Retail Markets," (with Timothy J. Richards), *Management Science* 55(8), August 2009, pp. 1368-76.

"Excise Taxes with Multi-Product Transactions," *American Economic Review* 99(1), March 2009, pp. 458-71.

"Vertical Restraints and Horizontal Control," (with Robert Innes), *RAND Journal of Economics* 40(1), Spring 2009, pp. 120-43.

"Informative Advertising in Concentrated, Differentiated Markets," *International Journal of Industrial Organization* 27(1), January 2009, pp. 60-69.

"Unintended Consequences: The Spillover Effects of Common Property Regulations," (with Gordon Rausser, Marty Kovach, and Ryan Stifter), *Marine Policy* 33(1), January 2009, pp. 24-39.

"Marketable Permits, Low-Sulfur Coal, and the Behavior of Railroads" (with Shelby Gerking),

*American Journal of Agricultural Economics* 90(4), November 2008, pp. 933-50.

"Fast Food, Addiction and Market Power," (with Timothy J. Richards and Paul M. Patterson), *Journal of Agricultural and Resource Economics* 32(3), December 2007, pp. 425-47.

"Green Markets, Eco-Certification, and Equilibrium Fraud" (with David Zilberman), *Journal of Environmental Economics and Management* 52(3), November 2006, pp. 627-44.

"Rivalry in Price and Variety among Supermarket Retailers," (with Tim Richards), *American Journal of Agricultural Economics* 88(3), August 2006, pp. 710-27.

"Naked Slotting Fees for Vertical Control in Multi-Product Retail Markets," (with Robert Innes), *International Journal of Industrial Organization* 24(2), March 2006, pp 308-18.

"The Transition from Dirty to Clean Industries: Optimal Fiscal Policy in a Two Sector Model of Endogenous Growth," (with Steven Cassou), *Journal of Environmental Economics and Management* 48(3), November 2004, pp. 1050-77.

"Vertical Structure and Strategic Environmental Trade Policy," (with Till Requate), *Journal of Environmental Economics and Management* 47(2), March 2004, pp. 260-69.

"Slotting Allowances as a Facilitating Practice by Food Processors in Wholesale Grocery Markets: Profitability and Welfare Effects," *American Journal of Agricultural Economics* 85(4), November 2003, pp. 797-813 (***lead article***).

"Public Goods and the Value of Product Quality Regulations: The Case of Food Safety," (with David Sunding, and David Zilberman), *Journal of Public Economics* 87(3-4), March 2003, pp. 799-817.

"An Empirical Test of the Rent-Shifting Hypothesis: The Case of State Trading Enterprises," (with Kyle Stiegert), *Journal of International Economics* 58(1), October 2002, pp. 135-57.

"Strategic Environmental Policy and International Trade in Asymmetric Oligopoly Markets," (with Yann Duval), *International Tax and Public Finance* 9(3), May 2002, pp. 259-71.

"Product Liability, Entry Incentives and Market Structure," (with David Sunding), *International Review of Law and Economics* 20(2), June 2000, pp. 269-83.

"Vertical Coordination, Antritrust Law, and International Trade," (with Kyle Stiegert), *Journal of Law & Economics* 43(1), April 2000, pp. 143-56.

"Does Market Timing Contribute to the Cattle Cycle," (with Terry Kastens), *American Journal of Agricultural Economics* 82(1), February 2000, pp. 82-96.

"The Comparative Incidence of Specific and Ad Valorem Taxation in Noncompetitive Environments," *Economics Letters* 63(2), May 1999, pp. 235-38.

“Tax Incidence under Oligopoly: A Comparison of Policy Approaches,” *Journal of Public Economics* 71(2), February 1999, pp. 233-46.

“Demand Shifts and Market Structure in Free-Entry Oligopoly Equilibria,” *International Journal of Industrial Organization* 17(2), February 1999, pp. 259-75.

“Returns to Public Investments in Agriculture with Imperfect Downstream Competition,” (with David Sunding), *American Journal of Agricultural Economics* 80(4), November 1998, 830-38.

“Taxation, Fines, and Producer Liability Rules: Efficiency and Market Structure Implications,” *Southern Economic Journal* 65(1), July 1998, pp. 140-50.

“Subsidies in Oligopoly Markets: A Welfare Comparison between Symmetric and Asymmetric Costs,” (with Rickard Sandin), *Public Finance Review* 25(6), November 1997, pp. 660-68.

“The Effect of Farm Supply Shifts on Concentration and Market Power in the Food Processing Sector,” (with David Sunding), *American Journal of Agricultural Economics* 79(2), May 1997, pp. 524-31.

**Articles Submitted to Refereed Journals**

“Inventory Competition and the Cost of Stockouts,” (with Timothy Richards and Elliot Rabinovich), revision submitted at the request of the editors of *Manufacturing and Service Operations Management*, November 2025.

“Fair Pricing, Eco-Certification, and Excess Supply,” (with Benjamin Ouvrard), November 2025.

“Vertical Restraints and Upstream Market Power,” (with Benjamin Ouvrard), October 2025.

**Working Papers**

“The Good, the Bad, and the Ugly: Home-Cooked Food, Ready to Eat Food, and Industrialized Production” (with Philippe Bontems and Catarina Goulao).

