# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

VICTORIA PALMER, SUE KIM and IVAN ZERMENO, Individually and On Behalf of All Others Similarly Situated,
Plaintiffs,

vs.

Case No.: 2:25-cv-04777-GW-AGR

THE COCA-COLA COMPANY,
Defendant.
______________________

VIDEOTAPED 30(b)(6) DEPOSITION OF
THE COCA-COLA COMPANY
GIVEN THROUGH
TYLER SIMPSON

May 29, 2026

9:36 a.m.

Veritext Legal Solutions

1075 Peachtree Street, N.E.

Suite 3625

Atlanta, Georgia

LAURA R. SINGLE, CCR-B-1343

A P P E A R A N C E S

For the Plaintiffs:

JASON A. IBEY, ESQ.
Kazerouni Law Group APC
169 W 2170 S Cir
Suite 204 D
St. George, Utah 84790
jason@kazlg.com

For the Defendant:

DAKOTAH BURNS, ESQ.
FAUST PETKOVICH, ESQ.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, New York 10036
dburns@pbwt.com

TANYA L. GREENE, ESQ.
DLA Piper, LLP
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, California 90067
tanya.greene@us.dlapiper.com

Also Present:

Katie Klorfein, In-House Counsel
(The Coca-Cola Company)

Trey Melville, Videographer
(Veritext Legal Solutions)

I N D E X


| EXAMINATION OF TYLER SIMPSON | | PAGE |
|---|---|---|
| BY MR. IBEY.................................. | | 8 |


* * *


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| For the Plaintiffs: | | |
| Exhibit 1 | Plaintiff's First Amended Notice of Taking Deposition of Defendant The Coca-Cola Company's Representative(s) Pursuant to Fed. R. Civ. P. 30(b)(6) | 23 |
| Exhibit 2 | First Amended Complaint for Violations of: 1) California Consumer Legal Remedies Act (“CLRA"), Cal. Civ. Code SS 1750, Et Seq.; 2) Breach of Express Warranty; 3) Intentional Misrepresentation; and 4) Unjust Enrichment | 30 |
| Exhibit 3 | Defendant The Coca-Cola Company's Answer to First Amended Complaint | 32 |
| Exhibit 4 | Primient Citric Acid Natural Statement, 1/1/26 and attached documents | 36 |
| Exhibit 5 | Defendant The Coca-Cola Company's Responses and Objections to Plaintiff's First Set of Requests For Admission | 85 |

I N D E X

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| For the Plaintiffs: | | |
| Exhibit 6 | Defendant The Coca-Cola Company's First Supplemental Responses and Objections to Plaintiff's First Set of Requests For Admission | 122 |
| Exhibit 7 | The Coca-Cola Company's Second Supplemental Responses and Objections to Plaintiff's First Set of Requests For Admission | 124 |
| Exhibit 8 | Defendant The Coca-Cola Company's Responses and Objections to Plaintiff's First Set of Interrogatories | 128 |
| Exhibit 9 | The Coca-Cola Company's First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories | 132 |
| Exhibit 10-A | The Coca-Cola Company's Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories | 134 |
| Exhibit 10-B | Excel spreadsheet - Sprite + Fanta Sales Performance in California SMM's from May 21-25 | 138 |
| Exhibit 10-C | Units of SPRITE TRADEMARK, FANTA TRADEMARK, 405 ITEM in California during 4 Years, YTD - 16 w/e 04/18/26 | 139 |

I N D E X


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| For the Plaintiffs: | | |
| Exhibit 11 | Printed versions of Exhibits 10-B and 10-C | 142 |
| Exhibit 12 | Defendant The Coca-Cola Company's Responses and Objections to Plaintiff's First Set of Requests for Production | 142 |
| Exhibit 13 | Printout of a web page from Coca-Cola on 5/26/26 | 148 |
| Exhibit 14-A | Sprite and Fanta labels (TCCC_0000001 - 0000080) | 150 |
| Exhibit 14-B | Sprite label (TCCC_0000069) | 151 |
| Exhibit 14-B(2) | Sprite packaging (TCCC_0000067) | 160 |
| Exhibit 14-C | Fanta Orange label (TCCC_0000036) | 163 |
| Exhibit 14-D | Fanta Orange secondary packaging (TCCC_0000027) | 166 |
| Exhibit 15-A | Consumer Survey (TCCC_0000157 - 0000160) | 169 |
| Exhibit 15-B | Excel spreadsheet (TCCC_0000161) | 173 |

# I N D E X


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| For the Plaintiffs: | | |
| Exhibit 15-C | Excel spreadsheet (TCCC_0000162) | 173 |
| Exhibit 16 | Listing of employees of Coca-Cola and job titles (TCCC_0000151) | 174 |
| Exhibit 17 | List of retailers (TCCC_0000152) | 177 |
| Exhibit 18-A | PDF Condensed spreadsheet (TCCC_0000155) | 180 |
| Exhibit 18-B | Electronic version of spreadsheet (TCCC_0000155) | 180 |
| Exhibit 19 | Excel spreadsheet (TCCC_156) | 190 |
| Exhibit 20 | Printout of spreadsheet tab 2025 (TCCC_0000508) | 195 |
| Exhibit 21 | Printout of spreadsheet tab 2024 (TCCC_0000508) | 197 |

MS. KLORFEIN: Katie Klorfein, in-house counsel for The Coca-Cola Company.

MS. GREENE: Tanya Greene, DLA Piper on behalf of Coca-Cola.

THE VIDEOGRAPHER: Thank you.

Will the court reporter please swear in the witness.

TYLER SIMPSON,

Having been first duly sworn to state the truth, was examined and testified as follows:

EXAMINATION

BY MR. IBEY:

Q. Great.

Mr. Simpson, good morning. Before the deposition, we spoke and I believe you said it was okay to refer to you as Tyler; is that --

A. Yes.

Q. -- correct?

Thank you for being here. My name is Jason Ibey. I represent the Plaintiff in the lawsuit against The Coca-Cola Company. If I abbreviate The Coca-Cola Company as Coca-Cola, is that understandable to you?

A. Yes.

Q. Okay. And if at any point that becomes

confusing because there's a Coca-Cola brand soda, just -- will you -- will you let me know?
A. Sure.
Q. Okay. Great.
Have you had your deposition taken before?
A. No.
Q. Okay. And is it your understanding that you are appearing here as a 30(b)(6) representative for Coca-Cola?
MR. BURNS: Objection to form.
THE WITNESS: Sorry. I don't understand the question.
BY MR. IBEY:
Q. Sure.
Are you appearing here today as a Rule 30(b)(6) witness as a representative for Coca-Cola?
MR. BURNS: Objection to form.
THE WITNESS: I'm still not sure I understand.
BY MR. IBEY:
Q. Okay. Do you understand that the testimony you give today is on behalf of Coca-Cola?
A. Yes.
Q. Is there any reason that you would not be able to give your best testimony today?

that.

A. I see.

Q. I just want you to give me the understanding that you have?

A. I see.

Q. And so if your response is you would have to guess at --

A. The answer.

Q. -- the answer --

A. I see.

Q. -- then I would appreciate it if you would let me know that that is essentially a guess or if it's an estimate, you have an idea of what the response is but maybe not precisely, I would just appreciate that you articulate that -- the level of your understanding or degree of your understanding?

MR. BURNS: Objection to form.

THE WITNESS: Okay.

BY MR. IBEY:

Q. Okay. How -- are you currently employed?

A. Yes.

Q. By what company?

A. The Coca-Cola Company.

Q. Okay. And how long have you been employed by Coca-Cola?

A. For 34 years in June, the end of June. So almost 34.
Q. Congratulations.
What is your current job title?
A. I am the vice president of ingredient and product governance.
Q. How long have you held that position?
A. For almost six years.
Q. And before that what was your job position?
A. I worked in our research and development area.
Q. And how long were you in that position?
A. Well, it was many positions there; but I worked in R&D for 28 years.
Q. Do you work out of Atlanta, Georgia?
A. I do.
Q. Okay. And has that been the case the entire time that you've worked with the company?
A. Yes.
Q. In your current position, in general terms what are your responsibilities?
A. So it's multifaceted. So I lead a team that has many different responsibilities such as delivering customs; clarifications, for example, leading sort of communications with regard to

certain -- I'm trying to think of a good way to explain it. It would be specific communications with regard to our formulations, and also I have a team that does specific things around global harmonized system for labeling of some of our materials. So it's many different aspects and then manage a team that oversees our formula management system.

