**PATTERSON BELKNAP WEBB & TYLER LLP**
Steven A. Zalesin (*Pro Hac Vice*)
sazalesin@pbwt.com
Dakotah M. Burns (*Pro Hac Vice*)
dburns@pbwt.com@pbwt.com
Faust Petkovich (*Pro Hac Vice*)
fpetkovich@pbwt.com
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2110
Facsimile: (212) 336-2111

**DLA PIPER LLP (US)**
Tanya L. Greene, Cal Bar No. 267975
tanya.greene@us.dlapiper.com
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3300

Attorneys for Defendant
*The Coca-Cola Company*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VICTORIA PALMER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>THE COCA-COLA COMPANY,<br><br>*Defendant.* | Case No. 2:25-cv-04777-GW-CTS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: October 1, 2026<br>Time: 8:30 a.m.<br>Judge: Hon. George H. Wu |

# TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

A. Plaintiff's Allegations .......... 2

B. The Class Products .......... 3

1. Coca-Cola Does Not Feature the 100% Representation .......... 3

2. Coca-Cola's Soda Products Are Line Priced .......... 5

C. Plaintiff's Self-Defeating Deposition Testimony .......... 5

1. Plaintiff Brought This Lawsuit Based On Her Son's Close Relationship with Her Counsel .......... 5

2. Plaintiff Does Not Care Whether the Beverages She Drinks Have Natural Flavors .......... 6

3. Plaintiff Does Not Care About the Function of the Challenged Ingredients and Considers Them to Be Flavor Enhancers .......... 7

4. Plaintiff Knows Almost Nothing About This Case or Her Role As Class Representative .......... 8

D. Few, If Any, Consumers Are Influenced by the 100% Representation .......... 9

ARGUMENT .......... 10

I. PLAINTIFF FAILS TO MEET THE REQUIREMENTS OF RULE 23 .......... 10

A. Plaintiff's Claims Are Not Typical of the Class .......... 10

B. Plaintiff Is an Inadequate Class Representative .......... 12

C. Plaintiff Cannot Establish Commonality or Predominance .......... 13

1. Individualized Proof Would Be Necessary to Determine Whether Class Members Share Plaintiff's Definition of "Natural" ........ 14

2. Few, if Any, Putative Class Members Were Influenced by the 100% Representation ........ 15

a. The 100% Representation Has No Effect on Purchase Interest ........ 15

b. Plaintiff's Survey Is Irrelevant and Unreliable ........ 16

3. Many Class Members Never Saw the 100% Representation ........ 18

II. PLAINTIFF FAILS TO SHOW THAT DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS ........ 19

A. Plaintiff's "Price-Premium" Theory of Damages Fails Because the Class Products Are Line Priced ........ 19

B. Plaintiff Cannot Rely on a "Fraud on the Market" Theory ........ 21

C. Plaintiff's Model Improperly Relies on Research About Different Claims and Different Products ........ 22

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Algarin v. Maybelline, LLC*,
300 F.R.D. 444 (S.D. Cal. 2014) .................... 16

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .................... 10

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .................... 13

*Backus v. ConAgra Foods, Inc.*,
2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) .................... 1

*Benedict v. Hewlett-Packard Co.*,
314 F.R.D. 457 (N.D. Cal. 2016) .................... 11, 12

*Cabrera v. Bayer Healthcare LLC*,
2024 WL 1699357 (C.D. Cal. Feb. 23, 2024) .................... 12

*Casey v. Home Depot*,
2016 WL 7479347 (C.D. Cal. Sept. 15, 2016) .................... 17

*In re Clorox Consumer Litig.*,
301 F.R.D. 436 (N.D. Cal. 2014) .................... 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .................... *passim*

*Corral v. Staples the Off. Superstore LLC*,
2023 WL 2347445 (C.D. Cal. Feb. 6, 2023) .................... 13

*Downey v. Pub. Storage, Inc.*,
44 Cal. App. 5th 1103 (Cal. Ct. App. 2020) .................... 18, 19

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .................... 10

*Faucett v. Move, Inc.*,
2025 WL 3719226 (C.D. Cal. Dec. 23, 2025) .................... 12

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .......... 10, 11

*Harnish v. Widener Univ. Sch. of L.*,
833 F.3d 298 (3d Cir. 2016) .......... 22

*Johnson v. Harley-Davidson Motor Co. Grp. LLC*,
285 F.R.D. 573 (E.D. Cal. 2012) .......... 16

*Jones v. ConAgra Foods, Inc.*,
2014 WL 2702726 (N.D. Cal. June 13, 2014) .......... 14

*Jovel v. Boiron, Inc.*,
2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) .......... 12

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) .......... 14

*Martinez v. TransUnion Rental Screening Sols., Inc.*,
2025 WL 806321 (C.D. Cal. Feb. 24, 2025) (Wu, J.) .......... 12

*Mier v. CVS Health*,
2023 WL 4837851 (9th Cir. July 28, 2023) .......... 20

*Moorer v. StemGenex Med. Grp., Inc.*,
830 F. App'x 218 (9th Cir. 2020) .......... 19

*Noohi v. Johnson & Johnson Consumer Inc.*,
146 F.4th 854 (9th Cir. 2025) .......... 15

*Pelayo v. Nestle USA, Inc.*,
989 F. Supp. 2d 973 (C.D. Cal. 2013) .......... 14

*In re POM Wonderful LLC*,
2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .......... 21, 22

*Rusoff v. Happy Grp., Inc.*,
2026 WL 2387098 (9th Cir. Aug. 17, 2026) .......... 15

*Saavedra v. Eli Lilly & Co.*,
2015 WL 9916598 (C.D. Cal. July 21, 2015) .......... 22

*Sevidal v. Target Corp.*,
189 Cal. App. 4th 905 (Cal. Ct. App. 2010) .......... 18, 19

*Tunick v. Takara Sake USA Inc.*,
806 F. Supp. 3d 912 (N.D. Cal. 2025) .......... 19

