# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

VICTORIA PALMER, SUE KIM, AND IVAN ZERMENO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

PLAINTIFFS,

VS.

THE COCA-COLA COMPANY,

DEFENDANT.

CASE NO. 25-CV-4777-GW-AGR

CORRECTED TRANSCRIPT

VIDEOTAPED DEPOSITION OF VICTORIA PALMER
WEDNESDAY, APRIL 15, 2026

JOB NO. 8007744
REPORTED BY KIMBERLY EDELEN, CSR. NO. 9042, CRR, RPR.
PAGES 1 - 165

VIDEOTAPED DEPOSITION OF VICTORIA PALMER, TAKEN ON BEHALF OF THE DEFENDANT, AT 10:14 A.M. PDT, WEDNESDAY, APRIL 15, 2026, AT 2000 AVENUE OF THE STARS, 6TH FLOOR, LOS ANGELES, CALIFORNIA, BEFORE KIMBERLY A. EDELEN, CSR NO. 9042, CRR, RPR.

APPEARANCES OF COUNSEL

FOR PLAINTIFFS:

KAZEROUNI LAW GROUP, APC
BY: GIL MELILI, ESQ.
245 FISCHER AVENUE
SUITE D1
COSTA MESA, CALIFORNIA 92626
800.400.6808
gil@kazlg.com

KAZEROUNI LAW GROUP, APC
BY: JASON A. IBEY, ESQ.
(VIA ZOOM)
321 NORTH MALL DRIVE
SUITE R108
ST. GEORGE, UTAH 84790
800.400.6808
jason@kazlg.com

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

APPEARANCES OF COUNSEL (CONTINUED)

FOR DEFENDANT:

PATTERSON BELKNAP WEBB & TYLER LLP
BY: DAKOTAH BURNS, ESQ
FAUST PETKOVICH, ESQ.
1133 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
212.336.2000
dburns@pbwt.com
fpetkovich@pbwt.com

DLA PIPER LLP (US)
BY: TANYA L. GREENE, ESQ.
ERIN HUNTINGTON, ESQ.
(VIA ZOOM)
2000 AVENUE OF THE STARS
6TH FLOOR, NORTH TOWER
LOS ANGELES, CALIFORNIA 90067
310.595.3000
tanya.greene@us.dlapiper.com
erin.huntington@us.dlapiper.com

ALSO PRESENT: TRISTAN KNUDSEN, VIDEOGRAPHER

# I N D E X


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| VICTORIA PALMER | | |
| | BY MR. BURNS | 8, 159 |
| | BY MR. MELILI | 151 |


## E X H I B I T S


| NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 1 | 32 | PLAINTIFF VICTORIA PALMER'S FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT'S INTERROGATORIES TO PLAINTIFF, SET ONE |
| EXHIBIT 2 | 36 | FIRST AMENDED COMPLAINT |
| EXHIBIT 3 | 47 | PHOTOGRAPH |
| EXHIBIT 4 | 68 | PHOTOGRAPH |
| EXHIBIT 5 | 114 | INSTACART RECEIPT, BATES NOS. PALMER000174 - PALMER000178 |
| EXHIBIT 6 | 130 | LETTER DATED APRIL 30, 2025 FROM KAZEROUNI LAW GROUP, BATES NOS. PALMER000376 - PALMER000378 |


(EXHIBITS CONTINUED ON FOLLOWING PAGE)

E X H I B I T S

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 7 | 137 | COMPLAINT RE: PALMER V. THE RECEIVABLE MANAGEMENT SERVICES, LLC: AND TRANSFORM SR HOLDING MANAGEMENT LLC D/B/A SEARS REPAIR SERVICES, BATES NOS. PALMER000365 - PALMER000375 |

QUESTIONS INSTRUCTED NOT TO BE ANSWERED

| PAGE | LINE |
|---|---|
| 38 | 20 |
| 49 | 1 |

LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 15, 2026;

10:14 A.M. PDT

THE VIDEOGRAPHER: Good morning. We're going on the record at 10:14 a.m. on the 15th of April 2026. 10:13:58 10:13:59 10:14:02

Please note your microphones are sensitive and they may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record. 10:14:05 10:14:07 10:14:12 10:14:14 10:14:16 10:14:19

This is Media Unit No. 1 of the video-recorded deposition of Victoria Palmer taken by counsel for defendant in the matter of Victoria Palmer, et al., versus Coca-Cola Company filed in the United States District Court, Central District of California, Case No. 25-cv-4777. The location of this deposition is 2000 Avenue of the Stars, Suite 400, North Tower, Los Angeles, California 90067. 10:14:20 10:14:22 10:14:28 10:14:31 10:14:37 10:14:39 10:14:50 10:14:53 10:14:58

My name is Tristan Knudsen representing Veritext, and I am the videographer. I am not 10:15:03 10:15:06

related to any party in this action nor am I financially interested in the outcome. 10:15:09 10:15:11

Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney, please. 10:15:14 10:15:17 10:15:19 10:15:21

MR. BURNS: Dakotah Burns of Patterson Belknap Webb & Tyler for the Coca-Cola Company, and I'm joined by my colleague Faust Petkovich. 10:15:25 10:15:26 10:15:29

MR. MELILI: Gil Melili for plaintiff, Victoria Palmer, from the firm Kazerouni Law Group, APC. And joining me today via Zoom is Mr. Jason Ibey from the same firm. 10:15:35 10:15:36 10:15:39 10:15:43

MS GREENE: Tanya Greene here from DLA Piper on behalf of Coca-Cola. I'm also joined on Zoom by Erin Huntington. 10:15:47 10:15:49 10:15:53

THE VIDEOGRAPHER: Thank you. 10:15:57

Just a quick correction. I said, I think, Suite 400. We're in the 600. 10:15:58 10:15:59

Will the court reporter please introduce herself and swear in the witness. 10:16:03 10:16:06

THE REPORTER: Pursuant to Business and Professions Code 8016(b)(1) and (2), my name is Kim Edelen and my CSR number is 9042. 10:16:10 10:16:10 10:16:10

Would you raise your right hand, please. 10:16:17

You do solemnly swear the testimony you're about to give shall be the truth, the whole truth and nothing but the truth? 10:16:19

THE WITNESS: Yes, I do. 10:16:26

THE REPORTER: Thank you. 10:16:27

EXAMINATION

BY MR. BURNS:

Q Good morning, Ms. Palmer. 10:16:30

A Good morning. 10:16:32

Q My name is Dakotah Burns, as I mentioned, and I'm an attorney with the law firm Patterson Belknap, and I represent the Coca-Cola Company in this action. 10:16:42

Before we begin, there are a few basic ground rules that I want to go over to avoid any possible confusion later. Okay. 10:16:48

First, there is a court reporter here, Kim, who's typing up everything we say today. So for that reason, it's important that we not talk over each other, just to make sure that Kim can hear everything that we're saying without any cross talk. 10:17:01

Does that make sense? 10:17:04

A Uh-huh. 10:17:05

Q Can you say "yes"? 10:17:06

A Yes. 10:17:07
Q And in keeping with that question, because our conversation is being transcribed by the court reporter, you'll need to answer each of my questions with audible words rather than saying "uh-huh" or shaking your head or that kind of thing. 10:17:08 10:17:10 10:17:12 10:17:15 10:17:18
Does that make sense? 10:17:20
A Yes. 10:17:21
Q Okay. And if you don't understand a question, please let me know and I'll try to clarify. But if you do answer my question, then I'll assume you understood it. 10:17:22 10:17:24 10:17:26 10:17:28
All right? 10:17:30
A Yes. 10:17:31
Q Your lawyer may make an objection to some of my questions. That's normal. But unless he specifically instructs you not to answer, then you still need to answer my question even if he objects. 10:17:32 10:17:34 10:17:38 10:17:41
Okay? 10:17:45
A Okay. 10:17:46
Q If at any point during the deposition you need to take a break, just let me know. I'm happy to accommodate you. I'd only ask that if I'm in the middle of asking a question, then you go ahead and answer the question before we take a break. 10:17:46 10:17:48 10:17:51 10:17:54 10:17:56

Okay? 10:17:58
A Okay. 10:17:59
Q Now, Ms. Palmer, is there any reason why you would not be able to give true and complete answers to my questions today? 10:18:01 10:18:02 10:18:04
A No. 10:18:08
Q Anything at all, including any medications that you may have taken, that would impact your ability to testify truthfully? 10:18:08 10:18:11 10:18:13
A No. 10:18:15
Q And anything at all besides the passage of time that would interfere with your memory? 10:18:16 10:18:19
A No. 10:18:21
Q Ms. Palmer, do you understand that you just testified -- that you're testifying under oath this morning? 10:18:23 10:18:25 10:18:28
A Yes. 10:18:29
Q And you understand that that means you're obligated to answer every question truthfully and completely just as you would if you were in a courtroom in front of a judge? 10:18:30 10:18:34 10:18:36 10:18:38
A Yes. 10:18:40
Q Okay. Ms. Palmer, how old are you? 10:18:40
A 72. 10:18:46
Q And where do you live? 10:18:48

A Northridge, California. 10:18:50
Q And what's your current address? 10:18:52
A 17605 Willard, W-i-l-l-a-r-d, Street, 10:18:53
Northridge. 10:19:00
MR. MELILI: And I would just, for the 10:19:02
record, like to designate that as confidential. 10:19:03
MR. BURNS: I'm sorry. Why is that 10:19:06
confidential? 10:19:08
MR. MELILI: Her address. Just in case. 10:19:08
We can discuss it later off the record. 10:19:10
MR. BURNS: Okay. 10:19:13
BY MR. BURNS: 10:19:16
Q How long have you lived there? 10:19:16
A 72 years off and on. It was my parents' 10:19:25
home. 10:19:27
Q Wow. 10:19:30
A So, I mean -- 10:19:30
Q You're 72 and you've lived at the same 10:19:31
address for 72 years. 10:19:33
A No. I have lived other places. 10:19:36
Q Oh, okay. 10:19:37
A But I guess 50 years, maybe. No, not that 10:19:39
much. Maybe 30 years. 10:19:42
Q Okay. Do you live with anyone? 10:19:48
A Yes. My son. 10:19:54

Q And what is your son's name? 10:19:59
A Matthew Palmer. 10:20:01
Q How old is Matthew? 10:20:04
A 36. 10:20:07
Q Do you have any other kids? 10:20:09
A I have a nephew that I raised. 10:20:12
Q What's your nephew's name? 10:20:15
A Jason Calvert, C-a-l-v-e-r-t. 10:20:18
Q You raised him from birth? 10:20:24
A No. From the time he was five. 10:20:26
Q Where does Jason live now? 10:20:36
A Santa Clarita, but I can't give you an address. 10:20:38 10:20:40
Q For how long did Jason live with you? 10:20:42
A Until he was 21, 22. 10:20:46
Q Are you employed? 10:20:52
A I'm retired. 10:20:54
Q Okay. What was your occupation before you retired? 10:20:55 10:20:58
A I was a teacher. 10:20:58
Q What did you teach? 10:21:02
A Elementary. 10:21:04
Q What subject? 10:21:06
A All subjects, multiple subjects, multiple grades. 10:21:08 10:21:14

Q For how long were you a teacher? 10:21:19
A 40 years. 10:21:21
Q Did you have any job before that? 10:21:25
A Yeah. I was a camp counselor in college. 10:21:28
Q Okay. Did you attend school after high school? 10:21:31 10:21:39
A Yes. 10:21:40
Q Where did you go to school? 10:21:42
A I got my BA at California State University, Fresno. 10:21:44 10:21:46
Q What did you study? 10:21:51
A I graduated with a degree in liberal studies. 10:21:54 10:21:56
Q What all did that entail? 10:22:00
MR. MELILI: Objection. Vague and ambiguous. 10:22:05 10:22:05
But you may answer if you know. 10:22:06
THE WITNESS: Okay. Multiple subjects. Everything. So science, literature, English, history. 10:22:08 10:22:10 10:22:16
BY MR. BURNS: 10:22:18
Q Did you get a degree? 10:22:19
A Yes. I have a BA in liberal studies. 10:22:20
Q Do you have any other education? 10:22:27
A Yes. I have a multiple subject credential. 10:22:28

Q Sorry. What does that mean? 10:22:35
A That means I can teach multiple subjects in 10:22:37
a self-contained classroom. 10:22:41
Q What subjects can you teach? 10:22:43
A All of them. 10:22:45
Q I'm sorry. What do you mean by that? 10:22:47
A Math, science, literature, reading, 10:22:49
languages, art, music. 10:22:54
Q Have you ever received any training in food 10:22:59
science? 10:23:02
A No. 10:23:03
Q Food manufacturing? 10:23:05
A No. 10:23:07
Q Food labeling? 10:23:07
A No. 10:23:09
Q Do you know what the FDA is? 10:23:11
A Yes. 10:23:13
Q What is the FDA? 10:23:14
A The Federal Drug Administration. 10:23:15
Q What does the FDA do? 10:23:19
A They -- they're -- they are into food 10:23:22
safety, drug safety. They do testing to make sure 10:23:23
that whatever we're putting into our bodies is safe 10:23:27
or at least approve what other people have tested. 10:23:32
MR. MELILI: I'd just like to object to the 10:23:39

extent it's calling for expert testimony. 10:23:41
But you already answered. 10:23:43
BY MR. BURNS: 10:23:45
Q Have you ever worked for the FDA? 10:23:46
A No. 10:23:47
Q Have you ever had any job that's related to the labeling of food or beverages? 10:23:50 10:23:51
A No. 10:23:54
Q And my apologies, but these are questions I have to ask. 10:23:58 10:24:00
Have you ever been charged with a crime before? 10:24:01 10:24:02
A No. 10:24:03
Q Have you ever been disciplined for dishonesty or giving a false statement? 10:24:05 10:24:06
A No. 10:24:09
Q Have you ever been deposed before? 10:24:11
A No. 10:24:13
Q Have you ever declared bankruptcy? 10:24:15
A Yes. 10:24:19
Q When was that? 10:24:19
A 2000 -- maybe 2005. 10:24:31
Q Is that the only time you declared bankruptcy? 10:24:34 10:24:37
A Yes. 10:24:37

Q Was that in California? 10:24:38
A Yes. 10:24:39
Q Do you recall the attorneys that represented you in that bankruptcy? 10:24:46 10:24:47
A No, I don't. 10:24:49
Q Was it the Kazerouni law firm? 10:24:52
A No. 10:24:55
Q Why did you declare bankruptcy? 10:24:57
A I had a sister that was disabled and we had a lot of medical debt. 10:25:04 10:25:06
Q What was the extent of your medical debt? 10:25:15
A The amount? 10:25:18
Q Uh-huh, yes. 10:25:19
A About 40,000. 10:25:21
Q That was the sum total of your debt that led you to file for bankruptcy? 10:25:25 10:25:27
A Yes. 10:25:28
Q Have you paid off that debt? 10:25:30
A Yes. 10:25:32
Q Are you currently in debt? 10:25:32
A No -- oh, wait. Go back. What do you mean by that? 10:25:34 10:25:40
Q I'm sorry. What do I mean by what? 10:25:42
A "In debt." 10:25:44
I have -- I do have a mortgage. 10:25:46

Q Do you currently owe more money to creditors than you have in income? 10:25:50 10:25:54
A No. 10:25:56
Q Have you ever been involved in any other litigation? 10:26:05 10:26:07
A Yes. 10:26:08
Q What was that? 10:26:09
A It was a suit against Sears because they kept charging me over and over again for work that was done on my dishwasher. And even though we cleared it with the debt collectors that they sent it to, Sears kept charging me. 10:26:14 10:26:18 10:26:22 10:26:27 10:26:31
Q You thought you didn't owe that debt? 10:26:37
A Exactly. 10:26:40
Q And you filed a lawsuit? 10:26:44
A Yes. 10:26:45
Q When was that? 10:26:47
A Wow. 20- -- 2023. 10:26:53
Q What was the outcome of that lawsuit? 10:27:07
A They just discharged the debt. 10:27:12
Q Did you testify in court during that lawsuit? 10:27:18 10:27:20
A No. 10:27:20
Q Have you ever been to a courtroom hearing in connection with any lawsuit that you've been 10:27:22 10:27:24

involved with? 10:27:26
A No. 10:27:27
Q Ms. Palmer, did you do anything today to prepare for this deposition? 10:27:42 10:27:44
A Other than get up and get here, no. 10:27:46
Q No. 10:27:49
You didn't meet with your lawyers? 10:27:50
A Oh, I'm sorry. Yes. 10:27:52
Q Which lawyers did you meet with? 10:27:53
A With Gil and Ali. 10:27:56
Q Ali...? 10:28:01
A I can't say his last name. 10:28:03
Gil? 10:28:05
Q Ali is another attorney -- 10:28:09
A He's another attorney, yeah. 10:28:11
Q -- at the Kazerouni law firm? 10:28:12
Did you meet with any other lawyers? 10:28:16
A No. 10:28:17
Q Were Gil and Ali present at every meeting that you had to prepare for today's deposition? 10:28:22 10:28:24
A Just -- Gil was at every meeting. 10:28:27
Q How many times did you meet with your lawyers? 10:28:31 10:28:33
A Two. 10:28:35
Q Two. 10:28:36

Who was present at the first meeting? 10:28:37
A Just Gil. 10:28:41
Q And when did you meet with Gil that first time? 10:28:43 10:28:45
A Last week, Monday. 10:28:50
Q And the second time, when was that? 10:28:53
A Wednesday, last week. 10:28:56
Q And that was with Gil and Ali? 10:29:00
A Yeah. I think he was on the phone. 10:29:03
Q All right. I'm going to preface my next set of questions by saying that I'm not going to ask you to tell me about the contents of what you spoke about with your lawyers. Okay. 10:29:12 10:29:16 10:29:18 10:29:20
Where did you meet with your lawyers, firstly, on that first meeting? 10:29:23 10:29:25
A On Zoom. 10:29:27
Q On Zoom. 10:29:28
And how long was that first meeting with Gil? 10:29:34 10:29:36
A Less than an hour. 10:29:37
Q Was anyone else in the room beside you and your lawyer during those meetings? 10:29:43 10:29:47
A No. 10:29:49
Q And that -- just to be clear, that means no one was in the room with you when you were on Zoom 10:29:49 10:29:51

during that meeting? 10:29:54
A Yes, no one was in the room. 10:29:56
Q And as far as you know, no one was in the room with Gil either? 10:29:58 10:30:00
A As far as I know, yeah. 10:30:01
Q Okay. Did you review any documents during that meeting? 10:30:02 10:30:07
A Yes. 10:30:08
Q What type of documents did you review? 10:30:08
A I don't know what they're called, but it was the -- we went through the case, what had been amended or changed. 10:30:15 10:30:16 10:30:21
I'm trying to think, the first meeting, it was basically just the -- the Complaint and what I had said, asking if that's -- was correct. 10:30:30 10:30:33 10:30:38
Q Okay. Do you know what an interrogatory is? 10:30:42 10:30:47
A Sort of, yes. 10:30:48
Q You mentioned a Complaint and then what you had said. 10:30:49 10:30:50
Do you recall being asked if responses you had -- you had been -- 10:30:52 10:30:55
A Yes. 10:30:55
Q -- you had given to an interrogatory were accurate? 10:30:56 10:30:58

MR. MELILI: Objection to the extent it calls for attorney-client privilege. I'd just advise my client not to disclose communications between her and her attorneys, but otherwise -- 10:30:59 10:31:01 10:31:04 10:31:07
BY MR. BURNS: 10:31:08
Q And I'm not asking you to tell me what specifically the attorney asked you and what you said in response. 10:31:08 10:31:11 10:31:12
I'm just -- I'm only asking -- 10:31:13
A It did say on there "Interrogatory" and then listed things. 10:31:14 10:31:17
Q And other than the Complaint and the interrogatories, do you recall reviewing any other documents? 10:31:19 10:31:21 10:31:23
A Not on that occasion. 10:31:24
Q All right. And in this second meeting, you met with Gil and Ali; is that correct? 10:31:25 10:31:30
A It was basically Gil. I think Ali was on the call, but I don't -- didn't talk with him. 10:31:33 10:31:36
Q Ali didn't speak to you? 10:31:39
A Not that I remember. 10:31:41
Q You don't remember Ali asking any questions or -- 10:31:42 10:31:44
A No. 10:31:45
Q -- saying anything? 10:31:45

Was this in person or by Zoom? 10:31:46
A By Zoom. 10:31:48
Q By Zoom. 10:31:49
How long did that meeting last? 10:31:50
A It was an hour-ish. 10:31:51
Q And was anyone else in the room with you 10:31:55 during that meeting? 10:31:57
A No. 10:31:58
Q Was it -- to your knowledge, was anyone 10:31:59 else in the room other than Gil and Ali on their 10:32:01 end? 10:32:04
A I have no idea. 10:32:04
Q Did you review any documents during that 10:32:07 meeting? 10:32:09
A Yes. 10:32:09
Q What documents did you review? 10:32:10
A Again, we went through the 10:32:13 interrogatories -- 10:32:16
Is that what you called them? 10:32:16
Q Yes. 10:32:17
A -- there were a couple of little changes 10:32:18 that needed to be corrected. We skimmed through 10:32:19 articles. I think that was basically it. 10:32:24
Q What articles were you referring to? 10:32:35
A Articles on the citric acid and its effects 10:32:36

and how it's made and -- I didn't really read those articles. I just... 10:32:44 10:32:46
Q You were given those articles? 10:32:58
A They were on the screen. 10:33:00
Q But you didn't read them? 10:33:03
A No. I just scrolled through them. 10:33:05
Q Did you understand what was in those articles? 10:33:12 10:33:14
A Some of it, yes. 10:33:15
Q What did you understand? 10:33:16
A That the manufacture of citric acid is not natural and does have some effects on the body. 10:33:21 10:33:26
Other than that, I... 10:33:33
Q What in those articles led you to believe that the manufacture of citric acid was not natural? 10:33:36 10:33:38
A I can't tell you that. I didn't read it that depth -- in that depth. 10:33:42 10:33:44
Q Then how did you understand that the manufacture of citric acid was not natural if you didn't understand what you were reading? 10:33:46 10:33:48 10:33:50
A No. I didn't say I wasn't -- didn't understand what I was reading. I said I just didn't read it thoroughly. 10:33:52 10:33:54 10:33:57
Q So if you understood what you were reading, what did you read? 10:33:58 10:33:59

