# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA PALMER, SUE KIM, AND IVAN ZERMENO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiffs, vs. THE COCA-COLA COMPANY, Defendant. | Case No. 25-CV-4777-GW-AGR |

VIDEO-RECORDED DEPOSITION OF MATTHEW PALMER
Los Angeles, California
Tuesday, June 30, 2026
Volume I

Reported by:
ROCHELLE HOLMES
CSR No. 9482
Job No. 8274774
PAGES 1 - 85

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

VICTORIA PALMER, SUE KIM, AND IVAN ZERMENO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

vs.

THE COCA-COLA COMPANY,

Defendants.

Case No. 25-CV-4777-GW-AGR

Deposition of MATTHEW PALMER, taken on behalf of Defendants, at 2000 Avenue of the Stars, Los Angeles, California, beginning at 9:23 a.m. and ending at 11:34 a.m. on Tuesday, June 30, 2026, before ROCHELLE HOLMES, Certified Shorthand Reporter No. 9482, Certified Realtime Reporter No. 0123.

APPEARANCES:

For Plaintiff:

KAZEROUNI LAW GROUP
BY: GIL MELILI, ATTORNEY
245 Fischer Avenue, Suite D1
Costa Mesa, California 92626
(800) 400-6808
Gil@kazlg.com

For Defendants:

PATTERSON BELKNAP WEBB & TYLER LLP
BY: DAKOTAH BURNS, ATTORNEY
FAUST PETKOVICH, ATTORNEY
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
Dburns@pbwt.com

APPEARANCES (Continued):

For Defendant:

DLA PIPER LLP (US)
BY: TANYA L. GREENE, ATTORNEY AT LAW
2000 Avenue of the Stars, Suite 600
Los Angeles, California 90067
(310) 595-3000
tanya.greene@us.dlapiper.com

VIDEOGRAPHER: KEVIN DEL CID

INDEX

| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| MATTHEW PALMER | | |
| Volume I | | |
| | MR. BURNS | 7 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Letter, 4/30/2025 | 54 |
| Exhibit 2 | Victoria Palmer's Responses to Defendant's Interrogatories to Plaintiff, Set Two | 55 |
| Exhibit 3 | Letter, 5/22/2026 | 58 |

Instruction Not To Answer

Page 49, Line 24

Page 75, Line 3

mentioned?

A Not to my knowledge.

Q And I'm just going to refer to Ali by his first name for purposes of this deposition, and when I refer to Ali you understand that you're referring to Ali the attorney at the Kazerouni law firm; correct? 09:37AM

A Correct.

Q What is your relationship with Ali?

A We're friends.

Q How did you become friends? 09:37AM

A Well, we were 11, so however that happened. Probably soccer.

Q So you have been friends since you were 11?

A Yes.

Q Did you go to the same school together? 09:38AM

A Uh-huh. Yes.

Q For how long did you go to the same school?

A Through middle school and most of high school.

Q Did you remain in touch after you started attending different schools? 09:38AM

A Yes.

Q Have you remained in touch throughout your life since you first met him?

A Yes. 09:38AM

Q Mr. Palmer, did you do anything to prepare for today's deposition?
A I verified the date that the photos were taken.
Q How did you verify that date? 09:39AM
A By scrolling through my camera gallery.
Q So what was the date?
A April 30th.
Q Of what year?
A 2025. 09:39AM
Q Did you do anything else to prepare for today's deposition?
A No.
Q You didn't speak to your lawyers about today's deposition? 09:39AM
A Oh, if that counts, then yes.
Q Who did you speak to?
A Gil and Jason, whose last name I forget.
Q Did you speak to anyone else?
A No. 09:39AM
Q You didn't speak to Ali?
A Not about this.
Q Which lawyers are representing you in this case?
A To my knowledge, Gil and Jason. 09:39AM

Q Not Ali?
A Again, not to my knowledge.
Q Again, it doesn't seem odd to you that Ali is not representing you in this case given that you're represented by his own law firm and you have known him for 30 years? 09:40AM
MR. MELILI: Objection; speculative.
But you may answer if you know.
THE WITNESS: Doesn't seem odd, no.
Q BY MR. BURNS: You have never spoken to him about whether he would represent you in this case given that he's been a friend of yours for 30 years? 09:40AM
A No.
Q How many times did you meet with your lawyers to prepare for today's deposition? 09:40AM
A Three times. Yeah.
Q Do you remember when you spoke to them each of those three times?
A I do.
Q When was that? 09:41AM
A Let's see, last one was yesterday. And then I had a short meeting on Friday. And then the first one was earlier in the week.
Q For how long did you meet with your lawyers during each of those meetings? 09:41AM

A Less than an hour.
Q How did you meet with your lawyers during those meetings?
MR. MELILI: Objection; vague and ambiguous.
But you may answer if you know. 09:41AM
THE WITNESS: Through Google Meet.
Q BY MR. BURNS: Was anyone else in the room besides you when you met with your lawyers during those meetings?
A No. 09:41AM
Q Did you review any documents in preparing for this deposition?
A Just the one that -- about the pictures.
Q You didn't review any other documents?
A No. 09:42AM
Q Did you review any of the complaints filed in this action?
A I did not, no.
Q Have you ever seen the complaints filed in this action? 09:42AM
A I may have.
Q You're not sure one way or the other?
A No.
Q You don't recall ever looking at the complaints filed in this action? 09:42AM