“Can Consumer Boycotts Backfire When Retailers Mediate Sales? The Case of Microbead Toothpaste,” (with Jackie Doremus and Timothy Richards).

**Work in Progress**

“Environmental Policy through Permitting and Licensing,” (with Cyrus Ramezani and David Sunding).

“Vertical Integration in Oligopoly Supply Chains,” (with David Zilberman).

“Capacity-Setting Games in Differentiated Product Oligopoly,” (with Jason Lepore).

“Product Quality Choices with Umbrella Brands,” (with Robert Innes and Vincent Requillart).

**Other Research Publications**

"Liability Rules and the Environment," (with Robert Innes), in M. Khanna (Ed.), *Encyclopedia of Energy, Natural Resource, and Environmental Economics,* 2nd Ed., North-Holland: Elsevier, 2025, pp. 131-145.

"Food Waste: Farms, Distributors, Retailers, and Households," (with Tim Richards and Brian Roe), in C. Barrett and D. Just (Eds.), *Handbook of Agricultural Economics*, Vol. 6, North-Holland: Elsevier, June 2022, pp. 4653-4703.

"Economic Impact of Offshore Wind Farm Development on the Central Coast," (with Chris Almacen, Cyrus Ramezani, and Ben Stephan), February 2021.

"Economic and Fiscal Impacts of the Morro Bay Offshore (MBO) Wind Farm," May 2018.

"Keys to Estimating Damages in Deceptive Pricing cases," (with Dan Werner), *Law360*, Lexis-Nexis, September 22, 2017: https://www.law360.com/articles/966658/

"Economic and fiscal impacts of the Topaz Solar Farm," (with Mark Berkman), *The Battle Group*, March 2011.

"Economic Benefits of Expanded Groundwater Storage in the Central and West Coast Basins of Southern Los Angeles County," (with David Sunding and Newsha Ajami), in Angelos Findikakis and Kuniaki Sato (eds.) *IAHR Monograph on Groundwater Management Practices*, Leiden, Netherlands: CRC Press/Balkema, Taylor & Francis Group, 2011, pp. 157-77.

"Economic Impacts of Residential Water Shortages in California," (with David Sunding). April 2010.

"Backwards Linkages and Strategic Firm Behavior: An Application to International Trade," (with Kyle Stiegert), in G. Galizzi and L. Venturini (Eds.), *Vertical Relationships and Coordination in the Food System*, Heidelberg: Physica-Verlag, 1999, pp. 113-28.

Hamilton, Stephen F. Book Review of Perloff's *Microeconomics*, in the *American Journal of Agricultural Economics*, November 1999, 81(4), pp. 225-26.

## PRESENTATIONS

**Selected Conference Presentations**

"Fair Pricing and Excess Supply," American Agricultural Economics Association Annual Meeting, July 2025.

"Fair Pricing, Upstream Market Power, and Vertical Restraint," International Industrial Organization Conference, May 2024.

"Optimal Deterrence for Environmental Damage under Asymmetric Information," American Agricultural Economics Association Annual Meeting, August 2022.

"Food Banks and Retail Margins," American Agricultural Economics Association Annual Meeting, August 2021.

"Food Banks and Food Waste," Allied Social Science Association Annual Meeting, January 2020.

"Retail Price Discrimination and Food Waste," 10th Conference on Industrial Organization and the Food Industry, June 2019.

"Keeping Food out of Landfills," ***Keynote Address***, *TRANSFORuM: Industry Pioneers & Visionaries,* Waste Expo, May 2019.

"Retail Price Discrimination and Food Waste," 17th Annual International Industrial Organization Conference, April 2019.

"Food Waste in Upstream and Downstream Markets of the Food System." American Agricultural Economics Association Annual Meeting, August 2018.

"Food Waste and the Sharing Economy." American Agricultural Economics Association Annual Meeting, August 2018.

"Food Waste and the Sharing Economy." Allied Social Science Association Annual Meeting, January 2018.

"Retail Market Power in a Shopping basket Model of Supermarket Competition." American Agricultural Economics Association Annual Meeting, August 2017.

"Pricing Complementary Products." American Agricultural Economics Association Annual Meeting, August 2016.

"Online Attribute Search and Retail Prices." American Agricultural Economics Association Annual Meeting, July 2015.

"Investment Incentives and Environmental Permit Uncertainty." Western Economic Association International 89th Annual Conference, June 2014.

"Environmental Policy with Collective Waste Disposal," 29th Annual Conference of the European Association of Environmental and resource Economists, Toulouse France, June 2013.

"Oligopoly Intermediation, Strategic Pre-Commitment and the Mode of Competition," ***Keynote Address***, 3rd GAEL Conference, Product Differentiation and Innovation, Grenoble France, June 2013.

"How do Supermarkets Respond to Brand-Level Demand Shocks? Evidence from the German Beer Market." Allied Social Science Association Annual Meeting, January 2013.

"Slotting Allowances and Variety Provision in Supermarket Retailing." Allied Social Science Association Annual Meeting, January 2013.

"Social Networks and New Product Choice." American Agricultural Economics Association Annual Meeting, August 2012.

"Oligopoly Intermediation, Strategic Pre-Commitment and the Mode of Competition." Western Economic Association International 87th Annual Conference, June 2012.