Q. So would it be accurate to say that you manage multiple different teams?

A. Yes.

Q. Okay.

A. Multiple different functions within a team.

Q. Within -- so there's one team but multiple functions?

A. Multiple functions, yes.

Q. Does that team have a name or designation?

A. They're all part of the ingredient and product governance team.

Q. Approximately, how many members are in that team?

A. 11.

Q. And they all report to?

A. No, they don't all report to me.

Q. Do they report to a supervisor that then reports to you?

property, our trade secret. It's what we own to produce our finished beverages, so that's the formula.

Q. I understand.

In terms of your responsibilities, does that involve the Sprite and Fanta brand of beverages?

A. I'm not sure I understand your question.

Q. The ingredient and product governance department or team -- would it be more accurate to say team?

A. Team.

Q. Okay. Do they help purview over the Sprite and Fanta brand of beverages?

MR. BURNS: Objection to form.

THE WITNESS: I'm still not sure I understand the question.

BY MR. IBEY:

Q. Sure.

Do -- the formulas that you were talking about, does that team involve the Sprite and Fanta brand of beverages?

A. I'm still not clear on -- I'm trying to understand because I'm not sure what your exact question is about that if that makes sense.

Q. Okay. Are you familiar with Coca-Cola's

Sprite brand of beverage?
A. Yes. I'm familiar with it, yes.
Q. Are you familiar with Coca-Cola's Fanta brand of beverages?
A. Yes, I'm familiar with them.
Q. Okay. In what way are you familiar with the Sprite brand of beverages in terms of your job responsibilities?
A. Could you be more specific? I'm not sure what you're -- you're asking.
Q. If someone has a question about the Sprite brand of beverage, would that potentially go to your department --
MR. BURNS: Objection to form.
BY MR. IBEY:
Q. -- or your team?
A. Not necessarily, no.
Q. Okay. What about for the Fanta brand of beverages?
MR. BURNS: Objection to form.
THE WITNESS: No, not necessarily.
BY MR. IBEY:
Q. Have you received inquiries internally about the Sprite brand of beverages?
MR. BURNS: Objection to form.

database we can go and look and see, yes, we have a product and we sell it in Kenya. So someone may ask the question here or they may ask what, you know -- whether -- you know, what other countries, you know, we have the product in, et cetera. So we're asked a lot of different questions, but it has nothing to do with the formula if that makes sense. It's just about what country it's sold in or things like that that, so it's ambiguous.

Q. I understand.

So your team addresses questions at times regarding formulas for the Sprite brand of beverage products?

A. What do you mean by formula?

Q. Well, you referenced earlier formulas. Would that include formulas for the Sprite brand of beverages?

A. Yes. We are the repository for the formula, but we don't necessarily design the formula if that makes sense.

Q. Is that a different department?

A. Yes. That would be in R&D.

Q. And previous when you were in research and development, were you involved with the formulations for the Sprite brand of beverages?

MR. BURNS: Objection to form.
THE WITNESS: Yes.
BY MR. IBEY:
Q. Also for Fanta?
A. On some occasions.
Q. The -- does your -- is your team involved with marketing of beverages?
MR. BURNS: Objection to form.
THE WITNESS: Could you be more specific?
BY MR. IBEY:
Q. More specific as to the type of beverage or --
A. No. What do you mean by marketing?
Q. Is your -- is your team involved in any type of marketing for beverages for Coca-Cola?
MR. BURNS: Objection to form.
THE WITNESS: No.
BY MR. IBEY:
Q. What about labeling?
MR. BURNS: Objection to form.
THE WITNESS: I think you need to be more specific around that.
BY MR. IBEY:
Q. Is there a different department that handles marketing of Coca-Cola products?

A. I have to look it up honestly.

Q. You're not -- you're not sure right now?

A. I do know, but it's not coming to my mind. But, yeah, his first name is Manolo.

Q. Okay. I'm going to introduce as Exhibit 1 this document.

(Exhibit 1 was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. And, Tyler, feel free to take a moment to look at this document.

MR. BURNS: We only have two copies per exhibit?

MR. IBEY: We have one for the witness and for you and for the court reporter.

THE COURT REPORTER: Do you want to use mine?

MR. BURNS: I have one. I would have preferred if all those present had opportunities to review the copies.

MR. IBEY: I wasn't told how many people would be coming for Coca-Cola. And if you would like I can put it on the TV monitor.

MR. BURNS: I think that would be

preferable, yeah.
MR. IBEY: Okay. Give me one moment. I'll attempt to do that.
BY MR. IBEY:
Q. Tyler, are you familiar with this document?
A. Yes.
Q. Okay. And had you seen it before today?
A. Yes.
Q. Okay. What -- what is your understanding of what this document is?
A. I'm not an attorney per se, so --
Q. Just in your own understanding.
A. It's the -- I'm not sure how to explain. It's the different topics of the -- that you've raised questions for -- for us to respond to.
Q. Okay. Great.
A. Is that --
Q. Sure.
I'll represent that this is the first amended notice of deposition, which essentially requested that Coca-Cola have a witness -- a representative here today, which I understand you are that witness for today.
Now, before the deposition I had discussions with attorneys for Coca-Cola. There's a few topics

that I understand have been withdrawn. And I'll just state that for the record.

So topic number 2 I understand has been withdrawn without prejudice with a caveat. Topic number 6 has been withdrawn without prejudice. Topic 14 has been withdrawn without prejudice and topic 22 has also been withdrawn without prejudice. And then I believe the second part of topic 16 has been withdrawn without prejudice.

MR. BURNS: I think our understanding, Jason, is that topic 10 has also been withdrawn --

THE COURT REPORTER: I'm sorry. I need you to speak up. I can't hear you.

MR. BURNS: My understanding is that topic 10 has also been withdrawn, which concerns conjoint or willingness-to-pay analysis.

MR. IBEY: That's correct. 10 as well.

BY MR. IBEY:

Q. Tyler, apart from these topics, which we've indicated have been withdrawn, are you prepared to give testimony on the remaining topics?

A. Yes. I have a question. Just to be clear on item 16, you said -- which part is withdrawn?

Q. So it would be beginning of line 3 where it

deposition notice, I want to review some of the definitions section.

Do you see in paragraph 5 where it says, class period?

A. Yes.

Q. Okay. If I refer to the class period throughout the deposition so that we have a clear understanding, I'm referring to this paragraph with the date range May 27, 2021, to March 12, 2026.

A. Okay.

Q. And if any time that becomes unclear to you or we need to reference that, feel free to let me know.

Similarly, if I refer to the class or class definition, I'm referencing the above paragraph 4, which is then referencing paragraph 130 of the first amended complaint.

MR. BURNS: Objection to form.

THE WITNESS: I'm not sure what that means.

BY MR. IBEY:

Q. Well, I'll introduce documents as we go along. I think that should make it clear.

My question is, do you understand that when I'm referencing the class or class definition that I'm referring to paragraph 130 of the first amended

BY MR. IBEY:
Q. But in terms --
A. Paragraph 130.
Q. In terms of paragraph 4 of this deposition notice, you understand when I'm referencing the class, I'm referencing the statement in paragraph 4 of the deposition notice.
MR. BURNS: Same objection.
THE WITNESS: I read the words, but I'm still unclear what -- what that actually means because I'm not familiar with the paragraph 130.
BY MR. IBEY:
Q. We can get to paragraph 130 in a bit.
When I refer to the class products or the products that are at issue in this lawsuit, do you have an understanding of what class products includes?
A. Yes.
Q. Okay. And what is that understanding based on?
A. It was in the documents; but if you don't mind, would you read those products for me?
Q. I'm going to introduce an exhibit that should hopefully help the process.
A. Okay.

A. Yes.
Q. Okay. Here -- this is what I was referencing earlier as the proposed class definition. So when I refer to the class, proposed class, or class definition, I'm referencing this paragraph. Is -- is that understood?
A. Okay. So basically you're saying all persons in California who purchased during the timeframe May 27th?
Q. Right.
So that would be essentially persons in California who purchased the class products, which we'll talk about in a moment, during the particular time period.
A. Okay.
Q. Then please turn to page 2 of that document. In paragraph 11 -- feel free to take a moment there -- it lists some names of beverages. Now, in terms of the class products or the product that are at issue in this lawsuit, is it your -- your understanding that the beverages listed in paragraph 11 are among those class products?
A. Yes.
Q. And then similarly in paragraph 16 are the products listed there also among the class products?