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 13, 15

*Weiner v. Snapple Beverage Corp.*,
2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) .......... 21

*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994) .......... 12, 13

*Whitaker v. Pharmavite LLC*,
2023 WL 3370729 (C.D. Cal. May 9, 2023) .......... 18

**Other Authorities**

21 C.F.R. § 101.22(a)(3) .......... 3, 14

21 C.F.R. § 170.3(o)(11) .......... 8

Fed. R. Civ. P. 23(a)(2) .......... 13

Fed. R. Civ. P. 23(a)(3) .......... 10

FTC, *Guides for the Use of Environmental Marketing Claims*,
75 FR 63552-01 (Oct. 15, 2010) .......... 14

## INTRODUCTION

Few cases are less suited to class certification than this one. Plaintiff seeks to represent consumers who purportedly were injured by the "100% Natural Flavors" designation on certain Sprite® and Fanta® beverages (the "Class Products"). Her theory is that this representation is false because the Class Products allegedly contain "artificial" ingredients that function as "flavors." Had Plaintiff and other putative class members known the truth, she alleges, they would not have purchased the Class Products or would have paid less for them.

Plaintiff's deposition testimony destroys this theory and shows that she is uniquely unfit to pursue these claims on behalf of the putative class. Plaintiff admitted under oath that she ***does not care*** whether soda she drinks has natural flavors—and in fact she has continued to consume the Class Products and "***pay full price***" for them even after agreeing to be the class representative here. These admissions establish that Plaintiff's claims are not "typical" of the putative class, as Rule 23 requires.

Nor is she adequate. Plaintiff's testimony reveals a startling ignorance about the most basic facts of this case and her role as class representative. Plaintiff testified that she only "skimmed" the operative FAC, "skimmed" her discovery responses signed under penalty of perjury "[b]ecause they were very long and very boring," and believed the "class" included only three individuals: herself and two other named plaintiffs who have already been dismissed from the case, including one who had already been dismissed before Plaintiff testified. Courts will not certify classes where, as here, the proposed representative "is not truly an aggrieved consumer but a hired plaintiff executing [her] attorney's raids on the deep pockets of food manufacturers." *Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505, at *6 (N.D. Cal. Dec. 22, 2016).

Plaintiff's motion fails for still another reason: she cannot demonstrate that common questions predominate over individual ones. Plaintiff's claims rest on her allegation that the citric acid in the Class Products is "non-natural." But as courts have

long recognized, individual consumers have different understandings of what makes an ingredient "natural" or "artificial"—and if class members consider the citric acid here to be "natural," they were not deceived and suffered no injury. Moreover, the "100% Natural Flavors" representation appears inconsistently, and in many cases not at all, in Coca-Cola's marketing. Determining whether any class member saw this representation—and how they would interpret "natural" if they did—requires myriad individualized inquiries.

Indeed, the evidentiary record confirms the absence of any class-wide injury. Coca-Cola has adduced a rigorous consumer survey showing that the "100% Natural Flavors" statement has ***no impact*** on consumers' purchase decisions. And all of Coca-Cola's carbonated soft drinks are ***line priced*** by retailers, meaning the price of every such product is the same regardless of whether it includes the "100% Natural Flavors" representation. As Coca-Cola's damages expert explains—and as Plaintiff's expert ignores—in the real world, no conceivable "price premium" exists.

Any one of these defects independently defeats class certification. Together, they make certification impossible.

## STATEMENT OF FACTS

### A. Plaintiff's Allegations

Plaintiff alleges that she purchased Sprite Lemon-Lime and Fanta Orange on Amazon.com in April 2025. FAC ¶¶ 89-100. She claims that she saw the "100% Natural Flavors" representation (the "100% Representation") on the webpages for both products before she bought them. *See* Declaration of Steven A. Zalesin ("Zalesin Decl."), Palmer Transcript, Ex. 1 ("Palmer Tr.") 35:22-36:4. According to Plaintiff, the 100% Representation deceived her because Sprite and Fanta allegedly contain a "purified, biotechnologically synthesized" form of citric acid that she believes is "non-

natural." FAC ¶ 63.[1] Although she agrees that citric acid does not provide the "core underlying flavor," she argues that it acts as a "flavor" because it "supplements the taste" of the beverages. Palmer Tr. 97:21-99:21.[2]

Plaintiff does not dispute that the citric acid in the Class Products is molecularly identical to citric acid derived from fruits. FAC ¶ 57. But she insists that the ingredient is "non-natural" because it is produced through fermentation (*id.* ¶ 62)—even though FDA regulations ***define*** "natural flavor" to include "flavoring constituents derived from a … plant material … or fermentation products thereof." 21 C.F.R. § 101.22(a)(3). On this basis, she declares that the 100% Representation is false, and seeks to represent a class of California consumers who were similarly "deceived." FAC ¶¶ 124-130.

### B. The Class Products

#### 1. Coca-Cola Does Not Feature the 100% Representation

The Class Products include the Sprite Lemon-Lime and Fanta Orange beverages Plaintiff purchased, plus 13 other varieties of Sprite and Fanta. FAC ¶ 16. The 100% Representation is not featured prominently, and often does not appear at all, in Coca-Cola's marketing. Eight of the 68 Class Product labels produced—including three labels for Fanta Orange, [redacted]—do not have the 100% Representation at all. *See* Zalesin Decl., Ex. 2; ECF 68-11 (sales data). For the majority of the remaining labels, the 100% Representation appears only in minuscule fine print on the back of the label or package:

---

[1] The FAC also alleges that certain preservatives and artificial sweeteners, which are present in some but not all of the Class Products, are "flavors." FAC ¶¶ 71, 74-76. But Plaintiff testified that the only "artificial flavor[]" she believes the Class Products contain is "citric acid." Palmer Tr. 62:17-21.

[2] Some of the Class Products' labels include different references to natural flavors, such as "Naturally Flavored" or "With … Other Natural Flavors." Plaintiff does not challenge these claims.