A I can't tell you that now. 10:34:05
Q You understood it but you have no recollection -- 10:34:07 10:34:09
A Right. 10:34:10
Q -- of anything inside it? 10:34:10
A I don't. 10:34:12
Q And you referenced the effects that citric acid had on the body. 10:34:13 10:34:16
What did you understand about those documents as it relates to the effect that citric acid has on the body? 10:34:18 10:34:19 10:34:21
A I honestly don't remember. 10:34:25
Q So you understood that it had an effect on citric acid -- on the body, you don't know what that effect was and you have no -- 10:34:26 10:34:29 10:34:32
A No, I don't remember. 10:34:35
Q -- recollection of anything in the document? 10:34:35 10:34:35
A No, I don't remember. 10:34:36
(Clarification by the Reporter.) 10:34:43
BY MR. BURNS: 10:34:52
Q Besides your lawyers, did you speak with anyone else in the world about this deposition? 10:35:04 10:35:06
A My son. 10:35:10
Q And that would be Matthew? 10:35:14

A Matthew. 10:35:15
Q When did you speak to Matthew? 10:35:16
A Well, when they said -- when they set the date, I -- we talked about it and whether he would take the day off to bring me here or not. 10:35:20 10:35:22 10:35:27
Q How long did you speak to Matthew about the deposition? 10:35:31 10:35:33
A How long? 10:35:34
Q Uh-huh. Yes. 10:35:34
A 25 seconds. 10:35:38
Q What did you discuss? 10:35:42
A If he could get the day off to bring me down here. 10:35:44 10:35:46
Q Did you discuss anything else? 10:35:47
A No. 10:35:49
Q And Matthew is the only person, other than your lawyers, that you've spoken to about this deposition? 10:35:53 10:35:55 10:35:57
A Yes. 10:35:58
Q Ms. Palmer, we're here today because you're suing Coca-Cola, correct? 10:36:04 10:36:06
A Yes. 10:36:08
Q Why are you suing Coca-Cola? 10:36:09
A It ticked me off that their advertising wasn't truthful. 10:36:14 10:36:19

Q You said "it." 10:36:23
What is "it" that tipped you off that their 10:36:25
advertising wasn't -- 10:36:26
A That it said that the flavors were all 10:36:28
natural. 10:36:30
Q All right. What tipped you off that the -- 10:36:30
that the representation that the flavors were 10:36:33
natural weren't truthful? 10:36:36
A Oh, I had bought the sodas for a specific 10:36:42
reason. And I guess my son had talked to a friend, 10:36:45
and -- about it, and he said that -- he came out and 10:36:47
said, you know that they're not all natural, that 10:36:55
there are ingredients, flavor ingredients that 10:37:00
aren't natural. 10:37:05
Q You said you bought the product for a 10:37:07
specific reason. 10:37:10
What was that reason? 10:37:10
A My nephew, Jason, and his children were 10:37:12
coming over and I was trying to find something that 10:37:15
would be approved by their mother. 10:37:22
Q What do you mean by "approved by their 10:37:28
mother"? 10:37:30
A No caffeine, no natural flavors -- or no 10:37:33
artificial flavors. 10:37:38
Q And your understanding was that Sprite and 10:37:51

Fanta had no caffeine and no artificial flavors? 10:37:54
A Yes. 10:37:57
Q You said you were looking for something all natural. 10:37:58 10:37:59
What does that mean to you? 10:38:00
A Something that -- okay -- doesn't necessarily have -- that the ingredients were from natural sources. And I realized that Fanta couldn't possibly be completely natural because it's orange, but it was the closest I could get. 10:38:03 10:38:08 10:38:12 10:38:16 10:38:18
Q At the time you bought Fanta Orange, you realized it couldn't possibly be all natural because it was orange? 10:38:25 10:38:28 10:38:30
A Yes. But that's coloring. That's not flavoring. 10:38:32 10:38:34
Q So you understood that Fanta had artificial ingredients when you bought it? 10:38:37 10:38:42
A Yes. 10:38:43
Q Does it matter to you whether an ingredient is -- functions as a coloring or as a flavor? 10:38:50 10:38:53
A Yes. 10:38:58
Q Why? 10:38:59
A I think pretty much everything that we eat has coloring in it and you can't get away without. Anything we buy has coloring in it. 10:39:03 10:39:05 10:39:11

Q Everything -- 10:39:16
A But the can said that it was natural flavored, so I assumed that it was -- there were no artificial flavorings in it. 10:39:17 10:39:19 10:39:23
Q You think everything you buy has artificial coloring in it? 10:39:25 10:39:28
A Except for maybe fruits and vegetables, but yes. 10:39:32 10:39:37
Q What is the coloring of Sprite lemon-lime? 10:39:37
MR. MELILI: Objection. Relevance. 10:39:42
But you can answer if you know. 10:39:43
THE WITNESS: It's clear-ish. 10:39:44
BY MR. BURNS: 10:39:46
Q Does it appear to have any coloring to you? 10:39:47
MR. MELILI: Same objection. 10:39:49
You may answer. 10:39:52
THE WITNESS: I have no idea. 10:39:53
BY MR. BURNS: 10:39:58
Q Did you have any reason to believe -- I'm sorry. 10:39:59 10:40:01
I should start by saying: Have you ever bought Sprite lemon-lime product? 10:40:01 10:40:03
A Very occasionally. 10:40:07
Q So when you bought Fanta Orange, you understood that Sprite lemon-lime was another 10:40:10 10:40:12

product you could purchase? 10:40:14
A Yes. 10:40:15
Q Did you have any reason to believe that 10:40:16
Sprite lemon-lime had artificial coloring in it? 10:40:18
A Had artificial -- 10:40:22
MR. MELILI: Objection. Relevance. 10:40:24
But you can answer. 10:40:25
THE WITNESS: I didn't even think about it 10:40:27
because it's clear. 10:40:29
BY MR. BURNS: 10:40:32
Q So if you were trying to avoid artificial 10:40:32
ingredients, why didn't you just buy Sprite 10:40:36
lemon-lime? 10:40:38
A Because I had seen Fanta at their house. 10:40:39
Q So you understood you could buy products 10:40:45
without artificial ingredients but you bought them 10:40:47
anyway? 10:40:50
MR. MELILI: Objection. Misstates -- 10:40:51
BY MR. BURNS: 10:40:53
Q Is that correct? 10:40:53
MR. MELILI: Misstates testimony. 10:40:54
But you may answer if you know. 10:40:55
THE WITNESS: I guess so. I didn't think 10:40:58
about it. 10:41:00
\\\

BY MR. BURNS: 10:41:01
Q You didn't give it any thought? 10:41:02
A Well, the can didn't say "no artificial coloring." It said "no artificial flavoring." 10:41:04 10:41:08
Q Did you see any coloring in the Sprite lemon-lime when you purchased it? 10:41:10 10:41:11
MR. MELILI: Objection. Relevance. 10:41:13
You may answer if you know. 10:41:15
THE WITNESS: Did I see any coloring in it? 10:41:17
BY MR. BURNS: 10:41:20
Q Uh-huh. 10:41:20
A No. 10:41:21
Q Do you believe the products you purchased from Coca-Cola were falsely labeled? 10:41:29 10:41:31
A Yes. 10:41:33
Q And what products were those? 10:41:35
A I don't understand the question. 10:41:39
Q What were the products you purchased -- 10:41:40
A All the products I purchased or just those two? 10:41:43 10:41:45
Q Coca-Cola products you purchased. 10:41:47
A I don't know what the other Coca-Cola products are unless it says "Coca-Cola" on it. 10:41:48 10:41:49
Q What products are you challenging in this lawsuit that you purchased? 10:41:52 10:41:54

A Sprite and Fanta. 10:41:55
Q And what products -- what specific products were those? 10:41:56 10:41:59
A Cans of Sprite and Fanta. 10:42:02
Q What flavors? 10:42:04
A Oh, Sprite, I guess lemon-lime. Sprite is Sprite. And orange Fanta. 10:42:05 10:42:10
Q And when I refer to "Sprite," you understand that I'm referring to the Sprite products that you're challenging in this action? 10:42:22 10:42:24 10:42:26
A Yes. 10:42:28
Q And when I refer to "Fanta," you understand that I'm referring to the Fanta products that you're challenging in this action? 10:42:28 10:42:30 10:42:32
A Yes. 10:42:34
Q And when I say "class products," do you understand that I'm talking about those Sprite and Fanta products together? 10:42:35 10:42:38 10:42:41
A Okay. Yes. 10:42:43
Q Okay. Let's talk about the Sprite product you purchased. 10:42:44 10:42:49
What do you recall about the Sprite lemon-lime product that you bought? 10:42:51 10:42:55
MR. MELILI: Objection. Vague and ambiguous. 10:42:58 10:42:58

But you may answer if you know. 10:42:59
THE WITNESS: What did I notice about it? 10:43:01
BY MR. BURNS: 10:43:03
Q Let me ask a more specific question. 10:43:04
Was it in a bottle or a can? 10:43:06
MR. MELILI: Objection. Asked and answered. 10:43:09
You may answer if you know. 10:43:11
THE WITNESS: Actually, it was looking at the box, and the box said "no artificial flavors." 10:43:15
BY MR. BURNS: 10:43:21
Q Okay. 10:43:21
A Or all -- no. It said "all natural flavors." 10:43:26
Q Was it in a bottle or a can? 10:43:27
A A can. 10:43:29
Q What size was it? 10:43:32
A The little minis. 10:43:34
Q You don't remember the specific size? 10:43:38
A No. Must be about 6 ounces. 10:43:41
MR. BURNS: All right. Let's go to the first exhibit which I'll mark as Exhibit 1. 10:43:53
(Deposition Exhibit 1 was marked for identification.) 10:43:56
MR. BURNS: Take your time reviewing this 10:44:38

document, and let me know when you've looked it over. 10:44:39 10:44:42

(Brief pause.) 10:45:30

THE WITNESS: All right. This is the document that we went through, and I've read it before. 10:46:44 10:47:04 10:47:07

BY MR. BURNS: 10:47:10

Q And do you see on the very last page that you declared under penalty of perjury that the contents of this document were true and correct? 10:47:10 10:47:15 10:47:16

A Yes. 10:47:18

Q All right. If you could go to Page 9. 10:47:19

Let me know when you're there. 10:47:42

A Okay. 10:47:44

Q You see the paragraph in the middle of this page, and toward the middle of that paragraph, it starts with "On April 27th, 2025." 10:47:45 10:47:49 10:47:54

Let me know when you see that. 10:47:57

A Yes. 10:47:59

Q Do you see where it says "On April 27th, 2025, using a Visa card ending in 0247, while in California, Plaintiff's purchased a 10-pack of Sprite 7 and a half ounce cans and a 10-pack of the Fanta Orange 7 and a half ounce cans via the Amazon.com online marketplace. Each unit cost 10:48:01 10:48:04 10:48:10 10:48:13 10:48:17 10:48:21

$5.98, exclusive of shipping, taxes and fees. The units of the Sprite and Fanta Orange products were shipped to the Plaintiff's residence on April 28th, 2025." 10:48:26 10:48:33 10:48:37 10:48:39

Do you see that? 10:48:40

A Yes. 10:48:41

Q Is that accurate? 10:48:42

A Yes. Although, I don't really know the difference between a Visa credit card and a Visa debit card. 10:48:44 10:48:50 10:48:54

Is there a difference? 10:48:55

Q There is a difference between a credit and debit card. I'm not -- I'm not interested in that difference, so if -- 10:48:58 10:49:00 10:49:03

A Okay. 10:49:04

Q -- it was a debit card, then so be it. 10:49:05

A That's the only thing I can see. 10:49:08

Q Okay. Is this the first time that you bought the Sprite lemon-lime product? 10:49:15 10:49:17

MR. MELILI: Objection. Vague and ambiguous. 10:49:20 10:49:21

BY MR. BURNS: 10:49:22

Q I've already defined "Sprite" earlier in the deposition. 10:49:23 10:49:25

So I just want to be clear when I refer to 10:49:25

the Sprite lemon-lime product, I'm referring to this product that you purchased -- 10:49:27 10:49:29

A Probably not, but I don't -- cannot remember buying it before. 10:49:31 10:49:32

Q Okay. Now, I'll just remind you, Ms. Palmer, I know it's hard to remember, but from our earlier instructions, try to let me finish my question before you answer, just for Kim's sake. 10:49:34 10:49:37 10:49:40 10:49:43

But we've already established when I refer to the "Sprite product" or the "Sprite lemon-lime product," I'm referring to the product you purchased that you're challenging in this case. 10:49:46 10:49:48 10:49:50 10:49:53

Do you understand? 10:49:54

A Yes. 10:49:55

Q You don't remember purchasing the Sprite product prior to this April 27th date; is that correct? 10:49:57 10:50:00 10:50:02

A No, I don't. 10:50:03

Q And where did you purchase the Sprite product on April 27th? 10:50:08 10:50:10

A From Amazon. 10:50:12

Q And when you purchased the Sprite product on April 27th on Amazon.com, did you read any information about the product on Amazon before you bought it? 10:50:25 10:50:28 10:50:33 10:50:36

A I read the information on the outside of the carton that said that it had no caffeine and that it was all natural flavors. And that's what I was looking for. 10:50:39 10:50:42 10:50:45 10:50:52

Q You said that was on the outside of the carton? 10:50:53 10:50:54

A Yes. 10:50:55

MR. BURNS: I'm going to introduce another exhibit which I'll mark as Exhibit 2. 10:51:17 10:51:19

(Deposition Exhibit 2 was marked for identification.) 10:51:21 10:51:21

MR. BURNS: This is a very long document so I'm just going to tell you in advance that my question is going to concern Paragraph 95 on Page 33, but take your time reviewing the document and let me know when you're ready to answer your question -- answer my questions. 10:51:54 10:51:56 10:51:58 10:52:02 10:52:05 10:52:07

(Brief pause.) 10:53:23

THE WITNESS: Yeah. I'm ready. I'm sorry. 10:53:54

BY MR. BURNS: 10:53:56

Q Where is a picture of the carton of the Sprite product on this web page in the photo on Paragraph 95? 10:53:57 10:53:59 10:54:03

A On Page 33? 10:54:10

Q Yes. 10:54:12

A I don't see a picture of the carton. 10:54:14
Q You told me just a moment ago that you saw a picture of the carton before you purchased the product, correct? 10:54:19 10:54:21 10:54:23
A I did. 10:54:24
Q When you told me you saw a picture of the carton before you purchased the product, was that false? 10:54:27 10:54:29 10:54:31
A No. I saw a picture of the carton. 10:54:32
Q And you said you bought the carton on Amazon.com? 10:54:35 10:54:37
A Yes. 10:54:38
Q And where is the picture of the carton on Amazon.com? 10:54:38 10:54:41
A I don't know, but I saw it. 10:54:42
Q So this picture is inaccurate? 10:54:44
A If you're telling me that's the carton, yes, it's inaccurate. 10:54:47 10:54:49
Q Did you review this Complaint before it was filed? 10:54:52 10:54:54
A I believe so, but I don't remember looking at these pictures. 10:54:58 10:54:59
Q You don't remember reviewing the Complaint before it was filed? 10:55:00 10:55:03
A That's not what I said. 10:55:04

I don't remember -- I remember reviewing it. I do not remember these pictures. 10:55:06 10:55:08

Q You don't remember reviewing pictures of the representations that you claim are false in this action before your Complaint was filed? 10:55:10 10:55:13 10:55:16

MR. MELILI: Objection. Misstates testimony. 10:55:19 10:55:19

But you may answer if you know. 10:55:20

THE WITNESS: I don't really understand that question. 10:55:23 10:55:23

BY MR. BURNS: 10:55:24

Q These are pictures of the representations that you claim are false in this action, correct? 10:55:24 10:55:27

A Yes. But I do not believe this is the picture that I saw. 10:55:30 10:55:32

Q Do you remember reviewing pictures of the representations that you claim are false before this Complaint was filed? 10:55:34 10:55:36 10:55:38

A Yes. 10:55:39

Q Do you recall telling your attorneys that there were no pictures of the representations that you saw in this Complaint before it was filed? 10:55:41 10:55:43 10:55:45

MR. MELILI: Objection. Attorney-client privilege. 10:55:48 10:55:50

I would advise my client not to answer. 10:55:51

MR. BURNS: What Ms. Palmer told you about the representations that she saw is absolutely not privileged, and if you instruct her to answer, then we'll be back here at another deposition asking the same questions. 10:55:54 10:55:56 10:55:59 10:56:02 10:56:05

BY MR. BURNS: 10:56:05

Q So I just want to be clear, do you recall telling your attorneys that the pictures of the representations in this Complaint contain no pictures of the representations that you saw before you bought this product? 10:56:05 10:56:08 10:56:11 10:56:14 10:56:17

A I don't remember discussing that with them. 10:56:21

Q So you have no recollection of telling your attorneys that? 10:56:23 10:56:25

A No. 10:56:26

Q All right. Please look at the pictures on Paragraph 95. 10:56:26 10:56:32

Do you recall seeing any of the pictures in Paragraph 95? 10:56:33 10:56:37

A Can you repeat that. 10:56:51

Q Yeah. Let me be clear. 10:56:53

Before you purchased the product on Amazon.com, do you recall seeing any of the pictures in Paragraph 95? And that would include the pictures on Page 33 and the pictures on Page 34 and 10:56:55 10:56:56 10:57:00 10:57:05

Page 35. 10:57:07
A Yes, I remember this picture. 10:57:10
Q So when you say "this picture," I need you to tell me -- I can see that you're pointing. I just want to state for the record, it appears that you're pointing at the bottom picture on Page 34? 10:57:14 10:57:16 10:57:19 10:57:21
A Yes. 10:57:24
Q Do you recall seeing any other pictures? 10:57:25
A No. 10:57:30
Q All right. I want to ask you a different set of questions. 10:57:33 10:57:36
Ms. Palmer, why did you first decide to buy this Sprite product on April 27th, 2025? 10:57:46 10:57:50
A My nephew, Jason, had called me to say that they might be stopping by. 10:57:54 10:57:56
Q I'm sorry. What do you mean -- oh, you mean -- by "they," you were referring to your nephew, Jason's children? 10:58:01 10:58:03 10:58:05
A Yes. 10:58:07
Q And I think you testified earlier that you understood Fanta Orange contained artificial ingredients; is that correct -- I'm sorry. I should -- let me restate. 10:58:27 10:58:29 10:58:34 10:58:36
I believe you testified earlier that you understood on April 27th that Fanta Orange contained 10:58:38 10:58:39

artificial ingredients; is that correct? 10:58:42
A Yes. 10:58:44
Q On April 27th, did you understand that Sprite lemon-lime contained artificial ingredients? 10:58:45 10:58:47
A No. 10:58:51
Q And when you bought Sprite lemon-lime on April 27th, did you do so because you thought that the product contained no artificial ingredients? 10:59:00 10:59:02 10:59:06
A Yes. 10:59:09
Q And you intended to avoid buying a product with artificial ingredients of any kind? 10:59:10 10:59:13
A Or at least minimal. 10:59:17
Q What do you mean by that? 10:59:22
A I wanted it to be as natural as possible. 10:59:28
Q I'm sorry. That's still pretty vague. 10:59:36
Can you give me more detail about what you mean by that? 10:59:38 10:59:40
A Well, I assumed that everything had artificial coloring in it. Although, I -- looking at it, I wouldn't assume that of the Sprite. 10:59:41 10:59:45 10:59:51
Q You didn't assume that of the Sprite? 11:00:00
A I guess not, no. 11:00:02
Q Was your expectation that Sprite lemon-lime had no artificial ingredients in that case? 11:00:05 11:00:10
A My expectation of the Sprite was that the 11:00:15

flavorings in it were natural. 11:00:20

Q And as to the other ingredients, you didn't care whether they were artificial? 11:00:25 11:00:28

A Not as much, no. 11:00:30

Q Why not? 11:00:32

A Like I said, I think everything has coloring in it. 11:00:33 11:00:35

Q So you already said you didn't think that Sprite had artificial coloring in it. 11:00:37 11:00:39

A I don't know if Sprite has artificial coloring in it. It does say that it's perfectly clear but that doesn't mean that something isn't added to keep it that way. 11:00:41 11:00:46 11:00:48 11:00:50

Q Did you think that any other ingredients within the Sprite product were artificial at the time? 11:00:52 11:00:53 11:00:55

A I think that there's one that it says to protect flavoring. I don't remember what that is, but I assumed that was not natural. 11:00:57 11:01:03 11:01:07

Q If something -- if an ingredient in a product is artificial, does it matter to you what function it serves within the product? 11:01:15 11:01:23 11:01:27