A I'm not sure.
Q So you don't recall?
A I don't recall one way or the other, no.
Q Besides your attorneys, did you speak to anyone else in the world about this deposition today? 09:42AM
A No.
Q You didn't speak to your mother?
A She knows I'm -- she knows where I am, yes.
Q Did you speak to her about this deposition other than to tell her where you would be? 09:43AM
A No.
Q How often would you say you speak with Ali?
A Quite often.
Q What do you mean by "quite often"?
A It can vary based on our schedules, but usually several times a week. 09:43AM
Q How close of a relationship would you say you have with Ali?
A Very close.
Q How do you typically communicate with Ali? 09:43AM
A Text or phone call if we're not in person.
Q Do you ever communicate over social media?
A Rarely.
Q Primarily text or phone call?
A Yes. 09:44AM

Q How often do you see Ali in person?
A Not as often as I'd like, but probably once a month.
Q Where do you typically meet when you meet in person? 09:44AM
A Usually my house.
Q Does Ali see your mother when he comes to visit?
A He does.
Q Does he talk to your mother? 09:44AM
A He does.
Q Would you say that he's friends with your mother as well?
A Insomuch as a friend is friends with that friend's mother. Friendly rather than friends. 09:44AM
Q Have you and Ali ever been in business together?
A No.
Q Have you ever provided financial assistance to Ali? 09:45AM
A Can you be more specific?
Q Have you ever given him money of any kind?
A For food, yes.
Q When was that?
A Any number of times we would pay for each 09:45AM

suing Coca-Cola over?
A I believe it's Sprite and Fanta.
Q Do you know which flavors?
A The orange flavor Fanta and I think regular Sprite. 10:03AM
Q Sprite lemon-lime, does that sound right to you?
A If that's the default Sprite, yeah.
Q So if I refer to Sprite you understand that I'm referring to Sprite lemon-lime and if I refer to 10:03AM Fanta you understand that I'm referring to Fanta orange?
A I do.
Q Okay. And if I say class products you understand I'm referring to both the Sprite and Fanta 10:04AM products?
A Together. Okay.
Q Do you know how your mother came to believe that the ingredients in Sprite and Fanta were natural -- I mean, were not natural? 10:04AM
A Originally I looked at the packaging and saw it. And I mentioned it to her.
Q What did you mention to her?
A The fact that they said 100 percent natural or all natural. 10:04AM

Q What did you say?
A Something along the lines of there's no way this is true.
Q Why did you believe that wasn't true?
A It just didn't seem right. 10:04AM
Q What do you mean?
A Kind of an uncanny value or AI image, it doesn't look right, same thing. It's just kind of a gut, you look at -- you think of orange-flavored Fanta or Sprite and doesn't seem to jive with all natural or 10:05AM 100 percent natural, whatever.
Q Seemed obvious to you that all of the ingredients in Sprite and Fanta were not natural?
A Yeah. That was my gut reaction.
Q Did you speak to anyone about the 10:05AM ingredients in Sprite and Fanta before you spoke to your mother?
A No.
Q Are you aware that your mother testified under penalty of perjury that you spoke to a friend of 10:05AM yours about the ingredients in Sprite and Fanta before you spoke to her?
A I'm not aware, no.
Q Did you speak to a friend of yours about the ingredients in Sprite and Fanta before you spoke to 10:05AM

her?
A I don't believe so.
Q So your mother just invented out of the blue that you spoke to a friend of yours?
A It was over a year ago, so I don't know. 10:06AM
Q You brought a federal lawsuit in this case and you have no idea whether you spoke to a friend of yours about the Sprite and Fanta products at issue before you told your mother that she should bring a lawsuit in this case, no recollection at all? 10:06AM
A I didn't --
MR. MELILI: Objection; misstates prior testimony.
But you may answer.
THE WITNESS: I didn't bring a lawsuit and I 10:06AM didn't advise her to bring a lawsuit.
Q BY MR. BURNS: So when your mother testified under oath that you told her you spoke to a friend about the Sprite and Fanta products before you spoke to her, she was lying, she made that up? 10:06AM
A She may have misremembered or I may be misremembering. I guess that was over a year and a half ago. Already two and a half ago.
Q Have you ever been diagnosed with a memory problem? 10:06AM

A No.

Q Does a year -- do you forget conversations you had a year ago that gave rise to federal lawsuits, typically?

A Ones that I'm not directly involved in, yeah. 10:07AM

Q So I just want to make sure I understand, Mr. Palmer, because you're testifying under penalty of perjury and you understand that?

A You like reminding me of that, so yeah, I'm aware. 10:07AM

Q Because there's a reason for that, which is that just your answers make no sense to me at all and I'm not going to say more than that, but I'm just explaining why I keep repeating myself. 10:07AM

A Sure. And I'm happy to help.