"Slotting Allowances and Product Variety in Supermarket Retailing." Industrial Organization and the Food Processing Industry, INRA-IDEI, Toulouse, France, June 2012.

"Emissions Standards and Ambient Environmental Quality Standards in Stochastic Receiving Media." Allied Social Science Association Annual Meeting, January 2011.

"Slotting Allowances and Product Variety in Supermarket Retailing." American Agricultural Economics Association Annual Meeting, July 2010.

"Long-Run Contracts, Conjunctive Use, and Imported Water Demand." Berkeley Water Consortium, University of California at Berkeley, November 2009.

"How Does Advertising Affect Market Demand? The Case of Generic Advertising." American Agricultural Economics Association Annual Meeting, July 2009.

"Advertising and Market Power." Western Economic Association International 83rd Annual Conference, June 2008.

"Comparative Statics Effects for Supermarket Oligopoly with Applications to Sales Taxes and Slotting Allowances." American Agricultural Economics Association Annual Meeting, July 2007.

"Can Manufacturers of National Brands Control Retail Prices of Private Labels?" American Agricultural Economics Association Annual Meeting, July 2006.

"Retail Competition in Prices and Varieties." American Agricultural Economics Association Annual Meeting, July 2005.

"From Green Markets to Black Markets: Environmental Regulations and the Emergence of Illicit Activities." Food System Research Group, University of Wisconsin, Madison, WI, June 2005.

"Variety Competition in Retail Food Markets." Industrial Organization and the Food Processing Industry, INRA-IDEI, Toulouse, France, June 2004.

"Advertising in Differentiated Markets." Food System Research Group, University of Wisconsin, Madison, WI, June 2003.

"Retailer Contracting." American Agricultural Economics Association Annual Meeting, July 2002.

"Vertical Structure and Strategic Environmental Trade Policy." World Congress of Environmental and Natural Resource Economists, Monterey, CA, June 2002.

"Facilitating Practices by Food Processors in the Retail Grocery Market: Channel Profitability and Farm Surplus Effects of Off-Invoice Fees." American Agricultural Economics Association Annual Meeting, August 2001.

"The Transition from Dirty to Clean Industries: Optimal Fiscal Policy in a Two-Sector Model of Endogenous Growth," ***Keynote Address***, International Dimension of Environmental Policy Conference, Dutch Science Foundation/EURESCO, Kerkrade, Holland, October 2000.

"Pollution Abatement Regulation, Property Rights, and the Political Economy," Western Economic Association International 75th Annual Conference, June 2000.

"Trade, Environmental Externalities, and Taxes in Unions, Federations, and Free Trade Areas," American Agricultural Economics Association Annual Meeting, August 1999.

"Taxation, Fines, and Producer Liability Rules: Efficiency and Market Structure Implications," American Agricultural Economics Association Annual Meeting, August 1998.

"Asymmetric Pricing and a Test for Market Power in the International Durum Wheat Market," American Agricultural Economics Association Annual Meeting, August 1998.

"Beating the Cattle Cycle," Cattle Profitability Conference, Kansas State University, August 1997.

"Returns to Public Investments in Agriculture with Imperfect Downstream Competition," American Agricultural Economics Association Annual Meeting, August 1997.

"Backwards Vertical Contracts and the Strategic Trade Implications of Antitrust," American Agricultural Economics Association Annual Meeting, August 1997.

"Vertical Coordination and Export Promotion in International Wheat Markets," American Agricultural Economics Association Annual Meeting, August 1997.

"Product Liability, Entry Incentives and Market Structure," Western Economic Association International 72nd Annual Conference, July 1997.

"Backwards Linkages and Strategic Firm Behavior: An International Trade Application," Vertical Relationships and Coordination in the Food System Conference, Italy, June 1997.

"The Effect of Farm Supply Shifts on Concentration and Market Power in the Food Processing Sector," American Agricultural Economics Association Annual Meeting, August 1996.

**Other Invited Presentations**

California Polytechnic (2), Cornell University, Economic Research Service (ERS), Grenoble Applied Economics Lab (GAEL), Iowa State University, Kansas State University, Northeastern University, Oregon State University, Politecnico di Milano, Purdue University (2), Stockholm School of Economics, Toulouse School of Economics (3), University of Arizona (3), University of the Basque Country, University of California at Berkeley (5), University of California Davis (4), University of California Merced (2), University of California Santa Barbara (3), University of Central Florida (2), University of Heidelberg, University of Kiel, University of Maryland, University of Massachusetts, University of Nebraska (2), University of South Florida, University of Wisconsin (3).

## RESEARCH AND INSTRUCTION GRANTS

Principal Investigator, Office of the Chief Economist, USDA-OCE, $199,983, "Diversion Ratios and Vertical Market Power in Agriculture," (with Timothy J. Richards).

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2026-67023-45781, $591,500, "Diversion Ratios and Vertical Market Power: Implications for Agriculture," (with Justin Bina and Timothy J. Richards).

Principal Investigator, Vistra Corp., $58,974, "Economic Impact of Vistra's Battery Energy Storage Systems (BESS) in California," 2022.

Principal Investigator, REACH dba the Hourglass Project, $74,998, "Economic Impact of Offshore Wind Power Development on the Central Coast," (with Cyrus Ramezani), 2020-2021.