A. Yes.
Q. Based on your understanding, how many class products total are there?
A. 15.
MR. IBEY: I'll introduce Exhibit 3.
(Exhibit 3 was marked for identification, attached at the end of the original transcript.)
BY MR. IBEY:
Q. Tyler, have you seen this document before today?
A. Yes.
Q. What is your understanding of what this document is?
A. It's a response to questions.
Q. On the very first page, if you turn there for me, do you see where it says, Defendant, The Coca-Cola Company's answer to the first amended complaint? Do you see that?
A. Yes.
Q. Do you have an understanding that this is Coca-Cola's response to the first amended complaint?
A. Yes.
Q. Turn please to page 25 of that document. Do you see at the top where it says, affirmative

defenses?
A. Yes.
Q. Okay. Do you have an understanding that Coca-Cola has asserted various affirmative defenses to the claims in this lawsuit?
MR. BURNS: Objection to form.
THE WITNESS: Could you explain more? I'm not sure what that means.
BY MR. IBEY:
Q. So one of the deposition topics referenced or involves documents that have been produced by Coca-Cola in support of affirmative defenses that may be used for purposes of class certification briefing.
Has Coca-Cola produced documents in this case in support of its affirmative defenses?
MR. BURNS: Objection to form and objection to the extent -- objection to the extent that questioning calls for a legal conclusions.
THE WITNESS: I'm not certain what that question is asking.
BY MR. IBEY:
Q. In response to requests for documents in this case, has Coca-Cola produced documents in that support any of its affirmative defenses?
MR. BURNS: Same objection.

THE WITNESS: Yes.
BY MR. IBEY:
Q. Okay. Do you know what those documents are?
A. They are -- you're asking if I know what they are?
Q. Yes.
A. Yes.
Q. Okay. Approximately, how many documents were produced that support affirmative defenses?
MR. BURNS: Objection to form.
THE WITNESS: Could you be more specific?
BY MR. IBEY:
Q. Sure.
Which -- which -- which documents that were produced support affirmative defenses?
A. Supplier documents.
Q. And by that do you mean documents that were provided by suppliers?
A. Yes.
Q. Were those in the form of letters?
A. Could you be more specific?
Q. Were they -- were they -- were they correspondence from suppliers?
A. Yes.
Q. Anything else from suppliers?

A. I'm not sure what that means.

Q. Any other type of document from suppliers that fall into this category of are documents supporting affirmative defenses?

A. Again, I'm not quite sure what that -- that means as well. The -- I mean, we had -- the documents are from the suppliers that's -- that are there. I'm not sure what else.

Q. Are they documents that are in the form other than a correspondence?

A. No, not to my knowledge.

Q. Apart from the supplier documents, are there any other documents?

A. Label documents, product labels.

Q. Those were produced from -- sorry. Those documents were prepared by Coca-Cola?

MR. BURNS: Objection to form.

THE WITNESS: I'm not sure what that means either.

BY MR. IBEY:

Q. They weren't prepared by suppliers, correct?

A. Yeah. Could you be more specific?

Q. Sure.

The product labels that you are referencing, are those documents created by Coca-Cola?

A. Yes. I believe all the documents were prepared by Coca-Cola.
Q. Apart from the supplier documents and the product labels, are there any other documents produced supporting affirmative defenses?
A. Not to my knowledge.
Q. Okay.
MR. IBEY: I'll introduce this as Exhibit 4.
(Exhibit 4 was marked for identification, attached at the end of the original transcript.)
MR. BURNS: Can you pull that up?
MR. IBEY: Sure. If I show each page of this, it may get time consuming because they're individual image files.
BY MR. IBEY:
Q. Tyler, have you seen the first page of this document, which has the bottom the -- actually, let me strike that.
Do you see at the bottom of this page where it says TCCC_ and then numbers?
A. Yes.
Q. Okay. Do you have an understanding of what this numbering system is?
A. I do not.

Q. Okay. Common nomenclature is Bates numbering. So if I refer to Bates number or Bates numbering, I'm referring to this designation that's usually found on the bottom right corner of the pages. Here this would be Bates 2. Does that make sense?

A. So when you're saying Bates numbering, it's only that number?

Q. Yes. It would have that beginning designation TCCC and then a number afterwards.

A. I see.

Q. So for the document at Bates number 2, are you familiar with this -- this document?

A. Yes.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Q. Are you a scientist?

A. I'm a food scientist.

Q. Food scientist.

What's your highest level of education?

A. I have a master's in food science.

Q. And where was that attained?

A. From the University of Georgia.

Q. And approximately what year?

A. Which year I graduated or --

Q. Sure, which year you graduated.

A. 1992.

Q. Okay. Do you have any other degrees?

A. I have a BS in food science as well.

Q. Was that obtained from the same university?

A. Yes.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

MR. IBEY: I think we can take a break now.

MR. BURNS: Okay. Thank you.

THE VIDEOGRAPHER: The time is 10:46 a.m. We are now off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 11:01. We are now back on the record.

BY MR. IBEY:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

MR. BURNS: Objection. It calls for speculation and the witness hasn't had an opportunity to read the entire document.

BY MR. IBEY:

Q. Do you need a moment to read more of the document?

A. Yes, please.

Q. Please take that moment.

A. I've read it.

Q. Okay. Great.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

BY MR. IBEY:

Q. You can set that aside for now.

THE COURT REPORTER: I'm sorry. Did you answer? I didn't hear it.

THE WITNESS: Yeah. I said I'm not certain.

THE COURT REPORTER: Okay.

MR. IBEY: I'll introduce Exhibit 5.

(Exhibit 5 was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. Tyler, feel free to take a moment to review this while I bring it up on the screen.

A. Okay. Okay.

Q. Now that you have reviewed this document, is this a document that you had seen before today?

A. Yes.

Q. Okay. Do you understand this document to be responses from Coca-Cola to discovery requests?

A. It has a different term on the front, but -- is that right if I am reading the front?

Q. Sure.

The title of the document is Defendant The

Coca-Cola Company's responses and objections to Plaintiff's first set of requests for admission.

A. Okay. Yes, I understand that.

Q. Okay. Turn please to page 4 of that document. For request number 1, do you see where it says: Admit you used the representation in quotation marks 100 percent natural flavors, end quotation, in the marketing of the Sprite 7.5 fluid ounce product during the class period?

A. Yes.

Q. Was the Sprite 7.5 ounce product advertised at any point during the class period with the representation of 100 percent natural flavors?

MR. BURNS: Objection to form.

THE WITNESS: In what way do you mean? Sorry.

BY MR. IBEY:

Q. In marketing in any form.

A. In any form?

Q. In any form.

A. Yes.

Q. Okay. Does Coca-Cola consider the label on the physical product to be a form of marketing of the product?

A. Yes. Okay. Sorry. Go ahead.

Q. Have -- sorry. Have all of the Sprite brand of beverages that make up the class products been marketed in one way as 100 percent natural flavors?

MR. BURNS: Objection to form.

THE WITNESS: I'm sorry. I didn't understand your question.

BY MR. IBEY:

Q. Sure.

Have the Sprite brand of beverages that make up the class products each been marketed as 100 percent natural flavors during the class period?

MR. BURNS: Objection to form.

THE WITNESS: I guess you would have to be more specific on when you're saying marketed.

BY MR. IBEY:

Q. Marketed in any form whether on the label, digital advertising, magazine.

A. I see. Yes.

Q. And is that the same case for the Fanta brand of products?

A. Yes.

Q. Okay. Have the Sprite brand of beverage products that make up the class products each been labeled as 100 percent natural flavors during the class period?

A. Could you be more specific when you say labeled?
Q. On the -- the printed label on either the can or the bottle of the physical product, has that said 100 percent natural flavors?
A. Meaning anywhere on the label?
Q. Anywhere on the label during the class period.
A. Yes.
Q. Okay. And is that the same case for Fanta brand of products?
A. Yes. To the best of our knowledge, yes.
Q. Is that also the case for the outer packaging of the class products?
A. I have not reviewed all of those, but I guess the -- I'm trying to think. There's an ingredient statement on the -- I can't be certain that's the case for you're saying the secondary packaging.
Q. And just so I have a clear understanding, when you say secondary packaging, what -- what does that mean?
A. That's what I'm trying to clarify for your question. Sorry.
Q. Okay. Sure.

A. When you're saying on the packaging -- so this is -- the primary package that this is -- what -- what the consumer would hold in their hand when they're drinking it, is that what you mean?

Q. For a -- that would be the case for a single product as if that can were sold by itself, right?

A. Yes.

Q. That would be considered the primary --

A. Yes.

Q. -- packaging?

A. Yes.

Q. Okay. Now, if that soda can were to have come in a multipack, is the advertising on the outside of that multipack what you consider the secondary marketing?

A. It would be a secondary package because it's not the primary package. It's housing the primary package.

Q. And so for the secondary packaging for the Sprite and Fanta brands, did they each include the 100 percent natural flavors representation during the class period?