Motion for Class Certification ("Mot."), Ex. 15, ECF 64-24 at 10.

When consumers buy the Class Products online, the 100% Representation frequently does not appear on the featured product image. Retailers often use "beauty" images that show only the brand and omit the 100% Representation. *See*, *e.g.*, Mot., Ex. 23, ECF 64-32 at 3; *see also* Declaration of Keith Ugone, Ex. 1 ("Ugone Report") at 36-38. Consumers would often not see the 100% Representation unless they clicked on a specific tab or dropdown arrow. *Id.*; *see also* Mot., Ex. 24, ECF 64-33.[3]

As for other forms of advertising, the 100% Representation does not appear at all in the vast majority of marketing images and videos. Plaintiff cherry-picks images where the 100% Representation is visible—often only if one zooms in—and a single video where the claim appears briefly on the bottle in almost imperceptibly small text. Mot., Ex. 16, ECF 64-25; Ex. 42, ECF 64-51. But Coca-Cola produced hundreds of marketing images, videos and social media posts featuring the Class Products that do not include the 100% Representation. Ugone Report at 32-36. Of the almost 400 produced images featuring a Class Product, only 33% clearly displayed the 100% Representation. Of the 43 videos, only 7% did; and of the almost 300 social media posts, only 23% did. *Id.*

---

[3] Because Plaintiff's Exhibit 24 uses a frozen screenshot, the 100% Representation appears under "Top Highlights" without clicking on a dropdown arrow. On live webpages, the text does not appear unless the corresponding arrow is clicked. *See, e.g.*, Amazon.com, "Sprite Lemon-Lime," https://tinyurl.com/yc3dezb3.

#### 2. Coca-Cola's Soda Products Are Line Priced

Coca-Cola's sparkling beverages are priced the same by retailers regardless of whether they include the 100% Representation. As explained in the declaration of Coca-Cola employee Erinc Sonmezer and the Ugone Report, Sprite and Fanta—like all Coca-Cola soda products—are "line priced." This means that [redacted] Those retailers, in turn, generally charge consumers the same price for every such product. Ugone Report ¶¶ 70-90. For example, in his report, Dr. Ugone examined the actual prices charged by 14 different retailers in Northern and Southern California, as well as Amazon.com, and confirmed that Sprite and Fanta products ***without*** the 100% Representation were priced the same as Sprite and Fanta products ***with*** the representation. *See id*.

### C. Plaintiff's Self-Defeating Deposition Testimony

#### 1. Plaintiff Brought This Lawsuit Based On Her Son's Close Relationship with Her Counsel

The circumstances surrounding this lawsuit show that it was manufactured by counsel, not driven by a genuine consumer grievance. Plaintiff testified that she bought the Sprite and Fanta products on Amazon.com for herself and her grandnephews and grandnieces on April 27, 2025. Palmer Tr. 64:17-65:1. Three days later, her son (who lives with her) claims his "gut" told him that the products had non-natural flavors. Zalesin Decl., Matthew Palmer Transcript, Ex. 3 ("M. Palmer Tr.") 42:4-43:23. Plaintiff's son then texted an attorney at the firm representing Plaintiff here. *Id.* 49:3-9. This was no coincidence—Plaintiff's son has a "very close" friendship with this attorney, who has known him for decades, speaks with him "several times a week" and frequently visits Plaintiff's home. *Id*. 23:12-24:11. Indeed, less than a year earlier, this attorney had represented Plaintiff *pro bono* in a lawsuit concerning a disputed debt. Palmer Tr. 138:5-139:19.

Plaintiff's now-attorney texted back that his firm was "already preparing a case" against Coca-Cola and was "looking for a client as we speak." Zalesin Decl., Ex. 4. The attorney apparently did not ask any questions about Plaintiff's reasons for purchasing the products or whether she cared about artificial flavors. Instead, he asked Plaintiff's son to do him "a favor" and forward his mother's "proof of purchase." *Id.* He then sent an engagement letter, which she signed that very day—three days after her purchase. Palmer Tr. 133:18-23.

### 2. Plaintiff Does Not Care Whether the Beverages She Drinks Have Natural Flavors

At her deposition, Plaintiff admitted that she ***does not care*** whether the beverages she drinks contain citric acid or artificial flavors. Palmer Tr. 60:6-9 ("Q: You weren't concerned about the fact that you believed Sprite lemon-lime contained artificial ingredients? A: For me, no."); *id.* 110:13-15 ("Q: If you're buying it for yourself or your son, you wouldn't care if it contained citric acid? A: No, I wouldn't."). Even after her son told her that he believed Sprite and Fanta had artificial flavors, she consumed both products because she was "in the mood" for them. *Id.* 59:22-60:9. In fact, Plaintiff bought another Class Product in December 2025, ***after this lawsuit had already been filed***. She explained that she was "intrigued" by the flavor of the beverage and was "willing to pay full price for it." *Id.* 105:19-106:7.

Plaintiff initially testified that "[f]or [her] grandnieces and grandnephews," she cared about natural flavors because she thought the children's mother would "approve[]" of beverages with "[n]o caffeine" and "no artificial flavors." Palmer Tr. 26:15-24; 60:6-10. Upon further questioning, however, Plaintiff admitted that she had ***no idea*** whether the children's mother actually cared about artificial flavors, and that she had expected the mother to care only whether the products had caffeine:

> Q: So if you were trying to cater to her preferences, I'm asking you what you think her preferences were. […]

A: I have no idea except that they don't drink things with caffeine in them. I don't know what her opinion of natural flavors is.

Q: Okay. So at least as it relates to your objective in purchasing the products to accommodate [her] preferences, you bought the products because you understood her preference to be that they drink products that had no caffeine; is that correct?

A: Yes.