A No. 11:01:33

Q Did you buy the Sprite product because you thought that your nephew's children would like the 11:01:39 11:01:42

taste of the product? 11:01:45
A Yes. 11:01:47
Q Did you like the price? 11:01:49
A I thought it was kind of expensive, but... 11:01:54
Q So I believe in -- in Tab -- I'm sorry. 11:01:59
In Exhibit 1, we established that the 11:02:03
product cost $5.98 for a ten-pack? 11:02:07
A Yes. 11:02:11
Q And you thought that was expensive? 11:02:12
A I think everything is expensive. 11:02:14
Q You think everything is expensive. Okay. 11:02:16
Do you think anything is worth the price -- 11:02:23
any food or beverage is worth the price that you pay 11:02:25
for it? 11:02:28
MR. MELILI: Objection. Vague and 11:02:30
ambiguous. 11:02:30
But you may answer if you know. 11:02:31
THE WITNESS: Obviously, I will settle 11:02:34
because I bought it. 11:02:37
BY MR. BURNS: 11:02:43
Q Generally, do you think foods and beverages 11:02:44
are overpriced? 11:02:46
A Yes. 11:02:48
Q Was there any other reason you bought the 11:02:56
Sprite product? 11:02:58

A Well, I was intrigued by the little cans and that it had no caffeine. 11:03:01 11:03:03

Q You didn't want your nephew's children to drink caffeine? 11:03:22 11:03:26

A I was trying to respect their mother's wishes. 11:03:28 11:03:31

Q How did you know what your mother's -- what their mother's wishes were? 11:03:36 11:03:39

A She's Mormon and they don't drink caffeine. 11:03:40

Q Would you say that the lack of caffeine was the most important reason that your nephew's children's mother wanted you to buy those products? 11:03:52 11:03:54 11:03:59

A It's what I was looking for to begin with, but then I was more intrigued by it not having any artificial flavorings in it. 11:04:03 11:04:05 11:04:09

Q What do you mean by "more intrigued"? 11:04:11

A That it was a bonus, that there was natural flavors. 11:04:15 11:04:19

Q All right. So you referred to the natural flavors as a bonus so I'm going to restate my original question. 11:04:22 11:04:25 11:04:27

Do you think that your nephew's children's mother was primarily interested in your purchasing products that had no caffeine for her children? 11:04:30 11:04:34 11:04:39

MR. MELILI: Objection to the extent it's 11:04:44

speculative. 11:04:45

But you may answer. 11:04:47

THE WITNESS: Yeah. I have no idea what 11:04:48
she was thinking. 11:04:49

BY MR. BURNS: 11:04:50

Q If you had no idea what she was thinking, 11:04:50
why did you mention her preferences? 11:04:52

A Because when I visit their house, that's 11:04:54
what they serve. 11:04:56

Q So when you bought the product, you were 11:04:58
trying to cater to her preferences? 11:05:00

A Yes. 11:05:03

Q So if you were trying to cater to her 11:05:07
preferences, I'm asking you what you think her 11:05:09
preferences were. 11:05:11

Do you think -- 11:05:12

A I have no idea except that they don't drink 11:05:13
things with caffeine in them. I don't know what her 11:05:15
opinion of natural flavors is. 11:05:18

Q Okay. So at least as it relates to your 11:05:23
objective in purchasing the products to accommodate 11:05:26
your nephew's children's mother's preferences, you 11:05:29
bought the products because you understood her 11:05:35
preference to be that they drink products that had 11:05:37
no caffeine; is that correct? 11:05:40

A Yes. 11:05:42

MR. MELILI: Dakotah, maybe after ten more minutes of questioning, we can go for a break? 11:05:46 11:05:48

MR. BURNS: Sure. Ten more minutes. Once I finish. Not ten minutes on the dot, but generally. 11:05:50 11:05:53 11:05:55

BY MR. BURNS: 11:05:59

Q Did you or any other family member suffer any adverse health consequences as a result of drinking the Sprite product? 11:05:59 11:06:01 11:06:04

A No. 11:06:06

Q Did you speak to anyone who works at the Kazerouni law firm about Sprite before you purchased it on Amazon on April 27th -- 11:06:13 11:06:15 11:06:18

A No. 11:06:21

Q -- 2025? 11:06:21

Did you speak to anyone else about Sprite before you purchased it on Amazon.com on April 27th? 11:06:28 11:06:30

A No. 11:06:36

Q Did you take pictures of the Sprite lemon-lime product after you bought it? 11:06:47 11:06:49

A My son did on his phone. 11:06:52

MR. BURNS: All right. Let's go to what we'll mark as -- I believe this is Exhibit 3; is that right? 11:06:55 11:06:57 11:07:00

MR. PETKOVICH: Uh-huh. 11:07:03
THE REPORTER: Yes. 11:07:04
(Deposition Exhibit 3 11:07:04
was marked for identification.) 11:07:04
BY MR. BURNS: 11:07:27
Q Let me know when you've had a chance to look at this. 11:07:27 11:07:29
A Yep. I've seen this picture before. 11:07:31
Q And you mentioned earlier that you saw a picture of the Sprite carton on Amazon.com when you purchased it? 11:07:46 11:07:48 11:07:51
A Yes. 11:07:51
Q Would this be the Sprite carton that you -- that you say you saw? 11:07:52 11:07:53
A Yes. 11:07:55
Q How confident are you that you're not remembering this picture that I'm showing you rather than the picture that you say you saw on Amazon.com on April 27th? 11:08:01 11:08:03 11:08:05 11:08:08
A I'm confident I've seen this picture. 11:08:10
Q Are you confident -- 11:08:12
A It's my counter. 11:08:13
Q Are you confident that you saw a picture of this carton on Amazon.com when you bought it on April 27th? 11:08:15 11:08:17 11:08:19

A I believe so, yes. 11:08:20
Q When did Matthew take this picture? 11:08:25
A I don't know. 11:08:28
Q So you bought the product on April 27th; is that right? 11:08:38 11:08:40
A Yes. 11:08:41
Q When did you receive it? 11:08:42
A The next day. 11:08:44
Q Do you have a sense of how many days passed before Matthew took this picture? 11:08:50 11:08:52
A No, I don't. 11:08:54
Q It could have been one day? 11:08:56
A I have no idea. 11:08:58
Q So it could have been one day? 11:09:00
A I have no idea. I -- I can't tell you if it was one day or ten days. I have no idea when he took this picture. 11:09:01 11:09:06 11:09:10
Q Did you provide this picture to your attorneys? 11:09:11 11:09:13
A He did, yes, because he took it on his phone. 11:09:15 11:09:17
Q Did he tell you that he had taken the picture? 11:09:25 11:09:27
A I believe so, but I honestly don't remember. 11:09:29 11:09:31

Q Do you remember when you first learned that he had taken this picture and given it to your attorneys? 11:09:34 11:09:38 11:09:40

A I don't remember. I believe that at some point they asked if we had the carton -- 11:09:42 11:09:44

MR. MELILI: Objection. 11:09:47

THE WITNESS: -- that's -- 11:09:48

MR. MELILI: I would advise my client not to disclose attorney-client communications. 11:09:48 11:09:49

THE WITNESS: Okay. 11:09:53

BY MR. BURNS: 11:10:02

Q Do you remember why he took this picture? 11:10:03

A No. I can only assume. 11:10:09

Q What would you assume? 11:10:16

A I think that would probably be a client-attorney thing. 11:10:19 11:10:23

MR. MELILI: I think it's a good time to take a break. 11:10:25 11:10:27

MR. BURNS: We're not even an hour in, Gil, so I'm going to finish my line of questioning unless -- unless Ms. Palmer has a specific need to take a break. 11:10:29 11:10:31 11:10:34 11:10:36

MR. MELILI: Ms. Palmer, would you like to take a break? 11:10:43 11:10:44

MR. BURNS: So I'm sure if Ms. Palmer would 11:10:45

like to take a break at any point during the deposition, my question -- I'm in the middle of a question, and as I already -- 11:10:47 11:10:49 11:10:52

THE WITNESS: Okay. I'm fine. 11:10:54

MR. BURNS: -- mentioned earlier, unless there's a specific need -- 11:10:55 11:10:56

MR. MELILI: Sure. 11:10:57

MR. BURNS: -- I would prefer to finish my line of questioning. 11:10:57 11:10:59

BY MR. BURNS: 11:11:17

Q Did Matthew tell you that he took the pictures at the instruction of counsel? 11:11:18 11:11:20

A I don't remember. 11:11:25

Q You don't remember anything about why your son took the pictures that formed the basis for this lawsuit? 11:11:29 11:11:31 11:11:33

A No. He was talking with somebody and... 11:11:35

Q Who was he talking to? 11:11:41

A I don't know. 11:11:43

Q You have no idea who he was talking to? 11:11:49

A No, I don't. 11:11:52

Q Do you have any idea whether he was speaking to someone at the Kazerouni law firm? 11:11:57 11:11:59

A I would assume so, yes. 11:12:02

Q Do you assume that based on something that 11:12:04

he told you? 11:12:05

A No. I -- 11:12:07

Q All right. So I just want to make sure I understand. 11:12:08 11:12:10

Matthew, your son, told you, "I'm speaking to someone about a lawsuit that I intend for you to file individually on your own behalf," and you never even bothered to ask him who that person was? 11:12:11 11:12:13 11:12:19 11:12:23

Is that your sworn testimony? 11:12:26

MR. MELILI: Objection. Misstates prior testimony. 11:12:28 11:12:29

But you can answer if you know. 11:12:30

THE WITNESS: I would assume so. I -- I honestly don't remember why we were taking pictures of the can -- of the carton. 11:12:32 11:12:38 11:12:41

BY MR. BURNS: 11:12:44

Q So you're taking -- 11:12:44

A But -- 11:12:45

Q Do you -- do you remember another time that you've taken pictures of cartons of beverages inside your refrigerator? 11:12:45 11:12:47 11:12:52

A No. 11:12:54

Q So your son is taking pictures of cartons of beverages inside your -- inside your refrigerator, and it doesn't occur to you to ask why 11:12:56 11:12:58 11:13:00

he might be doing that? 11:13:04
A I believe that this was taken after we had decided to file suit. 11:13:08 11:13:13
Q Is it your understanding that Matthew took these pictures because you had decided to file suit? 11:13:21 11:13:23
A Yes. 11:13:25
Q When did you first speak to Matthew about filing a lawsuit in this case? 11:13:32 11:13:35
A Oh, gosh, beginning of May. 11:13:39
Q Beginning of May. 11:13:46
A It could have been the end of April. 11:14:01
Q Let's go back to what I believe is Exhibit 1. That would be your interrogatory responses. 11:14:19 11:14:21 11:14:25
And if you could go to Page 17, at the bottom of the page. 11:14:32 11:14:35
Tell me when you're ready. 11:14:37
A Okay. 11:14:44
Q Do you see the last sentence beginning at the bottom of Page 17 where it says "Plaintiff first became aware that the labeling and/or advertising of the Class Products was allegedly false or misleading on or about April 30th, 2025. Plaintiff made this discovery after speaking with her son, Matthew, about the purchase of the allegedly naturally 11:14:48 11:14:50 11:14:53 11:14:56 11:15:01 11:15:06 11:15:09

flavored soda beverages, specifically the Sprite and Fanta Orange beverages purchased from Amazon.com on April 27th, 2025." 11:15:14 11:15:17 11:15:20

Do you see that? 11:15:24

A I would consider that the beginning of May, but, yeah, I see it says April 30th. 11:15:24 11:15:29

MR. MELILI: Okay. Dakotah, I do need to take a break so if we can pause the deposition. 11:15:40 11:15:41

MR. BURNS: You need to take a break? 11:15:43

MR. MELILI: Yes, sir. 11:15:45

MR. BURNS: I think, as I said previously, unless this is an emergency, I'm right in the middle of asking a line of questioning and it's not -- 11:15:51 11:15:53 11:15:56

MR. MELILI: Well, you -- 11:15:58

MR. BURNS: -- clear to me why -- 11:15:58

MR. MELILI: -- you just -- 11:15:59

MR. BURNS: -- you're interrupting this question in -- 11:15:59 11:16:01

MR. MELILI: I didn't interrupt the question. Can I take a few-minute break? 11:16:01 11:16:02

MR. BURNS: All right. We'll take a five-minute break. 11:16:07 11:16:08

MR. MELILI: Thank you, sir. 11:16:09

THE VIDEOGRAPHER: This marks the end of Media No. 1. The time is 11:16 a.m. We're off the 11:16:11 11:16:12

record. 11:16:15
(Off the record from 11:16 - 11:32 a.m.) 11:16:16
THE VIDEOGRAPHER: This marks the beginning 11:25:25
of Media No. 2. The time is 11:32 a.m. We're on 11:31:47
the record. 11:31:50
BY MR. BURNS: 11:31:53
Q Ms. Palmer, I want to go back to the 11:31:54
picture of the Sprite carton which I believe is 11:31:56
Exhibit 3. 11:31:58
Is that right? 11:32:01
THE REPORTER: Yes. 11:32:10
THE WITNESS: I lost it. 11:32:10
THE REPORTER: There's one that's marked. 11:32:13
It's right here. 11:32:13
THE WITNESS: Oh, thank you. 11:32:18
BY MR. BURNS: 11:32:19
Q This carton looks unopened to me. 11:32:19
Do you agree with that? 11:32:23
A Yes, maybe. 11:32:24
Q Do you recall whether anyone drank the 11:32:28
Sprite product after you purchased it? 11:32:31
A Yes. 11:32:35
Q Did anyone drink it? 11:32:36
A Yes. 11:32:38
Q Who drank it? 11:32:38

A A bunch of different people. 11:32:40
Q Who were those people? 11:32:42
A So I -- Jason's kids, me, Matthew may have, 11:32:43 we may have offered it to other guests. 11:32:54
Q At the time you took this photo, were you 11:33:07 already planning to file a lawsuit against 11:33:10 Coca-Cola? 11:33:13
A I think Matthew and I may have discussed 11:33:24 it. 11:33:27
Q And what did you understand the reasons to 11:33:31 be for filing a lawsuit against Coca-Cola at the 11:33:34 time you discussed that possibility? 11:33:38
A Yes. 11:33:40
Q What did you understand the reasons to be 11:33:42 for filing that lawsuit at the time? 11:33:44
A Well, I was miffed that the advertising was 11:33:47 false, after being informed that they weren't all 11:33:52 natural flavors, and I'm not sure who informed him. 11:33:59 He had a conversation with a friend. 11:34:04
Q And you never asked him? 11:34:09
A But I never asked him who he was talking 11:34:10 to, no. 11:34:12
Q So you're planning to file a federal 11:34:13 lawsuit and you never bothered to ask your son where 11:34:15 he got that information? 11:34:17

A Right, yeah. 11:34:20
Q No idea at all? 11:34:21
A No, I don't. Sorry. 11:34:22
Q So I just want to -- I just want to 11:34:28 understand how this conversation played out. 11:34:31
Your son informed you for the first time 11:34:34 that in his view the Sprite product you had 11:34:37 purchased one or two days before did not have all 11:34:41 natural ingredients; is that right? 11:34:52
A Right. 11:34:54
And I think we talked about it a little, 11:34:54 and then he said, Let me get ahold of Ali and ask 11:34:56 him if this is the kind of thing his firm does. 11:35:00
Q And your son told you that he understood 11:35:17 these ingredients were not all natural and you never 11:35:20 asked him how he came about that information? 11:35:24
A He told me he had a discussion with a 11:35:27 friend. 11:35:29
And, no, I didn't ask him who the friend 11:35:30 was. I can just -- 11:35:33
Q Is it possible that friend was Ali? 11:35:34
MR. MELILI: Objection. Speculative. 11:35:37
But you -- 11:35:39
THE WITNESS: Yeah, I don't know. It could 11:35:40 have been a number of people. 11:35:42

BY MR. BURNS: 11:35:43
Q He said, I had a discussion with a friend? 11:35:46
A Yes. 11:35:50
Q And it never occurred to you to ask who that friend was or how he came about that information? 11:35:50 11:35:52 11:35:55
MR. MELILI: Objection. Asked and answered. 11:35:55 11:35:56
But you can answer if you know. 11:35:57
THE WITNESS: No, I didn't ask him. 11:35:59
BY MR. BURNS: 11:36:01
Q So you decided to file a federal lawsuit without any understanding of where this information originated? 11:36:01 11:36:04 11:36:08
A Yes. 11:36:08
MR. MELILI: Objection. Asked and answered. 11:36:09 11:36:09
BY MR. BURNS: 11:36:12
Q And you understand you're under oath today? 11:36:13
A Yes. 11:36:15
Q Okay. Do you have any reason to believe it was not Ali who Matthew spoke to? 11:36:15 11:36:33
A Do I not believe it was not Ali? 11:36:39
It could have been. I don't know. 11:36:42
Q Did you ever speak to your son, Matthew, 11:37:15

about Sprite or Fanta before you purchased those 11:37:16
products on April 27th? 11:37:20
A No. 11:37:22
Q And after Matthew spoke to you about the 11:37:48
ingredients in the Sprite and Fanta products, I 11:37:53
believe you testified that your nephew's children, 11:37:58
you, Matthew and perhaps other guests consumed the 11:38:06
products; is that correct? 11:38:09
A Yes. 11:38:10
MR. MELILI: Objection -- 11:38:12
THE WITNESS: Oh, I'm sorry. 11:38:12
MR. MELILI: -- to the extent it misstates 11:38:12
testimony. 11:38:14
But... 11:38:15
BY MR. BURNS: 11:38:20
Q Why did you choose to offer those products 11:38:20
to all of those people, including yourself, after 11:38:23
Matthew told you that they did not contain all 11:38:25
natural ingredients? 11:38:28
A Because we had them. 11:38:29
MR. MELILI: Same objection. 11:38:32
BY MR. BURNS: 11:38:36
Q Did you have any other beverages -- 11:38:36
A Yes. 11:38:38
Q -- in your house at the time? 11:38:39

Why did you choose to offer them Sprite when you -- 11:38:42 11:38:43
A I offered them something to drink and gave them a choice. 11:38:44 11:38:46
Q And you offered Sprite lemon-lime? 11:38:47
A Yes. 11:38:50
Q And you -- 11:38:52
A But not exclusively. 11:38:53
Q And you testified that you consumed it yourself? 11:38:54 11:38:56
A Yes. 11:38:57
Q Why did you do that? 11:38:57
A It was there. 11:39:00
Q Was anything else there? 11:39:02
A Yes, but... 11:39:03
Q So why did you choose Sprite lemon-lime compared to any other options you had at the time? 11:39:06 11:39:08
A I was -- again, because it was there. 11:39:13
Q But I think we've already established there were other beverages available at the time as well. So my question isn't was it there. 11:39:16 11:39:17 11:39:19
My question is: Of the options available to you at the time, why did you choose Sprite lemon-lime? 11:39:22 11:39:25 11:39:28
A Because I wasn't in the mood for the other 11:39:30

options. 11:39:32

Q Why were you in the mood for Sprite lemon-lime? 11:39:33 11:39:35

A I have no idea. I mean, it was in my refrigerator taking up space. 11:39:40 11:39:46

Q You weren't concerned about the fact that you believed Sprite lemon-lime contained artificial ingredients? 11:39:51 11:39:53 11:39:57

A For me, no. For my grandnieces and nephews, yes. 11:39:58 11:40:02

Q But you offered it to your grandnieces and nephews? 11:40:03 11:40:06

A Yes. 11:40:08

Q If you were concerned about artificial ingredients in the beverages that you offered your grandnieces and nephews, why did you offer it to them? 11:40:11 11:40:13 11:40:16 11:40:19

A Because I had seen it at their house so I know that they had drunk it before. 11:40:19 11:40:22

Q You thought they would like it? 11:40:26

A Yes. 11:40:28

Q The day that you bought the Sprite lemon-lime beverage for the first time, did you consider buying any other beverages instead? 11:40:51 11:40:53 11:40:57

A Yes. 11:41:01

Q What were those? 11:41:02
A Okay. Not -- I'm sorry. I didn't consider buying something else. I had lemonade in the refrigerator for them also. 11:41:04 11:41:09 11:41:14
Q Do you know what ingredients are in lemonade? 11:41:23 11:41:25
A Yes. 11:41:29
Q What are those? 11:41:31
A Okay. Clarify. Is it a store bought lemonade, or is it a lemonade that I made? 11:41:32 11:41:38
Q I'm referring to the lemonade in your refrigerator. 11:41:42 11:41:44
A So it would have been sugar, water and lemons from my tree. 11:41:45 11:41:48
Q Why didn't you give them the sugar, water and lemons from your tree? 11:41:51 11:41:54
A I offered them choices. 11:41:56
Q And you were comfortable giving them the Sprite lemon-lime? 11:41:57 11:41:59
A Yes. 11:42:01
Q I think we established that you -- your testimony is that you spoke to Matthew on or about April 30th about the Sprite product's representation that it contained 100 percent natural flavors; is that right? 11:42:28 11:42:31 11:42:34 11:42:39 11:42:42

A Yes. 11:42:42
Q Prior to that, what was your understanding as to whether Sprite contained 100 percent natural flavors? 11:42:45 11:42:46 11:42:51
A I assumed that they were all natural flavors or derived from natural products. 11:42:52 11:42:53
Q Why did you assume that? 11:43:01
A Because that's what the box says. 11:43:02
Q So you based that assumption entirely on what the box says? 11:43:10 11:43:12
A Yes. 11:43:13
Q The carton itself? 11:43:14
A Yes. 11:43:15
Q And after April 30th, you believed that the Sprite product contained artificial flavors? 11:43:30 11:43:33
A Yes. 11:43:38
Q What artificial flavors do you believe Sprite contained? 11:43:39 11:43:41
A Citric acid. 11:43:42
Q Any others? 11:43:45
A No. 11:43:46
Q All right. Let's turn to the Fanta Orange product. 11:43:52 11:43:54
Do you recall whether the Fanta Orange product you bought was in a bottle or a can? 11:43:58 11:44:00