Q So your mother testifies under oath that you spoke to a friend about the ingredients in Sprite and Fanta a little over a year ago in April of 2025. It's now June of 2026. You spoke to her about the ingredients in Sprite and Fanta, she then brought a federal lawsuit on behalf of the information you provided to her. 10:07AM

And your testimony under penalty of perjury is that you have no recollection of how you acquired 10:08AM

that information, you might have obtained it from a friend, it might have been a gut reaction, you just have no idea?

A Wild misrepresentation of what I said.

Q Okay. So -- so -- 10:08AM

A Let me --

Q -- you didn't speak to a friend?

A Let me explain.

Q Okay.

A And as you advised me, crosstalk doesn't 10:08AM help.

Q Uh-huh.

A When I saw the product packaging I mentioned it to her. And I said, "There's no way this is true," something along those lines. 10:08AM

What she did from there, did I speak to someone beforehand, no. Did I speak to someone after, yes. That's not the question you asked.

Q So when your mother said that you told her you spoke to a friend, she just made that up? 10:08AM

A Again, that's not what I just said. I didn't speak to a friend beforehand.

Q And when your mother said that you did, she just made that up?

A She could be misremembering. Or I could be 10:09AM

misremembering. But I don't think I am.
Q Okay. So what I said earlier when you told me I was wildly misrepresenting you, now you're saying that that's accurate, that you just don't remember?
A I did not speak to anyone before I saw the packaging. 10:09AM
Q Okay. And just ten seconds ago you said you don't remember, so which is it, do you not remember or did you not speak to anyone?
A I did not speak to anyone before I saw the packaging. 10:09AM
Q You are 100 percent certain that that's correct?
A That is correct.
Q And when your mother said that you did speak to someone that was false testimony? 10:09AM
A I spoke to someone afterwards.
Q So when your mother said that you spoke to someone before that was false testimony?
A I'm not going to characterize it as that, but if you'd like to, sure. 10:09AM
Q So if it's not false testimony, what is it?
A It could be misremembering, I don't know.
Q But it's false is your -- is your testimony?
MR. MELILI: Objection; misstates prior 10:10AM

testimony and speculative as to why his mother stated something in a prior deposition.

THE WITNESS: Yeah.

Q BY MR. BURNS: So when your mother said that you spoke to a friend, that was false? 10:10AM

MR. MELILI: Same objections.

You may answer if you know.

THE WITNESS: It could be. I don't know exactly what she said.

Q BY MR. BURNS: So you just told me before 10:10AM that you were 100 percent certain and before that you told me you couldn't remember, now you're telling me it could be or could not be, it sounds like you're saying you can't remember anymore, so which is it?

Can you not remember, are you 100 percent 10:10AM certain, did your mother give false testimony, did she not, which is it, Mr. Palmer? You're testifying under oath, tell the truth.

Are you 100 percent certain that you didn't speak to someone about the Sprite and Fanta products 10:10AM before you spoke to your mother?

A I am.

Q So your mother gave false testimony when she said that you spoke to a friend?

A I'll let you interpret that. 10:11AM

Q It's either true or false, is it true or is it false?

MR. MELILI: Same objections; asked and answered.

You may answer if you know. 10:11AM

THE WITNESS: I'm not going to draw a conclusion from that.

Q BY MR. BURNS: So it might be true?

A It might be true, it might be false.

Q And you just told me you're 100 percent 10:11AM certain that it's false, now you're telling me that it might be true, it might be false?

A Which part are we talking about now?

Q You said when you spoke to a friend before you spoke to your mother about the Sprite and Fanta 10:11AM products?

A I did not speak to a friend.

Q So that was false testimony when your mother said that you did?

A Is there another term for "false testimony"? 10:11AM

Q Testimony that is either true or false, was it true or was it false, Mr. Palmer?

A To my understanding, to my memory, that was false.

Q Okay. Other than your mother, when was the 10:11AM

first time that you spoke to someone about the ingredients in the Sprite and Fanta products?

A I believe it would have been when I reached out to Ali.

Q And when did you reach out to Ali? 10:12AM

A It would have been around end of April, I imagine.

Q How did you reach out to Ali?

A Through text.

Q Did your mother ask you to reach out to Ali? 10:12AM

A No.

Q What did you ask Ali when you reached out to him?

MR. MELILI: Objection; attorney-client privilege. 10:13AM

To the extent it doesn't disclose attorney-client communications you may answer.

THE WITNESS: If I remember correctly, it was something along the lines of like -- something similar to: 10:13AM

"This doesn't look real; right? Or true?"

Q BY MR. BURNS: And what did Ali say?

MR. MELILI: Same objection.

I advise not to answer.

MR. BURNS: I for the record want to make 10:14AM

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, Rochelle Holmes, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated this 13th day of July, 2026

Rochelle Holmes
CSR No. 9482, CCRR No. 0123

GIL MELILI, ATTORNEY
Gil@kazlg.com

July 14, 2026

RE: Palmer, Victoria, Et Al. v. The Coca-Cola Company
6/30/2026, Matthew Palmer, (#8274774).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.