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2019-05808, $498,223, "Food Banks, Food Retailing and Food Security," (with Craig Gundersen and Timothy J. Richards), 2020-2022.

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2018-08525, $499,973, "Immigration Reform and Labor Shortages," (with Jennifer Ifft, Timothy J. Richards, Aric Shafran and Kathryn Vasilaky), 2019-2021.

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2018-08126, $498,434, "Big Data and Food Loss Mitigation in the Supply Chain," (with Miguel Gomes and Timothy J. Richards), 2019-2021.

Principal Investigator, Trident Winds, LLC, $25,309, "Economic Impact Analysis of the Proposed Morro Bay Offshore (MBO) Wind Farm," 2017-2018.

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2016-09921, $498,438, "Commercial Peer-to-peer Mutualization Systems (CPMS) to Eliminate Food Waste," (with Elliot Rabinovich and Timothy J. Richards), 2017-2018.

Principal Investigator, Department of the Interior - Bureau of Ocean Energy Management, $749,999, "Scenarios for Replacing Conventional Energy with Offshore Renewable Energy

along the Central California Coast," (with Benjamin Ruttenberg, Crow White, Ryan Walter, and Susan Zaleski), 2016-2019.

Principal Investigator, Texas Comptroller, $247,306, "An Evaluation of Potential Economic Impacts Resulting from Flows for Freshwater Mussels: An Update Using Best Available Science and Modeling," (with Brad Wolaver, Brian Perkins, and Sam Vaugh), 2016-2017.

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2015-07543, $482,831, "Online Retailing and Local Food," (with Miguel I. Gomez, Elliot Rabinovich, and Timothy J. Richards), 2016-2017.

Principal Investigator, California Air Resources Board, $249,983, "The Impact of AB32 on the Competitiveness of California Food Processing Industries," (with Ethan Ligon and Sofia Berto Villas-Boas), 2013-2014.

Principal Investigator, Element Power Solar Company, $25,000, "Economic Impact Analysis of the Proposed California Flats Solar Project," 2012-2013.

Principal Investigator, Agriculture and Food Research Initiative, USDA-NIFA 2011-02763, $387,365, "Consumer Search and Retail Pass Through: Implications for Food Price Inflation," (with Timothy J. Richards), 2011-2013.

Principal Investigator, Agriculture and Food Research Initiative, USDA-CREES 2010-65400-20441, $309,377, "Farm-Retail Price Transmission in Multi-Product Retail Environments," (with Timothy J. Richards), 2010-2011.

Principal Investigator, Agriculture and Food Research Initiative, USDA-CREES 2010-65400-20487, $268,068, "Equilibrium Price and Design of New Food Products in a Social Network," (with Timothy J. Richards), 2010-2011.

Principal Investigator, University of Wisconsin Madison P685510 (USDA Prime 2006-34101-18999), $35,839, "Pricing Relationships in the Food Retail Sector," 2006-2008.

Principal Investigator, University of Wisconsin Madison P685661 (USDA Prime 2005-34101-15664), $16,489, "Price and Advertising Relationships in the Food Retail Sector," 2005-2006.

Principal Investigator, U.S. Department of Agriculture, National Research Initiative Competitive Grants program, $180,697, "Competitive Interactions Among U.S. Retailers: A New Approach," (with Timothy J. Richards and Paul Patterson), 2005-2006.

Principal Investigator, University of Wisconsin Madison P622753 (USDA Prime 2004-34101-14559), $28,434, "Variety Competition in Retail Grocery Markets," 2004-05.

Principal Investigator, University of Wisconsin Madison P540503 (USDA Prime 2001-34101-10526), $44,632, "Advertising Agreements in a Market with Differentiated Products and Imperfect Competition," 2002-2004.

Principal Investigator, University of Wisconsin Madison P540433 (USDA Prime 2001-34101-10526), $28,978, "Retailer Contracting," 2002-2003.

Principal Investigator, U.S. Department of Agriculture, National Research Initiative Competitive Grants program, $98,130, "Empirical Tests of STE Leadership Behavior in International Grain Markets," with Kyle W. Stiegert, 2001-2003.

Principal Investigator, California Tree Fruit Agreement, $11,129, "Evaluating a Grading System: California Soft Fruit," June 2000-2001.

## SERVICE CONTRIBUTIONS

**National Committees and Leadership**

Galbraith Award Committee, American Agricultural Economics Association, 2017-present.

Publication of Enduring Quality Award Committee, American Agricultural Economics Association, 2018-present.

Annual Award Committee, American Agricultural Economics Association, 2015-2019.

Trust Committee, American Agricultural Economics Association, 2016-2018.

Chair, Quality of Research Discovery Award Committee, American Agricultural Economics Association, 2013-2016.

Outstanding Published Research Committee, Western Agricultural Economics Association, 2015.

Reviewer, selected paper program, American Agricultural Economics Association annual meeting, 2005.

Best Article Award Committee, American Agricultural Economics Association, 2001-05.

Outstanding Masters Thesis Award Committee, American Agricultural Economics Association, 2001-04, 2013-2015.

Topic Leader for selected paper sessions in Environmental Economics, American Agricultural Economics Association annual meeting, August 1999.

Panel Member, Sustainable Management Panel, Tallgrass Prairie National Preserve (Strong City, KS), U.S. Department of the Interior, National Park Service, 1998.