A. I'm not sure. I haven't seen all that, so I can't speculate.

Q. Has it appeared on at least some of the

secondary packaging for the class products?
A. Potentially. I'm not sure.
Q. Is the Sprite Lemon-Lime product sold in multiple sizes?
A. You mean of a package?
Q. Of let's say the primary packaging.
A. Yes. It has different sizes.
Q. Okay. And that 100 percent natural flavors representation appeared on all size variations for the class products during the class period for the primary packaging?
A. It may -- it may not be. Some -- some specialty bottles may not have the full labels on it, but most would.
Q. So for the class products that have a label, that -- that representation would have appeared on it --
A. Yes.
Q. -- during the class period?
A. Yes; but there may be some specialty products that would not have had a full label.
Q. Can you give me an example of one of the specialty products?
A. In some cases the glass bottle may not have the full label on -- on there as -- as you would see

on a can.

Q. I see.

A. It may look different because of the limited space on the package.

Q. And do the glass version come in multiple sizes for -- for the class products?

A. I'm not certain of all the sizes to be honest.

Q. Okay. And --

A. I just saw your 7.5 fluid ounce. I'm not familiar with that package, but I know on some of the smaller glass bottles they don't have a lot of room because you can't apply a label to the bottle because of the dimples, for example. So it has to be just on a specific part of the bottle. There's not a lot of room there.

Q. I see.

Now, for the secondary packaging for the class products, I believe you said earlier that it may be the case but you're not certain that on the secondary packaging the 100 percent natural flavors statement appeared?

A. Yeah. It -- it depends on the packaging. Normally, it -- it may be there, but it could be -- it wouldn't be on the predominant -- predominantly

listed, for example. It wouldn't be predominant on the package.

Q. What do you mean by predominantly? Do you mean a specific location on the package?

A. Well, it wouldn't -- like on -- on here, you know, you can only see Coca-Cola Zero. You don't see anything on this. This is the primary predominant area. If it's here you can't really read that. It's very small. So if you're trying to read the -- some of the materials here, so it's very small.

Q. I think I understand.

So the 100 percent natural flavors representation may appear on the secondary packaging, but it may be in smaller print than on the primary?

A. It may be very hard to read or it may be located in an area that wouldn't be -- based upon the shelf, you wouldn't see it or it may be very small, tiny.

Q. So you would expect it to be on the secondary packaging but it just may be in smaller print?

A. Yeah. I haven't -- I haven't checked or verified that.

Q. Are you aware of which product labels and outer packaging labels have been provided by

Coca-Cola to the Plaintiff in this case?
A. I've seen some of the labels, yes.
Q. Okay. Is the Sprite brand of beverages marketed online by Coca-Cola?
MR. BURNS: Objection to form.
THE WITNESS: I'm not sure what you mean by that.
BY MR. IBEY:
Q. Let's take Coca-Cola's website, for example. Does Coca-Cola market or advise the Sprite brand of products on its website?
A. They may have information about the Sprite brand on there, I suppose, from that perspective and they may have -- I think our bottlers have more specifics on -- on that. I think --
Q. Do the bottlers perform any type of marketing for the class products for Coca-Cola?
MR. BURNS: Objection to form.
THE WITNESS: When you say any type, could you be more specific?
BY MR. IBEY:
Q. Sure.
Do -- do the bottlers themselves advertise online the class products?
A. They wouldn't advertise themselves, but

Does Coca-Cola advertise the class products through amazon.com?

A. I think it's the opposite. Isn't -- isn't Amazon advertising our products on their website?

Q. Does Coca-Cola provide marketing materials to Amazon to show on amazon.com?

A. Yes.

Q. And you're not aware of whether there's a dedicated Amazon store page for Coca-Cola?

A. I'm not familiar with that, no.

Q. Does Coca-Cola have sales through amazon.com?

A. Do we -- do we sell product -- can the bottlers sell the product?

Q. But does Coca-Cola sell any of the class products through amazon.com?

MR. BURNS: Objection to form.

THE WITNESS: Our bottlers would sell to Amazon.

BY MR. IBEY:

Q. So your understanding is that the bottlers would sell the class products if at all on at least amazon.com?

A. They would provide the product that is sold on amazon.com.

Q. Okay. So they would provide it, but do you know whether they do their own advertising apart from just providing the product to retailers?

A. I'm not sure I understand what you're asking.

Q. Apart from the bottlers providing the class products to retailers, are you aware of them doing their own advertising of the class products?

A. As I said before, generally it's the retailer that's doing the advertising. The bottlers producing the product can provide it. The advertisement is through the retailer who is going to have the product for sale.

Q. Does Coca-Cola sell direct to consumers in California, the class products?

A. I don't know. I don't know specific to California. I mean, generally they're all sold through a retailer of some kind.

Q. Does Coca-Cola sell the class products to bottlers who then themselves sell in California?

A. Could you ask the question again? I'm not sure about what --

Q. Sure.

Just in terms of the chain of commerce, so to speak, do the bottlers themselves sell the class

products to consumers in California or would that only be through sales to retailers?

A. I'm not familiar with California, but in general bottlers would sell to other retailers who then sell the product. They don't have a direct-to-market sales. Again, I'm -- I'm not for certain if they would have any opportunity -- there have been, I guess, cases outside the U.S. where bottlers may sell directly to consumers; but I'm not familiar with that in California, so I'm not -- not sure.

Q. Okay. The -- are you -- are you aware of advertising on amazon -- amazon.com of the class products?

A. Only what I've seen in the pictures here.

Q. Are you referring to documents produced by Coca-Cola?

A. Yes.

Q. And that's the -- is that the extent of your knowledge of Amazon's advertising of the class products?

A. Yes, that's correct.

Q. Is it correct that Coca-Cola provides the images for the primary and secondary packaging for the class products to the bottlers?

A. Yes, we provide those to the bottlers.
Q. Are you aware of any instance where the bottlers created their own artwork to use on the class products?
A. No, I'm not familiar with that.
Q. Would that be permitted by Coca-Cola for the bottlers to create their own artwork for the class products?
A. No.
Q. Does Coca-Cola provide the retailers with the --
A. Let me take a step back to the basic artwork. They may have a promotion that they could work with and put something down that would be specific to them; but the basic information would be the same if that makes sense.
Q. So any additional content, if any, would come from the bottlers, but that wouldn't be from Coca-Cola?
A. Right. If they were going to go for offering -- you know, for example, Six Flags is going to -- you know, you get -- you collect a can and you get in Six Flags free and they have something specific on here for Six Flags. That could be a regional thing just for where Six Flags is at. So

products to retailers directly?

A. So say that in a different way. Sorry. I just want to make sure I get it.

Q. I'll try to give an example. For amazon.com I believe we established that they advertise the class products?

A. Yes.

Q. Does that artwork and content come from Coca-Cola?

A. Yes. To my knowledge, yes.

Q. Do you know if there's an intermediary that's used to convey that artwork and content to Coca-Cola?

A. I don't know.

Q. Is, for example, Amazon supposed to use the advertising images and content provided by Coca-Cola for the class products?

MR. BURNS: Objection to form.

THE WITNESS: Could you explain a different way just to you make sure I understand?

BY MR. IBEY:

Q. Sure.

Is Amazon instructed to use the content and images for the class product advertising that Coca-Cola provides?

A. Yes. I suppose that would be the case. They would have a specific image that they would provide them to use.

Q. Are you aware of any instance of amazon.com advertising the class products with artwork or content that wasn't provided by Coca-Cola?

A. I'm not familiar, no.

Q. There are other retailers that sell the class products in California; is that correct?

A. Yes.

Q. Is it the case that for all of those retailers that Coca-Cola provides artwork and content for the marketing of the class products to those retailers to use?

MR. BURNS: Objection to form.

THE WITNESS: Could you be more specific for which retailers?

BY MR. IBEY:

Q. All of the retailers to which marketing content is provided. Are they supposed to use the content that's provided by Coca-Cola for the class products?

A. It could be provided by the bottler. It could be point of sale, et cetera. It wouldn't by the bottler. It would be Coca-Cola who was providing

it to the bottlers from point of sale, for example.
Q. And Coca-Cola provides to the bottlers the content to use on class products; is that right?
A. We would give the information and then the point of sale could be created with that, but it would be based on the content I suppose that was given.
Q. Is Costco one of the retailers that sells the class products?
A. Yes.
Q. And were they selling the class products, at least some of them, during the class period?
A. Yes, to my knowledge.
Q. Do you know which of the class products they sold during the class period?
A. I do not know.
Q. Would you expect that that information is available somewhere?
A. I don't -- I don't know. That would be bottler -- the customers that are sold would be through our bottlers, and we don't have that information.
Q. Would it be accurate to say that the marketing content for the class products that is provided by Coca-Cola during the -- during the class

period is -- goes through an approval process before that information is given to the bottlers to use?