*Id.* 45:13-46:1. Indeed, Plaintiff admitted that she served the Sprite and Fanta products to these children even after she agreed to file sue. *Id.* 67:11-69:24. Although she had other options, including natural lemonade made of "lemons from [her] tree," she served them Sprite and Fanta because she thought they would "like it." *Id.* 60:11-61:20. Even though she believed the products had artificial flavors, she assumed the children's mother would not object to their consuming them:

Q: You assumed … when you offered them to your nephew's children that their mother would not object to their consuming —

A: Right.

Q: — artificial flavors?

A: I assumed that.

*Id.* 67:11-16.

**3. Plaintiff Does Not Care About the Function of the Challenged Ingredients and Considers Them to Be Flavor Enhancers**

Because the 100% Representation refers only to natural "flavors"—not to natural "ingredients"—Plaintiff must prove that the challenged ingredients function as "flavors" under preemptive FDA rules. ECF 20 at 3-6. If, by contrast, the ingredients are "flavor enhancers" or perform another function, then FDA authorizes Coca-Cola to make the 100% Representation, and any state-law challenge to it is preempted by

federal law. *Id.* At the motion-to-dismiss stage, the Court found it "premature" to determine whether the ingredients function as flavors, but noted that "[f]urther evidence may demonstrate that these ingredients do not in fact function as flavors." ECF 29 at 13.

Plaintiff testified that she ***does not care*** whether an artificial ingredient functions as a flavor or serves some other function. Palmer Tr. 42:20-23. Moreover, when asked how she believed citric acid functioned in Sprite, Plaintiff described precisely the function of a flavor enhancer as defined by FDA. *Compare id.* 99:18-100:2 ("So … citric acid wouldn't be the core underlying flavor, which would be lemon or lime. A: Exactly. Q: It would just supplement the core underlying flavor; is that … your understanding? A: Yes.") *with* 21 C.F.R. § 170.3(o)(11) (defining a flavor enhancer as a "[s]ubstance[] added to supplement … the original taste and/or aroma of a food, without imparting a characteristic taste or aroma of its own"). Thus, although Plaintiff admits she does not care about the core merits issue here—whether the ingredients function as flavors—her testimony supports ***Coca-Cola's*** position that they function as flavor enhancers.

#### 4. Plaintiff Knows Almost Nothing About This Case or Her Role As Class Representative

Plaintiff disclaimed almost any knowledge of the facts of this case or the nature and purpose of a class action. She testified she had "skimmed" the FAC—which she thought had been filed to add her son as a named Plaintiff[4]—and that she had "skimmed" her discovery responses signed under penalty of perjury "[b]ecause they were very long and very boring." Palmer Tr. 81:17-23; 133:1-17. Further, Plaintiff's testimony revealed that she:

- Did not understand her role as class representative. Plaintiff thought the class included only herself and two other named plaintiffs whose claims have since been dismissed—including one whose claims had been dismissed before she

[4] Plaintiff's son has never been a named Plaintiff in this case.

testified—and that her role as class representative was limited to "settl[ing]" the case on behalf of herself and those two individuals. *Id.* 142:9-12; 142:23-143:3.[5]

- Did not know what the Class Products were. *Id.* 142:17-19.
- Did not know what ingredients were being challenged, and stated that the only ingredient she considered an "artificial flavor[]" was "[c]itric acid." *Id.* 62:17-21; 100:6-102:24.
- Did not know the geographical scope of the class. *Id.* 142:20-22.
- Did not know the relevant class period. *Id.* 142:13-16.
- Did not know what damages were being sought. *Id.* 144:11-24.

**D. Few, If Any, Consumers Are Influenced by the 100% Representation**

Plaintiff has yet to identify a single individual—including Plaintiff herself—who actually cared about the 100% Representation. Meanwhile, a survey commissioned by Coca-Cola demonstrates that consumers are largely just like Plaintiff: their interest in purchasing the Class Products has nothing to do with the 100% Representation. *See* Declaration of Hal Poret, Ex. 1 ("Poret Report").

Coca-Cola's survey (the "Poret Survey") was conducted by Hal Poret, a highly-regarded expert in consumer research. Mr. Poret surveyed 600 consumers of lemon-lime soda in California. *Id.* at 7. Respondents in the "test' group were shown images of an actual Sprite bottle where the 100% Representation appeared on both the front and back of the label, while the "control" group was shown identical images, except the 100% Representation had been removed. *Id.* at 8-17. Respondents were then asked to rate how likely they were to purchase the product on a seven-point scale and to evaluate the price of the product on a five-point scale. *Id.* at 17-21.

---

[5] On cross-examination, Plaintiff's counsel directed Plaintiff to read the paragraph of the FAC that described the putative class. Counsel then asked Plaintiff if this "refreshed her recollection" whether she was representing a class of more than three individuals, and she agreed that it had. Palmer Tr. 154:11-22.

The Poret Survey showed ***no statistically significant difference*** in purchase interest or price acceptance between respondents who viewed the Sprite bottle with the 100% Representation and those who viewed the bottle without it. *Id.* at 22-25. Thus, contrary to Plaintiff's claims, the 100% Representation does not influence a typical consumer's purchase decision.

## ARGUMENT

Rule 23 "imposes stringent requirements for [class] certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). A party seeking certification bears the burden of demonstrating that it satisfies "each of the four requirements of … [Rule] 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). These are not "mere pleading standard[s]," but require "evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Plaintiff cannot carry this burden. Her self-defeating testimony exposes her to unique defenses, and she lacks even the most basic understanding of her role as class representative. She cannot demonstrate that common issues predominate over individual ones—instead, mini-trials would be necessary to determine whether individual class members were injured at all. Nor can she establish that damages are capable of measurement on a class-wide basis. Class certification should be denied.

### I. PLAINTIFF FAILS TO MEET THE REQUIREMENTS OF RULE 23

#### A. Plaintiff's Claims Are Not Typical of the Class

At the outset, the class cannot be certified because Plaintiff's claims are not "typical" of the putative class. Fed. R. Civ. P. 23(a)(3). A named plaintiff's claims are atypical if she is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). When "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to" her, the class cannot be certified. *Id*. at 508. This

"inquiry ***does not*** demand proof that a defense will ultimately defeat the class representative's claims"—it "asks only whether plaintiff is likely to be preoccupied with litigating the defense to the detriment of the class as a whole." *Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 471 (N.D. Cal. 2016) (emphasis added).