A They were cans. 11:44:03
Q Do you know what size they were? 11:44:05
A The mini. 11:44:06
Q Like the Sprite product? 11:44:08
A Yes. So 7 ounces. 11:44:10
Q Do you recall ever buying the Fanta product 11:44:17 previously before you bought it on Amazon? 11:44:19
A No. 11:44:27
Q So this was the same purchase you made on 11:44:31 Amazon on April 27th? 11:44:33
A Yes. 11:44:35
Q What color was the liquid in the Fanta 11:44:51 product you purchased on Amazon? 11:44:54
A Orange. 11:44:56
Q How do you think the product comes to have 11:45:03 an entirely orange color? 11:45:05
A It's dyed. 11:45:07
Q And on April 27th, your understanding was 11:45:14 that Fanta Orange had entirely natural flavors; is 11:45:17 that correct? 11:45:23
A Yes. 11:45:23
Q But you assumed that Fanta Orange had 11:45:38 artificial coloring? 11:45:42
A Yes. 11:45:43
Q And you weren't worried about that? 11:45:44

A No. 11:45:46

Q Why not? 11:45:47

A Because I had seen it at their house so I figured they were allowed to drink it. 11:45:50 11:45:53

Q So your concern was about what your children were allowed -- or what your nephew's children were allowed to drink? 11:45:57 11:45:59 11:46:02

A Yes. 11:46:03

Q Even if the ingredients were artificial, you weren't concerned unless your children weren't allowed to drink those ingredients? 11:46:09 11:46:11 11:46:13

A Yes. 11:46:18

Q Fair to say your only concern was about what your children were allowed to drink -- I mean your nephew's children were allowed to drink? 11:46:19 11:46:21 11:46:24

A Yes. 11:46:26

Q When you bought the Fanta product, did you buy it only for your nephew's children or did you buy it for yourself as well? 11:46:45 11:46:47 11:46:50

A For myself. 11:46:52

Q And I should have asked you this with respect to the Sprite product as well. 11:46:56 11:46:57

Did you buy the Sprite product only for your nephew's children or also for yourself? 11:46:59 11:47:01

A No. For myself. I assumed there would be 11:47:04

leftovers. 11:47:07

Q Did you buy it primarily for yourself -- I'm sorry. 11:47:08 11:47:10

Did you buy the Sprite product primarily for yourself? 11:47:11 11:47:13

A No. 11:47:14

Q So just to be clear, you bought the Sprite and Fanta products both for yourself and for your nephew's children? 11:47:18 11:47:20 11:47:24

A Yes. 11:47:25

Q Other than you and your nephew's children, did anyone else consume the Fanta Orange product that you bought? 11:47:38 11:47:41 11:47:45

A They must have. 11:47:47

Q What do you mean by that? 11:47:51

A Well, it's gone, and I didn't drink it all, so... 11:47:52 11:47:54

Q So all of the cans in the Fanta carton you purchased were consumed by someone? 11:47:58 11:48:02

A Yes. 11:48:03

Q Is that also true of the Sprite carton? 11:48:04

A Yes. 11:48:07

Q Were some of those Fanta cans consumed after you spoke to Matthew about whether the Fanta products had all natural ingredients? 11:48:27 11:48:30 11:48:35

A Yes. 11:48:38
Q If you understood at the time that the Fanta products contained artificial flavors, why did you offer them to your nephew's children? 11:48:44 11:48:47 11:48:51
MR. MELILI: Objection. Asked and answered. 11:48:57 11:48:57
But you may answer if you know. 11:48:58
THE WITNESS: Can you ask that again. 11:49:04
BY MR. BURNS: 11:49:06
Q If you understood that the Fanta products had artificial flavors at the time, why did you offer them to your nephew's children? 11:49:06 11:49:08 11:49:12
A Because I had bought them. And I had seen them in their house so I figured their mother would not object. 11:49:16 11:49:19 11:49:24
Q So your assumption was that your mother -- your nephew's mother would not object to their consuming products with artificial flavors? 11:49:30 11:49:33 11:49:37
MR. MELILI: Objection. Misstates testimony. 11:49:41 11:49:42
But you may answer if you know. 11:49:43
THE WITNESS: I don't know. I honestly don't know what her feelings are. 11:49:45 11:49:48
BY MR. BURNS: 11:49:50
Q I want to read back your testimony from a 11:49:50

moment ago. 11:49:53
When I asked you why you offered the Fanta product to your nephew's children, you said "Because I had bought them. And I had seen them in their house so I figured their mother would not object." 11:49:54 11:49:58 11:50:01 11:50:03
Was that false testimony? 11:50:05
A No. I assumed. But I honestly don't know what her feelings are. 11:50:06 11:50:09
Q All right. So I'm only asking you what you assumed. 11:50:10 11:50:13
You assumed when you bought them -- when you offered them to your nephew's children that their mother would not object to their consuming -- 11:50:14 11:50:16 11:50:18
A Right. 11:50:22
Q -- artificial flavors? 11:50:23
A I assumed that. 11:50:23
Q All right. And since you bought Fanta Orange on April 27th, have you ever purchased it again? 11:50:24 11:50:47 11:50:51
A No. 11:50:51
Q Did you speak to anyone who works at the Kazerouni law firm, including Ali, about Fanta before you purchased it on Amazon.com on April 27th? 11:50:56 11:50:59 11:51:03
A No. 11:51:08
Q Did you speak to Matthew about the Fanta 11:51:09

product before you purchased it on Amazon -- 11:51:11
A No. 11:51:13
Q -- on April 27th? 11:51:13
Did you speak to anyone about Fanta before you purchased it on April 27th? 11:51:17 11:51:19
A No. 11:51:21
MR. BURNS: All right. I'm going to mark another exhibit which I believe is Exhibit 4. 11:51:33 11:51:34
(Deposition Exhibit 4 was marked for identification.) 11:51:37 11:51:37
BY MR. BURNS: 11:52:13
Q Have you had a chance to look at this photo? 11:52:29 11:52:31
A Uh-huh. 11:52:32
Q Is this the product that you purchased from Amazon.com? 11:52:33 11:52:36
A Yes. 11:52:37
Q And I believe you testified earlier that you saw a picture or you recall seeing a picture of the Sprite carton on Amazon.com before you purchased it; is that correct? 11:52:38 11:52:40 11:52:45 11:52:48
A Yes. 11:52:50
Q Do you recall seeing a picture of the Fanta carton on Amazon.com before you purchased it? 11:52:51 11:52:53
A I think so, yes. 11:52:57

Q Do you recall seeing any other photo of the Fanta product on Amazon.com before you purchased it? 11:52:59 11:53:02
A I don't recall. 11:53:06
Q Did Matthew take this picture as well? 11:53:11
A Yes. 11:53:13
Q And this appears unopened; is that correct? 11:53:16
A Yes, but it might be on the end. 11:53:20
Q That looks opened to you? 11:53:26
A I don't know. 11:53:32
Q Is it possible that it's unopened? 11:53:35
A It's possible that it's unopened. 11:53:37
Q Do you remember approximately how many days it was after you received the Fanta product that you opened it? 11:53:48 11:53:50 11:53:54
A I'm thinking two or three. Two, I think. 11:54:07
Q Two days. Okay. 11:54:15
Would that also be true of the Sprite product? 11:54:18 11:54:20
A Yes. 11:54:21
Q When you opened it, would that have been to consume it -- 11:54:38 11:54:40
A Wait a minute. No. They didn't come over that weekend. It was the next weekend. So it was a week before we opened it up. 11:54:41 11:54:45 11:54:48
Q Okay. At least -- approximately a week? 11:54:51

A Yeah. 11:54:57
Q And that's true of both the Fanta and the Sprite product? 11:54:58 11:55:02
A Yes. 11:55:03
Q Do you know when Matthew took this picture? 11:55:22
A No, I don't. 11:55:27
Q Do you know why he took this picture? 11:55:29
A I think he was asked to, but I honestly don't recall. 11:55:35 11:55:38
Q Do you like any other orange sodas? 11:55:52
A Not particularly, no. 11:55:55
Q Have you purchased any other orange soda products in the last five years? 11:55:58 11:56:00
A I don't think so, but it's possible. 11:56:04
Q You don't recall buying any other -- 11:56:09
A I don't recall doing so, no. 11:56:12
Q And the day you bought Fanta Orange for the first time, did you consider buying any other beverages instead? 11:56:14 11:56:16 11:56:18
A I think these were the two that popped up when I did the search on Amazon, and I stopped looking. 11:56:25 11:56:27 11:56:34
Q And I believe you testified that you first spoke to Matthew about the ingredients in Fanta Orange on April 30th; is that correct? 11:56:46 11:56:48 11:56:52

A I think so, yes. 11:56:55
Q And prior to that, did you have any understanding as to whether Fanta Orange contained 100 percent natural flavors? 11:56:57 11:56:59 11:57:03
A I assumed before April 30th, yes, that they were natural flavors. 11:57:06 11:57:09
Q And that was based on the representations you saw on the carton? 11:57:14 11:57:15
A On the carton, yes. 11:57:17
Q All right. I want to talk about your typical practice when you're deciding whether you want to purchase a particular food or beverage. 11:57:31 11:57:32 11:57:36
So before you buy a product, do you look at the front of the package? 11:57:40 11:57:42
A Yes. 11:57:45
Q Do you look at the ingredients list? 11:57:47
A Not necessarily, no. 11:57:49
Q Why not? 11:57:50
A Most of them are things that are unreadable, and it's -- usually when I buy food, it's at a request from someone else. 11:58:00 11:58:04 11:58:10
Q Do you care what ingredients are in the food and beverages that you offer to other people? 11:58:14 11:58:19
A Depending on who the other people are. 11:58:23
Q Do you care what ingredients are in the 11:58:27

food and beverages that you offer to your nephew's children? 11:58:30 11:58:33

A Yes. 11:58:34

Q Do you care what ingredients are in the food and beverages that you consume yourself? 11:58:34 11:58:36

A Not so much. 11:58:39

Q Do you care what ingredients are in the food and beverages that you offer to your son? 11:58:43 11:58:45

A I'm sorry. I can't think of any time that I've offered him anything. 11:58:54 11:58:57

Not so much, no. 11:59:01

Q And you testified that Matthew consumed the Sprite and Fanta products that you purchased that are at issue in this case? 11:59:04 11:59:09 11:59:11

A Yes. 11:59:12

Q If it matters to you what ingredients are in the products that your nephew's children consume, why don't you check the ingredient list before you buy products that you expect them to consume? 11:59:23 11:59:25 11:59:31 11:59:33

A I assumed when I saw this that it was all natural. 11:59:35 11:59:39

Q So I'm not asking you about this product in particular. 11:59:40 11:59:42

I'm asking you about your typical practice. 11:59:42

A Okay. 11:59:45

Yes. I might look at the ingredients list. 11:59:48
Q You might look at the ingredient list; 11:59:55
sometimes you don't? 11:59:57
A Sometimes I don't. 11:59:59
Q Why not? 12:00:01
A It's either something that I know that 12:00:02
they've eaten before or I assume that it's pretty 12:00:04
clean product. 12:00:16
Q And if it's something they've eaten before, 12:00:18
you assume that their mother wouldn't object to them 12:00:21
eating it? 12:00:23
A Yes. 12:00:24
Q And that's your primary concern? 12:00:24
A Yes. My nephew could care less. 12:00:26
Q Do you look at the nutrition facts on a 12:00:35
product label before you buy the product? 12:00:38
A A lot of the times, yes. 12:00:43
Q Sometimes you don't? 12:00:45
A Sometimes I don't. 12:00:46
Q Why not? 12:00:50
A Again, it would be a product that I'm 12:00:52
pretty familiar with or I'm looking for how much of 12:00:54
a certain ingredient is in it. 12:00:58
Q Do you personally try to consume natural 12:01:17
foods? 12:01:19

A Yes. 12:01:20
Q Why is that? 12:01:23
A Because it's cheaper. 12:01:25
Q You think all natural foods are cheaper? 12:01:29
A Than buying processed foods, yes. I mean, 12:01:33 when I cook, it's cheaper than ordering or having a 12:01:36 processed food. 12:01:41
Q When you're buying a finished product 12:01:45 rather than something that you're going to cook, do 12:01:48 you try to consume natural foods? 12:01:51
A Not necessarily, no. 12:01:54
Q Why not? 12:01:55
A Because it's obviously something that I 12:01:58 want to either try or see what it is. 12:02:00
Q So if your consideration is not whether the 12:02:09 product is natural, what does play into your 12:02:13 decision to buy the product? 12:02:15
A Curiosity, a lot of the times. 12:02:18
Q Curiosity about what? 12:02:23
A I imagine I fall into the watching an ad 12:02:28 and wanting to know what that thing is like. 12:02:31
Q What it's like in what respect? 12:02:36
A How it tastes, if it's something that I 12:02:38 would duplicate on my own or if it's something I 12:02:43 would buy again. 12:02:46

Q What does natural -- the term "natural" mean to you? 12:02:59 12:03:02
MR. MELILI: Objection to the extent it asks for expert testimony. 12:03:03 12:03:04
But if you know, you may answer. 12:03:06
THE WITNESS: I can just give you my idea of what it would be. 12:03:09 12:03:11
Something that's unaltered or has additives added to it. 12:03:13 12:03:17
BY MR. BURNS: 12:03:25
Q What sort of additives? 12:03:25
A I can't give you a name. 12:03:27
Q So if something has additives added to it, you would still potentially consider it to be natural? 12:03:29 12:03:32 12:03:33
A I don't understand that question. 12:03:42
Q So I asked you what your understanding of natural was, and I believe your answer was "Something that's unaltered or has additives added to it." 12:03:43 12:03:47 12:03:51 12:03:56
So I'm asking you if you would potentially consider something to be natural if it has additives added to it? 12:03:57 12:04:00 12:04:04
A Depends on what the additive is. 12:04:10
Q What sort of additives would you consider 12:04:12

to -- 12:04:14

A Salt. 12:04:14

Q What sort of additives would you consider to make an ingredient unnatural? 12:04:16 12:04:19

A I'm sorry. 12:04:22

Salt. 12:04:22

Q Adding salt would make an ingredient unnatural? 12:04:23 12:04:25

A Yes. 12:04:26

Q Why? 12:04:27

A Because you've changed the flavor of the item. 12:04:31 12:04:34

Q Changing the flavor makes the flavor unnatural in your view? 12:04:37 12:04:41

A Yes. 12:04:42

Q So just to confirm, any ingredient that changes the flavor of a product would render that flavor unnatural. 12:05:20 12:05:22 12:05:26

Is that your view? 12:05:30

A I guess so, yes. 12:05:34

Q If -- strike that. 12:05:42

When you seek to avoid purchasing products with artificial ingredients, what do you do to make sure that none of the products you purchase have artificial ingredients? 12:05:55 12:05:58 12:06:02 12:06:05

A I don't make sure that they don't have artificial ingredients. It depends on who I'm buying that product for. 12:06:12 12:06:14 12:06:17
Q If you're buying it only for yourself, you don't ensure that it has artificial ingredients? 12:06:26 12:06:29
A There are certain ingredients that I try to avoid. 12:06:32 12:06:35
Q And what are those? 12:06:36
A MSG, corn syrup. And those aren't necessarily artificial but they are things that I try to avoid. 12:06:37 12:06:48 12:06:51
Q Okay. Just for health reasons? 12:06:52
A Yes. 12:06:57
Q And when you're trying to avoid MSG or corn syrup, do you look at the front label to confirm it doesn't -- the product doesn't have MSG or corn syrup? 12:07:01 12:07:04 12:07:10 12:07:12
A Okay. If the front label says "all natural," then I may not look at the ingredients. 12:07:16 12:07:18
Q Okay. And if it doesn't, what would you do? 12:07:23 12:07:26
A I might look at the ingredients. 12:07:26
Q You might look at the ingredients? 12:07:28
A Depending on what I'm buying. There are certain things that I wouldn't expect those things 12:07:30 12:07:33

to be in. 12:07:37

Q If a product contained natural flavors but also had some artificial flavors, would you consider purchasing the product? 12:08:12 12:08:14 12:08:17

MR. MELILI: Objection to the extent it's an incomplete hypothetical. 12:08:18 12:08:20

But you may answer. 12:08:21

THE WITNESS: If it had artificial ingredients in it, would I still consider? Is that the question? 12:08:25 12:08:27 12:08:30

BY MR. BURNS: 12:08:33

Q Yes. 12:08:33

A Possibly. 12:08:34

Q What would factor into your decision? 12:08:35

A How much I wanted that product, who I'm buying it for, has it been requested by someone else. 12:08:37 12:08:41 12:08:46

Q And if, for example, you assume that your nephew's mother was okay with you buying a product, then you would probably purchase it if you were buying it for your nephew's children? 12:08:55 12:08:58 12:09:03 12:09:06

A Yes. 12:09:08

MR. MELILI: Same -- 12:09:09

THE WITNESS: I'm sorry. 12:09:12

MR. MELILI: Same objection. 12:09:12

THE WITNESS: And it's not my nephew's mother. It's his wife. 12:09:26 12:09:27
BY MR. BURNS: 12:09:28
Q I'm sorry. Your nephew's children's mother? 12:09:29 12:09:31
A Yes. 12:09:32
Q I left the "children" part out. 12:09:33
(Simultaneous cross talk.) 12:09:35
BY MR. BURNS: 12:09:36
Q If there's a definition I can use. The mother. 12:09:38 12:09:41
When I say "the mother," you know I'm referring to your nephew's children's mother. 12:09:41 12:09:43
A Okay. 12:09:46
Q Okay. Let's turn to another exhibit. 12:09:59
Have we marked the Complaint yet? 12:10:07
Exhibit 2. 12:10:12
Do you recognize this document? 12:10:32
A The whole document? 12:10:36
Q Yes. 12:10:40
A Yes. 12:10:41
Q Have you seen this document before today? 12:10:43
A Yes. 12:10:45
Q What is it? 12:10:47
A This is the Amended Complaint. 12:10:51

Q When was the first time that you saw this document? 12:10:57 12:10:59
A I don't remember. 12:11:01
Q Do you remember whether you saw the document before or after it was filed with the court? 12:11:05 12:11:06 12:11:09
A After, I believe. 12:11:12
Q Who at the Kazerouni law firm have you spoken to about this document? 12:11:20 12:11:22
A Gil. I can't think if I talked to Ali about it or not. Just Gil. 12:11:26 12:11:36
Q What about the original Complaint, who did you speak to about that? 12:11:46 12:11:48
A Gil. 12:11:49
Q Anyone else? 12:11:50
A I might have -- I didn't speak to him, but I imagine my son spoke to Ali to find out if this was something they were considering -- would consider. 12:11:53 12:11:56 12:11:59 12:12:03
Q And as to the original Complaint, do you remember when you first reviewed the original Complaint? 12:12:08 12:12:09 12:12:12
A No, I don't. 12:12:13
Q Do you think that was also after it was filed? 12:12:15 12:12:17

A I have no idea. 12:12:19
Q It's possible it was after it was filed? 12:12:20
A It's possible, yes. 12:12:22
Q Do you have any reason to believe the information in this Complaint is inaccurate? 12:12:37 12:12:38
A I don't think so, no. 12:12:42
Q Do you recall seeing any other versions of this Complaint? 12:12:45 12:12:47
A I believe I saw one before. There were certain things amended or corrected. 12:12:50 12:12:54
Q Okay. 12:12:59
A I saw one before it was proofread. I believe that was this one, but it could have been this one. 12:13:03 12:13:06 12:13:12
Q The interrogatories, you mean? 12:13:13
A Yeah. 12:13:14
Q Okay. Are you aware of why an Amended Complaint was filed? 12:13:14 12:13:31
A Well, like I said, I believe that there were a couple of mistakes in it. I think they also added Matthew to it. 12:13:36 12:13:38 12:13:43
Q Matthew as a plaintiff? 12:13:46
A Yes. 12:13:48
Q Do you recall discussing whether to add Matthew as a plaintiff? 12:13:50 12:13:51

MR. MELILI: Objection to the extent it calls for attorney-client privilege. 12:13:54 12:13:56

But you may answer yes or no. 12:14:02

THE WITNESS: Ask the question again. 12:14:06

BY MR. BURNS: 12:14:07

Q Do you recall discussing with anyone about whether to add Matthew as a plaintiff in this case? 12:14:08 12:14:11

A I think I discussed it with him -- or he discussed it with me, that because he had talked to Ali and he had taken the pictures, that he was a part of this lawsuit. 12:14:16 12:14:19 12:14:22 12:14:27

Q What do you mean by "a part of this lawsuit"? 12:14:31 12:14:34

A That he had knowledge of it and that he helped me decide and he was the one that reached out. 12:14:35 12:14:41 12:14:46

Q What do you mean by "reached out"? 12:14:48

A He reached out to Ali to find out if this was something that they would consider representing. 12:14:51 12:14:53

Q Do you recall whether Matthew reviewed the Complaint before it was filed? 12:14:59 12:15:01