Co-Chair, Western Agricultural Economic Association annual meeting, 1997.

Ad Hoc Reviewer: *Agribusiness: An International Journal*, *Agricultural Economics, Agricultural and Resource Economic Review, American Journal of Agricultural Economics, American Economic Review, American Economic Journal –Policy, Applied Economic Perspectives and Policy, B.E. Journal of Economic Analysis and Policy, B.E. Journal of Theoretical Economics, Canadian Journal of Economics, Contemporary Economic Policy, Economic Geography, Economic Inquiry, Economic Theory Bulletin, Economics Bulletin, Economics Letters, Environmental & Resource Economics, European Economic Review, European Research Commission, European Review of Agricultural Economics, Food Policy, Games and Economic Behavior, International Economic Review, International Journal of Economics and Business, International Journal of Industrial Organization, International Tax and Public Finance, Journal of Agricultural and Applied Economics, Journal of the Agricultural and Applied Economics Association, Journal of Agricultural & Food Industrial Organization, Journal of Agricultural and Resource Economics, Journal of the Association of Environmental and Resource Economists, Journal of Cleaner Production, Journal of Economic Education,*

*Journal of Economics, Journal of Economics & Management Strategy, Journal of Environmental Economics and Management, Journal of Food Products Marketing, Journal of Industry, Competition and Trade, Journal of micromarketing, Journal of the Political Economy, Journal of Public Economic Theory, Journal of Public Economics, Journal of Public Policy and Marketing, Journal of Regulatory Economics, Journal of Retailing, Journal of Retailing and Consumer Services, Journal of Wine Economics, PLOS One, Nature, Proceedings of the National Academy of Science, Public Finance Review, Managerial and Decision Economics, Management Science, RAND Journal of Economics, Resource and Energy Economics, Review of Agricultural, Food and Environmental Studies, Review of Economic Studies, Review of Industrial Organization, Science, Sustainability.*

**University and College**
Faculty Affairs Committee, Orfalea College of Business, Cal Poly, 2025-2026.
Chair, Faculty Affairs Committee, Orfalea College of Business, Cal Poly, 2024-2025.
Faculty Mentor, First year Success program, 2025-2026.
Chair, Faculty Council, Orfalea College of Business, Cal Poly, 2023-2025
Distinguished Scholarship Committee, Cal Poly, 2022-2024
Faculty Council, Orfalea College of Business, Cal Poly, 2022-2023
Chair, Graduate Program Committee, Orfalea College of Business, Cal Poly, 2021-2023
Dean Search Committee, Orfalea College of Business, Cal Poly, 2020-21
Graduate Program Committee, Orfalea College of Business, Cal Poly, 2020-21
Chair, Faculty Affairs Committee, Orfalea College of Business, Cal Poly, 2016-2019.
Chair, Dean Search Committee, Orfalea College of Business, Cal Poly, 2014-2015
Faculty Affairs Committee, Orfalea College of Business, Cal Poly, 2007-2009.
Graduate Programs Committee, Orfalea College of Business, Cal Poly, 2004-05.
Research Incentive Award Committee, College of Business, UCF, 2003-04.
Promotion and Tenure Committee, College of Business, UCF, 2001-04.
Conference Organizer, New Perspectives in Environmental Economics, UCF, November 2001.
Faculty Advisor, UA Cycling Club, 2000-01.
KSU National Wheat Research Center Proposal Committee, 1998-99.
College of Agriculture Honors Advisory Committee, 1997-99.
KCARE Water Quality Committee, 1996-99.
KCARE Water Management Committee, 1996-99.

**Department**
Chair, Faculty Search Committee, Economics Department, Cal Poly, 2023-2024.
Curriculum Committee, Economics Department, Cal Poly, 2004-present.
Assessment Committee, Economics Department, Cal Poly, 2007-present.
Faculty Search Committee, Economics Department, Cal Poly, 2021-22.
Director of Graduate Studies, Economics Department, Poly, 2016-2019.
Faculty Search Committee, Economics Department, Cal Poly, 2015-2016.
Faculty Search Committee, Economics Department, Cal Poly, 2013-2014.
Faculty Search Committee, Economics Department, Cal Poly, 2007-2008.
Chair, Faculty Search Committee, Economics Department, Cal Poly, 2006-2007.
Faculty Search Committee, Economics Department, Cal Poly, 2005-2006.
Faculty Search Committee, Economics Department, Cal Poly, 2004-05.
Director of Graduate Studies, Economics Department, UCF, 2001-04.
Ph.D. Program Committee, Economics Department, UCF, 2002-04.

Graduate Committee, Economics Department, UCF, 2001-04.
Chair, Faculty Search Committee, Economics Department, UCF, 2002-03.
Seminar Committee, Economics Department, UCF, 2001-02.
Faculty Search Committee, Economics Department, UCF, 2001-02.
Graduate Committee, UA, 2000-01.
Seminar Committee, Co-Chair, UA, 1999-2000.
Graduate Committee, 1998-99.
General Preliminary Examination Committee, 1998-99.
Natural Resources Preliminary Examination Committee, 1998-99
Research Alliance, Farmland Industries, Inc., 1998-99.
Senior Advisor, Agricultural Economics / Agribusiness Club, 1998-99.
Agricultural Economics Graduate Program Committee, 1998-99.
Junior Advisor, Agricultural Economics / Agribusiness Club, 1997-98.
Seminar Committee, 1997-98.
Office of Local Government Extension Assistant Search Committee, 1997.
Seminar Committee Co-Chair, 1996-97.