A. The marketing?

Q. Yes.

A. The marketing content is reviewed, yes.

Q. And does that include the 100 percent natural flavors representation?

A. Yes.

Q. So that representation went through an approval process before it was used on the class products; is that correct?

A. I can't be specific because I don't -- that's a long time ago when that was there, but in theory it would have gone through an approval, yes.

Q. Are you aware of any documentation provided by Coca-Cola relating to the approval process for the 100 percent natural flavors statement?

A. No. We don't have any of that. Like I said, that was so long ago it's -- to my knowledge, we don't have anything on that.

MR. IBEY: Should we take a break at this time?

MR. BURNS: Do you want to do a lunch break?

MR. IBEY: Sure.

We can go off record.

THE VIDEOGRAPHER: Off the record at 12:17.
(A recess was taken.)
THE VIDEOGRAPHER: We are now on the record. The time is 1:01 p.m.
You may continue.
BY MR. IBEY:
Q. We're now back from a lunch break. I still want to stick with the same exhibit but if you could please turn to page 8.
A. This is Exhibit 5?
Q. Exhibit 5. I pulled it up on the screen also.
So for request number 8, which starts on page 7 and actually goes on to page 8, I want to ask about this here. The question is: Admit Defendant's Fanta Orange 7.5 fluid ounce product was marketed on amazon.com during the class period as having 100 percent flavors.
And then do you see the response that is below that, Tyler?
A. Yes.
Q. There's some objections and do you see where it starts, subject to and without waiving the foregoing --
A. Yes.

Q. -- specific and general objections?

Okay. It says: Coca-Cola admits that the 100 percent natural flavor statement has appeared in to Fanta Orange advertising copy provided to amazon.com during the class period.

And then it also says, this is otherwise denied.

Have you seen the advertising copy referenced here that was provided to amazon.com?

A. No, I have not.

Q. Do you have any reason to believe that this statement that the advertising copy was provided to amazon.com is not accurate?

A. No, I have no reason to believe that.

Q. Okay. And is it your understanding that an advertising copy for the class products was provided to amazon.com for -- strike the for part.

A. Sorry. Could you repeat that?

Q. Sure.

Is it correct that the advertising copy for the class products was provided to amazon.com?

A. Yes.

Q. Okay. Does that advertising copy include every one of the 15 class products or a subset of those products?

MR. BURNS: Objection to form.
THE WITNESS: Could you be more specific?
Sorry.
BY MR. IBEY:
Q. The advertising copy provided to amazon.com, does that include all 15 of the class products?
A. As far as I know.
Q. Okay. For the advertising copy of the class products provided to retailers, does that vary depending on the retailer?
A. I'm not sure I understand the question.
Q. In other words, is the content that is provided in the -- in the advertising copy to the retailers, does that differ depending on which retailer it's sent to?
A. I'm not sure. I don't believe so.
Q. Going back to the different modes or channels for advertising for the class products, I believe we've talked about marketing on Coca-Cola's website and also on amazon.com. Are you aware of other retailers who advertised the class products on their own website during the class period?
A. I'm not.
Q. Would it surprise you if they marketed the class products on their own website during the class

advertising?

A. It would be reviewed. I think, again, depending on, you know, as we discussed before, if there were local adaptations for various promotions, the full display may not have been; but the basic content would have been something that they would have gotten to use specific to the product itself. But outside of that, if it's, you know, an advertisement for Disney World or, you know, Six Flags or whatever else they may put up there, that's not something that we would dictate.

Q. I understand.

Does Coca-Cola consider the primary or -- the primary labeling of the class products following under the category of point-of-sale -- point-of-sale advertising?

MR. BURNS: Objection to form.

THE WITNESS: Yeah. I'm not sure I understand what your question is.

BY MR. IBEY:

Q. Earlier we were talking about point-of-sale advertising and I gave an example of a display. Are there other types of point-of-sale advertising for the class products that you're aware -- aware of?

A. For example, you know, there could be a

different display in the store. So rather than in a cooler, they could have a box on the end of the aisle, for example, and display product there; and in that case, you know, it would be a cardboard display that they would build to put product in to show. So that would have been a potential point of sale -- you know, a different area of the store, so not necessarily in the cooler or not in the actual beverage aisle, for example. It may be somewhere else, and that would be a unique space. I have no idea if that's the case or not. I'm just using that as --

Q. As a possible example?

A. -- an example.

Q. And for point-of-sale advertising for the class products, would that come from Coca-Cola?

A. Again, depending on the type of -- as we said earlier, if it's specific to the product and it's something we could -- The Coca-Cola Company could give that information. If it's something that's specific to the bottler like a Disney World or a Six Flags, they could have a specific display that they would showcase for that and it could not be even about the product. It would be something else, pick a -- buy a six-pack of this product and, you know,

get into Disneyland half off. And it would be a whole different display, and that wouldn't be something that we would regulate.

Q. Okay. And so if you wouldn't regulate that, would Coca-Cola not have records of -- of that?

A. Right. We wouldn't -- yes, we wouldn't have records of that.

Q. Going back to the -- the primary packaging for the class products, is that considered a point-of-sale advertising?

A. For a can to be a point of sale?

Q. For a can, for example.

A. I mean, I'm not a marketing expert; but that's not called a point of sale. It's a primary package, I guess. Point of sale is a display that's at the location where you're going to get the product. It's an advertisement that's locally based at that specific point.

Q. I see.

And so would that also be the case for the secondary packaging that that wouldn't be generally considered a point-of-sale advertising?

A. No. It wouldn't be considered a point of sale. It's a secondary package. It's not necessarily a point of sale.

make claims that are not things that we would agree to to that point.

Q. For the advertising copies provided to the retailers for the class products used during the class period, would those retailers be permitted to omit any of the content that was provided in that advertising copy?

A. I don't know honestly if that's the case. I mean, if they would omit something, I mean, it would probably be due to, you know, other factors there. So I can't -- I don't want to speculate and say. I'm not sure.

Q. Okay.

A. And they may only have a certain amount of time for a commercial or whatever else and they have certain things to say. I don't -- I don't know how that works.

Q. Let's go specific to the labeling of -- of the products, the primary and secondary labeling. Would they be permitted to omit any of the content for -- for that?

A. No, not on labeling. The actual label, the information we share with them, that's -- they have to print those up on that label that we give them.

Q. And that's for the secondary packaging as

well?

A. Yes.

Q. Please turn to page 9, and I'll pull it up on the screen also. I'm going to ask specifically about the response in request number 11. The request is: Admit the Sprite 7.5 fluid ounce product contains at least one non-natural flavoring ingredient.

Do you see the response below which says in part: Subject to and without waiving the foregoing specific and general objections, this is denied?

A. Yes.

Q. Does Coca-Cola consider citric acid to be a flavoring ingredient?

A. No, we don't consider it to be a flavoring.

Q. Does Coca-Cola consider sodium citrate to be a flavoring ingredient?

MR. BURNS: I'm just going to object to the extent that these questions concern the function of the ingredients which we've agreed is outside the scope of the class certification.

MR. IBEY: I'm tailoring these to the requests here but noted on your objection.

I'm sorry. Did I finish my question?

THE COURT REPORTER: I don't think so.

BY MR. IBEY:
Q. Does Coca-Cola consider sodium citrate to be a flavoring ingredient?
A. No.
Q. Does Coca-Cola consider potasium citrate to be a flavoring ingredient?
A. No.
Q. Okay. Then on page 10 if you would please turn there, for request number 22 -- and I'll read it. Admit that the citric acid used in the class products is not extracted directly from any plant in which citric acid occurs naturally.
Do you see that question?
A. Yes.
Q. Okay. And then I'll direct your attention to the response, the part that starts with, subject to and without waiving.
Do you see that?
A. Yes.
Q. Okay. It says: Subject to and without waiving the foregoing specific and general objections. Coca-Cola admits that the citric acid used in the class products is not extracted directly from a plant.
And then it says, This is otherwise denied.

Is the sodium citrate used by Coca-Cola for the class products also not extracted directly from a plant?

A. That's correct.

Q. Is that the same case for potasium citrate?

A. That's correct.

[redacted]

[redacted]

[redacted]

Q. Please turn to page 11. For request 35, do you see below where it starts with, subject to and without waiving the foregoing specific and general objections?

A. Yes.

Q. Okay. It says: Coca-Cola admits that it conducts qualification audits of the third parties that supply the citric acid, sodium citrate, and potasium citrate identified in the first amended complaint during the class period. This is otherwise denied.