This case offers a textbook example of a named plaintiff who is subject to unique defenses that threaten to become the focus of this litigation. Plaintiff admitted at deposition that she "wouldn't care" if a product she purchased contained artificial flavors and was "willing to pay full price" for a Class Product she believed contained artificial flavors long after this suit was filed. *See supra* at 6-7. As to her grandnieces and grandnephews, she likewise admitted that she "ha[d] no idea" if the children's mother cared whether they drank beverages with artificial flavors, but "assumed" that the mother "would not object" to their doing so. *Id.* at 7. Even after her son and his friend arranged for her to become the class representative, Plaintiff and the children consumed the beverages and enjoyed them. *Id.* Plaintiff is not simply an ordinary consumer who might have different purchasing motivations; she affirmatively testified that the challenged representation at the heart of this lawsuit did not matter to her, an admission that makes her uniquely vulnerable.

Moreover, Plaintiff admitted that she does not care whether artificial ingredients in the Class Products function as flavors, and suggested that she believes citric acid functions instead as a flavor enhancer—which, if true, would defeat every putative class member's claims. *Id.* at 7-8. She further testified that the only ingredient in the Class Products that she considers an "artificial flavor" is "citric acid," which precludes her from challenging the other at-issue ingredients on behalf of the class. *Id.* at 9.

Such testimony would, at minimum, expose Plaintiff to cross-examination at trial that would "threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. Even if Plaintiff could somehow explain away these damning admissions, she undoubtedly would be "preoccupied with litigating" these issues "to the detriment of

the class as a whole." *Benedict*, 314 F.R.D. at 471; *Martinez v. TransUnion Rental Screening Sols., Inc.*, 2025 WL 806321, at *5 (C.D. Cal. Feb. 24, 2025) (Wu, J.) ("It does not matter whether Defendants will ultimately prevail on these defenses. What matters is that Defendants will assert these defenses, and they have a factual basis for doing so.").

Courts routinely deny class certification under such circumstances. *See Martinez*, 2025 WL 806321, at *5 (denying certification where "plaintiff's 'unique … factual situation require[s] him to prepare to meet defenses that are not typical of the [class]"); *Cabrera v. Bayer Healthcare LLC*, 2024 WL 1699357, at *6 (C.D. Cal. Feb. 23, 2024) (same where testimony created "a plausible merits defense that Plaintiff was not … injured by Defendants' description of the Products"); *Faucett v. Move, Inc.*, 2025 WL 3719226, at *9 (C.D. Cal. Dec. 23, 2025) (same where testimony would "[a]t the very least … confuse the jury or create a risk that the jury would develop … doubt" as to plaintiff's claims). The Court should do the same here.

**B. Plaintiff Is an Inadequate Class Representative**

Plaintiff is inadequate for the same reason she is atypical: her testimony leaves her with no viable cause of action. *See Jovel v. Boiron, Inc.*, 2014 WL 1027874, at *4 (C.D. Cal. Feb. 27, 2014) (finding named plaintiff inadequate because "[i]f a jury concludes that because of [his] prior inconsistent testimony he cannot be believed when he states that he relied on [defendant's] label … [he] will jeopardize the interests of all of the other class members"). She is also inadequate because she understands almost nothing about this case or her role as class representative.

"Courts have held that a class representative who is unfamiliar with the case" is inadequate because she "will not serve the necessary role of 'check[ing] the otherwise unfettered discretion of counsel in prosecuting the suit.'" *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994). That concern readily applies here. As explained above, Plaintiff testified that she (1) only "skimmed" the operative FAC, which she believed

had been filed to add her son as a class representative; (2) "skimmed" her discovery responses signed under oath "[b]ecause they were very long and very boring"; and (3) believed her role as class representative was merely to "settle[]" this case on behalf of herself and two since-dismissed co-plaintiffs. *Supra* at 8-9. She knew virtually nothing about the nature of the putative class or the bases for its claims, and she did not even know that ingredients other than citric acid were being challenged. *Id.* A representative who does not understand who she represents or what claims are being pursued cannot meaningfully supervise counsel or protect absent class members. Such "striking unfamiliarity" with this action renders Plaintiff inadequate. *Welling*, 155 F.R.D. at 659; *Corral v. Staples the Off. Superstore LLC*, 2023 WL 2347445, at *8 (C.D. Cal. Feb. 6, 2023) (denying certification where plaintiff "lack[ed] basic knowledge about … the nature of his claims and the contours of the putative class").

**C. Plaintiff Cannot Establish Commonality or Predominance**

The class should not be certified for an equally fundamental reason: Plaintiff cannot establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). While "any competently crafted class complaint literally raises common questions," merely "[r]eciting these questions is not sufficient" to establish commonality. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Instead, Plaintiff must "demonstrate that the class members have suffered ***the same injury***." *Id.* at 350 (emphasis added).

Because Plaintiff seeks to certify a damages class under Rule 23(b)(3), she must also satisfy Rule 23(b)'s predominance requirement. The predominance criterion is "far more demanding" than the commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Plaintiff must not only identify common questions, but also come forward with "***evidentiary proof***" that those inquiries "predominate over" individual issues. *Comcast*, 569 U.S. at 33 (emphasis added). If "figuring out whether each individual putative class member was harmed would involve an inquiry specific

to that person," then "common questions do not predominate." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022). Plaintiff fails this test.

### 1. Individualized Proof Would Be Necessary to Determine Whether Class Members Share Plaintiff's Definition of "Natural"

Plaintiff offers no evidence that individual class members would share her view that the citric acid in the Class Products is unnatural. This is fatal to predominance: if individual consumers consider the citric acid to be natural, then the 100% Representation did not deceive them, and they sustained no injury.