A No, I don't think so. 12:15:03

Q Do you recall whether Matthew reviewed the Complaint at all? 12:15:05 12:15:07

A I don't think so. 12:15:08

Q Do you see on the first page where your name is in the middle of the document -- I'm sorry, on the very first page, the title page. 12:15:18 12:15:27 12:15:31
A The title page. Back. 12:15:36
Q Do you see your name on that document? 12:15:38
A Yes. 12:15:41
Q Do you see two other names, Sue Kim and Ivan Zermeno? 12:15:42 12:15:45
A Yes. 12:15:49
Q Do you have any relationship to either of those people? 12:15:50 12:15:51
A No. 12:15:52
Q Do you know them? 12:15:53
A No. 12:15:53
Q Do you know how they became plaintiffs in this case? 12:15:54 12:15:55
A No. 12:15:56
Q Did you ever communicate with them? 12:15:59
A No. 12:16:00
Q Can you give me an example of an artificial flavor? 12:16:50 12:16:54
A I'm not quite sure what you're talking about. 12:17:04 12:17:06
Q Well, your entire lawsuit is premised on the idea that these two products contain artificial 12:17:07 12:17:10

flavors so I'm asking you to give me an example of 12:17:14
an artificial flavor. 12:17:17
A I would say that -- something that is 12:17:18
artificially made to taste like something else. 12:17:21
Q And what makes an ingredient artificially 12:17:29
made? 12:17:31
A That it's not taken from the actual 12:17:33
product. For instance, something that labeled 12:17:35
watermelon very rarely is made from watermelon but 12:17:38
something that is made to taste similar to 12:17:43
watermelon. 12:17:46
Q So in your view, something is artificial if 12:17:47
it weren't extracted directly from the plant or the 12:17:50
food that it references? 12:17:56
A Exactly. 12:17:58
MR. MELILI: Objection. Calls for a legal 12:17:59
conclusion and expert testimony. 12:18:00
BY MR. BURNS: 12:18:11
Q And when you first bought Sprite and Fanta, 12:18:12
what did the word "flavors" mean to you? 12:18:14
MR. MELILI: Same objections. 12:18:17
You may answer. 12:18:20
THE WITNESS: The -- that the flavors lemon 12:18:24
and lime or orange would be derived from the actual 12:18:29
fruits. 12:18:34

BY MR. BURNS: 12:18:45
Q So you consider a lemon-lime to be a flavor? 12:18:45 12:18:47
A It's two flavors. 12:18:48
Q Lemon and lime? 12:18:50
A Lemon and lime. 12:18:52
Q And orange is a flavor? 12:18:56
A Yes. 12:18:57
Q And in your view, Fanta Orange, if it were made of 100 percent natural flavors, would have been derived from 100 percent orange juice? 12:18:58 12:19:00 12:19:04
A Yes. 12:19:07
MR. MELILI: Same objections. 12:19:07
THE WITNESS: Although, I have no idea how they would do that. 12:19:09 12:19:10
BY MR. BURNS: 12:19:11
Q What do you mean by that? 12:19:11
A Well, I don't know how they derive their flavors. I am not the expert. 12:19:15 12:19:17
Q Okay. So -- anything else? 12:19:20
A No. 12:19:23
Q Okay. So I'm asking for your truthful, common sense testimony. 12:19:23 12:19:27
When you bought Fanta Orange soda on April 27th, 2025, you assumed that the flavor of 12:19:30 12:19:34

Fanta Orange soda came entirely from 100 percent natural orange juice squeezed from the orange? 12:19:38 12:19:44

A No, because other things like sugar has been added to change that flavor. 12:19:49 12:19:53

Q And you testified -- 12:19:56

A But sugar is not a not -- an unnatural thing. 12:19:58 12:20:01

Q Is salt an unnatural thing? 12:20:02

A Depending on the salt. 12:20:04

Q What do you mean by that? 12:20:06

MR. MELILI: Same objections. 12:20:07

THE WITNESS: That one, I don't -- I can't answer. 12:20:08 12:20:10

BY MR. BURNS: 12:20:11

Q You think there's artificial salt? 12:20:11

MR. MELILI: Same objections. 12:20:14

THE WITNESS: Yes, I think there's artificial salt. 12:20:18 12:20:19

BY MR. BURNS: 12:20:23

Q Does orange juice contain sugar? 12:20:23

A Yes, but not the amount of sugar that's in orange soda. 12:20:26 12:20:30

Q So when you bought Fanta Orange soda on April of 2025, your sworn testimony is that you assumed it contained 100 percent natural orange 12:20:31 12:20:35 12:20:38

juice squeezed directly from the orange and added sugar? 12:20:43 12:20:46

MR. MELILI: Objection to the extent it misstates prior testimony. 12:20:46 12:20:48

But you may answer. 12:20:49

THE WITNESS: Okay. Probably not. Logically, that doesn't make sense. But I did assume that the flavor of the soda came from a natural source. I don't know how they do it, but I assumed. 12:20:50 12:20:55 12:20:59 12:21:05 12:21:12

BY MR. BURNS: 12:21:13

Q So you told me earlier that you consider a natural flavor to be one that comes directly from the source, like watermelon, correct? 12:21:13 12:21:15 12:21:18

A Yes. 12:21:21

Q And you just told me that you assumed Fanta flavor came from something other than the source? 12:21:22 12:21:25

MR. MELILI: Same objection. 12:21:29

But you may answer. 12:21:30

THE WITNESS: Okay. Not having very much Fanta Orange soda, I can't remember what it tastes like. But it could also be referring to the color of it. 12:21:31 12:21:36 12:21:40 12:21:44

But I assumed that when it says it's naturally flavored, it's got to be something that's 12:21:47 12:21:49

not chemically produced to make that flavor. 12:21:51

BY MR. BURNS: 12:21:55

Q So when you told me earlier that you assume a natural flavor comes directly from the source, like watermelon, that was not true? 12:21:56 12:21:58 12:21:59

A Yes, that was true, but it's also true that it could come from something else. 12:22:03 12:22:06

MR. MELILI: And I would just like to state an objection, calls for legal conclusion, expert testimony and to the extent it misstates prior testimony. 12:22:09 12:22:11 12:22:14 12:22:16

But go ahead. 12:22:17

BY MR. BURNS: 12:22:18

Q Right. 12:22:18

So can we go back to the statement about watermelon. 12:22:19 12:22:28

I said: 12:22:29

"Q What makes an ingredient artificially made?" 12:22:29 12:22:32

You said that: 12:22:33

"A It's not taken from the actual product. For instance, something that labeled" -- "is labeled watermelon very rarely is made from watermelon but something 12:22:33 12:22:35 12:22:37 12:22:39 12:22:42

that is made to taste similar to watermelon. 12:22:44 12:22:46

"Q So in your view, something is artificial if it weren't extracted directly from the plant or the food that it references? 12:22:47 12:22:49 12:22:51 12:22:53

"A Exactly." 12:22:56

Was that false testimony? 12:22:59

A No, that's not false testimony, but it doesn't mean that all natural flavoring is necessarily taken from that fruit. 12:23:00 12:23:02 12:23:06

Q So in your view, something is artificial if it weren't extracted directly from the plant or the food that it references? 12:23:13 12:23:15 12:23:18

MR. MELILI: Same objections. 12:23:20

BY MR. BURNS: 12:23:21

Q That was my question. 12:23:21

Your answer was "Exactly." 12:23:22

Was that false testimony? 12:23:24

A I guess so, because no, I'm not going to say that it completely has to be -- but it -- 12:23:25 12:23:27

Q So you're revising your testimony under oath now that I've asked you about the flavors of Fanta Orange soda? 12:23:31 12:23:33 12:23:35

MR. MELILI: Objection. Calls for expert 12:23:39

testimony. 12:23:41
But you may answer. 12:23:42
THE WITNESS: I don't think I'm going to answer that one. 12:23:46 12:23:47
BY MR. BURNS: 12:23:47
Q Well, you have to answer, Ms. Palmer -- 12:23:48
A Oh. 12:23:50
Q -- or else you have to withdraw from the lawsuit. I'm sorry. 12:23:50 12:23:51
A Okay. Then ask it again. 12:23:53
Q I asked: 12:24:08
"Q So in your view, something is artificial if it weren't extracted directly from the plant or the food that it references?" 12:24:09 12:24:10 12:24:12 12:24:14
Your answer was: 12:24:16
"A Exactly." 12:24:17
Are you revising that testimony now that I've asked you about the ingredients of Fanta Orange? 12:24:18 12:24:20 12:24:22
A No. I still believe that's true. But I also believe that there are other ways of naturally manipulating flavors of things. 12:24:25 12:24:28 12:24:34
Q But I want to be clear. 12:24:38
If something isn't extracted directly from 12:24:40

the plant or the food that it references, your sworn testimony is that you believe that ingredient is artificial? 12:24:42 12:24:46 12:24:48

MR. MELILI: Same objections. 12:24:51

THE WITNESS: Not in all cases. 12:24:58

BY MR. BURNS: 12:25:00

Q All right. So I'm going to read back -- 12:25:00

A I don't know how it's done, but I'm sure that flavors can be made naturally without having extracted them from the actual fruit. 12:25:03 12:25:04 12:25:11

Q And how do you imagine that one would go about that? 12:25:14 12:25:17

A I have no idea. 12:25:18

MR. MELILI: Same objections. 12:25:19

THE WITNESS: I'm not an expert. I don't know. 12:25:22 12:25:23

BY MR. BURNS: 12:25:24

Q So what is your basis for concluding that the citric acid in Fanta or Sprite is artificial? 12:25:25 12:25:29

A Ah, because that's the information that Matthew brought to me that said that it's artificially manufactured. 12:25:32 12:25:35 12:25:37

Q What do you mean by "artificially manufactured"? 12:25:41 12:25:42

A That it's not extracted from the fruit, 12:25:44

that it's made some other way. And I don't remember. He did explain it to me, but I don't remember. 12:25:47 12:25:51 12:25:54

Q Okay. So, again, in your view, is something artificial if it is not extracted directly from the plant or the food that it references? 12:25:57 12:26:05 12:26:07

A Again, I'm not an expert on that. I don't know. 12:26:10 12:26:12

Q Then why did you bring this lawsuit? 12:26:13

A Because it says that it's all naturally flavored. 12:26:15 12:26:18

Q And the premise of your Complaint is that it's not naturally flavored so I'm asking you why you believe that. 12:26:18 12:26:20 12:26:23

MR. MELILI: Same objections. 12:26:26

THE WITNESS: I believe it because when he explained to me about the citric acid and how it's made, something about -- I don't remember, but any rate, then it's not -- that component of this is not naturally flavored. 12:26:28 12:26:32 12:26:35 12:26:41 12:26:45

BY MR. BURNS: 12:26:46

Q So you believe it because your son told you that was so? 12:26:46 12:26:48

A Yes. 12:26:49

Q But you don't have any independent reason 12:26:50

to know or believe that the ingredients are artificial? 12:26:51 12:26:53

A Not at the time, no. 12:26:54

Q And your personal view is that if something -- something is artificial if it was not extracted directly from the plant or the food that it references? 12:26:56 12:26:58 12:27:00 12:27:02

A Yes. 12:27:06

MR. MELILI: Same objections. 12:27:08

Let's take a break at 12:30. 12:27:17

MR. BURNS: Roughly, yeah. When I finish my next line of questions. 12:27:20 12:27:22

BY MR. BURNS: 12:27:34

Q How would you define "a flavor"? 12:27:34

MR. MELILI: Same objections. Calls for a legal conclusion and expert testimony. 12:27:36 12:27:38

You may answer. 12:27:41

THE WITNESS: How would I describe a flavor? 12:27:44 12:27:45

BY MR. BURNS: 12:27:46

Q Uh-huh. 12:27:46

A It's a -- it's a component within food that strikes certain taste buds on your tongue. 12:27:47 12:27:57

Q Anything that strikes taste buds on your tongue is a flavor to you? 12:28:04 12:28:07

MR. MELILI: Same objections. 12:28:09

THE WITNESS: Probably, yes. 12:28:17

BY MR. BURNS: 12:28:19

Q Is salt a flavor to you? 12:28:20

A Yes. 12:28:21

Q Is strawberry a flavor? 12:28:24

A Yes. 12:28:26

Q Have you ever seen a food or beverage labeled as having strawberry flavor? 12:28:28 12:28:30

A I can't recall that I have, no. 12:28:37

Q In your entire life, you've never seen a product labeled as having strawberry flavor? 12:28:39 12:28:41

A Or -- did -- you said soda, didn't you? 12:28:44

Q Food or beverage. 12:28:54

A Food or beverage. 12:28:55

Okay. Yeah. I hate strawberries so, therefore, it's not a good... 12:28:55 12:29:00

Q Is lemon-lime a flavor? 12:29:02

A Yes. 12:29:03

Q And beverages like Sprite are labeled as having a lemon-lime flavor? 12:29:04 12:29:07

A Yes. 12:29:09

Q Is cherry a flavor? 12:29:09

A Yes. 12:29:11

Q Have you ever seen a food or beverage 12:29:12

labeled as having a cherry flavor? 12:29:13
A Yes. 12:29:15
But that's not what I'm objecting to in this, is that they're saying that it's naturally flavored. 12:29:18 12:29:21 12:29:24
Q Have you had ever -- 12:29:25
A And my assumption is, again, that it's not going to come from an artificial. Something can be flavored and not be natural. 12:29:26 12:29:29 12:29:33
Q Have you ever seen a food or beverage labeled as having citric acid flavor? 12:29:37 12:29:39
A Not flavor, but citric acid, yes. And I know what the taste of it is. But I don't think I've ever seen something saying that it is a citric acid flavor. 12:29:44 12:29:48 12:29:51 12:29:53
Q Why do you think that is? 12:29:55
MR. MELILI: Same objections. 12:29:58
THE WITNESS: I don't think people would buy it if they thought it had acid in it. 12:30:03 12:30:04
BY MR. BURNS: 12:30:07
Q You think people assume that the foods and beverages they buy don't have any acids in them? 12:30:08 12:30:10
MR. MELILI: Speculative. 12:30:13
THE WITNESS: I have no idea what people think. 12:30:14 12:30:16

BY MR. BURNS: 12:30:16
Q Do you assume when you buy a food or 12:30:16
beverage that it has no acid in it? 12:30:18
A I don't understand that question. I -- 12:30:24
yes, I assume that most foods do not have acid in 12:30:28
them. 12:30:31
Q What about lemonade? 12:30:33
A Certainly it has acid in it. 12:30:36
Q Do you check product labels to determine 12:30:42
whether a food or beverage has any acid in it? 12:30:45
A No. 12:30:48
Q Why not? 12:30:50
A Again, the assumption is that if it's -- it 12:30:52
probably doesn't have it. 12:30:56
Q You said you think you know what citric 12:31:04
acid tastes like. 12:31:07
What is that taste? 12:31:08
A Tart. 12:31:09
Q Safe to say a fair number of foods and 12:31:16
beverages have a tart flavor? 12:31:18
A Flavor, yes. 12:31:20
Q Do you assume that those products have 12:31:23
citric acid in them? 12:31:24
A They could, yes. 12:31:27
Q Have you ever told someone, Oh, that tastes 12:31:30

like citric acid? 12:31:33
A No. 12:31:34
Q Why not? 12:31:35
A I don't think that's ever come up in a conversation. 12:31:39 12:31:41
Q Have you ever told someone that any food or beverage that you consumed tasted like some flavor in particular? 12:31:43 12:31:45 12:31:49
A Yeah. 12:31:52
Q But never in your life have you said, That tastes like citric acid? 12:31:54 12:31:56
A I don't think so, no. 12:31:58
Q Why not? 12:32:00
A I just don't think that would come up in conversation. 12:32:00 12:32:02
Q Why not? 12:32:03
A Because you would say that it tastes like something else, like it tastes of lemon or it tastes tart. But I wouldn't use the term "that tastes like citric acid." 12:32:08 12:32:10 12:32:14 12:32:17
Q So if lemon is a flavor, do you think citric acid is independently a flavor? 12:32:21 12:32:23
MR. MELILI: Same objections. 12:32:27
THE WITNESS: Yes. 12:32:31
\\\

BY MR. BURNS: 12:32:31
Q Why? 12:32:32
A I think it's probably used to make something tarter. 12:32:33 12:32:35
Q So do you think citric acid would enhance the tart flavor of something that tastes like lemon or lime? 12:32:40 12:32:43 12:32:46
A I'm not sure the word "enhance" is right, but it would change the flavor, yes. 12:32:51 12:32:54
Q How would it change it? 12:32:56
A It would make it tarter. 12:32:57
Q So if it makes it tarter, why doesn't it enhance the flavor? 12:32:59 12:33:02
A You might not like tart. 12:33:04
Q I'm not asking what your preference is. I'm asking what the actual consequence would be. 12:33:05 12:33:07
A Well, if it's going to -- I'm sorry. 12:33:10
If it's going to enhance a flavor, it's -- my understanding of the word "enhance" is to make it better tasting. 12:33:12 12:33:13 12:33:17
If I don't like that taste, it's not enhancing it. 12:33:19 12:33:21
Q Okay. Well, let me represent to you that when I say "enhance," I don't mean make it taste better subjectively according to the individual 12:33:22 12:33:25 12:33:28

who's drinking the beverage. 12:33:31

I mean do you make it taste more like the core flavor, such as lemon, than it would have tasted absent the addition of citric acid. 12:33:33 12:33:37 12:33:39

A Not necessarily. I am -- this is an assumption. I'm not an expert. I'm assuming that something like citric acid is used in a product to make it cohesive from time to time, to make it taste the same. 12:33:45 12:33:49 12:33:52 12:33:56 12:34:02

Q What do you mean by that? 12:34:03

A Well, if you were to squeeze lemons, they're not going to taste the same each time. But if you add something like citric acid to it, you would have that same tartness. So it -- 12:34:04 12:34:06 12:34:10 12:34:14

Q You think it supplements the taste? Is that a better term? 12:34:18 12:34:20

A Yes. 12:34:21

Q So in this case, citric acid wouldn't be the core underlying flavor, which would be lemon or lime. 12:34:23 12:34:25 12:34:28

A Exactly. 12:34:29

MR. MELILI: Same objections. 12:34:30

BY MR. BURNS: 12:34:31

Q It would just supplement the core underlying flavor; is that -- is that your 12:34:31 12:34:34

understanding? 12:34:35
A Yes. 12:34:36
MR. MELILI: Calls for expert testimony, 12:34:38
legal conclusion. 12:34:39
BY MR. BURNS: 12:34:41
Q What about sodium citrate, is that a 12:34:41
flavor? 12:34:45
A With the word "citrate" in it, I would say 12:34:46
again it's a tart. 12:34:48
MR. MELILI: Same objections. 12:34:51
BY MR. BURNS: 12:34:52
Q Do you know what sodium citrate tastes 12:34:52
like? 12:34:55
A No. 12:34:55
Q What about potassium citrate, is that a 12:34:58
flavor? 12:35:05
MR. MELILI: Same objections. 12:35:06
THE WITNESS: Again, with the word 12:35:06
"citrate" -- I know what potassium tastes like. 12:35:07
BY MR. BURNS: 12:35:10
Q What does it taste like? 12:35:11
A It's salty. 12:35:12
Q So with respect to sodium citrate -- I'm 12:35:17
sorry, I'm going back to my previous question -- 12:35:21
again, would you think that sodium citrate might 12:35:23

supplement the underlying core flavor of a product? 12:35:27
MR. MELILI: Same objections. 12:35:30
THE WITNESS: Honestly, I have no idea. 12:35:31
BY MR. BURNS: 12:35:33
Q No idea. 12:35:34
And you have no idea with respect to potassium citrate? 12:35:35 12:35:37
MR. MELILI: Same objections. 12:35:40
THE WITNESS: No. 12:35:41
BY MR. BURNS: 12:35:41
Q No idea with respect to sodium benzoate? 12:35:41
MR. MELILI: Same objections. 12:35:44
THE WITNESS: I have no idea what that tastes like. 12:35:46 12:35:48
BY MR. BURNS: 12:35:49
Q No idea with respect to potassium benzoate? 12:35:49
MR. MELILI: Same objections. 12:35:52
THE WITNESS: Don't know anything about it. 12:35:54
BY MR. BURNS: 12:35:56
Q Do you consider aspartame to be a flavor? 12:35:56
MR. MELILI: Same objections. 12:36:02
THE WITNESS: Yes. 12:36:03
BY MR. BURNS: 12:36:03
Q Why? 12:36:04
A It's sweet. 12:36:04

Q What if a product were already sweet, say it has a strawberry flavor, is aspartame still a flavor if it's added to that product? 12:36:05 12:36:07 12:36:11
A Yes. 12:36:13
MR. MELILI: Same objections. 12:36:13
BY MR. BURNS: 12:36:15
Q Why? 12:36:15
A It makes it -- it makes it sweeter. 12:36:16
Q So, again, this would be supplementing the underlying flavor? 12:36:18 12:36:20
A Yes. 12:36:22
Q And if someone liked the strawberry flavor and you made it sweeter, you might say it's enhancing the flavor; is that fair? 12:36:22 12:36:25 12:36:28
MR. MELILI: Same objections. 12:36:30
THE WITNESS: That's fair. 12:36:31
BY MR. BURNS: 12:36:34
Q What about acesulfame potassium, if I'm pronouncing that correctly? 12:36:34 12:36:39
MR. MELILI: Same objections. 12:36:41
THE WITNESS: I have no idea what that is. 12:36:42
BY MR. BURNS: 12:36:43
Q Have you heard of Ace-K? 12:36:43
A No. 12:36:46
Q So no idea whether Ace-K is a flavor? 12:36:48

A No. 12:36:51

MR. BURNS: Okay. We can take a break. 12:36:56
Maybe this is a good time for lunch. 12:36:57

MR. MELILI: Sure. 12:36:59

MR. BURNS: Okay. 12:36:59

THE VIDEOGRAPHER: This marks the end of 12:37:00
Media 2. The time is 12:37 p.m. We're off the 12:37:01
record. 12:37:04

(Lunch recess taken at 12:37 p.m.)