## INDUSTRY CONSULTING AND LITIGATION EXPERIENCE

Consulting experience (1994 – present) in the measurement of economic damages, complex litigation, antitrust, market analysis of regulated industries, economic feasibility studies, environmental and land use regulation, forensic economics, groundwater basin management, and portfolio investment modeling.

# Exhibit B

## Testimony Provided 2022-2026

**STEPHEN F. HAMILTON**
**Testimony 2022-2026**

*Randall Arseneau v. City of San Luis Obispo,* No. 22CV-0121, (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (January 2026)

*Aaron Spiller v. City of Atascadero.,* No. 23CVP-0300, (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (November 2025)

*Lisa Rouse et al. v. H.B. Fuller Company,* No. 0:22-cv-02173-JMB-JFD (District of Minnesota)
- Expert Report
- Deposition (September 2025)

*Andrew M. Nuckles v. Ling M. Wu et al.,* No. 20STCV47639, (Cal Sup, Los Angeles)
- Expert Report
- Deposition (August 2025)
- Trial Testimony (August 2025)

*Christian Poquette v. Gertrude Joan Romanelli,* No. 23CV-0002, (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (July 2025)

*Heritage Livestock v. Zoetis, Inc.* MID-L-007367-21 (NJ Sup, Middlesex)
- Expert Report
- Deposition (February 2025)
- Deposition (April 2025)
- Deposition (May 2025)
- Deposition (June 2025)

*James Jackson v. Connor Johnson et al.,* No. 17-08593, (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (December 2021)
- Trial Testimony (September 2024)

*Lenore Miley v. Belkin International Inc.,* No. 20STCV00033 (Cal Sup, Los Angeles)
- Expert Declaration for Class Certification
- Deposition (January 2024)

*Michael Alderete v. Quinn Company,* No. 19CVP-0310 (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (October 2023)

*Goodwin v. Whole Foods Market Inc.,* No. 21STCV40456 (Cal Sup, Los Angeles)
- Expert Report
- Deposition (August 2023)

*In the Matter of the Application of the Cities of Hays Kansas and Russell, Kansas for Approval to Transfer Water from Edwards County, Kansas Pursuant to the Kansas Water Transfer Act*, OAH No. 23AG0003 AG (Office of Administrative Hearings, State of Kansas)
- Expert Report
- Trial Testimony (July 2023)

*David Torres. v. Estate of Ali Salmanzadeh et al.*, No. 1:20-cvp-0084 Consolidated (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (July 2023)
- Trial Testimony (November 2023)

*Martin Weifield et al. v. Coastal Christian School*, No. 1:17-cv-0640 (Cal Sup, San Luis Obispo)
- Expert Report
- Deposition (June 2023)

*Josephine Loguidice and Emilie Norman v. Gerber Life Insurance Co., No. 7:20-cv-03254-KMK*, (S.D. New York)
- Expert Declaration
- Deposition (October 2022)

*David Moore D/B/A Moore Family Farms, et al. v. C.H. Robinson Worldwide, Inc.,* No. 20-cv-252 PJS/HB, (District of Minnesota)
- Expert Report
- Deposition (July 2022)

*Metrolink Train Accident Cases* (Consolidated), No. BC607964 (Cal Sup, Los Angeles)
- Expert Declaration
- Deposition (June 2022)

# Exhibit C

## Materials Received and/or Relied Upon

## Legal Documents and Pleadings

Answer Dkt. No. 40. Coca-Cola Company's Anwers to Complaint, dated January 13, 2026.

30(B)(6) Coca-Cola Tyler Simpson - 05-29-2026_Linked Deposition Transcript

Exhibit 13 to Rule 30(b)(6) deposition of Defendant.

Defendant's First Supplemental Response and Objections to Plaintiff's First Set of Interrogatories,

Defendant's Second Supplemental Responses and Objections to Plaintiff's First Set of Requests for Production, May 22, 2026.

Deposition of Victoria Palmer, April 15, 2026.

Dkt. No. 1. Palmer, Class Action Complaint, dated May 27, 2025.

Dkt. No. 57. Order granting stipulation on limiting scope of discovery prior to class cert, dated March 30, 2026.

Expert Report of R. Sukumar, Ph.D. –Consumer Materiality and Perception, June 24, 2026.

First Amended Class Action Complaint, filed March 12, 2026.

Palmer - TCCC First Supplemental R&Os to P's First Set of RFPs - 04.24.26

Palmer - TCCC First Supplemental R&Os to P's First Set of ROGS - 04.24.26

Palmer - TCCC ROs to Ps First Set of RFAs - 03.27.26

Palmer - TCCC ROs to Ps First Set of RFPs - 03.27.26

Palmer - TCCC ROs to Ps First Set of ROGs - 03.27.26

Palmer - TCCC Second Supplemental R&Os to P's First Set of RFAs - 04.24.26

Palmer - TCCC Second Supplemental R&Os to P's First Set of RFPs - 05.22.26

Palmer - TCCC Second Supplemental R&Os to P's First Set of ROGS - 05.22.26

Palmer - TCCC Supplemental R&Os to P's First Set of RFAs - 04.08.26

Request for Admission, March 12, 2026.