Do you see that?

A. Yes.

Q. These qualification audits, are those also conducted by third parties for other ingredients in the class products?

A. Could you be more specific?

Q. So there's a reference to three ingredients, right, the citric acid, sodium citrate, and potasium citrate. Would you expect that to be the case for

MR. BURNS: Objection. It calls for a legal conclusion.

THE WITNESS: I'm not sure.

BY MR. IBEY:

Q. You're not sure or you don't understand the question?

A. Yeah. I'm not -- if it's a requirement, I'm not sure.

Q. Oh, I see.

Did Coca-Cola decide to include the 100 percent natural flavors representation on the class products?

A. I'm not sure. It's a long time ago.

Q. Regardless of when the 100 percent natural flavors statement first appeared on the class products, is that statement continuing -- continuing to be on the class -- on the products in production?

A. You mean today?

Q. Today, yes.

A. Yes, as far as I know.

Q. For the class products sold in California during the class period, does Coca-Cola have contact information for any of the consumer purchases?

A. No. Only our bottlers know that information. We don't have access to it.

Q. You're aware that bottlers have some information for consumer purchases of the class products?

A. I don't know what information they have -- they retain. Sorry.

THE COURT REPORTER: I don't know what information they have?

THE WITNESS: I don't know what information they have or retained.

BY MR. IBEY:

Q. Does Coca-Cola have access to customer purchase information for sales on amazon.com?

A. No. Only our bottlers would know that information or Amazon, I suppose. I don't know if the bottlers would even know that.

Q. Sales information for the class products has been requested from amazon.com and produced, correct?

A. Overall sales information, I suppose, at a macro level, I suppose.

MR. IBEY: This will be Exhibit 6.

(Exhibit 6 was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. Please feel free to take a moment to review

while I bring this up on the screen.
A. Okay.
Q. You have reviewed this document?
A. Yes.
Q. Okay. Before today had you seen this document?
A. Yes.
Q. If you look please on page 2. So the first part of the request actually starts on page 1, request number 27; but then there's a response in part on page 2.
Do you see where it says subject to towards the top of page 2?
A. Yes.
Q. It says: Subject to and without waiving the foregoing specific and general objections, Coca-Cola admits that the class products labels did not expressly identify the preservative function of the citric acid in the class products sold in California during the class period.
And it says, This is otherwise denied.
Is that also true for the secondary packaging?
MR. BURNS: Object again given that this request is expressly about the function of the

ingredients, which we've agreed in writing is outside the scope of this deposition and class certification.

MR. IBEY: This is the written discovery response.

MR. BURNS: It's outside the scope of our agreement.

MR. IBEY: I don't agree with that.

BY MR. IBEY:

Q. Do you have any reason to believe that this statement here is inaccurate.

A. I do not have any reason to believe.

Q. Okay. And in terms of my prior question, this refers to the labels. Is it also the case that the second packaging did not expressly identify the preservative function of the citric acid in the class products?

A. Yes, the secondary packaging did not have that information.

Q. Okay.

MR. IBEY: This will be Exhibit 7, right?

THE COURT REPORTER: Yes.

(Exhibit 7 was marked for identification, attached at the end of the original transcript.)

A. I don't know.

MR. IBEY: Are we on 8?

THE COURT REPORTER: Yes.

MR. IBEY: Exhibit 8.

(Exhibit 8 was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. Similarly feel free to review while I bring this up.

Have you had a chance to review?

A. (Witness nods head affirmatively.)

[redacted]

[redacted]

[redacted]

[redacted]

Q. For the product labels for the class products that were produced in this case by Coca-Cola, does Coca-Cola not have in its possession or access to some of the product labels?

MR. BURNS: Objection to form.

THE WITNESS: Could you specify a bit more?

BY MR. IBEY:

Q. I'll back up.

Coca-Cola has produced in this case some documentation regarding the labeling for the class products; is that right?

A. Yes.

Q. Has it produced a label for each variation of the labeling for the class products during the class period?

A. I'm not certain.

Q. Are there any class products including size variations for which Coca-Cola does not have a label -- a copy of the label?

A. I'm not certain.

[redacted]

MR. IBEY: I'll introduce Exhibit 9.

(Exhibit 9 was marked for

identification, attached at the end of
the original transcript.)
BY MR. IBEY:
Q. Again, feel free to review and I'll pull this up on the screen. Please turn to page 18. Actually, let's go to 17. Here for Interrogatory 19 -- have you been able to read this request?
A. Let me glance at it for a moment here.
Q. Okay.
A. Okay.
Q. Okay. And then I'll go to page 18 where we get supplemental response -- do you see where it says April 24, 2026, supplement response to number 19?
A. Yes.
Q. Okay. What is meant here by category leader?
A. It appears to be the title that -- a person who is employed by Amazon who oversees or manages the Amazon store is called a category leader.
Q. Okay. Is there knowledge of who the category leader is presently?
A. No. We have no knowledge of that Amazon employee.
Q. Okay. Is there an individual designated at Coca-Cola who currently communicates with this

category leader -- category leader?

A. I don't know.

Q. Okay.

MR. IBEY: This will be 10.

(Exhibit 10-A was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. Please turn to page 6, Interrogatory Number 7, which reads: Identify all of your variations of labeling of the class products during the class period.

And do you see below bold and underlined it says, May 22nd, 2026, Supplemental Response Number 7?

A. Yes.

Q. Okay. What is Coca-Cola's interpretation here of the words -- I'm sorry, the word "variation" when it's providing the supplement response?

MR. BURNS: Objection to form.

Where is the word "variation" you're referring to?

MR. IBEY: It's in the Interrogatory 7 request itself.

THE WITNESS: I'm not sure what you mean either.

BY MR. IBEY:
Q. Okay. It appears to be identification of several Bates numbers, right, in the supplemental response; is that correct?
A. You lost me. I'm sorry.
Q. Okay.
A. So your original question was about variations?
Q. Correct. I was wondering how Coca-Cola is interpreting the word "variations" here when it's providing this response.
MR. BURNS: Same objection.
THE WITNESS: Well, I think it started with your question to identify all of your variations, so I'm not sure what you meant by your original question. Right?
BY MR. IBEY:
Q. I'm just trying to understand since Coca-Cola provided the response.
A. I think it says, the response is ambiguous with respect to the term "variation." So it goes back to you --
Q. Right. So I'm curious --
A. -- what is a variation to you. I'm not sure what you mean by that.

Q. I'm curious, especially given the objection of vague and ambiguous how was the Coca-Cola interpreting the word "variations" when responding to this request?

MR. BURNS: Objection to form; asked and answered.

THE WITNESS: Well, I think we don't understand your question, so that's why we don't understand what you're asking. What does variation mean in your question?

BY MR. IBEY:

Q. Well, Coca-Cola provided a response. I was just asking what its response was based on in terms of how it interpreted the word "variations."

MR. BURNS: Objection to form; asked and answered.

THE WITNESS: Well, it seems a bit -- it's still ambiguous to me from a standpoint of a variation. If you think there's a -- there is a specific label that has been approved, there's only one type. So I'm not sure what variations of the labeling would mean.

BY MR. IBEY:

Q. Okay.

A. So you would have to say what you're meaning

by your question.
Q. Turn please to page 7. For Interrogatory Number 20 it reads: State the number of units of each of the class products sold within California during the class period.
And then in brackets it says: If needed, give an approximation.
Do you see that?
A. Yes.
Q. And then the response -- there's a May 22nd, 2026, supplemental response on page 8.
Do you see that as well?
A. Yes.
Q. Okay. And then towards the end it's referencing Bates number 180 and 189.
Do you see that also?
A. Yes.
Q. Okay. For the information produced in those documents, are the number of units including sales on amazon.com during the class period?
A. Do you mind showing those?
Q. You would need -- it would be helpful to see it --
A. Yeah.
Q. -- in order to answer?

A. Can we look at it again? Sorry.
Q. Let me see if I can blow this up a little bit.
Can you see that clearly on the screen?
A. Yes.
Q. Okay.
A. So could -- could you ask again? Sorry.
Q. Sure.
MR. IBEY: And I'll -- is it possible to mark this as 10-B and the prior one 10-A?
THE COURT REPORTER: Sure.
(Exhibit 10-B was marked for identification, attached at the end of the original transcript.)
BY MR. IBEY:
[redacted]

[redacted]

[redacted]

[redacted]

for production number 3. So I think the topic is withdrawn.

MR. IBEY: We have a difference of view.

BY MR. IBEY:

Q. For request number 16 -- actually, we'll skip that.

So go please to page 16. For request 33 is it correct that documents have not yet been produced in response to this request?