As courts have recognized, "there is no fixed meaning for the word 'natural.'" *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *14 (N.D. Cal. June 13, 2014); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 979 (C.D. Cal. 2013) (consumers lack a common understanding of what "natural" means); FTC, *Guides for the Use of Environmental Marketing Claims*, 75 FR 63552-01 (Oct. 15, 2010) (noting lack of "evidence indicating how consumers understand the term 'natural'"). FDA has, however, adopted a definition of "natural flavors" that expressly includes "flavoring constituents derived from a … plant material … or fermentation products thereof." 21 C.F.R. § 101.22(a)(3). FDA's definition undercuts Plaintiff's assumption that such fermentation-derived constituents are necessarily "non-natural."

Plaintiff admits that the citric acid in the Class Products is derived from "plant material"—sugar—through "fermentation" by a naturally occurring fungus. *See* FAC ¶ 62. [redacted] Zalesin Decl., Ex. 5.[6] Plaintiff nevertheless insists that citric acid manufactured via this fermentation process is "non-natural." FAC ¶ 67. But she offers ***no evidence*** that individual class members would share her definition of "natural." Even the leading questions in Plaintiff's fatally flawed survey asked only whether

[6] [redacted] *See id.* at 11-13.

respondents understood the 100% Representation to mean that the flavors came from "natural sources." Sukumar Decl., ECF 64-11 at 31. The survey did not even attempt to determine whether respondents considered citric acid produced via fermentation to come from "natural sources." Zalesin Decl., Sukumar Deposition Transcript, Ex. 6 ("Sukumar Tr.") 135:12-16.

Because Plaintiff has submitted no "evidentiary proof" that individual class members share her definition of "natural," she cannot "demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 349-50. To the contrary, class members who considered the ingredients to be "natural" suffered ***no injury at all***—regardless of whether the 100% Representation impacted their purchase decision.[7] Plaintiff thus cannot establish predominance. *See Rusoff v. Happy Grp., Inc.*, 2026 WL 2387098, at *8 (9th Cir. Aug. 17, 2026) (no predominance where plaintiff's evidence provided "no indication of what 'pasture raised' means or how consumers understand the phrase").

### 2. Few, if Any, Putative Class Members Were Influenced by the 100% Representation

#### *a. The 100% Representation Has No Effect on Purchase Interest*

Even if Plaintiff had proven that consumers share her definition of "natural," Coca-Cola has adduced compelling evidence that the 100% Representation caused no

[7] The decision in *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854 (9th Cir. 2025), does not change the analysis. The defendant in *Noohi* argued only that the plaintiff could not establish *materiality*—not injury—because the challenged claim ("oil-free") could "be interpreted in multiple ways." *Id.* at 869. In rejecting that argument, the court observed that the defendant's "contention [was] not that the 'oil-free' title did not affect the purchase decision of—and so was immaterial to—a portion of the class, but that it affected the purchase decision of class members—and so was material—for different reasons." *Id.* at 870. Here, Coca-Cola's argument is distinct: regardless of whether the 100% Representation was material, consumers' different understandings of "natural" affect whether they were ***injured at all***. Separately, as discussed *supra* at 9-10, Coca-Cola's survey establishes that the 100% Representation does not affect purchase interest.

class-wide injury. As explained *supra* at 9-10, the Poret Survey demonstrates that the 100% Representation has ***no impact*** on a typical consumer's willingness to purchase the Class Products or pay the market price for them. Courts deny certification where evidence establishes that the challenged statement did not affect consumers' purchase decisions and thus caused them no injury. *See Johnson v. Harley-Davidson Motor Co. Grp. LLC*, 285 F.R.D. 573, 581 (E.D. Cal. 2012) (predominance not satisfied in view of "persuasive evidence that [the alleged defect] would not be material to many … consumers"); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453, 457 (S.D. Cal. 2014) (similar). This Court should do the same.

*b. Plaintiff's Survey Is Irrelevant and Unreliable*

The survey commissioned by Plaintiff does not refute the Poret Survey's findings. Dr. Sukumar admitted that Plaintiff's survey did ***not*** "test whether consumers would be willing to pay the same price for a product that has the '100% Natural Flavors' claim versus one that does not." Sukumar Tr. 85:12-24. Instead, it tested only the "relative' importance of the 100% Representation compared to seven other attributes hand-picked by Dr. Sukumar. *Id.* 126:7-129:4. Because the survey did not even evaluate whether consumers would pay the same price for a product without the 100% Representation, it does nothing to contradict the Poret Survey.

Regardless, Dr. Sukumar's own data disproves his assertion that the 100% Representation "is highly important to consumers." ECF 64-11 at 14. Rather than use a test and control group to determine reliably whether the 100% Representation influenced purchase decisions, Dr. Sukumar's survey forced respondents to "allocate 100 points across" eight different product attributes "based on their importance in your purchasing decision." *Id.* at 12. As explained in the report of Dr. On Amir—a renowned academic with decades of experience and scholarship in marketing research—such an "exercise is inherently artificial and wholly disconnected from any real-world purchase decisions," as it requires respondents to allocate points "in a contextless vacuum" that

disregards their "preexisting beliefs and experiences with the products" or any other factor not chosen by Dr. Sukumar. *See* Declaration of On Amir, Ex. 1 ("Amir Report") ¶¶ 35-36.

Moreover, the survey instructions failed to inform respondents that they could assign a "0" to any attribute—and, accordingly, almost 90% of respondents allocated points to ***all eight*** attributes. *See id.* ¶ 38. Remarkably, Dr. Sukumar then assumed that every respondent who assigned the 100% Representation even ***1 point out of 100*** considered this representation "important" to their purchase decision. *See* Sukumar Tr. 124:14-125:6. At deposition, Dr. Sukumar admitted that a respondent assigning only one point to an attribute "wouldn't be meaningful" to his "interpretation of the results," yet he inexplicably assumed that any respondent who did so considered the 100% Representation "important" to their purchase decision. Sukumar Tr. 120:8-121:5.