\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\

LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 15, 2026;

1:20 P.M.

THE VIDEOGRAPHER: This marks the beginning of Media 3. The time is 1:20 p.m. We're on the record. 13:20:36 13:20:37 13:20:40

EXAMINATION (Continued.)

BY MR. BURNS:

Q Ms. Palmer, I just want to confirm, after you bought the Sprite lemon-lime product on April 27th, your testimony is that you never bought it again? 13:20:48 13:20:51 13:20:53 13:20:56

A Not that Sprite. 13:21:02

Q You bought a different Sprite? 13:21:04

A Yes. 13:21:07

Q Just one different -- 13:21:09

A Yes. I was -- 13:21:12

Q -- variety of Sprite? 13:21:15

A -- intrigued by the cranberry Sprite at Thanksgiving. 13:21:15 13:21:18

MR. BURNS: Let's go back to your interrogatory responses. 13:21:34 13:21:38

Is that Exhibit 1? 13:21:43

MR. PETKOVICH: 1. 13:21:47

BY MR. BURNS: 13:22:02

Q If you go to Page 13, Paragraph 9 at the bottom of that page... 13:22:02 13:22:08

Tell me when you've had a chance to look at that. 13:22:34 13:22:36

A Yep. 13:22:37

Q Is it accurate that you brought -- bought this Sprite Winter Spiced Cranberry soda on December 15, 2025? 13:22:46 13:22:48 13:22:53

A Yes. 13:22:55

Q Are you aware that Sprite Winter Spiced Cranberry is one of the products that you're challenging in this lawsuit? 13:22:58 13:23:00 13:23:03

A Yes. 13:23:07

Q Did you ask for a discount when you bought this product in December of 2025? 13:23:13 13:23:18

A No. 13:23:21

Q If you were challenging this Sprite product in an active lawsuit as misleading, why did you choose to purchase the product at full price? 13:23:32 13:23:35 13:23:43

A I was intrigued. 13:23:48

Q What do you mean by that? 13:23:51

A What a Winter Spiced Cranberry juice or soda tasted like. 13:23:53 13:23:58

Q So you were more interested in the taste than you were in whether it contained artificial flavors? 13:24:01 13:24:02 13:24:07
A Yes. 13:24:07
Q And you were willing to pay full price for it? 13:24:09 13:24:11
A Yes. But, again, this was purchased for me, not the -- my grandnieces and nephews. 13:24:12 13:24:21
Q Did you purchase it for your son as well? 13:24:26
A Which one? 13:24:32
Q The Sprite Winter Spiced Cranberry. 13:24:34
A I know. Which son? Not for Jason. 13:24:37
Q Did you purchase it for anyone other than yourself? 13:24:42 13:24:43
A No, not really. No. I don't know if he drank any, but I did not consider him at all. 13:24:44 13:24:45
Q Did you anticipate that others might drink the product when you bought it? 13:24:49 13:24:52
A I -- if it was in the refrigerator and someone came over, I would offer them as a choice. 13:24:56 13:25:00
Q What about Fanta, did you stop buying Fanta after you purchased it on April 27th -- 13:25:25 13:25:29
A Yes. 13:25:32
Q -- 2025? 13:25:32
A I think so, yeah. 13:25:33

Q Is it possible you bought it again? 13:25:34
A I don't think so, no. 13:25:37
Q At the time you brought -- bought Sprite 13:25:50
and Fanta in April of 2025, what was your 13:25:53
understanding of what citric acid was? 13:25:56
MR. MELILI: Objection to the extent it 13:26:00
calls for expert testimony. 13:26:02
But you may answer. 13:26:04
THE WITNESS: I assume the citric acid is 13:26:07
there to boost up the tartness of the soda or even 13:26:10
give it a tartness. 13:26:17
BY MR. BURNS: 13:26:24
Q Was that your understanding in April of 13:26:24
2025? 13:26:26
A Yes. 13:26:31
Q At the time you bought the product? 13:26:31
A Yeah. I had to count back on the years. 13:26:33
Yes. 13:26:38
Q What is your understanding of how the 13:26:54
citric acid in the class products is produced? 13:26:56
MR. MELILI: Same objection. 13:27:00
THE WITNESS: I don't know. 13:27:05
BY MR. BURNS: 13:27:08
Q Are you aware that it's produced through a 13:27:08
fermentation process? 13:27:10

MR. MELILI: Same objection. 13:27:12
THE WITNESS: I assume that it is made through a process. I don't know what the process is. 13:27:17 13:27:18 13:27:22
BY MR. BURNS: 13:27:24
Q Do you know what a fermentation process involves? 13:27:26 13:27:28
MR. MELILI: Same objection. 13:27:29
THE WITNESS: No. I thought that's what you did to wine. 13:27:30 13:27:48
BY MR. BURNS: 13:27:49
Q It is what you do to wine. 13:27:49
Did you know that wine is produced through a fermentation process? 13:27:51 13:27:53
A Yes, I did know that. 13:27:55
Q Do you consider wine -- 13:27:56
A I don't drink wine. 13:27:58
Q Do you consider wine to be artificial? 13:27:59
A I don't drink it. 13:28:01
Q That wasn't my question. 13:28:01
A I know, but I don't know because I don't drink it. 13:28:04 13:28:05
Q So you think wine may be artificial? 13:28:07
MR. MELILI: Same objection. 13:28:10
THE WITNESS: It could be. 13:28:11

BY MR. BURNS: 13:28:13
Q Did you know that many cheeses are produced through fermentation? 13:28:14 13:28:16
MR. MELILI: Irrelevant and same objection. 13:28:18
THE WITNESS: I did not know that. 13:28:20
BY MR. BURNS: 13:28:20
Q Do you think that cheeses are artificial if they're produced through fermentation? 13:28:21 13:28:23
MR. MELILI: Same objection. 13:28:26
THE WITNESS: Possibly. 13:28:27
BY MR. BURNS: 13:28:27
Q Did you know that sourdough bread is produced through fermentation? 13:28:27 13:28:29
MR. MELILI: Same objections. 13:28:31
THE WITNESS: I do not know. 13:28:32
BY MR. BURNS: 13:28:32
Q Do you think sourdough bread is artificial? 13:28:33
MR. MELILI: Same objections. 13:28:35
THE WITNESS: It could be. I don't know. 13:28:35
BY MR. BURNS: 13:28:36
Q If all sourdough bread is produced through fermentation, do you think that all sourdough bread is artificial? 13:28:37 13:28:39 13:28:43
A No. 13:28:44
MR. MELILI: Same objections. 13:28:46

THE WITNESS: Sorry. 13:28:47

MR. BURNS: And I would ask, Gil, that you give her an opportunity to answer as well rather than interrupting her. 13:28:51 13:28:51 13:28:54

BY MR. BURNS: 13:28:59

Q Do you know what kombucha is? 13:29:00

A No. 13:29:02

Q Have you ever decided not to buy a food or beverage because you noticed that it contained citric acid? 13:29:05 13:29:07 13:29:11

A No. Again, it would depend on who I'm buying it for. 13:29:16 13:29:30

Q If you're buying it for yourself or your son, you wouldn't care if it contained citric acid? 13:29:32 13:29:34

A No, I wouldn't. 13:29:37

Q You would only care if you were buying it for the children of your nephew? 13:29:39 13:29:41

A Yes. 13:29:46

Q Okay. And that's because of the -- what you think might be the preferences of the mother of your children's nephew? 13:29:46 13:29:50 13:29:52

A Yes. 13:29:54

Q Okay. 13:29:54

A I try to keep on her good side. 13:29:57

Q Fair enough. 13:30:00

If I told you citric acid is commonly found in fruit-flavored candies, salad dressing and most soft drinks, would that surprise you? 13:30:03 13:30:07 13:30:12
A No. 13:30:14
Q Why not? 13:30:15
A Because it seems to be in everything. 13:30:17
Q Okay. 13:30:19
A I mean -- 13:30:20
Q And I thought you testified earlier that you don't check whether products contain citric acid because you assume that they don't contain citric acid? 13:30:21 13:30:23 13:30:25 13:30:28
A I don't expect it to be in everything but it is -- seems to be in a lot of things. 13:30:31 13:30:33
Q Okay. I asked you: 13:30:35
"Q If I told you citric acid is commonly found in fruit-flavored candies, salad dressing and most soft drinks, would that surprise you? 13:30:38 13:30:39 13:30:41 13:30:43
"A No. 13:30:45
"Q Why not? 13:30:46
"A Because it seems to be in everything." 13:30:47 13:30:50
A Well, okay. Let me clarify. The fruit candies, I would expect that it's there for the 13:30:52 13:30:54

tartness, again with the salad dressings. 13:30:56
And what was the other thing? 13:31:02
Q Soda. 13:31:07
A Sodas, so I would again... 13:31:08
Q So you would assume that citric acid is in 13:31:11
soda? 13:31:14
A Anything that's tart. 13:31:15
Q And that would include soda? 13:31:17
A Yes. 13:31:19
Q Can you remember at any point seeing a soda 13:31:44
product for sale and deciding that you didn't want 13:31:48
to purchase it because it had artificial flavors? 13:31:51
A In how many years are we going back? Five 13:32:01
years? Or in a lifetime? 13:32:03
Q Well, I assume you can't remember in your 13:32:07
entire lifetime. I'm only asking what you can 13:32:09
recall. 13:32:12
A I can't -- in the last two years, I don't 13:32:14
think so. 13:32:16
Q Why not? 13:32:18
A Because usually when I'm purchasing 13:32:25
something like soda -- I'm trying to think -- I 13:32:26
don't do it that often, so it's usually for an 13:32:33
occasion for other people. 13:32:36
I don't generally buy it for myself unless 13:32:43

I'm intrigued in what that new product is. 13:32:45

Q Can you tell me about any other time that you've paid more for a product than you otherwise would have because of your beliefs that it had 100 percent natural flavors? 13:32:55 13:32:57 13:33:00 13:33:03

A Why I would pay more for natural flavors than... 13:33:07 13:33:09

Q Uh-huh. 13:33:13

A I went through a phase buying organic, and that was always more expensive, but I was willing to buy organic products. 13:33:16 13:33:19 13:33:23

Q Was that specifically because you believed it didn't contain 100 percent natural flavors, or was it because you generally thought the product was organic? 13:33:30 13:33:32 13:33:35 13:33:38

A Because I thought the product was organic. 13:33:39

Q Can you think of a time when you were considering a purchase and you decided not to purchase something because you believed it contained artificial flavors? 13:33:41 13:33:45 13:33:47 13:33:51

A I have been known to, like -- when purchasing something, an Asian-type thing, to specifically look for MSG. And if it has it in it, I don't buy it. 13:33:57 13:34:00 13:34:06 13:34:12

Q Do you consider MSG to be an artificial 13:34:13

flavor? 13:34:16

A I really don't know. I just know that it gives me a migraine. 13:34:18 13:34:20

MR. MELILI: Same objection. Calls for expert testimony. 13:34:22 13:34:24

MR. BURNS: I'm going to show you another document. 13:34:39 13:34:40

Would this be Exhibit 4? 13:34:44

THE REPORTER: 5. 13:34:46

MR. BURNS: 5. 13:34:47

(Deposition Exhibit 5 was marked for identification.) 13:34:47 13:34:47

BY MR. BURNS: 13:35:26

Q And this looks to be a receipt -- 13:35:27

A Instacart list. 13:35:30

Q -- yes, for an Instacart order. 13:35:32

And do you see that the date on this order is May 23rd, 2025? 13:35:36 13:35:38

A Yes, I see that. 13:35:41

Q And do you recall testifying that you spoke to your son about the artificial ingredients in Sprite and Fanta on April 30th of 2025? 13:35:42 13:35:45 13:35:50

A Yes. 13:35:54

Q So this would be after that, correct? 13:35:55

A Yes. 13:35:56

Q If you could go to the page ending in 175. It's the second page of the document. 13:36:04 13:36:09
Do you see three items down, Red Bull Sugarfree energy drink? 13:36:17 13:36:20
A Yes. 13:36:21
Q What ingredients are in a Red Bull Sugarfree energy drink? 13:36:23 13:36:25
A I have no idea. And I believe that Matthew added that to the list, because it's not something I would ever buy. 13:36:29 13:36:32 13:36:36
Q So you bought this on behalf of your son? 13:36:42
A I'm guessing that's how it got there. Either that or the delivery driver wanted Red Bull. I personally have never had one. 13:36:45 13:36:50 13:36:57
Q You don't recall ever looking at the ingredient list or nutrition facts of a Red Bull energy drink? 13:37:00 13:37:02 13:37:05
A No. 13:37:06
Q Are you aware that Red Bull contains artificial flavors? 13:37:08 13:37:11
A I know nothing of this product. 13:37:12
Q Do you think your son cares whether the Red Bull that he drinks has artificial flavors in it? 13:37:16 13:37:19 13:37:22
A I'm sure he doesn't care at all. 13:37:22

MR. MELILI: Objection. Relevance. 13:37:24
BY MR. BURNS: 13:37:31
Q All right. Let's go to the page ending in 13:37:31
177. 13:37:33
The top of the page, do you see 13:37:41
Keebler E.L. Fudge Elfwich cookies stuffed with 13:37:43
cream filling? 13:37:48
A Yep. 13:37:49
Q Do you recall buying that? 13:37:51
A No. But, again, I usually hand him the 13:37:55
Instacart thing and have him add what he needs and 13:38:01
wants. So I personally don't remember buying those 13:38:04
cookies. 13:38:13
Q Does Matthew ever buy products for you on 13:38:16
Amazon? 13:38:20
A No. 13:38:20
Q Why does he only buy products for you on 13:38:22
Instacart? 13:38:25
A No, he didn't buy it for me. 13:38:25
Q Let me correct myself. 13:38:28
Why does he only buy products on Instacart? 13:38:30
A Because I would have handed him the phone 13:38:32
and said, Do you want to add anything to this list? 13:38:34
Q And why don't you ever hand him the phone 13:38:37
and ask him if he wants to add anything to your 13:38:39

Amazon order? 13:38:41
A Because he has his own Amazon order -- or 13:38:42
account. He doesn't have an Instacart account. 13:38:45
Q Are Sprite and Fanta available on 13:38:56
Instacart? 13:38:58
A Yes. 13:38:59
Q And you typically buy products on 13:39:00
Instacart? 13:39:02
A Yes. 13:39:03
Q Why didn't you just buy Sprite and Fanta on 13:39:03
Instacart? 13:39:06
A Okay. Because this is my dumb thinking. 13:39:07
I needed it because Jason said they were coming 13:39:09
over. I thought they were coming over immediately, 13:39:11
like the next weekend. So I wanted it faster than I 13:39:15
get with my Instacart, because I only Instacart when 13:39:21
I have an entire list. 13:39:25
And I realize now that I probably could 13:39:29
Instacart anything, but I don't. 13:39:32
Q You see on the first page of this document 13:39:44
where it says "Your order from Ralphs was placed on 13:39:48
May 23rd and delivered on May 23rd"? 13:39:51
A Uh-huh. 13:39:55
Q Did you ever notice that all of your 13:39:56
Instacart orders arrived on the same day that you 13:39:58

made the order? 13:40:01
A Yes, but I don't put an Instacart order in 13:40:03
unless I have maybe 20 items. 13:40:05
Q Why is that? 13:40:07
A My stupid thinking. It's... 13:40:08
Q Okay. Let's go back to what I believe was 13:40:10
marked as Exhibit 1. This would be your 13:40:37
interrogatory responses. 13:40:48
Do you see in Paragraphs 5 and 6 on 13:41:16
Page 13 -- 13:41:19
A Paragraph -- okay. 13:41:25
Q -- where it says "Plaintiff purchased, as 13:41:27
part of a Ralphs grocery order on Instacart.com, 13:41:28
'Red Bull Sugar Free Energy Drink'" on May 16th -- 13:41:31
in Paragraph 5 -- and May 23rd -- in Paragraph 6? 13:41:37
A Uh-huh. 13:41:40
Q Did you tell your attorneys that you didn't 13:41:42
purchase that product and that your son did it? 13:41:45
MR. MELILI: Objection to the extent it 13:41:48
calls for attorney-client privilege. 13:41:49
I'd advise my client not to answer. 13:41:55
MR. BURNS: I'm asking her what she told 13:41:57
her attorneys, not what her attorney -- what legal 13:41:59
advice her attorneys provided her. 13:42:01
MR. MELILI: Well, communications between 13:42:03

attorney and client, no matter which way it goes, is protected under that privilege. 13:42:04 13:42:06

MR. BURNS: And you think that your client telling you when she bought a product is protected in a protected attorney-client communication? 13:42:07 13:42:08 13:42:11

MR. MELILI: I believe so. 13:42:15

MR. BURNS: And you're instructing her not to answer? Because that's just blatantly improper. And if you want to come back here and ask questions again, then fine, but if you're actually instructing her not to answer a basic question about whether she told her attorneys when she bought a product -- 13:42:16 13:42:17 13:42:21 13:42:23 13:42:27 13:42:29

MR. MELILI: If it's a yes or no question, then that's fine. 13:42:32 13:42:34

BY MR. BURNS: 13:42:35

Q All right. Did you tell your attorneys that you didn't buy the Red Bull energy drink that was purchased on May 16th and then again on May 23rd? 13:42:35 13:42:37 13:42:41 13:42:44

A Okay. The technicality of that is yes, I did buy it. No, I did not tell them I did not buy it. But I don't -- did not put that item on my list. 13:42:48 13:42:52 13:42:54 13:42:59

Q Okay. 13:43:00

A But it came out of my bank account on my 13:43:04

Instacart account. 13:43:07

Q In Paragraph 8, do you see where it said that you purchased an A&W Root Beer with zero sugar on September 25th? 13:43:09 13:43:12 13:43:16

A Yes. 13:43:19

Q Did you buy that product? 13:43:20

A Yes, I did. 13:43:22

Q For yourself? 13:43:25

A No. I have a friend that's a diabetic that was coming over and I wanted to have something for her to drink, and that's what she requested. 13:43:26 13:43:29 13:43:32

Q Were you concerned about whether the product that you purchased had artificial flavors? 13:43:36 13:43:38

A No, because she requested the product. It wasn't my choice. 13:43:42 13:43:44

Q You didn't advise her that the product contained artificial flavors? 13:43:46 13:43:48

A No. I'm not going to advise a 70-year-old woman on what to drink. 13:43:50 13:43:53

Q In Paragraph 7, do you see where it says "On May 29th, Plaintiff purchased, as part of a Ralphs grocery order on Instacart.com 'Slice Lemon Lime Health Soda' for $2.59"? 13:44:13 13:44:16 13:44:21 13:44:26

A Yes. 13:44:30

Q Did you buy that product for yourself? 13:44:32

A I did. 13:44:33
Q Do you recall checking the ingredient list on this product before you bought it? 13:44:41 13:44:44
A I don't remember. I might have. 13:44:46
Q And you've answered here that Slice Lemon Lime Health Soda contained citric acid? 13:44:54 13:44:55
A Yes. I see that now. 13:45:00
Q Did you ask for a discount when you purchased this product? 13:45:02 13:45:03
A No. 13:45:04
Q Did you care that it contained citric acid? 13:45:05
A Maybe, yes. 13:45:10
Q But you didn't ask for a discount? 13:45:12
A No. I don't know how you would do that. 13:45:15
Q May 29th was only days after you filed the original -- 13:45:34 13:45:37
A Right. 13:45:37
Q -- lawsuit in this case, correct? 13:45:38
A Yes. 13:45:39
Q Ms. Palmer, who are your lawyers in this case? 13:46:10 13:46:11
A Gil and Jason. 13:46:13
Q Uh-huh. 13:46:17
A And Abbas. 13:46:19
Q Uh-huh. What about Ali? 13:46:21

A Tangentially, I guess, yes. 13:46:31

Q Do you have any kind of social or personal relationship with Ali? 13:46:34 13:46:36

A Me personally, no. He is my son's friend. 13:46:38

Q How does your son know Ali? 13:46:43

A They've known each other since elementary school. 13:46:46 13:46:48

Q How close a friendship would you say they have? 13:46:53 13:46:55

MR. MELILI: Objection. Vague and ambiguous as to the word "close" in that sentence. 13:46:56 13:46:56

But if you know you can answer. 13:47:00

THE WITNESS: They're friends. I wouldn't say they're close, close friends. 13:47:03 13:47:05

BY MR. BURNS: 13:47:06

Q They've known each other -- 13:47:07

A But they are still -- but they've known each other a long time. They still keep in contact with one another. 13:47:08 13:47:09 13:47:11

Q For how long did your son and Ali go to school together? 13:47:28 13:47:33

A From about fifth grade through high school. And then they went to separate colleges. 13:47:36 13:47:50