## Articles, Books, and Reports


Adalja, A.A., 2018. The Impact of Voluntary Non-GMO Labeling on Demand in the Ready-to-Eat Cereal Industry. In 2018 Annual Meeting, August 5-7, Washington, DC (No. 273817). *Agricultural and Applied Economics Association*.

Anstine, J., 2007. Organic and all natural: Do consumers know the difference? *Journal of Applied Economics & Policy*, 26(1), pp. 15-27.

Arrondo, R., Garcia, N. and Gonzalez, E., 2018. Estimating product efficiency through a hedonic pricing best practice frontier. *BRQ Business Research Quarterly*, *21*(4), pp.215-224.

Berndt, E.R. and Rappaport, N.J., 2001. Price and quality of desktop and mobile personal computers: A quarter-century historical overview. *American Economic Review*, *91*(2), pp.268-273.

Berry, S., Levinsohn, J., and Pakes, A. 1995. Automobile prices in market equilibrium. *Econometrica* 63(4): 841-890.

Bimbo, F., Bonanno, A., and Viscecchia, R., 2016. Do Health Claims Add Value? The Role of Functionality, Effectiveness and Brand. *European Review of Agricultural Economics*, 43(5): 761–780.

Bonanno, A., 2016. A Hedonic Valuation of Health and Nonhealth Attributes in the U.S. Yogurt Market. *Agribusiness*, 32(3): 299-313.

Bronnmann, J., and Hoffmann, J., 2018. Product Differentiation in the German Soft Drink Market: Which Attributes Matter? *Applied Economics Letters*, 25(14): 968–971.

Chang, J.B., Lusk, J.L. and Norwood, F.B., 2010. The price of happy hens: A hedonic analysis of retail egg prices. *Journal of Agricultural and Resource Economics*, pp.406-423.

Cole, G. 2014. "Natural" labeling and consumers' sentimental pastoral notion, *Journal of Product & Brand Management*, Vol. 23 No. 4/5. https://doi.org/10.1108.

Fox, K.J. and Melser, D., 2014. Non-Linear Pricing and Price Indexes: Evidence and Implications from Scanner Data. *Review of Income and Wealth*, 60: 261-278.

Gardner, Sherwin. "Consumers and food safety: A food industry perspective." In Food, Nutrition and Agriculture—8/9—Consumer participation in food control. Food and Agriculture Organization of the United Nations, 1993.

Green, P.E., Krieger, A.M. and Wind, Y., 2001. Thirty years of conjoint analysis: Reflections and prospects. *Interfaces*, 31(3_supplement), pp. S56-S73.

Greene, C. and Calvin, L., "'Organically grown' vegetables: U.S. acreage and markets expand during the 1990s," *USDA Economic Research Service Vegetables and Specialties Situation and Outlook*, Special Article VGS-271, (1997) p 27-28.

Greene, C., Dimitri, C., Lin, B.-H., McBride, W., Oberholtzer, L., and Smith, T., "Emerging issues in the U.S. Organic Industry," *Economic Research Service/USDA* EIB 55 (2009), p. 18.

Gulseven, O. and Wohlgenant, M., 2014. Demand for Functional and Nutritional Enhancements in Specialty Milk Products. *Appetite*, 81: 284-294.

Hamilton, Stephen, David Sunding, and David Zilberman. "Public goods and the value of product quality regulations: The case of food safety," *Journal of Public Economics* 87 (2003): 799-817.

Karato, K., Movshuk, O. and Shimizu, C., 2015. Semiparametric Model of Hedonic Housing Prices in Japan. *Asian Economic Journal,* 29(4), pp.325-345.

Lancaster, K., 1966. "A New Approach to Consumer Theory," *The Journal of Political Economy* 74(2), pp. 132-157.

Leschewski, A., Weatherspoon, D. and Kuhns, A., 2016. A Segmented Hedonic Analysis of the Nutritional Composition of Fruit Beverages. *International Food and Agribusiness Management Review*, 19(3): 119-140.

Lin, B.-H., Smith, T.A., and Huang, C.L., "Organic premiums of fresh produce," *Renewable Agriculture and Food Systems* 23.3 (2008), p. 214.

Loke, M.K., Xu, X. and Leung, P., 2015. Estimating organic, local, and other price premiums in the Hawaii fluid milk market. *Journal of Dairy* Science, 98, pp.2824-2830.

Lusk, J.L. and Fox, J.A., 2002. Consumer demand for mandatory labeling of beef from cattle administered growth hormones or fed genetically modified corn. *Journal of Agricultural and Applied Economics*, 34(1), pp.27-38.

Lusk, J.L., Jamal, M., Kurlander, L., Roucan, M. and Taulman, L., 2005. A meta-analysis of genetically modified food valuation studies. *Journal of Agricultural and Resource Economics*, pp.28-44.

Maguire, K.B., Owens. N., and Simon, N.B., "The price premium for organic baby food: A hedonic analysis," *Journal of Agricultural and Resource Economics* 29 (2004), p. 147.