A. Yes. I believe they're still working on those.

Q. Okay. Please turn to page 18.

MR. IBEY: I'll also put on the record, Dakotah, in relations to the prior discussion to the extent the Court would substain any -- sustain any such objection, then the testimony could be treated as a 30(b)(1).

BY MR. IBEY:

Q. So, Tyler, please look at request number 57. This request is concerning complaints relating to the 100 percent natural flavors representation. Is that your understanding?

A. Say that one more time. I'm sorry.

Q. Sure.

Is it your understanding that this request

concerns any written complaints concerning the 100 percent natural flavors representation?

MR. BURNS: Objection. It mischaracterizes the request.

THE WITNESS: Could you state the question another way? Sorry.

BY MR. IBEY:

Q. Sure. I'll ask this.

Have -- has Coca-Cola produced written complaints from consumers relating to the 100 percent natural flavors representation?

A. I believe they've submitted consumer complaints on a wide variety of topics, just whatever consumers call in to say. It -- it may not be specific to the 100 percent natural flavors or they may have stated other things when they called in.

MR. IBEY: Is now probably a good time for a ten-minute break?

MR. BURNS: Yeah.

THE VIDEOGRAPHER: The time is 2:21 p.m. We are now off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 2:33 p.m. We are now back on the record.

You may continue.

Q. Tyler, please turn to Bates number 69.

MR. IBEY: So I'm also displaying this on the TV and I would like to make that -- mark that electronic file as Exhibit 14-B and the prior physical copy as Exhibit 14-A.

(Exhibit 14-B was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. Tyler, whether it's easier for you to review the printed copy or the electronic copy I have up on the screen, does this appear to be a label for Sprite Lemon-Lime 20 ounce -- 20 ounce size?

A. Yes.

Q. Okay. Are you able to see the content okay or should I zoom in on anything in particular?

A. It depends on what you're wanting me to see.

Q. Okay.

A. Small of it is small.

Q. Towards the -- is it accurate to say that the product labels for the class products have a front and a back side?

A. Yes. There's a front of pack and back of pack, yes.

THE COURT REPORTER: A front and back of?

THE WITNESS: Front of pack and back of pack.
BY MR. IBEY:
Q. There is also a side of the label?
A. It can be depending on the type of package, yes.
Q. So for this particular label, generally speaking, what portion of the content would you consider the front of pack for this label?
A. The part that's shaded with the 40 percent above it.
Q. Okay.
A. That seems to be the front of the pack there. Only the -- what's underneath -- exactly underneath the 40 percent.
Q. Okay. And the remainder would either be the back or partially the side?
A. Yes.
Q. And on the front of pack portion of this label, does it say 100 percent natural flavors?
A. Yes. In tiny print, yes.
Q. Is that print size the same as the content above it where it says, Lemon-Lime Soda?
A. Yes, it appears to be.
Q. Okay. And does it also appear to be the

same size as the content below it that says, no caffeine?

A. Yes, it does.

Q. Is there a -- does the 100 percent natural flavors representation appear on a second place on the label?

A. You would have to make it bigger to see it.

Q. Let me -- I can zoom on any portion you like.

A. So you're asking if it's on another part of the label?

Q. Correct.

A. I see it over there on the back of pack there, 100 percent natural flavors, yes.

Q. Okay. And does that appear to be the same font size as the content below it that says, no caffeine?

A. Yes.

Q. And does that also appear to be the same font size as the list of ingredients above it?

A. Yes.

Q. Okay. When did Coca-Cola include the 100 percent natural flavors statement twice on the same label?

A. I don't know.

[redacted]

Q. Is that process documented?

A. Yes.

Q. Please turn to Bates 41 in this exhibit. Is this a label for Sprite Lemon-Lime for the 12 fluid ounce size?

A. Yes, it appears to be.

Q. Okay. I'm going to zoom in a bit here.

Is it also correct -- strike that.

Is it correct that the 100 percent natural flavors representation appears on this label twice?

A. Yes; but in different places.

Q. The -- does it appear once on the front of pack and then once on the back of pack?

A. Yes, that appears to be the case.

Q. Okay. And then for the back of pack, it is a different direction than the front of pack; is that correct?

A. Yes. It appears underneath the ingredient statement.

Q. Okay. Do you know why it's placed that way with the different direction than the front of pack?

A. It's probably due to fitting it on the

label. It appears there's not much room, so they had to put it there if they wanted to have it on the label.
Q. Likely due to spacing limitations, is that what you're saying?
A. Yes. That's what it appears to be. This seems to be -- this is one for -- I see canned in Atlanta, so this is specific to Atlanta. I see --
Q. I'm sorry. I didn't quite that make out.
A. So it says canned under the authority of The Coca-Cola Company Atlanta. So it looks like that is specific to an Atlanta bottler.
Q. Okay. Do the labels typically indicate the -- the identification of the bottler on them?
A. The final bottler label should because I think that's a requirement to -- to show the location where it was built.
Q. Do you have an understanding of what the UPC code is?
A. I know it exists, yes --
Q. Okay.
A. -- on the product.
Q. Are each of the labels of the class products -- do each of the labels of the class products contain a UPC?

A. Yes.

Q. Do you see the part towards the right? I believe it would be on the back of pack portion where it says scan for info and then below it there appears to be a QR code?

A. Yes. It's the smart label.

Q. Okay. Are you familiar with that smart label?

A. I haven't looked at it directly, but I know in principal it's supposed to give information. It goes to a website to give them more information.

Q. About the particular product?

A. Yes.

Q. Is the information on that website provided by Coca-Cola?

A. I'm not sure. Again, I haven't viewed -- viewed one to see.

Q. Okay.

A. There may be information that we provided. There may be other information. It really depends on the bottler and what's their piece. I don't know that -- I don't know who owns that website and uses it.

Q. But you do know it's not Coca-Cola?

A. I don't know if it is or not. Sorry.

hear you?
A. When you fold this over, I suppose this and this would come together and that would be the front facing that you put on the shelf.
Q. Okay. Thank you.
And is it accurate that this second -- secondary package includes the representation 100 percent natural flavors twice?
A. Yes, it appears to be.
Q. So let me zoom in here.
So it appears once under the lemon-lime soda content; is that correct?
A. Yes.
Q. Okay. And that's immediately above no caffeine, correct?
A. Yes.
Q. Okay. And then let me see if I can flip this image.
And then is it also correct that it appears a second time underneath the QR code?
A. Yes.
Q. And then immediately under no caffeine, correct?
A. Yes.
Q. Okay. Please turn to Bates 36.

MR. IBEY: I will mark the electronic version of Bates 36 as Exhibit 14-C.

(Exhibit 14-C was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. Okay. Tyler, is it correct that this appears to be a label for the 7.5 fluid ounce version of Fanta Orange?

A. Yes.

Q. Is there anything indicated on this label that tells us whether this is a can or a bottle?

A. The recycle says metal can.

Q. Okay. Does this label include the statement 100 percent natural flavors?

A. Yes.

Q. Okay. Would that be considered on the back of pack?

A. Yes.

Q. Okay. And then is it accurate to say that on the front of pack appears the words in caps "naturally flavored"?

A. Yes.

Q. Okay. Do you know why this label does not have a 100 percent natural flavors statement twice?

A. I do not know.
Q. Does Coca-Cola consider the statement naturally flavored to convey the same meaning as the statement 100 percent natural flavors?
MR. BURNS: Objection to form.
THE WITNESS: Could you ask it a different way? Sorry. I want to make sure I understand.
BY MR. IBEY:
Q. Do the statements naturally flavored and also 100 percent natural flavors have the same meaning?
MR. BURNS: Objection to form.
THE WITNESS: I'm not sure. In this -- in this particular case, I think as it's saying naturally flavored because if you -- if it wasn't all natural, you would have to say naturally and artificially flavored, I believe. So in that case it would be meaningful to say that all the flavors are natural.
MR. BURNS: I'll object to the extent the question is requiring a legal analysis of regulatory requirements.
BY MR. IBEY:
Q. Would it be accurate to say that a synonymous phrase for 100 percent natural flavors is

no artificial flavors?

MR. BURNS: Objection to form.

THE WITNESS: Say it -- say it a different way. Sorry.

BY MR. IBEY:

Q. Sure.

100 percent natural flavors, what is that -- what is that conveying by Coca-Cola?