Compounding the problem, even if respondents gave the 100% Representation a "de minimis" number of points, the survey nonetheless instructed them that "[y]ou mentioned that 100% natural flavors is important in your purchasing decision," then asked a series of "incredibly leading" questions about the 100% Representation. Amir Report ¶ 53. When asked why the 100% Representation happened to be referenced in "the first answer option for every question in [his] survey," Dr. Sukumar responded, "you can call it a coincidence." Sukumar Tr. 162:5-163:23. Such biased questions "fundamentally undermine the reliability of the survey's results and [is] grounds for its complete exclusion." *See Casey v. Home Depot*, 2016 WL 7479347, at *20-21 (C.D. Cal. Sept. 15, 2016); *see also* Amir Report ¶¶ 53-59 (explaining why these leading questions are unreliable and unsound).[8]

---

[8] Nor can Plaintiff rely on [redacted] referenced in her Motion (ECF 68-7 at 2), which [redacted]. Zalesin Decl., Ex. 7 [redacted] Even Dr.

### 3. Many Class Members Never Saw the 100% Representation

Plaintiff also cannot use class-wide proof to establish injury because the 100% Representation appears inconsistently—and frequently not at all—in Coca-Cola's marketing of the Class Products. California law is clear that a consumer suffered no injury if she "never saw … the alleged misrepresentation." *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 910 (Cal. Ct. App. 2010). Thus, "common issues of fact do not predominate" where class members stand in "different positions vis-à-vis how and whether they were exposed to" the challenged claim. *Downey v. Pub. Storage*, *Inc.*, 44 Cal. App. 5th 1103, 1117 (Cal. Ct. App. 2020).

As explained *supra* at 3, the 100% Representation does not appear at all on eight of the produced Class Product labels. And on most of the remaining labels, the representation appears only in minuscule text buried in fine print on the back label, where many consumers would never look. *See Whitaker v. Pharmavite LLC*, 2023 WL 3370729, at *2 (C.D. Cal. May 9, 2023) ("consumers do not instinctively … read every back label before placing groceries in their carts"); *In re Clorox Consumer Litig.,* 301 F.R.D. 436, 445 (N.D. Cal. 2014) (denying certification where the challenged claim appeared only on the back label in small print). Indeed, Plaintiff's own survey expert ***never noticed*** the 100% Representation on the back of Fanta's labels, and incorrectly assumed that the purpose of his survey was to test consumer perception of these labels even though the 100% Representation never appeared on them. Sukumar Tr. 165:23-166:9. Any class member who, like Plaintiff's expert, "never saw" the 100% Representation was not injured. *Sevidal*, 189 Cal. App. 4th at 910.

Further, in many instances, online purchasers could have purchased the Class Products without ever seeing the 100% Representation unless they selected certain images, tabs, or dropdown arrows. *See supra* at 4. That, too, defeats predominance.

---

Sukumar admitted that [redacted] would not be "reliable" because of its "intolerable" margin of error. Sukumar Tr. 61:13-18.

*See Moorer v. StemGenex Med. Grp., Inc.,* 830 F. App'x 218, 220 (9th Cir. 2020) (class was "overbroad" because it was "possible that someone who visited the website failed to scroll down the homepage to view the" challenged claims); *Tunick v. Takara Sake USA Inc.*, 806 F. Supp. 3d 912, 929 (N.D. Cal. 2025) (no predominance where "at least some online purchasers would not have been exposed to the" claim).

Coca-Cola's production confirms the same pattern in other advertising: the 100% Representation did not appear in the vast majority of Coca-Cola's marketing images, videos and social media posts. *Supra,* at 4. Because individualized inquiries would be necessary to determine "how and whether [consumers] were exposed to" the challenged claim, Plaintiff cannot establish predominance. *Downey*, 44 Cal. App. at 1117.[9]

## II. PLAINTIFF FAILS TO SHOW THAT DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS

Plaintiff also cannot establish that "damages are capable of measurement on a class-wide basis." *Comcast*, 569 U.S. at 34. Rule 23 requires a "rigorous analysis" more exacting than *Daubert*'s requirements. *See id.* at 35. Courts must determine whether proposed damages models are "arbitrary" or sound, "consistent with [the Plaintiffs' theory of] liability," and "measure only those damages attributable to [the asserted] theory" of liability. *Id.* at 35-36. Plaintiff's proposed damages model fails the "rigorous" test that *Comcast* requires.

### A. Plaintiff's "Price-Premium" Theory of Damages Fails Because the Class Products Are Line Priced

Plaintiff's damages model rests on the assumption that "consumers paid more for the Products than they would have had the Products not been labeled with the" 100% Representation. Hamilton Declaration, ECF 64-10 ("Hamilton Decl.") ¶ 10. But this

---

[9] Plaintiff cites "consumer complaints" as supposed evidence of Coca-Cola's "longstanding and widespread use" of the 100% Representation. These records confirm the opposite: of the millions of Sprite and Fanta products sold nationwide since 2019, Coca-Cola received [redacted]. ECF 68-13.

"price-premium" theory of damages ignores that all of Coca-Cola's soda products, including the Class Products, are ***line priced***—that is, the [redacted] retail price of every product in the same category is generally the same, regardless of brand (Coke®, Diet Coke®, Sprite, etc.) or what language appears on the label. *See* Ugone Report ¶¶ 70-90. Thus, as explained *supra* at 5, Sprite and Fanta products that include the 100% Representation are priced ***exactly the same*** by retailers as other Coca-Cola soda products that do not include the representation.

Dr. Hamilton proposes to measure the purported price effect of the 100% Representation with techniques such as conjoint analysis and hedonic regression. But as Dr. Ugone explains, this would be a fool's errand: no study can find a "price premium" when the simple truth is the products are priced the same by retailers whether or not the 100% Representation appears. *See id*. The Ninth Circuit made this very point in *Mier v. CVS Health*, 2023 WL 4837851 (9th Cir. July 28, 2023). The *Mier* court held that "testimony that [the defendant] did not consider label claims in its pricing decisions … reasonably suggest[ed] ***there was no price premium at all***" attributable to the challenged claim. *Id.* at *1 (emphasis added). The reason for this was plain: "If the value of the product on the open market were the same regardless of the alleged misrepresentation, then there would be no difference between what the consumer paid for the product and what the market price of the product would have been but for the statement." *Id.*

That common-sense observation applies with equal force here. Because Dr. Hamilton did not even consider the fact that Coca-Cola's soda products are line priced by retailers, his damages model is arbitrary, unsound, and incapable of isolating any damages purportedly attributable to the 100% Representation. *Comcast*, 569 U.S. at 35-36. Plaintiff thus cannot carry her burden of establishing that "damages are capable of measurement on a classwide basis." *Id.* at 34; *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *10 n.19 (S.D.N.Y. Aug. 5, 2010) (proposed class-wide damages

model not reliable where expert failed to consider that defendant "line-priced" its beverages "based on the size of the bottle and the number of bottles in a package, not on whether the beverage is labeled 'All Natural.'").[10]

**B. Plaintiff Cannot Rely on a "Fraud on the Market" Theory**

Plaintiff's damages model also improperly assumes that "the specific reason why each customer purchased a Product is irrelevant to the measurement of overall damages, because a properly labeled product would have been less expensive to all consumers." Hamilton Decl. ¶ 49. Again, that is wrong because the Class Products are line priced by retailers, and thus they would have exactly the same price even without the 100% Representation.

Further, this theory of injury equates to a "fraud-on-the-market": regardless of how many consumers were actually misled by the 100% Representation, the market supposedly incorporated a uniform overcharge. But this approach is only possible in markets "where the price of (in most cases) a stock is determined by openly disseminated information about a business." *In re POM Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014). Courts have rejected its application to the market for consumer goods, where marketing claims do not have "traceable market-wide influence" because consumers may "buy a product for myriad reasons." *Id.* at *4 (market for refrigerated juice products); *Saavedra v. Eli Lilly & Co.*, 2015 WL 9916598, at *3 (C.D. Cal. July 21, 2015) (prescription drugs); *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 313 (3d Cir. 2016) ("courts have refused to recognize [a fraud on the market] theory outside the federal securities fraud context"). Plaintiff cannot salvage her damages model using this discredited theory. *See* Ugone Report ¶¶ 177-183 (explaining why this theory is inapplicable to market for consumer goods).

---

[10] Plaintiff's alternative "unjust gains" theory is similarly untenable: if Coca-Cola charges the same price for all soda products, it cannot have wrongfully gained additional profit from the 100% Representation. *See* Ugone Report ¶¶ 167-176 (explaining why unjust enrichment calculation is flawed and unreliable).

### C. Plaintiff's Model Improperly Relies on Research About Different Claims and Different Products

Plaintiff's proposed damages model is also not "consistent with [her theory of] liability" because it presumes a price premium based on research related to marketing claims that never appeared on the Class Products. *Comcast*, 569 U.S. at 35.

Dr. Hamilton claims there is "substantial" research supporting the notion that "consumers are willing to pay a Price Premium" for products with "100% Natural Flavors." Hamltion Decl. ¶¶ 41-42. Yet he fails to cite a ***single study*** that tested any price premium associated with the 100% Representation, on soda products or otherwise. Indeed, he admitted that he "wasn't able to find" any such research. Zalesin Decl., Hamilton Deposition Transcript, Ex. 8 ("Hamilton Tr.") 59:16-25. Dr. Hamilton therefore resorts to citing literature related to "natural," "all natural," and "organic" claims on products such as carrots, poultry, and broccoli—in many cases citing decades-old research concerning non-U.S. consumers. *Id.* ¶¶ 41-46. Dr. Hamilton admitted that consumer demand and preferences for such products are ***not*** the same as for carbonated soft drinks. Hamilton Tr. 33:5-60:6; *see also* Ugone Report ¶¶ 41-53 (explaining why literature cited by Hamilton says nothing about whether consumers would pay a "price premium" for the 100% Representation at issue here).

In any case, flavors make up only a fraction of the Class Products' ingredients, and the Class Products are not represented as "all natural" or "organic"—to the contrary, their labels expressly disclose the presence of some artificial ingredients. Purchasers who (like Plaintiff) are willing to buy soda with artificial ingredients are simply not the type of consumers addressed in the literature on which Dr. Hamilton relies. *See id.*

## CONCLUSION

Class certification should be denied.

Dated: August 20, 2026

Respectfully submitted,

By: */s/ Steven A. Zalesin*
Steven A. Zalesin

PATTERSON BELKNAP WEBB & TYLER LLP
Steven A. Zalesin (*Pro Hac Vice*)
sazalesin@pbwt.com
Dakotah M. Burns (*Pro Hac Vice*)
dburns@pbwt.com
Faust Petkovich (*Pro Hac Vice*)
fpetkovich@pbwt.com
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2110
Facsimile: (212) 336-2111

DLA PIPER LLP (US)
Tanya L. Greene, Cal Bar No. 267975
tanya.greene@us.dlapiper.com
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
Telephone: (310) 595-3000
Facsimile: (310) 595-3300

*Attorneys for Defendant The Coca-Cola Company*

## CERTIFICATE OF COMPLIANCE

The undersigned Counsel of record for Defendant certifies that this brief contains 6,986 words, which complies with the 7,000 word limit of L.R. 11-6.1.

DATED: August 20, 2026

*/s/ Steven A. Zalesin*
PATTERSON BELKNAP WEBB & TYLER LLP
Steven A. Zalesin (*Pro Hac Vice*)
Dakotah Burns (*Pro Hac Vice*)
Faust Petkovich (*Pro Hac Vice*)

DLA PIPER LLP (US)
Tanya L. Greene, Cal Bar No. 267975

*Attorneys for Defendant*
*The Coca-Cola Company*