Q But they remained in touch? 13:47:52

A Yes. 13:47:54

Q Where did Ali go to college? Do you know? 13:48:01
A I think he went to UCLA. 13:48:04
Q And where did Matthew go to college? 13:48:07
A Cal State Northridge. 13:48:10
Q Did they socialize in person after high school? 13:48:15 13:48:17
A Not very often. 13:48:20
Q But sometimes? 13:48:21
A Occasionally, yes. Occasionally, there's a group of them that get together so it wouldn't have been a one-to-one thing. 13:48:23 13:48:30 13:48:33
Q How often have you spoken to Ali yourself in your life? 13:48:34 13:48:38
A In my life? 13:48:39
Q Not -- well, yeah. Let's -- start when they were in school together, how often did you see Ali? 13:48:41 13:48:44 13:48:46
A Not very often. At one point he was banned from my house because he broke too many things. 13:48:49 13:48:52
But I can't quantify the number. I don't know. 13:48:59 13:49:04
Q And after Matthew and Ali graduated from high school, did you see or speak to Ali again? 13:49:05 13:49:10
A Yes. Maybe five -- five, ten times. No more than that. 13:49:14 13:49:23

Q In what context? 13:49:24

A He'd come in and say hello before they went out. I think he's scared of me. 13:49:26 13:49:28

Q What do you mean by that? 13:49:46

A Well, he used to break things a lot. He was a very active child. 13:49:47 13:49:55

Q Does anyone else in your family have any social or personal relationship with anyone at the Kazerouni law firm? 13:50:12 13:50:13 13:50:16

A I don't think so, no. 13:50:17

Q Do you have any other kind of social or personal relationship with anyone else at the Kazerouni -- 13:50:19 13:50:21 13:50:23

A No. 13:50:24

Q -- law firm? 13:50:24

Do you know how long Ali has worked at the Kazerouni law firm? 13:50:27 13:50:30

A No. 13:50:31

Q Do you know what Ali's job title is -- 13:50:36

A No. 13:50:38

Q -- at the Kazerouni law firm? 13:50:39

Have you discussed this case with Ali? 13:50:41

A Very briefly. 13:50:45

Q When did you discuss it with him? 13:50:46

A He called me just before I had my Zoom 13:50:54

meeting in order to instruct me how to get in -- 13:51:00

MR. MELILI: Objection to the extent -- 13:51:05

THE WITNESS: Okay. 13:51:06

MR. MELILI: -- it calls for attorney-client privilege. 13:51:06 13:51:07

You may otherwise answer, but just -- 13:51:09

THE WITNESS: Okay. He called me to instruct me how to get on Zoom. 13:51:11 13:51:13

MR. BURNS: That doesn't sound privileged. 13:51:18

MR. MELILI: Yeah, just in case. 13:51:20

MR. BURNS: Yeah. 13:51:22

BY MR. BURNS: 13:51:22

Q And that was the first time you spoke to Ali about this case? 13:51:22 13:51:25

A I think so, yeah. 13:51:26

Q Was it the first time you ever spoke to Ali about any issues related to the Sprite and Fanta products? 13:51:28 13:51:31 13:51:39

MR. MELILI: Objection. Vague and ambiguous as to "any issues." 13:51:39 13:51:39

But you may otherwise answer. 13:51:41

THE WITNESS: I don't think so. He mostly talked with -- with Matthew, and I don't even know how much they talked about it. 13:51:44 13:51:47 13:51:50

\\\

BY MR. BURNS: 13:51:54

Q Do you know when the first time Matthew spoke to Ali was as it relates to the Sprite and Fanta products? 13:51:55 13:51:56 13:52:00

A It was shortly after I bought the product. 13:52:02

Q Are you sure it was after you bought the product? 13:52:08 13:52:10

A Yes. 13:52:10

Q Are you aware that shortly before you bought the product, Ali's law firm had sent Coca-Cola a demand letter challenging the labeling claims only on Sprite lemon-lime and Fanta Orange? 13:52:14 13:52:16 13:52:21 13:52:26

A No, I didn't know that. 13:52:29

Q And you just so happened shortly thereafter to buy only Sprite lemon-lime and Fanta Orange on Amazon.com for the first time in your life? 13:52:31 13:52:33 13:52:37

A I guess so. I did not know the -- I don't discuss lawsuit things with Ali. 13:52:39 13:52:44

Q I'm not talking about lawsuit things. I'm talking specifically about Sprite and Fanta. 13:52:48 13:52:50

A Right. 13:52:53

Q You just so happened to buy Sprite and Fanta, as far as you know, for the first time in your life on April 27th while your son's friend was actively threatening to file a lawsuit related to 13:52:53 13:52:56 13:52:59 13:53:03

those very -- not just Sprite and Fanta but the very two flavor varieties -- 13:53:07 13:53:10
A That's the same two, yeah. 13:53:12
Q -- that you purchased? 13:53:12
That seems like a remarkable coincidence, doesn't it, Ms. Palmer? 13:53:13 13:53:16
A I guess so. 13:53:17
Q And your testimony under oath -- 13:53:18
A Yes. 13:53:19
Q -- is that you never spoke to anyone about Sprite or Fanta before April 27th, 2025? 13:53:19 13:53:23
A No, I did not. 13:53:27
Q And your son never spoke to anyone about Sprite or Fanta before April 27th, 2025? 13:53:29 13:53:32
MR. MELILI: Objection. Argumentative and speculative. 13:53:36 13:53:38
THE WITNESS: I don't know. 13:53:40
BY MR. BURNS: 13:53:40
Q You don't know? 13:53:41
MR. MELILI: Speculative. 13:53:42
BY MR. BURNS: 13:53:42
Q Is it possible that he did? 13:53:42
A I don't know. 13:53:43
Q So it's possible? 13:53:43
MR. MELILI: Same objections. 13:53:47

THE WITNESS: I think pigs flying is possible, but I don't know. 13:53:49 13:53:50
BY MR. BURNS: 13:53:52
Q Did your son ever say anything to you that gave you any reason to believe that he may have spoken to someone about Sprite or Fanta -- 13:53:53 13:53:56 13:53:59
A No. 13:54:02
Q -- before April 27th, 2025? 13:54:02
A No. 13:54:04
MR. MELILI: Same objections. 13:54:06
BY MR. BURNS: 13:54:33
Q Have you ever spoken to Ali about this case over e-mail? 13:54:33 13:54:34
A No. 13:54:37
Q Have you ever spoken to Ali about Sprite or Fanta over e-mail? 13:54:39 13:54:42
A No. 13:54:43
Q Has your son ever spoken to Ali about this case over e-mail? 13:54:46 13:54:48
A I assume so. 13:54:52
Q Why do you assume so? 13:54:54
MR. MELILI: Objection. Speculative. 13:54:57
THE WITNESS: I assume because that's how he deals with a lot of conversations. 13:55:02 13:55:04
\\\

BY MR. BURNS: 13:55:09

Q And you don't know when that first e-mail took place? 13:55:09 13:55:10

A No, I don't. 13:55:11

Q Did your son say anything to you about Sprite or Fanta before you purchased it on April 27th? 13:55:21 13:55:23 13:55:25

A No. 13:55:26

Q Have you given any e-mail -- have you told your attorneys that e-mails between Ali and Matthew may exist? 13:55:35 13:55:38 13:55:41

A Yes. 13:55:42

Q Has Matthew given your attorneys those e-mails? 13:55:46 13:55:48

A I have no idea. 13:55:49

MR. MELILI: Objection. Speculative. 13:55:50

BY MR. BURNS: 13:56:14

Q You said your son told you that the Sprite and Fanta products contained artificial flavors on April 30th; is that correct? 13:56:17 13:56:21 13:56:24

A Yes. 13:56:26

Q And you signed your engagement letter with Ali's law firm that very same day? 13:56:31 13:56:34

A I guess -- is that the date I signed it? 13:56:37

MR. BURNS: Let's go back to Exhibit 1. 13:56:49

THE WITNESS: That's the last one. 13:56:50

MR. BURNS: Actually, rather than going back to Exhibit 1, let me just mark a new exhibit. 13:56:50 13:57:00

(Deposition Exhibit 6 was marked for identification.) 13:57:03 13:57:03

THE WITNESS: This was -- I see this says April 30th on there but there is no date of when I signed it. 13:57:42 13:57:43 13:57:46

BY MR. BURNS: 13:57:50

Q So you think that the letter was drafted on April 30th but you didn't sign it until later? 13:57:51 13:57:53

A Unfortunately, yes. Because if they sent it to me on an e-mail, I might not have seen it for days. I don't remember. 13:58:00 13:58:02 13:58:08

Q Let's go to Exhibit 1 which is your interrogatory responses. 13:58:10 13:58:13

Can you go to the last page. 13:58:19

Did you review this document before you signed it? 13:58:24 13:58:26

A Yes. 13:58:26

Q Do you see where you've written "I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct"? 13:58:27 13:58:29 13:58:32 13:58:34

A No. Where are you? 13:58:37

Oh, yeah. 13:58:44
Q And you understand that your testimony 13:58:48
today is also under penalty of perjury? 13:58:49
A Yes. 13:58:51
Q Go to Page 23 -- or, actually, let's start 13:59:06
on Page 22. 13:59:08
A Of the first one? Okay. 13:59:12
Q You see under Interrogatory No. 9 where it 13:59:29
says "Identify the date on which You signed any 13:59:33
engagement letter with the attorney representing you 13:59:37
in this lawsuit"? 13:59:41
A Yeah. 13:59:43
Q Go to the last sentence of your response to 13:59:44
Interrogatory 9. 13:59:47
Do you see where you've written 13:59:50
"April 30th, 2025"? 13:59:51
A Okay. 13:59:55
Q Did you sign this on April 30th, 2025? 13:59:59
A I guess so. 14:00:02
Q You said you couldn't recall when you 14:00:05
signed it. 14:00:07
A No, I don't. 14:00:08
Q Then why did you state that you signed it 14:00:09
on April 30th under penalty of perjury? 14:00:11
A Probably because I didn't pay attention to 14:00:14

the date. 14:00:16

Q So you didn't pay attention to your interrogatory responses before you signed them under penalty of perjury? 14:00:17 14:00:19 14:00:21

MR. MELILI: Objection to the extent it misstates prior testimony. 14:00:23 14:00:24

But you may answer. 14:00:28

THE WITNESS: I read them, yes. But did -- not probably word for word, and they were very boring. 14:00:30 14:00:36 14:00:41

BY MR. BURNS: 14:00:43

Q So you're not concerned about whether you're perjuring yourself if the information that you're perjuring yourself under which is boring? 14:00:44 14:00:45 14:00:48

A I didn't think about that, no. 14:00:51

Q Do you care whether you're perjuring yourself today? 14:00:53 14:00:54

A Yes. 14:00:55

Q Why do you care today when you didn't care before? 14:00:55 14:00:57

A Because you're here asking me questions and pointing out where I may have made mistakes. 14:00:58 14:01:01

Q Were you concerned about the truthfulness of your interrogatory responses? 14:01:07 14:01:08

A Yes. 14:01:11

Q Why didn't you review them carefully before you signed them under penalty of perjury? 14:01:11 14:01:14
A Because they were very long and very boring, and I did skim through them. Actually, I read through this one, and I skimmed through the second one. 14:01:15 14:01:17 14:01:23 14:01:26
Q So before you signed this document under penalty of perjury, you skimmed it? 14:01:30 14:01:31
MR. MELILI: Objection. Misstates prior testimony. 14:01:34 14:01:35
But you may answer. 14:01:38
THE WITNESS: I skimmed the second one twice. I read this one. 14:01:39 14:01:42
BY MR. BURNS: 14:01:46
Q You skimmed the Complaint -- the Amended Complaint? 14:01:46 14:01:48
A Yes. 14:01:49
Q So you read the document that states that you signed your engagement letter on April 30th? 14:01:50 14:01:52
A Yes. 14:01:56
Q And you stated under penalty of perjury that you signed it on April 30th? 14:02:01 14:02:02
A Yes. 14:02:05
Q So I just want to make sure I understand how this could have possibly happened, Ms. Palmer. 14:02:07 14:02:09

You bought Sprite and Fanta on April 27th, Sprite lemon-lime, Fanta Orange as far as you know for the first time in your life. 14:02:15 14:02:19 14:02:23

At the same time your son's friend was threatening to file suit related only to Sprite lemon-lime and Fanta Orange. 14:02:25 14:02:27 14:02:31

Three days later your son, out of the blue, informs you, lo and behold, Sprite lemon-lime and Fanta Orange have artificial flavors in them. 14:02:35 14:02:40 14:02:42

That very same day the law firm sends you a three-page, single-spaced letter they've already prepared and that you signed. 14:02:46 14:02:55 14:02:57

A Okay. 14:03:00

Q Does that -- does that seem like a plausible story to you, Ms. Palmer? 14:03:00 14:03:01

A It sounds like -- 14:03:03

MR. MELILI: Objection. Argumentative. 14:03:04

But you may answer. 14:03:06

THE WITNESS: It sounds like a coincidence, and possibly it's I have the timeline wrong in that I bought them and that he talked with someone. 14:03:07 14:03:08 14:03:13

But whether it was on that particular day, I don't know. I do remember him saying to me that we should ask Ali if his law firm does this kind of thing because they handled the Sears thing for us. 14:03:21 14:03:23 14:03:25 14:03:30

BY MR. BURNS: 14:03:36

Q Uh-huh. 14:03:36

And you can't -- do you remember whether he asked you about that before you purchased the products? 14:03:37 14:03:38 14:03:41

A Oh, definitely not before, no. 14:03:41

Q And it's just an extraordinary coincidence that for the first time in your life you bought Sprite lemon-lime and Fanta Orange at the same time that your son's friend was threatening suit related to those very two products and three days later you had signed an engagement letter agreeing to act as the class representative in this action? 14:03:44 14:03:47 14:03:50 14:03:55 14:03:57 14:04:01 14:04:05

A I guess so. 14:04:07

MR. MELILI: Objection. Asked and answered and argumentative. 14:04:09 14:04:10

THE WITNESS: Can I -- I don't remember ever buying Fanta, but I -- in my entire life, I am sure I bought Sprite. 14:04:19 14:04:20 14:04:24

BY MR. BURNS: 14:04:25

Q It's the only time you remember buying Sprite lemon-lime? 14:04:26 14:04:28

MR. MELILI: Objection. Vague and ambiguous. 14:04:30 14:04:30

THE WITNESS: No. I'm sure I have bought 14:04:32

lemon-lime Sprite. I had a sister that lived with me and she was a big soda drinker. She drank all kinds of soda. 14:04:37 14:04:39 14:04:44
BY MR. BURNS: 14:04:45
Q Okay. So at some point in your life, you may have bought Sprite lemon-lime? 14:04:45 14:04:47
A Absolutely. 14:04:51
Q It was so infrequent you can't remember a specific instance. 14:04:51 14:04:54
The only instance you remember doing it happens to have -- happens to have occurred three days before you signed this engagement letter at the same time -- 14:04:56 14:04:57 14:05:00 14:05:03
A I guess so. 14:05:04
Q -- that your son's friend was suing -- threatening to sue Coca-Cola related only to these very same two products that you're now -- 14:05:05 14:05:06 14:05:12
A Well, like I said, I bought them specifically because I had seen them at Jason's house. And I don't think he has anything to do with -- I know he has nothing to do with Ali. They are not friends. 14:05:14 14:05:15 14:05:17 14:05:23 14:05:28
MR. MELILI: Same objections. 14:05:29
BY MR. BURNS: 14:05:31
Q Is it possible that Ali called Michael to 14:05:31

ask him about whether you were interested in suing on behalf of -- related to the Sprite and Fanta products that you purchased? 14:05:34 14:05:36 14:05:40

MR. MELILI: Speculative. 14:05:41

THE WITNESS: I don't know who Michael is. 14:05:43

BY MR. BURNS: 14:05:44

Q I'm sorry. Matthew. 14:05:44

A No. I don't think so. 14:05:47

Q You're not sure? 14:05:49

A I'm not sure. 14:05:50

MR. BURNS: All right. Let's mark what I believe is Exhibit 6. 14:06:28 14:06:29

THE REPORTER: 7. 14:06:33

MR. BURNS: 7. I'm always one behind. 14:06:34

(Deposition Exhibit 7 was marked for identification.) 14:06:36 14:06:36

BY MR. BURNS: 14:07:25

Q Do you recognize this document? 14:07:25

A No. 14:07:27

Q Do you see your name on it? 14:07:29

A No -- oh, there it is. 14:07:41

Q Did the Kazerouni law firm previously represent you before you brought this lawsuit? 14:07:49 14:07:52

A Yes. 14:07:54

Q Would that have been in 2023? 14:08:06

A Yes. 14:08:09

Q Can I give you a moment to read the -- the introduction to this Complaint to familiarize yourself with what it's about. 14:08:17 14:08:29 14:08:32

A Yeah. This is the Sears thing. 14:08:37

Q What did this lawsuit concern? 14:08:41

A Sears fixing my dishwasher and charging me over and over again when it was promised in writing that their work was guaranteed and the repairmen telling me over and over again that I would not be charged and yet I was charged over and over. 14:08:48 14:08:57 14:08:59 14:09:13 14:09:15

It went to a debt collector -- oh, I actually paid it twice and still went to a debt collector. When we showed the debt collector the payment, they dropped it but Sears again brought suit for nonpayment when I had paid it twice. 14:09:19 14:09:22 14:09:30 14:09:37 14:09:42

Q And the amount you owed was $290.37; is that right? 14:09:55 14:09:59

A I don't remember, but I guess so. Sounds about right. 14:10:01 14:10:03

Q And this was a lawsuit filed in federal court? 14:10:07 14:10:09

A Yes. 14:10:10

Q It's a fairly small amount of money to file a federal lawsuit, don't you think? 14:10:14 14:10:17

MR. MELILI: Objection to the extent it calls for expert testimony and/or legal conclusion. 14:10:19 14:10:20

But you may answer. 14:10:23

THE WITNESS: This was another one that Matthew went to Ali on. My sister was in the hospital dying, and I kept getting these notices so he filed it for me. 14:10:28 14:10:29 14:10:35 14:10:42

BY MR. BURNS: 14:10:44

Q You think Ali facilitated this lawsuit as a personal favor to you? 14:10:46 14:10:52

MR. MELILI: Objection. Speculative. 14:10:54

But you may answer. 14:10:55

THE WITNESS: Yeah. I don't know. I know that they talked. 14:10:57 14:10:59

BY MR. BURNS: 14:11:02

Q Did you speak to Ali? 14:11:03

A No. 14:11:04

Q Did you pay Ali? 14:11:06

A No. 14:11:08

Q So you didn't pay Ali to file this federal lawsuit on your behalf and you have no idea whether he did it as a favor to you? 14:11:10 14:11:13 14:11:15

A All I know is that Matthew came back and said Ali was going to take care of it. So I guess that's a personal favor for me or for him, for just 14:11:20 14:11:22 14:11:25

being a kind person, because I was already under duress. 14:11:30 14:11:34

Q Ali wanted to help you get out of this debt? 14:11:41 14:11:43

MR. MELILI: Objection. Speculative. 14:11:44

But you can answer if you know. 14:11:47

THE WITNESS: I don't think it was so much get out of the debt. I was just aggravated because I kept paying it and they kept sending me bills. 14:11:50 14:11:51 14:11:54

BY MR. BURNS: 14:12:01

Q And Ali wanted to help you stop the bills? 14:12:02

MR. MELILI: Same objection. 14:12:05

THE WITNESS: Yes. However, I personally did not talk to Ali about this. 14:12:08 14:12:14

BY MR. BURNS: 14:12:19

Q Has Ali ever helped you with any other legal issues? 14:12:19 14:12:21

A No. 14:12:22

Q Has your son ever asked Ali to help you with any other legal issues? 14:12:25 14:12:27

MR. MELILI: Speculative. 14:12:31

THE WITNESS: Help me? Not that I know of. 14:12:32

BY MR. BURNS: 14:12:33

Q Has Ali ever helped your son with any other legal issues? 14:12:34 14:12:35

A I don't know. 14:12:37
Q It's possible that he did? 14:12:38
MR. MELILI: Same objection. 14:12:41
THE WITNESS: I don't know. 14:12:42
BY MR. BURNS: 14:13:13
Q Do you have any other kind of financial 14:13:15 relationship with Ali? 14:13:17
A No. 14:13:18
Q Has Ali ever given you money? 14:13:18
A No. 14:13:20
Q Has Ali ever given your son money? 14:13:20
A Not that I'm aware of. 14:13:22
Q Does Ali have any other kind of financial 14:13:24 relationship with your son? 14:13:26
A No. 14:13:27
MR. MELILI: Speculative. 14:13:28
BY MR. BURNS: 14:13:29
Q Have they ever been involved in business 14:13:29 together? 14:13:31
A No. 14:13:31
Q Have you paid your lawyers to represent you 14:13:51 in this case? 14:13:52
A No. 14:13:54
Q Any understanding as to how your lawyers 14:13:55 are being compensated? 14:13:57

A A vague idea. 14:14:07
Q What is your vague idea? 14:14:09
A That the costs will come, I guess, if they win. It's very vague. I... 14:14:12 14:14:17
Q Do you understand that you personally are seeking to represent an entire class of persons in this lawsuit? 14:14:24 14:14:26 14:14:29
A Yes. 14:14:30
Q Do you know who the other members of that class would be? 14:14:33 14:14:34
A I imagine that two of the people that are listed on the -- Sue Kim and Ivan Zemero -- Zermeno. 14:14:36 14:14:38
Q Do you know what time period someone would have had to have purchased the Sprite and Fanta class products in order to be a member of the class? 14:14:51 14:14:53 14:14:57
A No. 14:14:59
Q Do you know what product someone would have had to have purchased to be a part of the class? 14:15:01 14:15:04
A No. 14:15:07
Q Do you know what states they would need to be from? 14:15:07 14:15:08
A No. 14:15:09
Q What are your responsibilities as a class representative in this case? 14:15:14 14:15:16
A To keep them in mind in any kind of 14:15:18

settlement, that it's not just me, it's -- 14:15:20
Q It's Ms. Kim and Mr. Zermeno? 14:15:24
A Yes. 14:15:29
Q Other than what we already discussed today, have you ever been a named plaintiff in a class action before? 14:15:32 14:15:34 14:15:37
A No. 14:15:37
Q Other than being a named plaintiff, have you ever been a member of a class action before? 14:15:47 14:15:48
A I don't think so. 14:15:53
Q Are you expecting to receive any extra compensation in this case for being the named plaintiff? 14:15:57 14:16:00 14:16:01
A No. 14:16:02
Q Have you spoken to any other consumers about the Sprite or Fanta products? 14:16:15 14:16:18
A I might have, but I couldn't tell you who. 14:16:25
Q Do you have any idea what other consumers paid for the Sprite and Fanta products? 14:16:32 14:16:34
A No. 14:16:36
Q Fair to say the price may have varied? 14:16:39
A May have, yes. 14:16:42
Q Do you know any other consumers who share your concerns about the Sprite and Fanta products? 14:16:49 14:16:51
A Yes. 14:16:55

Q Who are they? 14:16:56
A I know that I talked about this with a group of ladies in my aqua aerobics class. I don't know their names. 14:17:02 14:17:06 14:17:12
Q How did you communicate with them about it? 14:17:16
A We were gossiping in the pool. 14:17:19
Q Okay. So not over e-mail? 14:17:22
A No. 14:17:24
Q Nothing written down? 14:17:24
A No. 14:17:25
Q Okay. What do you think your damages are in this case? 14:17:25 14:17:55
A I have no idea. 14:17:55
MR. MELILI: Objection. Calls for a legal conclusion and/or expert testimony. 14:17:56 14:17:57
BY MR. BURNS: 14:18:02
Q How do you think you should be compensated in this case? 14:18:02 14:18:05
MR. MELILI: Same objections. 14:18:05
THE WITNESS: I have no idea. I don't know how any of that's done. 14:18:06 14:18:08
BY MR. BURNS: 14:18:16
Q Do you want to be compensated in this case? 14:18:29
A Sure. 14:18:32
Q Other than your communications with your 14:18:40

attorneys, have you had any written communications with anyone about Sprite or Fanta? 14:18:42 14:18:44

A No. 14:18:46

Q Other than communications with your attorneys, have you had any written communications with anyone about this lawsuit? 14:18:50 14:18:51 14:18:53

A No. 14:18:55

Q Have you ever kept any sort of journal or diary or other notes that mention your purchase or -- 14:18:59 14:19:01 14:19:04

A No. 14:19:05

Q -- consumption of soda -- 14:19:05

A No. 14:19:07

Q -- pardon me -- soda -- Sprite or Fanta? 14:19:07

Have you ever discussed Sprite or Fanta on social media? 14:19:16 14:19:19

A No. 14:19:21

Q Have you ever discussed this lawsuit on social media? 14:19:23 14:19:25

A No. 14:19:26

MR. BURNS: Okay. I think we can take another five-minute break. I should be close to wrapping up. 14:19:36 14:19:37 14:19:42

THE VIDEOGRAPHER: Okay. This marks the end of Media 3. The time is 2:20 p.m. We're off 14:19:43 14:19:45

the record. 14:19:49

(Off the record from 2:20 - 2:34 p.m.) 14:19:50

THE VIDEOGRAPHER: This marks the beginning of Media 4. The time is 2:34 p.m. We're on the record. 14:34:38 14:34:39 14:34:42

BY MR. BURNS: 14:34:47

Q Ms. Palmer, do you recall how you received the engagement letter that you signed? 14:34:48 14:34:50

A I think it's -- I'm -- not trying to think -- e-mail, not text. 14:35:00 14:35:02

Q Was the e-mail sent to you or to your son? 14:35:05

A To me. 14:35:08

Q Did you send anyone at the Kazerouni law firm any documents before you received the engagement letter? 14:35:13 14:35:18 14:35:22

A I don't think so. 14:35:25

Q How did the law firm know that you had purchased the Sprite and Fanta products before it sent you the engagement letter? 14:35:28 14:35:30 14:35:32

A I don't know. 14:35:36

MR. MELILI: Objection. Speculative. 14:35:37

THE WITNESS: I don't remember. 14:35:41

BY MR. BURNS: 14:35:44

Q Is it possible that your son spoke to the law firm separately about that? 14:35:44 14:35:47

A I have no idea. 14:35:49
MR. MELILI: Same objection. 14:35:50
BY MR. BURNS: 14:36:06
Q Do you recall when I showed you your Instacart receipts earlier today? 14:36:07 14:36:09
A (Witness nods head.) 14:36:13
Q How did you go about compiling the Instacart receipts that you sent to your lawyers? 14:36:14 14:36:18
A I went to the Instacart site and you can go back in your orders and get the receipts from them. 14:36:22 14:36:26
Q Did you pick and choose which receipts to send, or did you send all of the receipts? 14:36:33 14:36:35
A I think I sent all of the receipts for a couple of years, maybe back to 2021, '2. It was long and arduous. 14:36:44 14:36:48 14:36:56
Q So you didn't look at your receipts and decide which receipts reflected products that might have contained -- 14:37:00 14:37:03 14:37:06
A No. 14:37:07
Q -- the ingredients that you're challenging in this lawsuit? 14:37:07 14:37:09
Okay. 14:37:11
A And then I think they had an expert go through them. 14:37:15 14:37:22
Q What kind of expert? 14:37:27

A I don't know. I just remember Matthew saying something about an expert. 14:37:28 14:37:32
Q So, again, Matthew was in contact with the law firm separately? 14:37:39 14:37:41
A I guess so. 14:37:45
Q Was it Ali that he was speaking to? 14:37:51
A I don't know. 14:37:53
MR. MELILI: Speculative. 14:37:55
BY MR. BURNS: 14:38:19
Q Can we go back to the Complaint that you filed in connection with the Sears debt for a moment? 14:38:20 14:38:22 14:38:26
A Which one is that? Exhibit 7. Okay. 14:38:33
Q On the first page, the title page, Ali's name is not listed as an attorney under Kazerouni Law Group, is he? 14:38:46 14:38:50 14:38:52
A Is he an attorney? 14:38:59
Q Ali is not listed as an attorney under the Kazerouni Law Group heading on this page, is he? 14:39:01 14:39:03
A Okay. 14:39:07
Q Do you recall whether Ali performed legal work for you in this case? 14:39:10 14:39:11
A No. I don't recall any of this. I mean, I know it was happening, but specifics, no. 14:39:15 14:39:18
Q You don't know why Ali's name wouldn't have 14:39:22

been listed here? 14:39:24
A No. 14:39:25
Q Do you recall discussing with anyone 14:39:29
whether Ali's name should be listed on the 14:39:30
Complaints that you filed? 14:39:34
A No. 14:39:35
Q Do you recall discussing with anyone 14:39:42
whether your son's relationship with Ali created a 14:39:44
conflict of interest in this case? 14:39:48
A No. 14:39:51
Q Do you recall discussing with anyone any 14:39:53
concerns about the fact that your son had this 14:39:56
relationship with Ali? 14:39:58
A No. 14:39:59
MR. BURNS: All right. That's all I have. 14:40:19
Thank you. 14:40:21
MR. MELILI: I would like to do a redirect, 14:40:22
but first if we can take a 15-minute break. 14:40:24
MR. BURNS: We just took a 15-minute break 14:40:28
five minutes ago. 14:40:29
MR. MELILI: I would like to take a 14:40:31
15-minute break. 14:40:33
MR. BURNS: Why is that? 14:40:34
MR. MELILI: I don't have to give my 14:40:35
reasons. 14:40:36

MR. BURNS: You don't have to give a reason 14:40:36
for taking a 15-minute break after we just took a 14:40:38
15-minute five minutes ago? 14:40:40
MR. MELILI: You said five-minute break. 14:40:42
MR. BURNS: I'm sorry? 14:40:44
MR. MELILI: You said a five-minute break. 14:40:44
MR. BURNS: Yeah, and it took 15 minutes. 14:40:45
And now we've been -- I've been asking questions for 14:40:47
five and you want to take another 15-minute break? 14:40:48
MR. MELILI: I want to take a 15-minute 14:40:50
break. 14:40:52
MR. BURNS: Okay. Well, that's not clear 14:40:52
to me why but -- how about -- do you really -- given 14:40:54
that we just took a 15-minute break, why don't we 14:40:59
take a five-minute break. 14:41:01
MR. MELILI: I'll meet you halfway. Ten. 14:41:03
MR. BURNS: Okay. 14:41:06
MR. MELILI: Okay. 14:41:06
THE VIDEOGRAPHER: All right. This marks 14:41:08
the end of Media 4. The time is 2:41 p.m. We're 14:41:08
off the record. 14:41:13
(Off the record from 2:41 - 2:50 p.m.) 14:41:15
THE VIDEOGRAPHER: This marks the beginning 14:50:27
of Media 5. The time is 2:50 p.m. We're on the 14:50:28
record. 14:50:31

EXAMINATION 14:50:32

BY MR. MELILI: 14:50:32

Q All right. Ms. Palmer, I'm going to ask you a few questions about the exhibits that we saw today. 14:50:32 14:50:35 14:50:37

Do you mind pulling up Exhibit 2? It should be right there. 14:50:38 14:50:42

Can you tell me what that document is? 14:50:49

A It's the First Amended Complaint for violations of the California Consumer Legal Remedies Act. 14:50:59 14:51:01 14:51:05

Q Okay. Can you tell me by looking at the first page of this document who the plaintiffs in this case are? 14:51:05 14:51:10 14:51:13

A Me -- I'm sorry -- Sue Kim and Ivan Zermeno. 14:51:15 14:51:24

Q Is Matthew Palmer a named plaintiff in this Complaint? 14:51:27 14:51:32

A No. 14:51:33

Q Okay. Can you go to Page 20 of this document. 14:51:53 14:51:55

A Okay. 14:52:03

Q And starting on Page -- on Paragraph 59, just read that to yourself, if you can. And it continues on to the next page. 14:52:04 14:52:08 14:52:17

A Oh, I had read -- okay. 14:52:32
Q After reading Paragraph 59 of this document, do you recall seeing this allegation before it was filed? 14:52:35 14:52:38 14:52:41
A Yes. 14:52:42
Q And what does the allegation in Paragraph 59 say, in your own words? 14:52:44 14:52:46
A That it's economically not used because it's too expensive to use natural citric acid and that it's -- the industry synthesizes it through a process. Genetically mutated mold, I knew I'd read that somewhere. 14:52:50 14:52:53 14:52:57 14:53:04 14:53:08
Q Okay. 14:53:09
A Not from citrus fruit. 14:53:14
Q Now, if we go to Page 33, Paragraph 95, can you read that paragraph for me. 14:53:18 14:53:35
A "As of May 19th, 2025, the Amazon page for the Sprite Product continues to show images representing 100 percent natural flavors, as depicted below." 14:53:37 14:53:44 14:53:47 14:53:51
Q And can you tell me what you see below that paragraph? 14:53:52 14:53:55
A A picture of the Sprite box or a Sprite ad saying "100 percent Natural Flavor, Zero Caffeine, Perfectly Clear," and it's not what I saw from 14:53:56 14:54:04 14:54:08

Amazon. 14:54:11
Q What is it you saw from Amazon? 14:54:12
A It's different than the one that I looked at when I ordered. 14:54:15 14:54:16
Q Okay. But you -- did you view the Amazon web page for this product before you purchased -- 14:54:17 14:54:21
A Yes. 14:54:26
Q -- before you purchased it? 14:54:26
A Yes. 14:54:27
Q Do you recall seeing anything about natural flavors? 14:54:28 14:54:32
A Yes. 14:54:33
MR. BURNS: Objection. Leading. 14:54:33
BY MR. MELILI: 14:54:42
Q Do you recall seeing any of these images? 14:54:43
A This image, the mini Sprite can, I remember seeing that. 14:54:49 14:54:53
Q Okay. Moving on to Page 36, starting at Paragraph 100, do you mind reading that sentence for me? 14:54:57 14:55:11 14:55:14
A "As of May 19th, 2025, the Amazon page for the Fanta Product continues to show images representing 100 percent natural flavors, as depicted below." 14:55:14 14:55:17 14:55:20 14:55:22
Q And what is depicted below Paragraph 100? 14:55:24

A It's a picture of the Fanta box and a part of a box saying -- showing the calorie nutrition facts. 14:55:28 14:55:32 14:55:41
Q Do you see a price listed in this picture? 14:55:42
A 6.58. 14:55:46
Q Is that the same price that you -- 14:55:49
A No, I don't think so. 14:55:51
Q Is that the same price that you purchased the Fanta product for in April? 14:55:53 14:55:55
A I don't think so, no. 14:55:57
Q Okay. Still in the same exhibit, can you flip to Page 43. Under Paragraph 130, do you mind just reading that to yourself. 14:56:00 14:56:23 14:56:40
A Okay. 14:57:05
Q After reading that, does that refresh your recollection as to what class is being involved in this lawsuit? 14:57:05 14:57:07 14:57:12
A Yes. 14:57:13
Q And in your own words, what is the class involved in this lawsuit? 14:57:13 14:57:16
A People who purchased the products and were represented it as being 100 percent natural flavors. 14:57:20 14:57:24
Q Okay. And then is there -- do you recall the time period for this class? 14:57:29 14:57:33
A No, I don't. 14:57:37

Q Okay. Do you recall whether this class is limited to people within a specific geographical region? 14:57:41 14:57:45 14:57:52
A No. 14:57:52
Q Okay. We're going to go to Exhibit 1. 14:58:07
So it's going to be on Page 11. It's going to be Interrogatory No. 3. And I'll just read that off. It asks to "Identify each instance in which You purchased products other than the Class Products containing citric acid, sodium citrate, potassium citrate, aspartame, acesulfame potassium, sodium benzoate, or potassium benzoate, including the date of the purchase, the location of the purchase, the price paid, the quantity purchased, and the identity of the person or persons, if any, who purchased the product on Your behalf." 14:58:18 14:58:22 14:58:30 14:58:34 14:58:36 14:58:39 14:58:44 14:58:47 14:58:49 14:58:51 14:58:54
Now, if you go to Page 13, this is part of your response to Interrogatory No. 3. If you go to Paragraph 9, can you tell me what product is being represented in here? 14:58:56 14:59:03 14:59:08 14:59:15
A "Sprite Soda, Winter Spiced Cranberry." 14:59:16
Q Do you recall seeing any representation about natural flavors -- 14:59:20 14:59:23
MR. BURNS: Objection. Leading. 14:59:25
\\\

BY MR. MELILI: 14:59:28
Q -- for that product? 14:59:28
A No. 14:59:30
Q Okay. Moving on to Exhibit 3, just by looking at this image of this Sprite container, can you tell whether or not -- whether it's open or not? 14:59:31 14:59:48 14:59:56
A No, not -- it's obviously not opened on the top, but it doesn't mean that it wasn't opened. 15:00:03 15:00:06
Q Okay. And why is that? 15:00:09
A We can't see the sides. 15:00:13
Q Okay. Now let's go to Exhibit 4. 15:00:15
Same question: Can you tell whether or not this is opened? 15:00:22 15:00:25
A Not particularly except that one side looks like it might have been. 15:00:28 15:00:30
Q Okay. Now let's go to Exhibit 6. 15:00:32
This is the attorney -- the class representative fee agreement. 15:00:38 15:00:41
A Okay. 15:00:48
Q Okay. Go to the last page. It's marked PALMER000378. 15:00:48 15:00:55
Do you know whether that is a handwritten signature or an e-signature? 15:01:01 15:01:03
A That's an e-signature. 15:01:07
Q How did you sign this agreement? 15:01:10

A I got an e-mail with a attachment that came up for me to sign, and I did it with my fingers. 15:01:15 15:01:19
Q Based on that, do you believe there may be an electronic record of when you signed this agreement? 15:01:24 15:01:27 15:01:30
MR. BURNS: Objection. Leading. 15:01:31
THE WITNESS: Yes. 15:01:35
BY MR. MELILI: 15:01:36
Q Okay. Do you -- strike that. 15:01:36
In prior testimony, you discussed your education. Did any part of that education involve obtaining a degree in any sciences? 15:02:07 15:02:10 15:02:19
MR. BURNS: Objection. Leading. 15:02:23
THE WITNESS: Yes. 15:02:25
BY MR. MELILI: 15:02:26
Q Can you tell me more about that? 15:02:27
A I started out as a premed major. 15:02:29
Q Okay. 15:02:31
A Until my junior year. 15:02:32
Q Did any of that education involve knowing the difference between the ingredients in products? 15:02:35 15:02:45
MR. BURNS: Objection. Leading. 15:02:50
THE WITNESS: I don't believe so, no. 15:02:53
BY MR. MELILI: 15:02:55
Q Okay. 15:02:55

A It was 55 years ago. 15:02:57
Q Uh-huh. 15:03:00
Are you a scientist? 15:03:01
A No. 15:03:02
Q Are you a lawyer? 15:03:05
A No. 15:03:06
Q Are you an expert in what makes a flavor or a product natural or not? 15:03:13 15:03:15
A No. 15:03:19
Q Let's go back to Exhibit 2. That's the First Amended Complaint. 15:03:27 15:03:32
Do you -- 15:03:36
A Exhibit 2? 15:03:50
Q Yeah. 15:03:51
A Okay. 15:03:53
Q Do you recall reviewing this document before it was filed with the court? 15:03:53 15:03:56
A Yeah. Yes. 15:03:59
Q Okay. And, unfortunately, we don't have the original Complaint in front of us in this case, but do you recall reviewing the original Complaint in this case before it was filed with the court? 15:04:06 15:04:08 15:04:11 15:04:15
A Yes. 15:04:17
Q Okay. Before, you testified about offering your nephew's children different beverage options. 15:04:18 15:04:49

Do you recall which beverages you offered them? 15:04:57 15:05:01

A I probably -- okay. I sent them to the refrigerator and let them choose what we had. 15:05:06 15:05:10

Q Okay. 15:05:15

A Which would have been the two. There was also lemonade and milk and probably a clear soda water. 15:05:16 15:05:20 15:05:25

MR. MELILI: I think that's it for my questions. 15:05:37 15:05:39

MR. BURNS: Just a few more for me and then we can finish up. 15:05:39 15:05:39

FURTHER EXAMINATION

BY MR. BURNS:

Q Ms. Palmer, your attorney asked you if you recall seeing the 100 percent natural flavors claim on Winter Spiced Cranberry when you brought it. 15:05:44 15:06:00 15:06:03

Do you recall that? 15:06:08

A I recall him asking me, yes. I do not recall seeing a "natural." 15:06:09 15:06:12

Q Can we go to -- back to your First Amended Complaint which should have been Exhibit 2. Can you go to Page 3, Paragraph 16. 15:06:15 15:06:20 15:06:30

A Page 3, 16. 15:06:44

Q Do you see Winter Spiced Cranberry listed there among the products that you're challenging in this lawsuit? 15:06:50 15:06:53 15:06:56
A Oh, yes. 15:07:01
Q And do you see that this paragraph alleges that Winter Spiced Cranberry contains the phrase "100 percent Natural Flavors" on its label? 15:07:03 15:07:06 15:07:09
A Yes. 15:07:15
Q Do you have any reason to dispute that? 15:07:17
A No. 15:07:19
Q Mr. -- 15:07:31
Is it Melili, or am I mispronouncing it? 15:07:32
MR. MELILI: Melili. 15:07:36
MR. BURNS: Melili. Sorry. 15:07:37
BY MR. BURNS: 15:07:38
Q Mr. Melili asked you if there would be an electronic record of the date that you signed your engagement letter. 15:07:38 15:07:41 15:07:43
Do you recall that? 15:07:44
A Yes. 15:07:45
Q Do you have that electronic record? 15:07:46
A No. 15:07:48
Q Do you know if your attorneys do? 15:07:49
A I assume. 15:07:52
Q Do you dispute that the engagement letter 15:07:59

was sent to you on April 30th? 15:08:01

A No. 15:08:03

MR. BURNS: All right. That's all I have. 15:08:17

MR. MELILI: All right. 15:08:18

MR. BURNS: Thank you. Ms. Palmer. 15:08:21

THE VIDEOGRAPHER: This marks the end of Media 5 and concludes today's testimony of Victoria Palmer. We're off the record at 3:08 p.m. 15:08:24 15:08:25 15:08:30

(The following proceedings were held off the video record.) 15:08:32 15:08:32

THE REPORTER: Did you want a copy? 15:08:35

MR. MELILI: Yes. We'll do a rough draft first, and then we'll let you know. 15:08:38 15:08:42

(Whereupon, at 3:08 p.m., the deposition of VICTORIA PALMER was concluded.)

---oOo---

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES ) ss.

I, Kimberly A. Edelen, C.S.R. No. 9042, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was {X} was not requested.

I further certify that I am not interested in the event of the action.

Witness my hand this 17th day of April, 2026.



KIMBERLY A. EDELEN, C.S.R. NO. 9042

GIL MELILI, ESQ.
gil@kazlg.com

April 30, 2026

RE: Palmer, Victoria, Et Al. v. The Coca-Cola Company

4/15/2026, Victoria Palmer, (#8007744).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

_x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Palmer, Victoria, Et Al. v. The Coca-Cola Company

Victoria Palmer (#8007744)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

(Victoria Palmer) Date