Martínez-Garmendia, J., 2010. Application of Hedonic Price Modeling to Consumer Packaged Goods Using Store Scanner Data. *Journal of Business Research*, 63(7): 690-696.

McFadden, J.R. and Huffman, W.E., 2017. Willingness-to-pay for natural, organic, and conventional foods: The effects of information and meaningful labels. *Food Policy*, 68, pp.214-232.

Moscato, E.M. and Machin, J.E., 2018. Mother natural: motivations and associations for consuming natural foods. *Appetite*, 121, pp.18-28.

Nevo, A., 2001. Measuring Market Power in the Ready-to-Eat Cereal Industry. *Econometrica* 69(2): 307–342.

Oberholtzer, L., Dimitri, C., and Greene, C., "Price premiums hold on as U.S. organic produce market expands," *Economic Research Service/USDA* VGS-308-01 (2005), p. 14.

Richards, T.J., Hamilton, S.F. and Yonezawa, K., 2018. Retail market power in a shopping basket model of supermarket competition. *Journal of Retailing*, *94*(3), pp.328-342.

Richards, T.J., Hamilton, S.F. and Yonezawa, K., 2017. Variety and the cost of search in supermarket retailing. *Review of Industrial Organization*, *50*(3), pp.263-285.

Richards, T.J. and Hamilton, S.F., 2015. Variety pass-through: An examination of the ready-to-eat breakfast cereal market. *Review of Economics and Statistics*, *97*(1), pp.166-180.

Richards, T.J., Allender, W.J. and Hamilton, S.F., 2013. Rivalry in price and location by differentiated product manufacturers. *American Journal of Agricultural Economics*, *95*(3), pp.650-668.

Richards, T.J., Allender, W.J. and Hamilton, S.F., 2012. Commodity price inflation, retail pass-through and market power. *International Journal of Industrial Organization*, *30*(1), pp.50-57.

Richards, T.J. and Hamilton, S.F., 2012; Network externalities in supermarket retailing. *European Review of Agricultural Economics*, *40*(1), pp.1-22.

Richards, T.J., Hamilton, S.F. and Patterson, P.M., 2010. Spatial competition and private labels. *Journal of Agricultural and Resource Economics*, pp.183-208.

Richards, T.J. and Hamilton, S.F., 2006. Rivalry in Price and Variety among Supermarket Retailers," *American Journal of Agricultural Economics*, 88(3), August 2006, pp. 710-27.

Rosen, Sherwin. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," *Journal of Political Economy* 82, no. 1 (1974): 34-55.

Smith, T.A., Huang, C.L., and Lin, B.-H., "Estimating organic premiums in the US fluid milk market," *Renewable Agriculture and Food Systems* 24.3 (2009), p. 203.

Sok, E., and Glaser, L., "Tracking wholesale prices for organic produce," USDA, Economic Research Service Agricultural Outlook (2001), pp. 7-8.

Staudigel, M. and Trubnikov, A., 2022. High Price Premiums as Barriers to Organic Meat Demand? A Hedonic Analysis Considering Species, Cut and Retail Outlet. *Australian Journal of Agricultural and Resource Economics*, 66: 309-334.

Szathvary, S. and Trestini, S., 2014. A Hedonic Analysis of Nutrition and Health Claims on Fruit Beverage Products. *Journal of Agricultural Economics*, 65: 505-517.

Tavares, V. de S., Perez, R., Stringueta, P.C. and Braga, G.B., 2021. Impact of Organic Certification on the Price of Ready-to-Drink Fruit Nectars and Juices. *Food Science and Technology*, 41(2):395-403.

Thompson, G.D. and Kidwell. J., 1998. Explaining the choice of organic produce: cosmetic defects, prices, and consumer preferences. *American Journal of Agricultural Economics* 80 (1998), p. 279.

Waugh, F.V., 1928. Quality factors influencing vegetable prices. *Journal of Farm Economics*, 10(2), pp.185-196

**Data**

TCCC_0000152
TCCC_0000161-0000162
TCCC_0000180
TCCC_0000189
TCCC_0000266-0000267
TCCC_0000269
TCCC_0000508-0000509
TCCC_0000596
TCCC_0000763
TCCC_0000779
TCCC_0002748

**Non-Bates Numbered Documents:**

*Natural Foods Merchandizer*, "Protein, pixels, and purchasing power: Decoding today's natural products consumer," Summer 2025.

**Websites**

Federal Trade Commission. "Advertising FAQ's: A Guide for Small Business." April 2001, accessed June 1, 2026 at https://www.ftc.gov/tips-advice/business-center/guidance/advertising-faqs-guide-small-business.

Mintel Group Ltd., GNPD database, accessed June 1, 2026, at https://www.mintel.com/global-new-products-database.

**Bates Numbered Documents:**

PALMER000189-0000194
PALMER000264-0000294
PALMER000348-0000364
PALMER000379-0000398
PALMER000270, 273 and 285
PALMER000306, 362, 363 and 364
TCCC_0000085-0000150
TCCC_0000152
TCCC_0000155-0000162
TCCC_0000180
TCCC_0000189
TCCC_0000266-0000267
TCCC_0000269
TCCC_0000467-0000507
TCCC_0000508-0000583
TCCC_0002733-0002746
TCCC_0000596
TCCC_0000763
TCCC_0000779
TCCC_0002748
TCCC_0002733-0002747