A. I'm still not sure I understand the question.

Q. I'm asking what -- what message to the consumer the phrase "100 percent natural flavors" is conveying?

A. It's a factual statement. I guess it's conveying that this is a factual statement.

Q. And is that the same for the statement naturally flavored that it's a factual statement?

A. Yes.

Q. Below the UPC code, do you see where it says, 2023-00802?

A. Yes.

Q. Do you know what that is referencing?

A. I do not know.

Q. Do you see on the outer edges the word "overlap"?

A. Sorry. What?
Q. The outer edges of the sides of the label where it says overlap or --
A. Yes. I see overlap, okay.
Q. Is it your understanding that those portions of the image would be overlapping each other?
A. That would appear to be my interpretation of what that means, yes.
Q. Okay. And at the top do you see where it says, contains no juice?
A. Yes.
Q. Is that a factual statement?
A. Yes, that's a factual statement.
Q. On the front of pack for this label, does it appear that there would be enough room to include the statement 100 percent natural flavors?
A. You're asking me if that would fit on the label?
Q. Yes; on the front of pack.
A. It seems plausible.
Q. Please turn to Bates 27.
MR. IBEY: I'll mark the electronic file for Bates 27 as Exhibit 14-D.
(Exhibit 14-D was marked for identification, attached at the end of

the original transcript.)
BY MR. IBEY:
Q. Tyler, is this a representation of the secondary packaging for a Fanta Orange product?
A. Yes.
Q. And is this the 10 count 7.5 ounce can package?
A. Yes. 10 count 7.5 ounce can, yes, that's correct.
Q. Okay. And when we were talking about the side and the front of pack for the Sprite label, does the same convention apply for this Fanta Orange label?
MR. BURNS: Objection to form.
THE WITNESS: Sorry. Is this the same question you asked me before about which side is displayed? Is that --
BY MR. IBEY:
Q. Correct.
A. So, yeah, it would still be -- I think the left-hand side would be the displayed side on shelf. It's just going to be that end cap basically with the -- because you can't display it on the shelf the other way.
Q. It would be the, if I understand correctly,

the portion that says to the left 10 mini cans and below it Fanta Orange?

A. Yes. You would the brand displayed. In that case, the bigger side Fanta.

Q. Okay. And that's if it's being displayed on the side?

A. Well, that's the only way on a shelf you could display it. So it's just going to be that square on the very end. You can't see the long ways on the shelf. They don't stack them that way.

Q. Okay. Are they instructed not to stack them that way?

A. I don't think they can. On the shelf -- it would take too much room on the shelf.

Q. And this label includes the phrase "naturally flavored," correct?

A. Yes.

Q. And is that -- sorry. Does the packaging also include the phrase "100 percent natural flavors"?

A. Not that I can see.

Q. Let me zoom in to the product and flip it.

Now that I have adjusted the frame, does that statement appear?

A. Yes, it does.

Q. Okay. Does that appear to be the same font size as the content above it saying caffeine free?
A. Yes.
Q. Okay. Where it says orange soda and then below it naturally flavored, does it also appear that there would be enough room to include the statement 100 percent natural flavors?
A. Again, it seems plausible, yes.
Q. Does Coca-Cola have any evidence that consumers do not rely on the 100 percent natural flavors representation when it's on the back of pack for the class products?
MR. BURNS: Objection to form. It calls for a legal conclusion. It calls for speculation.
THE WITNESS: I'm not sure.
BY MR. IBEY:
Q. Okay. Does Coca-Cola have any evidence that consumers do not rely on the 100 percent natural flavors statement when it's on the front of pack?
MR. BURNS: Same objections.
THE WITNESS: I'm not sure.
MR. IBEY: I'll introduce this as Exhibit 15.
(Exhibit 15-A was marked for identification, attached at the end of

the original transcript.)

MR. BURNS: Sorry. Is this all one exhibit?

MR. IBEY: We'll consider it one exhibit, yeah.

MR. BURNS: Okay.

BY MR. IBEY:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

MR. IBEY: I'll introduce as Exhibit 16 the electronic version of Bates 151.

(Exhibit 16 was marked for identification, attached at the end of the original transcript.)

BY MR. IBEY:

Q. I believe that should be included in the grouping of documents that you have.

A. And it may not --

Q. It may not be in the exact order. It should say -- actually, you know what? It may not actually have the Bates number --

A. I don't -- I don't think it --

Q. It may not have the Bates number on it because I think this is a PDF version of the spreadsheet 151. So I think we can refer to the --

A. Yeah. I don't see it in this deck.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 3:38 p.m. We are now back on the record.

You may continue.

MR. IBEY: Okay. I want to make a

[redacted]

[redacted]

[redacted]

[redacted]

Q. Okay. What does SAP stand for?

A. It's -- I don't know what it stands for. I know what it is. SAP is a company.

Q. I see.

And what is --

A. They provide the software. What is -- I'm sorry.

Q. No. I was going to wait for you to finish.
A. No. SAP is a company that provides software for accounting and tracking end-to-end processes basically. So it's how inventory management, whatever it may be -- they have different modules that do different things, but it's software used by a lot of companies to manage their internal task.
Q. I see.
Do you know what is meant by -- I think it's P08?
A. It's -- it's a specific type of SAP. So there's P40, BOA, et cetera. So it's just naming the type of -- it's like version one, version two, version three. It's how they keep up with what version of SAP they're using.
[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

You may continue.

BY MR. IBEY:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Q. Okay. Earlier in the deposition I asked about any consumer complaints received by Coca-Cola about the product. I believe you said that those are documented; is that right?

A. Yes.

Q. Okay. Is it your understanding that some -- that documents relating to consumer complaints were produced in this case?

A. Yes.

MR. IBEY: Can we just take a five-minute break?

MR. BURNS: Uh-huh (affirmative).

THE VIDEOGRAPHER: The time is 4:11 p.m. We are now off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 4:17 p.m. We are now back on the record.

You may continue.

BY MR. IBEY:

Q. Tyler, are you aware -- apart from the consumer survey about the Fanta product that we discussed, is Coca-Cola aware of any other documentation that reflects consumers' view of the 100 percent natural flavors statement?

A. I'm not aware of anything.

Q. Is that also the case for the statement naturally flavored?

A. Correct. Yes, I'm not aware.

Q. Okay. Is it correct that Coca-Cola

maintains records of sales of the class products to the bottlers?

A. Could you be more specific?

Q. For -- for the class period, does Coca-Cola maintain records of its sales to the bottlers?

A. Yeah; but we don't sell -- we don't sell this product. Obviously, they make that.

Q. So the -- the sales would be individual components that would be used by the bottlers; is that right?

A. Yes. It would be our concentrate that we sell to the bottler.

Q. And the concentrate, that's the syrup?

A. No. They make the syrup.

Q. They make the syrup, and the concentration is used to make the syrup?

A. Concentrate would be ingredients used to make the syrup.

Q. Okay.

MR. IBEY: All yours.

MR. BURNS: Can we take -- I didn't realize we had -- it would be passed to me so quickly.

MR. IBEY: Yeah. Sure.

THE VIDEOGRAPHER: The time is 4:19 p.m. We are now off the record.

COURT REPORTER DISCLOSURES

The following representations and disclosures are made in compliance with Georgia Law, more specifically:

Article 10(B) of the Rules and Regulations of the Board of Court Reporting (disclosure forms) OCGA 9-11-28(c) (disqualification of reporter for financial interest) OCGA 15-14-37(a) and (b) (prohibitions against contracts except on a case-by-case basis).

- I am a certified reporter in the State of Georgia.
- I am a subcontractor for Veritext Legal Solutions.
- I have been assigned to make a complete and accurate record of these proceedings.
- I have no relationship of interest in the matter on which I am about to report which would disqualify me from making a verbatim record or maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.
- I have no direct contract with any party in this action and my compensation is determined solely by the terms of my subcontractor agreement.

FIRM DISCLOSURES

- Veritext was contacted to provide reporting services by the noticing or taking attorney in this matter.
- There is no agreement in place that is prohibited by OCGA 15-14-37(a) and (b). Any case-specific discounts are automatically applied to all parties, at such time as any party receives a discount.
- Transcripts: The transcript of this proceeding as produced will be a true, correct, and complete record of the colloquies, questions, and answers as submitted by the certified court reporter.
- Exhibits: No changes will be made to the exhibits as submitted by the reporter, attorneys, or witnesses.
- Password-Protected Access: Transcripts and exhibits relating to this proceeding will be uploaded to a password-protected repository, to which all ordering parties will have access.

* * *

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF GWINNETT:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 7th day of June, 2026

LAURA R. SINGLE, CCR-B-1343

Dakotah Burns
dburns@pbwt.com

June 8th, 2026

RE:Palmer, Victoria, Et Al. v. The Coca-Cola Company

5/29/2026, 30(B)(6) Coca-Cola Tyler Simpson (#8030723)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (Calendar-utah@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions